**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EXELON BUSINESS SERVICES COMPANY, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16-cv-00611 |
| | ) | |
| v. | ) | Judge Robert M. Dow |
| | ) | |
| PELCO STRUCTURAL, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Exelon Business Services Company, LLC ("Exelon"), for its Amended

Complaint against Defendant Pelco Structural, LLC ("Pelco"), states as follows:

## NATURE OF THE ACTION

1. This is a breach of contract and breach of warranty action arising from Pelco's

manufacture and supply of defective conductor cross arms to Exelon for use by Exelon's

affiliate, Commonwealth Edison Company ("ComEd"), on the Illinois Tollway's Elgin/O'Hare

project in 2014 ("Tollway Project"). ComEd and Exelon will be referred to collectively

hereafter as "Exelon."

2. Exelon's role in the Tollway Project was to raise the height of six existing transmission

circuits to accommodate the new Elgin/O'Hare expressway.

3. After installation, one of the Pelco cross arms broke apart at its weld and crashed

approximately 80 feet to the ground, breaking another arm on its way down and causing damage

to other equipment on the transmission circuit.

4. Inspections and testing conducted immediately following the arm failure revealed pervasive defects in not only the cross arm that failed but throughout the cross arms manufactured and supplied by Pelco.

5. Exelon afforded Pelco the opportunity to cure the defects, but the replacement cross arms supplied by Pelco were likewise defective.

6. Thereafter, in order to complete the time-sensitive Tollway Project, Exelon exercised its right to purchase replacement cross arms from a third party and to remove the defective Pelco arms and install the conforming replacement arms.

7. Through this action, Exelon seeks recovery from Pelco of the costs and expenses incurred to remedy Pelco's breaches of contract and warranty.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and because the amount in controversy exceeds the sum of $75,000.00.

9. Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391, because a substantial portion of the transactions giving rise to this cause of action occurred within the Northern District of Illinois.

## PARTIES

10. Exelon Business Services Company, LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Illinois. Exelon Corporation is the sole member of the LLC and is a corporation organized under the laws of the State of Pennsylvania.

11. Pelco Structural, LLC is a limited liability company organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma. On information and belief, Pelco

2

Products, Inc. is the sole member of the LLC and is a corporation also organized under the laws of the State of Oklahoma.

## FACTUAL BACKGROUND

**Exelon's Request for Proposal**

12. Exelon issued a Request for Proposal ("RFP") in or about November 2013 for the supply of transmission poles and conductor cross arms for use on the Tollway Project.

13. Pelco submitted a Response to the RFP on or about December 5, 2013 ("RFP Response"). A copy of Pelco's RFP Response is attached here as Exhibit A.[1]

14. Exelon awarded the Project to Pelco in or about January 2014.

**The Contract**

15. On or about February 3, 2014, Exelon and Pelco entered into Master Terms and Conditions for the Purchase of Materials and Services ("Master T&Cs"), a copy of which is attached hereto as Exhibit B, pursuant to which Exelon would be the Buyer and Pelco the Contractor.

16. Exelon and Pelco thereafter entered into Purchase Order No. 001135575 (the "Purchase Order") for the purchase by Exelon, in part, of 64 conductor cross arms for the Tollway Project. A copy of the Purchase Order is attached hereto as Exhibit C.

17. The Purchase Order expressly provides that it is governed by the Master T&Cs.

**Pelco's Representations and Warranties**

18. The conductor cross arms requested for the Tollway Project were tubular arms.

19. The RFP included the Tollway Project Specifications, which stated, in part, "All tubular arms shall have a uniform taper without flanges or miters."

---

[1] Due to size, Exhibit A omits the attachments referenced therein.

20. In its RFP Response, Pelco represented that it "accepts and will comply with the scope of work [Specifications] without exception."

21. Pelco further represented and warranted under the Master T&Cs that:

    a.   It would perform any work assigned to it in a competent manner, consistent with the ordinary degree of skill and care required for the applicable business, craft, industry, profession or trade, and to furnish all materials necessary for the complete, proper and timely completion of the work. (Master T&Cs, § 3.1.)

    b.   Any material it furnished to Exelon would (1) comply with the agreed upon Specifications, (2) be free from defects in design, workmanship and materials, (3) be suitable for its intended use, and (4) fit for the particular purpose intended. (Master T&Cs, § 4.1.1.)

    c.   It would provide Submittals, which "shall include all information and documentation in [Pelco's] possession which are required by [Exelon] for the design, construction, licensing, maintenance, quality assurance, operation and/or use of the Work…Review by [Exelon] shall not relieve [Pelco] from fulfilling all of [Pelco's] obligations under [the Master T&Cs] or the Contract Documents, including obligations relating to design and detailing. (Master T&Cs, § 8.1.)

22. Before manufacturing began, Pelco submitted drawings of the cross arms to Exelon for approval.

23. Through the submitted drawings, Pelco represented that the cross arms would have a bend without any transitional breaks or cuts at the bend location. A copy of an approved design drawing for the cross arms submitted by Pelco is attached as Exhibit D.

24. At no time during the Project did Pelco inform Exelon that it would fabricate the cross arms with any transitional breaks and/or cuts at the arm bend location.

**Remedy Provisions**

25. The parties contractually agreed that if any material supplied by Pelco did not comply with section 4.1.1 of the Master T&Cs, then Pelco would promptly correct by repair or replacement any non-conforming material and any other materials or equipment damaged by the non-conforming material. The Master T&Cs required that all costs and expenses associated with the repair or replacement be paid by Pelco. (Master T&Cs, § 4.2.1.)

26. In the event Pelco was unable or unwilling to repair or replace the non-conforming material, then Exelon had the right to correct the non-conforming materials or purchase replacement materials. The Master T&Cs required that all costs and expenses associated with correcting or replacing the non-conforming materials likewise be paid by Pelco. (Master T&Cs, § 4.4.)

27. Pelco agreed that time was of the essence in completing the work assigned to it. (Master T&Cs, § 3.2.)

**The Initial Arm Failure**

28. Pursuant to the Purchase Order, Pelco delivered 64 conductor cross arms to Exelon in or about August 2014.

29. On or about December 5, 2014, one of the installed cross arms supplied by Pelco suffered a complete failure at the arm-to-clamp weld and crashed to the ground. The failed arm caused

damage to another conductor arm on its way down and to other equipment on the transmission line.

30. The site was immediately secured and precautions taken to protect the surrounding structures and workers on site.

31. Exelon timely notified Pelco of the arm failure, and, within a few days, Pelco conducted visual inspections and ultrasonic testing of both the failed and remaining conductor arms.

32. Following its inspection, Pelco confirmed in writing to Exelon that at least 14 of the 64 arms needed to be replaced.

33. On or about December 11, 2014, Pelco provided two replacement arms followed shortly thereafter by an additional twelve replacement arms.

**The Defects**

34. Exelon's inspection of the original and replacement Pelco cross arms revealed two types of material defects in both sets of arms:

    a.   The original and replacement arms had defective arm-to-clamp welds.

    b.   The larger cross arms had relief-cut-welds—or transitional cuts—at the arm bend location. Pelco had cut the arms in several places along the bend location and welded the cut pieces back together in order to achieve the bend.

35. The relief cuts were not shown in any of the approved drawings for the Project. Moreover, because the cuts resulted in joints along the arm bend, they did not comply with the Specifications.

36. To test whether the original or replacement cross arms would still have adequate design strength, despite their non-compliance with the Specifications, Exelon engaged a metallurgist to

perform destructive testing on a sampling of the arms from both the original and replacement batches supplied by Pelco.

37. Two arms were selected for testing: one from the original batch of Pelco arms, all of which had been designed and manufactured in the same manner, and one from the replacement batch of Pelco arms, all of which had been designed and manufactured in the same manner.

38. In a report dated January 5, 2015, the metallurgist reported that the tested arms failed to achieve Pelco's own weld penetrations at both the arm-to-clamp welds and relief cut welds.

39. Accordingly, both the original and replacement arms contained material defects that rendered them unsuitable for the Tollway Project.

40. Exelon timely provided Pelco with a copy of the metallurgist report.

**Exelon's Purchase of Conforming Replacement Arms from a New Supplier**

41. Because the destructive testing revealed that both the original and replacement cross arms were defective and unsuitable for their intended purpose, Exelon engaged a new supplier to manufacture replacement cross arms.

42. The replacement arms were provided by the new supplier on or about February 1, 2015, and installed from mid-February to mid-March by Exelon's contractor.

43. Exelon seeks through this action to recoup the costs and expenses it incurred to (1) address the original arm failure, (2) purchase the replacement arms, (3) remove the defective Pelco arms, and (4) install the replacement arms.

## COUNT I
### (Breach of Contract)

44. Exelon restates and realleges the allegations set forth in paragraph 1-43 above as if fully set forth herein.

7

45. Exelon and Pelco contracted for the purchase and sale of 64 conductor cross arms, pursuant to the Purchase Order and Master T&Cs, for use in the Tollway Project.

46. Exelon fully performed all of its obligations under the Purchase Order and Master T&Cs.

47. Pelco materially breached the terms of the parties' Purchase Order and Master T&Cs by supplying conductor cross arms that failed to meet the agreed upon Project Specifications and were neither free from defects nor suitable for their intended use.

48. Despite being given the opportunity to do so, Pelco failed to cure its breach.

49. As a direct and proximate result of Pelco's foregoing breach of contract, Exelon has sustained damages in an amount in excess of $2,000,000.00.

**COUNT II**
**(Breach of Warranty)**

50. Exelon refers to and incorporates by reference paragraph 1-43 as though fully set forth herein.

51. Exelon and Pelco contracted for the sale of goods; specifically, conductor cross arms for use by Exelon in the Tollway Project.

52. Pelco made several representations and warranties to Exelon relating to the cross arms, including:

    a. Pelco expressly represented and warranted that the cross arms would comply with the Tollway Project Specifications;

    b. Through the submittal of design drawings, Pelco represented and warranted that the cross arms would conform to those drawings and, *inter alia,* be free of transitional cuts, breaks, and/or joints at the arm bend location.

    c. Pelco expressly represented and warranted that the cross arms would be free from defects;

    d. Pelco expressly represented and warranted that the cross arms would be suitable for their intended use; and

    e. Pelco expressly represented and warranted that the cross arms would be fit for their intended purpose.

53. Exelon reasonably relied upon these representations and warranties in purchasing the Pelco cross arms.

54. At the time of sale and delivery, Pelco breached these representations and warranties by supplying cross arms that:

    a. failed to conform to the Project Specifications and design drawings;

    b. were defective; and

    c. were unsuitable and unfit for their intended purpose and use.

55. Exelon fully performed its obligations under the Master T&Cs and Purchase Order and timely notified Pelco of the defects identified in the cross arms.

56. Exelon afforded Pelco the opportunity to cure the defects in the cross arms, but Pelco failed to do so.

57. Exelon thereafter exercised its right to purchase conforming cross arms from a new supplier.

58. As a direct and proximate result of Pelco's foregoing breach of warranty, Exelon has sustained damages in excess of $2,000,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Exelon Business Services Company, LLC, respectfully requests a judgment in its favor and against Defendant, Pelco Structural LLC, in an amount in excess of

$2,000,000.00, plus pre-judgment interest and costs, together with all further relief in its favor as deemed just and equitable.

Dated: 12 August 2016

Respectfully submitted,

EXELON BUSINESS SERVICES COMPANY, LLC

_/s/ Tracy Hannan_____
One of its attorneys

Tracy A. Hannan
ARDC # 6281834
Assistant General Counsel
Exelon Corporation
10 S. Dearborn St., 49th Floor
Chicago, Illinois 60603
Telephone: 312-394-8994
Facsimile: 312-394-8322
Tracy.Hannan@exeloncorp.com

# EOWA Elgin - O'Hare Steel Poles RFP
## Request for Proposal (Event-5537)

| Event Information | | | |
|---|---|---|---|
| **Description:** | ComEd is pursuing a sourcing initiative to support the EOWA Elgin - O'Hare steel pole requirements. | **Intent Due:** | N/A |
| **Contact Name:** | Kelly Gaunce | **Initial Response Due:** | N/A |
| **Phone:** | 630-437-2170 | **Fax:** | | **Open:** | 11/22/2013 3:27 PM CST |
| **Contact E-mail:** | kelly.gaunce@exeloncorp.com | **Response Due:** | 12/13/2013 4:00 PM CST |

## General Event Control and Navigation Instructions

## Please Read Before Creating Your Response

1. For technical support on using the eSourcing system please contact Perfect Commerce at **1 888 304 5847.**
2. Users in your organization cannot log into the system and work on the same event simultaneously.
3. To have additional users added to the system, please contact the event owner.
4. **NOTE** All event control buttons will appear in the upper left hand corner of your screen.
5. If there is a deadline by which you must indicate your Intention to Participate, click on the **Register Intent** button and select your intent to respond or not to respond prior to this deadline date. If there is no such deadline or requirement, the **Register Intent** button will not appear on your screen.
6. Use the **Table of Contents**, **Next** and **Previous** links on the top right corner of each page to navigate through the pages and sections of the event.
7. Click on **Create Response** button to begin completing your responses.
8. You can **Save as Draft** to finish a later time. You will get a pop-up confirmation box each time you save.
9. Click on **Edit Response** to go back in and complete your answers or modify any work.
10. Click on **Submit Response** once you have completed your response and are ready to submit. Please note that while the Event is in open status, you can edit your response up to the final deadline date and time. *If there are any errors in your response, navigate to the* **Table of Contents** *where the locations of errors will be highlighted and then use the hyperlink to navigate and fix the error.*
11. If a price list has been used in the event, do **not** modify any rows or columns in

**EXHIBIT**

**A**

**000001PELCO**

the price list attachments; only fill in the data as requested.

**Comprehensive fact sheets on the Exelon Companies can be found at
http://www.exeloncorp.com/aboutus/news/presskit/**

## Table of Contents

- Section A. Introduction and Overview
- Section B. Scope of Work
- Section C. RFP Contractual Information
- Section D. General Information
- Section E. Diversity Supplier Participation
- Section F. Pricing

Section A. Introduction and Overview

**A1.** (Instruction)

**PROJECT DESCRIPTION**

ComEd is pursuing a sourcing initiative for supply of 11 structures to support the EOWA Elign - O'Hare Steel Poles Project.

The objectives of this marketplace evaluation are:
- Obtain market-competitive program pricing
- Obtain best-in-class technical and administrative services
- Partner with an organization that has proven financial stability
- Maximize financial impact of quality and cost effective networks
- Identify a partner that can ensure a seamless implementation

**A2.** (Instruction)

**MILESTONE DATES:**

The purpose of this event is to provide an opportunity for candidate vendors to respond to this Request for Proposal (RFP). Subsequent events, including the use of reverse auctions, may be issued to selected Bidders as our selection process progresses. Exelon may request the need to substantiate specific information included in Bidder's response to this RFP.

Important milestones include:

1. Event Open for Response - 11/22/2013  4:00 PM CST
2. All Responses Due (Bid Due Date) - 12/13/2013 4:00 PM CST

Dates are subject to change at Exelon's discretion.

000002PELCO

**A3.** (Instruction)

### Introduction to Exelon

**About Exelon Corporation**

Exelon is the leading U.S. competitive energy provider, with one of the cleanest and lowest-cost power generation fleets and largest retail customer bases in the country. The Exelon family of companies participates in every stage of the energy business, from generation to power sales to transmission to delivery. Headquartered in Chicago, the company has operations and business activities in 47 states, the District of Columbia and Canada. Exelon has approximately $23.5 billion in annual revenues and trades on the NYSE under the ticker symbol EXC.

**Energy Generation**

Exelon Generation is one of the largest competitive power generators in the nation, with owned generating assets totaling approximately 34,650 megawatts. With strong positions in the Midwest, Mid-Atlantic, Texas and California, Exelon is the largest owner and operator of nuclear plants in the United States and maintains a growing renewable energy development business headquartered in Baltimore.

Competitive Energy Sales

Constellation is Exelon's competitive retail and wholesale energy business. Constellation and its companies provide an array of innovative energy products and services to customers across the United States and in Canada. Headquartered in Baltimore, Constellation serves more than 100,000 business and public sector customers, including two-thirds of the FORTUNE 100, and more than 1 million residential customers.

**Energy Delivery**

Through its BGE, ComEd and PECO utility subsidiaries, Exelon is one of the largest electric and natural gas distribution companies in the nation. It delivers electricity to approximately 6.6 million customers in central Maryland (BGE), northern Illinois (ComEd) and southeastern Pennsylvania (PECO). It delivers natural gas to approximately 1.2 million customers in central Maryland (BGE) and the Philadelphia area (PECO).

**By the Numbers for 2012**
- Operating Revenues $23.5 billion
- Assets $79 billion
- Employees Approximately 26,000
- Owned U.S. Generating Capacity Approximately 34,650 megawatts
- Load served Approximately 164 terawatt-hours (electric) and 372 billion cubic feet (natural gas)
- Service Territory 15,800 square miles
- Electric Transmission 7,350 miles

**How Exelon Ranks**
- Exelon has been the top-ranked electric and gas utility on the FORTUNE 500 each year since 2008.
- Fortune Magazine has recognized Exelon as one of the "World's Most Admired Companies" each year since 2006.
- Exelon was the No. 1 ranked U.S. and global electric utility on Platts' Top 250 Global Energy Companies list in 2012.
- Exelon was the No. 1 ranked U.S. energy company on Public Utilities Fortnightly's 40 Best Energy Companies list in 2012.

| Buyer Attachments | Date/Time Uploaded | File/URL | Size |
|---|---|---|---|
| Company Fact Sheets | 10/12/2010 2:40 PM CDT | www.exeloncorp.com/.../downloads.aspx | 0 |

Back to table of contents    Back to top

**Section B. Scope of Work**

**B1.** (Instruction)

### Scope of Work / Technical Specification

Please read the Technical Specification completely and thoroughly.

If you have bid on this technical specifications before or if you are currently providing these pole

000003PELCO

requirements to ComEd you should note that the technical specifications may have been enhanced.

| Buyer Attachments | Date/Time Uploaded | File/URL | Size |
|---|---|---|---|
| Spec | 11/19/2013 9:38 AM CST | EM10361.pdf | 7,841,252 |
| Structure Drawings | 11/19/2013 9:38 AM CST | Structure Drawings for Bid.zip | 2,147,881 |

**B2.** (Question)

**Exceptions**

All exceptions to the Scope of Work/Technical Specifications must be listed together, specifically identified, and attached hereto. Bidder's exceptions shall be void if they are not listed in this section. Bidder's printed terms and conditions (e.g. Bidder's form agreement) and Bidder's comments to Section C2 of this RFP shall NOT be accepted by Exelon and are not considered exceptions to the Scope of Work / Technical Specifications.

Make sure you list all exceptions to our Specifications. We will only review and potentially accept the exceptions that are listed in your response.

- ● Bidder accepts and will comply with the scope of work without exceptions.

- ○ Bidder accepts and will comply with the scope of work with the attached summarized exceptions.

Supplier Comments:

| Buyer Attachments | Date/Time Uploaded | File/URL | Size |
|---|---|---|---|
| Exceptions to Requirement Doc (Template).doc | 2/15/2005 2:46 PM CST | Exceptions to Requirement Doc (Template).doc | 28,672 |
| Supplier Attachments | File/URL | | Size |

**B3.** (Question)

**INTERPRETATION OF TECHNICAL DOCUMENTS**

If a Bidder is in doubt as to the true meaning or intent of any part of the technical documents, then the Bidder shall submit a written request for interpretation via the Messaging Feature, no later than two (2) business days prior to event close. The interpretation will be made by Exelon within two (2) business days, and issued to all Bidders via the Messaging Feature. Bidders shall adhere to the Exelon's written interpretation of all documents. Exelon will not be responsible for any other explanations or interpretations.

✓ Bidder accepts and will comply with the terms and conditions stated above.

**B4.** (Question)

Can you comply with our Made in America specifications?            **Response Required**
Yes.

| Buyer Attachments | Date/Time Uploaded | File/URL | Size |
|---|---|---|---|
| | | | |

000004PELCO

| Made in America #1 | 11/19/2013 9:38 AM CST | 2012 12 20 ClarificationUtility.pdf | 451,381 |
| Made in America #2 | 11/19/2013 9:38 AM CST | 2012 12 21 Clarification.pdf | 925,282 |
| Made in America #3 | 11/19/2013 9:38 AM CST | Buy America.docx | 21,804 |

Back to table of contents    Back to top

### Section C. RFP Contractual Information

**C1.** (Question)

#### MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT:

Please note that Exelon and vendor have entered into a Mutual Confidentiality and Nondisclosure Agreement (MCNDA) which can be referenced by clicking the Supplier Agreement button on the upper left portion of the screen.

✓   I have read and am duly authorized by and have capacity to legally bind vendor to the terms above.

**C2.** (Question)

#### DISCLAIMER:

Exelon makes no representations or warranties regarding the accuracy or completeness of the information contained in this RFP and its schedules or any statements made by representatives of Exelon during the procurement process. Bidder is responsible for making its own evaluation of information and data contained in this RFP and in preparing and submitting responses to this RFP.

The issuance of this document and the receipt of information in response to this document shall not, in any way, cause Exelon to incur any liability (whether contractual, financial or otherwise) to any Bidder participating in the RFP process, except any liabilities arising from an Exelon breach of the MCNDA. Bidder agrees to assume all costs incurred in the preparation of the response to this RFP and in the fulfillment of any other information requested during Exelon's evaluation of the responses.

✓   Bidder accepts and will comply with the terms and conditions stated above.

**C3.** (Question)

#### RESERVATION OF RIGHTS:

This RFP is issued to elicit responses to Exelon's requirements. It is therefore not an offer. The issuance of the RFP and the submission of Bidder's proposal does not create any obligation upon Exelon to buy goods or services from Bidder. Exelon reserves the right to amend, suspend or terminate the RFP process at any time, and makes no commitments, implied or otherwise, that this process will result in a business transaction with one or more Bidders. No contract or other binding obligation on Exelon will be implied unless and until a definitive agreement has been executed on terms and conditions acceptable to Exelon. In addition, Exelon reserves the right to do all or any of the following:

a.)  require additional information from any Bidder;

000005PELCO

b.)  change the structure and timing of the proposal process;

c.)  terminate further participation in the proposal process by any Bidder for any reason, regardless of whether the proposal submitted by such Bidder conforms with the requirements of this RFP;

d.)  terminate any negotiations being conducted at any time with any Bidder for any reason;

e.)  negotiate with one or more Bidders and enter into a definitive agreement (and other transaction documents) without prior notice to any Bidder;

f.)  order all or none or part of the materials/services which have been offered, and in any quantity, for delivery without providing reasons and without being liable for any compensation to any party;

g.)  vary or extend any time or date in this RFP, for all or any Bidders or other persons, at any time and for such period, as Exelon considers appropriate; and

h.)  permit any person to participate as a Bidder in the RFP process whether prior to or after the final date for submission of proposals.

✓  Bidder accepts and will comply with the terms stated above.

| **C4.** (Question) |
| --- |

**PUBLICITY:**

Bidder is not permitted to announce or release any information regarding this RFP or Exelon's evaluation process without Exelon's prior written consent.  Exelon may withhold approval in its sole discretion.  Bidder understands and agrees that Exelon does not permit a Bidder to use media releases of any kind to publicize Bidder's business relationship or potential relationship with Exelon.  Bidder shall not use any trade name, trademark, service mark or any other information which identifies Exelon in Bidder's sales, marketing and publicity activities, including interviews with representatives of any written publication, or television or radio station or network, without Exelon's prior written consent.

✓  Bidder accepts and will comply with the terms and conditions stated above.

| **C5.** (Question) |
| --- |

**SUBMISSION BEYOND DUE DATE:**

Proposals received after the Bid Due Date and Time may not be considered.  Please ensure enough time to respond to all required questions and address any technical difficulties Bidder may encounter prior to the Bid Due Date and Time.

✓  Bidder accepts and will comply with the terms and conditions stated above.

| **C6.** (Question) |
| --- |

**ASSIGNMENT:**

000006PELCO

Bidder shall not "assign" this Request for Proposal (RFP), but may subcontract. Any anticipated subcontractors shall be identified.

It is the Bidder's responsibility to gather and dispense all information to his subcontractors regarding the provisions of this RFP and any other information a subcontractor may require preparing their portion of the overall Bid.

Contracts between subcontractors and the Purchaser shall be only through the Bidder, and Bidder shall so inform his subcontractors.

The Bidder assumes all responsibilities related to the subcontractor's portion of the Bid.

**SUBCONTRACTORS:**

Bidder will be responsible for securing appropriate and qualified personnel for any portion of this project that is subcontracted. The Contractor shall submit to Exelon the name of each proposed subcontractor engaged for any portion of this project for prior approval.

✓ I will comply with the terms stated above.

---

**C7.** (Question)

**BIDDER QUESTIONS:**

All commercial and technical questions must be sent to Exelon through the Messaging Feature.

✓ Bidder accepts and will comply with the conditions stated above for bidder questions.

---

**C8.** (Question)

**AUDIT DOCUMENTATION:**

Due to compliance issues with Sarbanes-Oxley and during the RFP process and/or negotiation of a possible definitive agreement, Exelon may require selected Bidder(s) to provide to Exelon audit documentation including SSAE16-type audits.

✓ Bidder accepts and will comply with the terms and conditions stated above.

---

**C9.** (Question)

**BID VALIDITY:**

This RFP shall remain valid for a minimum of sixty (60) after the Bid Response Date and Time.

⦿ Bidder accepts and will comply with the terms and conditions stated above.

○ Bidder cannot comply with the terms and condition stated above, please state exceptions below.

○ Answer not selected.

000007PELCO

Supplier Comments:

**C10.** (Question)

**COMPLETENESS OF PROPOSAL:**

Bidders response to this RFP shall be complete in all aspects and shall include the following:

- All required resources.
- All assumptions regarding any of the project requirements (e.g. if a requirement cannot be met, it shall be noted as an exception).
- All work that is indicated in this RFP and that is normally considered part of the type of work covered by this RFP.

✓ Bidder accepts and will comply with the terms and conditions stated above.

Back to table of contents    Back to top

**Section D. General Information**

**D1.** (Instruction)

Please answer all questions as completely and succinctly as possible. Keep in mind that the thoroughness of Bidder's response will be considered in evaluating the bid. Responses to the questionnaire will serve as the framework for discussion if Bidder is chosen as a finalist. Base answers on current capabilities. Bidder also may describe planned future capabilities, but only as a supplement. For any questions left blank, Exelon will assume a conservative answer that could count negatively in evaluating Bidder's response.

*Text responses are generally limited to 2000 characters in length, although some short text responses do exist at 40 characters. Supplier comments are limited to 200 characters in length. If a supplier attachments has been allowed, the file size limitation on each attachment is 10.2Mb, but there is not a limit on the number of attachments that can be posted.*

**D2.** (Question)

Please identify one individual to be the lead decision-maker for Bidder's RFP response, as well as to provide any clarifications that may be required.

RFP Primary Contact Person:
Title:
Phone Number:
E-mail Address:
Fax Number:

Kasey Scott Vice President of Sales (918) 283-4004 kasey.scott@pelcostructural.com (918) 283-4005

**D3.** (Question)

**Subcontracted Work**

The Bidder shall list below any or all portions of the Work to be subcontracted. If none proposed, please state "Not Applicable" in the text box below. In this regard attention is specifically directed to the requirements set forth in the

000008PELCO

Owner's General Terms and Conditions, Exhibit "SMA".

- Company Name
- Address:
- Phone Number:
- Type of Work:
- % of Work (Lump Sum):
- MWBE (yes or no):

Not Applicable

Back to table of contents    Back to top

**Section E. Diversity Supplier Participation**

**E1.** (Instruction)

**Supplier Diversity Policy**

It is the policy of Exelon and its affiliates to engage in business processes and relationships that stimulate growth of Diversity Certified businesses. Exelon promotes and values inclusion of Diversity Certified businesses in procurement of materials, goods, and services. Diversity Certified suppliers are encouraged to disclose all certifications in RFI/RFP responses. This includes but is not limited to: MBE, WBE, MWBE, VOB, SDVOB, LGBT, DBE, and other diversity certifications from recognizable third party certification organizations. In order to be responsive to this policy, Exelon may require participation in select RFP packages. The requirement for this RFP in the questions below. In the event the bidder is not a certified diverse supplier, bidder shall include a subcontracting plan detailing how bidder will meet Exelon's minimum requirements as stated below. Bidder's response and subcontracting plan will be evaluated with appropriate consideration given to the extent certified Diverse Suppliers are actively involved in the completion of the scope of work, as a prime supplier, joint venture partner(s) or subcontractor(s).

**E2.** (Question)

In the event the bidder is not a diverse certified supplier, bidder may be required to include a subcontracting/supplier diversity inclusion plan for this RFP. If bidder understands and has the capacity, Bidder shall include a comprehensive subcontracting plan detailing how bidder will maximize diversity inclusion. Please complete the "Subcontracting Plan Template" and attach the completed plan below.

- In support of this RFP, Bidder accepts and will comply with the requirement above.
- In support of this RFP, Bidder cannot comply with the requirement above.
- Bidder is a Diverse Supplier, this does not apply.
- Answer not selected.

Supplier Comments:

| Buyer Attachments | Date/Time Uploaded | File/URL | Size |
|---|---|---|---|
| Final Subcontracting Plan Template_rev 1.docx | 10/18/2012 11:16 AM CDT | Final Subcontracting Plan Template_rev 1.docx | 27,496 |

| plier Attachments | File/URL | | Size |
|---|---|---|---|
| Information | Agile.zip | | 1,027,808 |

ion)

000009PELCO

It is Exelon's goal that 15% of total cost for this contract will be contracted and/or subcontracted to Diversity *Certified* Suppliers.

- ● Bidder accepts and will comply with the requirement above.
- ○ Bidder cannot comply with the requirement above. (propose certified contracting percentage below)
- ○ Answer not selected.

Supplier Comments: Order should be placed through Agile (Diversity Supplier) in order to receive 100% deversity spend.

Back to table of contents     Back to top

### Section F. Pricing

**F1.** (Question)

#### Proposal Instructions

Bidder shall provide **contract pricing** for the materials listed in the Scope of Work. Bidder shall consider Exelon's scope of work noted in this RFP. Please quote with freight (delivery on April 1st for Anchor Bolt Cages and August 1st for Steel Structures). Please click "No Quote for This Item" if Bidder declines to bid.

Please follow these instructions:

1. Download and save the Excel file(s) to your computer.
2. Rename the Excel file(s) to include Bidder's company name. Ex: *company name_xxxx Price List .xls.*
3. Do **NOT** edit the format of the files in any way; doing so will prevent you from uploading Bidder's pricing.
4. Complete ONLY the yellow areas in the tabs as instructed in the files.
5. Save the updated workbook to your computer.
6. In each of the pricing line items attach the completed saved workbook to the questions below in the appropriate box.

| Buyer Attachments | Date/Time Uploaded | File/URL | Size |
|---|---|---|---|
| Price Sheet | 11/19/2013 10:01 AM CST | Engineered pole stats summary v1 0.xlsx | 15,411 |
| **Supplier Attachments** | **File/URL** | | **Size** |
| Calculations | Q20066-Calcs.zip | | 1,627,567 |
| Engineered pole stats summary v1 0.xlsx | Engineered pole stats summary v1 0.xlsx | | 13,993 |

**F2.** (Question)

#### Additional Value

Please identify any additional value added services you can provide for Exelon.

Pelco Structural can store at our facility without additional fees; invoices submitted upon completion of stored materials.

| Supplier Attachments | File/URL | Size |
|---|---|---|
| | | |

**F3.** (Question)

000010PELCO

Are you able to support the delivery schedule listed below?

**Response Required**

1. Delivery of anchor bolt cages - April 1, 2014

2. Delivery of steel structures - August 1, 2014

Pelco Structural, LLC can meet the required delivery schedule as stated above, or deliver anchor cages in 3 - 4 weeks and structures in 10 - 12 weeks after receipt of approved drawings.

---

**F4.** (Question)

**Bidders Response Capacity**

Bidder's representative submitting this RFP response

1. has read this RFP (including attachments) and Bidder's responses to the RFP (including attachments)
2. certifies on behalf of Bidder that such response is accurate, true and correct to the best of Bidder's ability and
3. is duly authorized by and has capacity to legally bind Bidder to the terms and conditions contained herein

◉ Yes
◯ No

Supplier Comments: Kasey Scott

Back to table of contents    Back to top

000011PELCO

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

# MASTER TERMS AND CONDITIONS

# FOR THE PURCHASE OF MATERIALS AND SERVICES

Between

**Exelon Business Services Company, LLC**

and

**Pelco Structural, LLC**

**Dated as of February 3, 2014**



**EXHIBIT**

**B**

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **ARTICLE 1.** | **DEFINITIONS** | 7 |
| | | |
| **ARTICLE 2.** | **SCOPE AND FORMATION OF CONTRACT** | 12 |
| 2.1 | No Requirements Contract or Affiliate Liability. | 12 |
| 2.2 | Issuance and Acceptance of Purchase Orders. | 13 |
| 2.3 | Applicability of These Terms and Conditions to Purchase Orders. | 13 |
| 2.4 | Priority of Contract Documents. | 13 |
| 2.5 | Emergency Work. | 14 |
| | | |
| **ARTICLE 3.** | **STANDARDS FOR PERFORMANCE** | 14 |
| 3.1 | Standards. | 14 |
| 3.2 | Schedule of Performance. | 14 |
| 3.3 | Final Acceptance. | 15 |
| 3.4 | Site Investigations. | 15 |
| 3.5 | Permits, Fees and Notices. | 15 |
| 3.6 | Compliance with Laws and Buyer Policies and Procedures. | 16 |
| 3.7 | Disaster Recovery and Business Continuity. | 16 |
| 3.8 | Subcontractor Compliance. | 17 |
| 3.9 | Compliance with Legal Holds. | 17 |
| | | |
| **ARTICLE 4.** | **WARRANTIES** | 17 |
| 4.1 | Performance of Work. | 17 |
| 4.2 | Remedies. | 18 |
| 4.3 | Inspection. | 19 |
| 4.4 | Buyer's Right to Perform. | 19 |
| 4.5 | Assignment of Warranties. | 19 |
| 4.6 | Non-infringement. | 19 |
| | | |
| **ARTICLE 5.** | **CONTRACT PRICE, INVOICING AND PAYMENT** | 19 |
| 5.1 | Contract Price. | 19 |
| 5.2 | Taxes. | 20 |
| 5.3 | Submission of Invoices. | 20 |
| 5.4 | Invoice Format and Copies. | 20 |
| 5.5 | Statement. | 21 |
| 5.6 | Payments and Retainage. | 21 |
| 5.7 | Reports. | 21 |
| 5.8 | Grounds for Not Paying Invoices. | 21 |
| 5.9 | Final Payment. | 22 |
| 5.10 | Payment Not Waiver of Contractor's Breach. | 22 |
| 5.11 | Right to Setoff. | 22 |
| | | |
| **ARTICLE 6.** | **LIQUIDATED DAMAGES** | 22 |
| | | |
| **ARTICLE 7.** | **TERM** | 23 |
| | | |
| **ARTICLE 8.** | **CONTRACTOR'S SUBMITTALS; SAMPLES** | 23 |
| 8.1 | Submittals. | 23 |
| 8.2 | Samples and Mock-Ups. | 23 |

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**ARTICLE 9.**    **BUYER'S PROPERTY** ........................................................................... 23

**ARTICLE 10.**   **MATERIAL PROVISIONS** ........................................................ 24
10.1   Advance Manufacture or Procurement ........................................ 24
10.2   Prefabricated Material ............................................................... 24
10.3   Spare Parts ................................................................................ 24
10.4   Maintenance, Repair and Refurbishment Services .................... 24
10.5   Cessation of Production .............................................................. 24
10.6   Counterfeit, Fraudulent and Substandard Items ....................... 25

**ARTICLE 11.**   **INSPECTION AND TESTING** .................................................. 25
11.1   Buyer Inspections ...................................................................... 25
11.2   Testing ...................................................................................... 25
11.3   Rejected Work ........................................................................... 25
11.4   Covering the Work .................................................................... 26

**ARTICLE 12.**   **CHANGES IN THE WORK** ..................................................... 26
12.1   Buyer Changes .......................................................................... 26
12.2   Claims for Equitable Adjustments ............................................. 26

**ARTICLE 13.**   **DELAY, ACCELERATION AND FORCE MAJEURE** .................. 27
13.1   No Extension of Date for Final Completion ............................... 27
13.2   Compensable Delay Claim ......................................................... 27
13.3   Compensable Delay ................................................................... 27
13.4   Force Majeure ........................................................................... 27

**ARTICLE 14.**   **DELIVERY TERMS; LOSS OR DAMAGE; TITLE** ..................... 28
14.1   Delivery Terms .......................................................................... 28
14.2   Risk of Loss .............................................................................. 28
14.3   Routing of Shipments; Shipping ................................................ 28
14.4   Passage of Title ......................................................................... 29

**ARTICLE 15.**   **CONTRACTOR'S INDEMNIFICATION** ................................... 29
15.1   Indemnification .......................................................................... 29
15.2   Limitations on Indemnity ........................................................... 29
15.3   Indemnification for Claims by Governmental Authorities or Others ......... 29
15.4   Pollution Indemnification ........................................................... 30
15.5   Settlement of Claims ................................................................. 30
15.6   Contractor Cooperation ............................................................. 30

**ARTICLE 16.**   **INSURANCE** ........................................................................ 30
16.1   Required Coverages .................................................................. 30
16.2   Additional Coverages ................................................................ 32
16.4   Evidence of Insurance ............................................................... 32
16.5   Waiver of Subrogation .............................................................. 32
16.6   Ratings ..................................................................................... 33
16.7   Breach of Terms and Conditions ............................................... 33
16.8   Non-Waiver .............................................................................. 33
16.9   Buyer's Right to Purchase ......................................................... 33
16.10   Contractor's Commencement of Work Without Insurance ......... 33
16.11   Contractor Obligations Not Limited .......................................... 33

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**ARTICLE 17.** **LIMITATION OF LIABILITY** ......................................................... 34
  17.1 Limitation of Liability. ............................................................ 34
  17.2 Contractor Liability. ............................................................... 34

**ARTICLE 18.** **TERMINATION AND SUSPENSION** ............................................. 34
  18.1 Termination With Cause. ...................................................... 34
  18.2 Termination Without Cause. ................................................. 34
  18.3 Suspension of Work. ............................................................ 34
  18.4 Termination Charges. ........................................................... 35
  18.5 No Overhead Costs or Profits. .............................................. 35
  18.6 Disputed Termination. .......................................................... 35
  18.7 Contractor's Duties Upon Termination. ................................ 36
  18.8 Completion of Fabrication. ................................................... 36
  18.9 Resumption of Work. ............................................................ 36
  18.10 Temporary Deferment of Services. ...................................... 36
  18.11 Subcontractors. ................................................................... 37

**ARTICLE 19.** **CONTRACTOR'S INTELLECTUAL PROPERTY AND INFRINGEMENTS** ... 37
  19.1 Buyer's License to Use Intellectual Property Incorporated in the Work. .......... 37
  19.2 Buyer's Access to Intellectual Property Used in Performance of the Work. ..... 37
  19.3 Indemnity Against Infringement. ........................................... 37
  19.4 Remedies. ............................................................................ 38

**ARTICLE 20.** **WAIVER OF LIEN** ....................................................................... 38
  20.1 Lien Waivers in Jurisdictions Which Do Not Permit No-Lien Contracts. .......... 38
  20.2 Lien Waivers in Jurisdictions Which Permit No-Lien Contracts. ..................... 38
  20.3 Lien Free Work. .................................................................... 38
  20.4 Buyer's Right to Discharge Liens. ......................................... 39

**ARTICLE 21.** **LABOR RELATIONS** ................................................................... 39
  21.1 Notice of Potential Labor Disputes. ...................................... 39
  21.2 Jurisdictional Disputes. ........................................................ 39
  21.3 Prevent Stoppage or Slowdown. .......................................... 39
  21.4 Indemnification. .................................................................... 40
  21.5 Contractor's Rights. .............................................................. 40

**ARTICLE 22.** **CONTRACTOR'S PERSONNEL** ................................................... 40
  22.1 Competent Workers. ............................................................ 40
  22.2 Qualification. ........................................................................ 40
  22.3 Compliance with Exelon GPPMA ......................................... 41
  22.4 Use of Contractor Personnel ................................................ 41
  22.5 Background Investigation. ..................................................... 43
  22.6 Key Personnel. ..................................................................... 44

**ARTICLE 23.** **SUBCONTRACTUAL RELATIONS** .............................................. 45
  23.1 Subcontractual Relations. .................................................... 45
  23.2 Subcontracts. ....................................................................... 45
  23.3 Assignment of Subcontracts. ............................................... 45
  23.4 Contractor's Payments to Subcontractors. ........................... 45
  23.5 Disputes with Subcontractors. .............................................. 45
  23.6 Compliance with Laws and Buyer Policies and Procedures. ........... 45

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**ARTICLE 24.**    **SAFETY, SECURITY AND ENVIRONMENTAL REQUIREMENTS; COMPLIANCE WITH LAWS** ..................................................................... 45
     24.1    Acknowledgement of Hazardous Conditions and Applicable Laws................. 45
     24.2    Safety. ............................................................................................................ 46
     24.3    Security. ......................................................................................................... 47
     24.4    Reports of Accidents. .................................................................................... 47
     24.5    Environmental Requirements. ....................................................................... 47
     24.6    Compliance Audits. ....................................................................................... 49
     24.7    Site Control. ................................................................................................... 49

**ARTICLE 25.**    **WASTE MATERIALS ASSOCIATED WITH WORK** ................................ 49
     25.1    Disposal Facilities. ........................................................................................ 49
     25.2    Environmental Records/Waste Manifests. .................................................... 49
     25.3    Hazardous Substance Vendors...................................................................... 49
     25.4    Use of Laboratories. ...................................................................................... 50
     25.5    Recycling Material. ......................................................................................... 50

**ARTICLE 26.**    **AGENCY PROVISION FOR MANIFESTS** .............................................. 50
     26.1    Agency. .......................................................................................................... 50
     26.2    Generator Identification. ................................................................................ 50
     26.3    No CERCLA Liability. ..................................................................................... 50
     26.4    Limited Indemnity. ......................................................................................... 50

**ARTICLE 27.**    **WORK PRODUCT** ............................................................................... 51

**ARTICLE 28.**    **CONFIDENTIAL INFORMATION** .......................................................... 51
     28.1    Definition. ....................................................................................................... 51
     28.2    Exclusions. ..................................................................................................... 51
     28.3    Contractor's Obligations. ............................................................................... 51
     28.4    Disclosure Pursuant to Order of Governmental Authority. ............................ 52
     28.5    Irreparable Harm. .......................................................................................... 52
     28.6    Buyer's Obligations. ...................................................................................... 52
     28.7    Personally Identifiable Information ................................................................. 52

**ARTICLE 29.**    **DISPUTE RESOLUTION** ..................................................................... 53
     29.1    Step Negotiations. ......................................................................................... 53
     29.2    Work to Continue. .......................................................................................... 53
     29.3    Waiver of Jury Trial. ...................................................................................... 53

**ARTICLE 30.**    **MISCELLANEOUS** .............................................................................. 53
     30.1    Complete Agreement. .................................................................................... 53
     30.2    Notices. .......................................................................................................... 53
     30.3    Captions. ........................................................................................................ 54
     30.4    Execution; Counterparts. ............................................................................... 54
     30.5    Survivability. .................................................................................................. 54
     30.6    No Third-Party Beneficiaries. ........................................................................ 54
     30.7    Publicity. ......................................................................................................... 54
     30.8    Assignment..................................................................................................... 54
     30.9    Choice of Law; Interpretation; Severability. .................................................. 55
     30.10   Amendments. ................................................................................................ 55
     30.11   Bankruptcy or Insolvency. ............................................................................. 55

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

30.12   Audit. ...................................................................................................... 55
30.13   Non-Waiver. ............................................................................................ 56
30.14   Cumulative Remedies. ............................................................................ 56
30.15   Domain Names. ....................................................................................... 56
30.16   Nondiscrimination and Affirmative Action. ............................................ 56
30.17   Diversity Supplier Spend. ........................................................................ 57
30.18   Employee Rights Notification. ................................................................. 57

EXHIBIT A - BUYER AFFILIATES* ....................................................................... 59

EXHIBIT B – BUYER POLICIES AND PROCEDURES ........................................ 60

EXHIBIT C - THIRD PARTY PERSONNEL ACKNOWLEDGEMENT ...................... 62

EXHIBIT D - FOREIGN MATERIAL EXCLUSION ADDENDUM ........................... 64

EXHIBIT D - NUCLEAR SPECIAL TERMS AND CONDITIONS .......................... 67

EXHIBIT F – BACKGROUND INVESTIGATIONS .............................................. 73

## MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

These Master Terms and Conditions for the Purchase of Materials and Services establish the standard contractual terms and conditions under which Exelon Business Services Company, LLC ("Exelon") and its Affiliates may, from time to time, purchase Material and/or Services from Contractor.

### ARTICLE 1.
### DEFINITIONS

As used in these Terms and Conditions, the following terms shall have the following meanings:

**"Affiliate"** means, with respect to Exelon, those entities identified in **Exhibit A** as amended from time to time by Exelon, and also includes those entities that now or hereafter own, are owned by or under common control with Exelon, where "control" means at least a fifty percent (50%) ownership interest.

**"Buyer"** means Exelon or the Affiliate that issues a particular Purchase Order.

**"Buyer Data"** means any data or information in whatever media (a) provided to Contractor by Buyer under the terms of this Agreement or a Purchase Order or a Scope of Work; or (b) provided by a subcontractor, customer of Buyer or Buyer's Authorized Representative or other person designated to provide such data to Contractor under the terms of this Agreement or a Purchase Order or a Scope of Work.

**"Buyer's Designated Representative"** means the individual or individuals designated by the Buyer who will provide the general administration of these Terms and Conditions and shall be Buyer's field representative in all matters related to the Purchase Order. Buyer may, in its sole discretion, change its representative at any time or from time to time, and shall promptly notify Contractor, in writing, of any such change.

**"Buyer Parties"** has the meaning given to it in Section 15.1.

**"Buyer Personnel"** means "Buyer's directors, officers, employees, consultants, independent contractors, agents and representatives."

**"Change Order"** means a written order issued by Buyer that permits and directs an addition to, deletion from, or adjustment or revision to a Purchase Order and in the case of Constellation Energy Nuclear Group ("CENG") includes a fully executed Extra, Deletion and Delay Form.

**"Compensable Delay"** has the meaning given to it in Section 13.3.

**"Contract Documents"** means the Purchase Order, any Change Orders thereto, these Terms and Conditions, and any other documents identified as Contract Documents herein, or in such Purchase Order or Change Orders.

**"Contract Price"** means the price set forth in the Purchase Order (as may be adjusted pursuant to any subsequent Change Orders) to be paid by Buyer to Contractor for the Work, including any incentives or bonuses.

**"Contractor"** means the party identified as such in the Purchase Order which is contractually responsible to deliver the Material and perform the Services pursuant to Purchase Order(s) incorporating these Terms and Conditions.

**"Contractor's Designated Representative"** means the individual or individuals designated by the Contractor who will provide the general administration of these Terms and Conditions and shall be Contractor's field representative in all matters relating to a particular Purchase Order.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

"**Contractor Parties**" has the meaning given to it in Section 15.1.

"**Contractor Personnel**" means any and all individuals assigned by, through or on behalf of Contractor or its Subcontractors to perform the Work; including their partners, employees, officers, and agents. Contractor Personnel may also be referred to in Exelon's Use of Contractor Policy as a "Third Party Contractor."

"**Critical Cyber Assets**" as defined by the North American Reliability Council (NERC), includes, computers, including installed software and electronic data, and communication networks that support, operate, or otherwise interact with the bulk electric system operations. This does not include process control systems, distributed control systems, or electronic relays installed in generating stations, switching stations and substations.

"**Day(s)**" means any calendar day which is not a Saturday, Sunday or legal holiday in the state where the Work is performed.

"**Designated Environmental Contractor**" means a Contractor whose Work involves significant environmental aspects and potential impacts, and who has been designated as such by Buyer in the Contract Documents.

"**Designated Safety Contractor**" means a Contractor whose Work involves exposure to significant safety and health risks, and who has been designated as such by Buyer in the Contract Documents.

"**Disaster Recovery Plan**" means a disaster recovery plan set forth in Section 3.7 (Disaster Recovery and Business Continuity).

"**Disputes**" has the meaning given to it in Section 29.1.

"**Dollars**" and "**$**" means United States Dollars.

"**Drawings**" means the final drawings to be provided by Contractor in accordance with the Scope of Work.

"**Effective Date**" means, notwithstanding anything herein to the contrary, the date set forth on the cover page hereto, or, if there is no such date, then the date Contractor accepts a Purchase Order incorporating these Terms and Conditions.

"**Emergency Work**" has the meaning given to it in Section 2.5.1.

"**Environmental Laws**" means any Laws pertaining to the protection of the environment, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. 6901, et seq. ("RCRA"); the Toxic Substances Control Act, 15 U.S.C. 2601, et seq. ("TSCA"); the Clean Air Act, 42 U.S.C. 7401, et seq. ("CAA"); the Federal Water Pollution Control Act, 33 U.S.C. 1251 et seq. ("FWPCA"); and the Occupational Safety and Health Act, 29 U.S.C. 651 et seq. ("OSHA") and any other law that governs: (a) the existence, removal, or remediation of Hazardous Substances on real property; (b) the emission, discharge, release, or control of Hazardous Substances into or in the environment; or (c) the use, generation, handling, transport, treatment, storage, disposal, or recovery of Hazardous Substances.

"**Exelon Generating Site**" means any real property owned, leased by, or otherwise used by Exelon in connection with generating facilities which are wholly-owned or operated by Exelon, and excludes generating facilities owned or operated by Constellation Energy Nuclear Group, LLC.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**"FERC"** means the U.S. Federal Energy Regulatory Commission.

**"Final Completion"** means the date for completion of the Work listed in the Purchase Order or Project Schedule. In the event of a conflict between the date of final completion listed in the Purchase Order and the Project Schedule, the date listed in the Project Schedule shall govern.

**"Final Payment"** has the meaning set forth in Section 5.9.

**"Force Majeure"** means the occurrence of a fire, flood, earthquake, elements of nature or act of God; riot, civil disorder, rebellion or revolution, or other catastrophic event beyond the reasonable control of a Party that delays or prevents the party, directly or indirectly, from performing its obligations under a Purchase Order, provided that (i) the non-performing Party is without fault in causing or failing to prevent such occurrence, and (ii) such occurrence could not have been avoided by reasonable precautions and cannot be circumvented through the use of commercially reasonably alternative sources, workaround any act or failure to act of any civil or military authority, or strikes plans, or other means.

**"Foreign Material"** has the meaning given to it the Foreign Materials Exclusion Addendum attached to and incorporated herein as Exhibit D.

**"Governmental Authority"** means any and all federal, state, county, municipal, local, foreign or other government, or any agency or subdivision of any or all of the foregoing, or any quasi-governmental agency, self-regulating organization, board, bureau, commission, department, instrumentality, or public body, or any court, administrative agency, arbitrator, mediator, regulator, or other tribunal or adjudicative authority.

**"Hazardous Substances"** means and includes chemicals, flammable substances, explosives, radioactive materials, asbestos, hazardous wastes or substances, crude oil or any fraction thereof, refined or partially refined petroleum products, and any other contaminants, wastes, pollutants, or materials in any physical form that may pose a present or potential threat to human health and safety or the environment, including material falling within the definitions of "hazardous substance," "hazardous constituent," "toxic substance," "hazardous material," "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "special waste," or words of similar import under any Environmental Law.

**"Health and Safety Laws"** means any Laws pertaining to safety and health in the workplace, including the Occupational Safety and Health Act, 29 U.S.C. 651 et seq. ("OSHA"), and the Toxic Substances Control Act, 15 U.S.C. 2601, et seq. ("TSCA").

**Investigation"** has the meaning given to it in Section 12.5.1.

**"IP Rights"** means all right, title and interest in and to any and all intellectual property, including inventions, patents, copyrights, trade secrets, trade names, know-how, software, shop rights, moral rights, licenses, developments, research data, designs, processes, formulas and other intangible proprietary or property rights, whether or not patentable (or otherwise subject to legally enforceable restrictions or protections against unauthorized third party usage), and any and all applications for, and extensions, divisions and reissuances of, any of the foregoing, and rights therein, and whether arising by statute or common law.

**"Key Personnel"** means Contractor Personnel who possess critical knowledge or skills for performance of the Work and whose loss might delay or disrupt performance of the Work.

**"Labor Dispute"** means any controversy concerning terms or conditions of employment, or concerning the

## MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

**"Law" or "Laws"** means all laws, statutes, codes, ordinances, rules, regulations, lawful orders, applicable guidance documents from regulatory agencies including judicial decrees and interpretations, standards, permits and licenses, including Environmental Laws, tax laws and applicable tax treaties, health, safety, building, and employment laws, as amended from time to time, of all Governmental Authorities that are applicable to the Work and any of Contractor's obligations under the Contract Documents.

**"Lien"** means any judgment, charge, mortgage, deed of trust, encumbrance, pledge, lease, easement, servitude, exercise of rights, powers or privileges, rights of others, security interest, or claims of any kind, including, among other things, any oral or written agreement to give any of the foregoing or arising under any conditional sale or title retention agreement or under any federal, state, county, municipal, local, or other governmental lien imposed as a result of an actual or alleged violation of any applicable Law.

**"Material"** means all material, equipment, components, products, supplies, goods, and documentation to be furnished by Contractor and necessary to complete the Work set forth in the Purchase Order.

**"Material Information"** has the meaning given to it in Section 19.2.

**"Milestone Dates"** means the date of Substantial Completion, the date of Final Completion, and any other dates stated in the Purchase Order or Project Schedule for Contractor's completion of specific components of the Work.

**"NERC"** means North American Electric Reliability Corporation or an entity with authority delegated by NERC, including without limitation the Reliability First Corporation, Northeast Power Coordinating Council, Florida Reliability Coordinating Council, Midwest Reliability Organization, SERC Reliability Corporation, Southwest Power Pool, RE, Texas Regional Entity, and the Western Electricity Coordinating Council.

**"Nuclear Special Terms and Conditions"** means the terms and conditions attached hereto and incorporated herein as Exhibit F.

**"Obsolete Material"** has the meaning given to it in Section 10.5.

**"Other Material"** has the meaning given to it in Section 4.2.1

**"Party" or "Parties"** means Contractor or Buyer, individually or Contractor and Buyer, collectively.

**"Person"** means any natural person, partnership (limited, general, or other), joint venture (limited or otherwise), company (limited liability or otherwise), corporation, association, Governmental Authority, or any other legal entity of whatever kind or nature, together with any combination of one or more of the foregoing.

**"Personally Identifiable Information"** means any name or number that may be used, alone or in conjunction with any other information, to identify a specific person, including any (a) name, address, email address, password, account number, social security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number, or any similar identification, (b) personal, financial, or healthcare information, credit card information, bank account number, credit card number or debit card number, (c) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation, (d) unique electronic identification number, address, or routing code, (e) telecommunication identifying information or

## MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

access device (as defined in 18 U.S.C. §1029(e)), or (f) personal preferences, demographic data, marketing data, or any other identification data. For the avoidance of doubt, Personally Identifiable Information includes all "nonpublic personal information," as defined under the Gramm-Leach-Bliley Act (15 U.S.C. §6801 et seq.) and "protected health information" as defined under the Health and Insurance Portability and Accountability Act of 1996 (42 U.S.C. §1320d), and "Personal Data" as that term is defined in EU Data Protection Directive (Directive 95/46/EEC) on the protection of individuals with regard to processing of personal data and the free movement of such data.

"**Policies and Procedures**" means all applicable rules, policies, Site requirements, and procedures of Buyer and any of its Affiliates, including those in Exhibit B, which have been or shall be provided to Contractor and/or posted on a secure website as designated by Buyer.

"**Project Schedule**" means the schedule mutually agreed to by Buyer and Contractor for the performance of the various elements of the Work identified in the Purchase Order. The Project Schedule shall be one of the Contract Documents.

"**Punchlist**" means an itemized list prepared by Contractor and augmented, if necessary, by Buyer, of those portions of the Work, which Buyer's inspection indicates have not been completed in accordance with the requirements of the Contract Documents.

"**Purchase Order**" means a written or electronic document issued by Buyer to Contractor incorporating by reference these Terms and Conditions and which upon acceptance by Contractor for the performance of the Work. As used herein, Purchase Order includes documents that may be variously referred to as "contracts," "releases" or "purchase order releases" by Affiliates in their Contract Documents.

"**Rejected Work**" has the meaning given to it in <u>Section 11.3</u>.

"**Retiree**" means a former Exelon or Affiliate employee whose employment was not governed by a collective bargaining agreement with IBEW Union Local 15 at the time of such person's termination of employment and who previously received, is eligible to receive or is currently receiving benefit payments under an Exelon or Affiliate tax-qualified retirement plan, including the Exelon Corporation Retirement Program (Service Annuity Plan of PECO Energy Company or Commonwealth Edison Company Service Annuity System), the Exelon Cash Balance Pension Plan, the Exelon Employee Pension Plan for Clinton, TMI and Oyster Creek, the Pension Plan of Constellation Energy Group, Inc., and Pension Plan of Constellation Energy Nuclear Group, LLC and Nine Mile Point Pension Plan of Nine Mile Point Nuclear Station.

"**Reviewing Representative**" has the meaning given to it in <u>Section 28.6</u>.

"**Scope of Work**" or "**Statement of Work**" means the description of the Work to be provided by Contractor as set forth in the Purchase Order and other Contract Documents.

"**Services**" means all of the labor, supervision, administration and other services identified in the Scope of Work and required to complete the Work set forth in the Purchase Order, including engineering, design, fabrication, construction, installation, demolition, testing, technical assistance, delivery of Material, if appropriate for the Services rendered, and documentation.

"**Site**" means Buyer's facilities or such other premises (including premises owned or controlled by a third party) where the Work is to be performed and for which the Work is intended. Site may include Exelon Generating Facilities, where applicable.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**"Special Terms and Conditions"** means terms and conditions not contained in these Terms and Conditions but made a part of a Purchase Order by attachment to or reference therein.

**"Specifications"** means the final characteristics, dimensions, tolerances, performance requirements, and other particulars for the Work set forth in the Purchase Order and other Contract Documents.

**"Staff Augmentation"** means Work performed by Contractor Personnel that is either: (1) designated by Buyer as "Staff Augmentation" in the Purchase Order (2) not designated by Buyer as a project, "Outsourced" or "Outage" Work in the Purchase Order, or (3) directly supervised or managed on a day-to-day by Buyer.

**"Subcontract"** has the meaning given to it in Section 23.2.

**"Subcontractor"** means any Person contracting directly with Contractor to furnish any part of the Work, or a Person contracting with a Subcontractor of Contractor (regardless of tier) to furnish any part of the Work.

**"Submittals"** means all Specifications, Drawings, sketches, reports, shop drawings, diagrams, illustrations, schedules, and other data or information, which are prepared or assembled by or for Contractor and submitted by Contractor to Buyer pursuant to the Contract Documents.

**"Suspension for Convenience"** has the meaning given to it in Section 18.3.3.

**"Substantial Completion"** means the point in time at which the entire or designated portion of the Work is sufficiently complete such that Buyer can occupy and utilize the Work for commissioning, start-up, and completion of performance, and reliability testing as required hereunder, with only Punchlist items remaining to be completed, as reasonably determined by Contractor and approved by Buyer.

**"Terms and Conditions"** means these Master Terms and Conditions for Materials and Services between Contractor and Buyer together with all appendices, exhibits, schedules, and attachments hereto, all as such may be amended, restated, or supplemented from time to time as stated herein.

**"Termination for Convenience"** has the meaning given to it in Section 18.3.2.

**"Test"** has the meaning given to it in Section 11.2.

**"Work"** means all Material, Services, and Submittals required to be provided by Contractor under the Purchase Order and its associated Contract Documents including re-work and warranty work.

**"Work Product"** means the Work and any IP Rights resulting from the performance of the Work. The term Work Product excludes Contractor's, Subcontractors' and third parties' IP Rights developed independently of the performance of the Work.

All other capitalized terms used herein but not set forth above shall have the meanings ascribed to them in these Terms and Conditions.

## ARTICLE 2.
## SCOPE AND FORMATION OF CONTRACT

**2.1   No Requirements Contract or Affiliate Liability.**

These Terms and Conditions do not create a requirements contract. Buyer reserves the right to use their own resources and to employ other contractors to perform any and all work at any or all of its Sites.

## MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

Subject to the provisions of <u>Section 30.8</u> (Assignment), no Affiliate will have any right, interest, obligation, or liability under Purchase Orders issued by any other Affiliate as a result of these Terms and Conditions. Contractor shall not hold, nor attempt to hold, Exelon or any Affiliate liable for the acts, omissions, or breaches of any other Affiliate. No breach or default of a Purchase Order referencing these Terms and Conditions by an Affiliate shall constitute a breach or default of any Purchase Order issued by another Affiliate.

**2.2    Issuance and Acceptance of Purchase Orders.**

During the term of these Terms and Conditions, Buyer may request Contractor to perform Work by issuing a Purchase Order to Contractor signed by Buyer's Designated Representative or other authorized representative of Buyer. Subject to <u>Section 2.5</u> (Emergency Work), Contractor shall not commence Work without receipt of a Purchase Order. The Purchase Order shall specify, at a minimum, the: (i) other Contract Documents, (ii) Scope of Work, (iii) Submittals; (iv) Contract Price, (v) time for performance and Milestone Dates, (vi) Buyer's and Contractor's Designated Representatives, (vii) liquidated damages, if any, and (viii) agreed upon terms or conditions that deviate from these Terms and Conditions, if any. Upon the request of Buyer, Contractor shall sign and return the Purchase Order to Buyer's Designated Representative. Contractor's signature on the Purchase Order shall constitute Contractor's unconditional acceptance of the Purchase Order and these Terms and Conditions. Contractor's commencement of performance of the Work shall also be deemed an effective mode of acceptance of the Purchase Order and these Terms and Conditions. Buyer may also send a Purchase Order by means of a variety of electronic commerce and electronic business process alternatives, including the use of Electronic Data Interchange ("<u>EDI</u>"). Should EDI be the selected alternative to conduct business electronically for Purchase Orders (EDI 850), Purchase Order Revisions (EDI 861), Purchase Order Acknowledgements (EDI 855), Invoices (EDI 810), Payment (EDI 820), Product Activity Data (EDI 852), and Advanced Ship Notices (EDI 856), Contractor shall follow Buyer's published implementation guidelines and be fully compliant with no less than the ANSI X-12 004010 EDI version.

**2.3    Applicability of These Terms and Conditions to Purchase Orders.**

These Terms and Conditions shall apply to each Purchase Order unless specifically modified in the Purchase Order. These Terms and Conditions supersede any preprinted terms or conditions on any preprinted purchase order or any printed or typed conditions forming a part of Contractor's proposal. Any additional or different terms and conditions set forth in Contractor's proposal or preprinted purchase orders, Contractor's Purchase Order acknowledgments, or similar writings, or in Contractor's invoices or electronic data interchange acknowledgments, or any attempt by Contractor to vary in any degree any of the terms in the Contract Documents are objected to by Buyer and will not be binding upon Buyer unless specifically assented to in writing by Buyer's Designated Representative.

**2.4    Priority of Contract Documents.**

In the event of any conflict or inconsistency between the documents comprising the Contract Documents, the authority of the individual documents for each respective Purchase Order, relative to the other document, is, in descending order of priority: Change Orders; the Project Schedule; the Purchase Order; Special Terms and Conditions; Software License Agreements; these Terms and Conditions; Drawings; Specifications; and any other Contract Documents. Notwithstanding the foregoing, the several documents forming the Contract Documents shall be taken as mutually explanatory of one another; however, in case of ambiguities, discrepancies, or inconsistencies, this priority of documents shall govern.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

2.5     **Emergency Work.**

        2.5.1     In the event of an emergency (as reasonably determined by Buyer), the Buyer's Designated Representative may request in writing that Contractor perform Work prior to execution of a Purchase Order or Change Order ("Emergency Work"). In such event Contractor immediately shall commence the performance of Emergency Work and prepare and submit to Buyer a request for a Purchase Order or Change Order, as applicable, within 5 days after the commencement of Emergency Work. When issued by Buyer, the Purchase Order or Change Order issued for such Emergency Work shall be effective retroactively to the time of the performance of the Emergency Work. In the event Contractor fails to submit a request for a Purchase Order or Change Order within five (5) days after the commencement of Emergency Work, then Buyer may prepare a Purchase Order or Change Order identifying the scope of the Emergency Work and Contractor shall be bound thereby. Unless otherwise agreed to by the Parties, Emergency Work shall be performed [at the billing rate set forth in the Contract Documents.]

        2.5.2     In any emergency affecting the safety of persons or property, Contractor shall act, at its reasonable discretion, to prevent threatened damage, injury, or loss. Any extension to the affected Milestone Dates in the Project Schedule or request for an adjustment of Contract Price claimed by Contractor on account of Emergency Work shall be documented in a request for a Change Order submitted by Contractor to Buyer in accordance with Article 12 hereof.

        2.5.3     All Emergency Work shall be performed in accordance with the terms and conditions of these Terms and Conditions.

        2.5.4     Emergency Work performed prior to receipt of a Purchase Order or Change Order shall not exceed a total cost to Buyer of One Hundred and Fifty Thousand Dollars and No Cents ($150,000.00), and Contractor shall immediately stop the performance of Emergency Work once reaching that amount, pending receipt of a Purchase Order or Change Order from Buyer authorizing the continuation of the Work in excess of such amount.

## ARTICLE 3.
## STANDARDS FOR PERFORMANCE

3.1     **Standards.**

        Contractor shall perform the Work as set forth in the Purchase Order and other Contract Documents. Except as otherwise provided in the Contract Documents, Contractor shall furnish all the Materials and Services necessary for the complete, proper and timely completion of the Work, including, providing the necessary management, technical and other qualified personnel, home office support, supervision, labor, equipment, supplies, and transportation, except as explicitly excluded in the Contract Documents. Contractor shall perform all Work assigned to it in a competent manner consistent with the ordinary degree of skill and care required for the applicable business, craft, industry, profession or trade.

3.2     **Schedule of Performance.**

        Contractor shall complete all Work on or prior to the Milestone Dates for such completion set forth in the Contract Documents or the Project Schedule, or, if no Milestone Date is specified, in a commercially reasonable period of time. **TIME IS OF THE ESSENCE IN COMPLETING WORK BY A MILESTONE DATE.** Delays or possible delays in performance of the Work or in the completion of Milestone Dates shall be reported promptly after Contractor's discovery thereof to Buyer. Contractor shall take all necessary steps, at no additional cost to Buyer, to recover delays in the Project Schedule. Buyer and other contractors retained by Buyer may be performing work directly or indirectly affected by Contractor's

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

Project Schedule, and Contractor agrees to use best efforts in cooperating with other contractors to support Buyer's overall operations schedules.

**3.3     Final Acceptance.**

No Work shall be deemed to be accepted by Buyer until the earlier of Final Payment to Contractor in accordance with Section 5.9 or, if required by the Contract Documents, upon execution by Contractor and Buyer of a certificate of final completion. Neither Contractor nor Buyer may unreasonably withhold its execution of a certificate of final completion. However, Buyer is not required to accept the Work, including any Punchlist Work and any required documentation, is completed to Buyer's reasonable satisfaction. Contractor shall, at its own expense, complete all Punchlist Work (including all corrections or replacements) and test, inspect, re-test, or re-inspect, as appropriate, any portions of the Work so completed or corrected. Such tests, inspections, re-tests, and re-inspections shall be subject to verification by Buyer. Except as expressly provided herein, Final Acceptance shall not waive any rights and remedies that Buyer has, or release Contractor from any duties and obligations that Contractor has, under the Contract Documents, including, but not limited to, breach of contract and warranty.

**3.4     Site Investigations.**

Contractor represents that it (1) has inspected or has had the opportunity to inspect the Site where the Work is to be performed and has secured full knowledge of all conditions under which the Work is to be executed and completed, including soil conditions, including any and all physical parameters necessary to build any structures, and groundwater conditions, including estimates of flow direction and volume, the nature, location, and type of contamination likely to be encountered, the location of any and all above or below ground utilities, approaches to the Sites and the space available for work areas, storage and temporary buildings, (2) is not relying on any investigations performed by or information provided by Buyer relating to the conditions at the Site, (3) has ascertained all the facts concerning conditions to be found at the Site, including all physical characteristics that could in any way affect the Work or Contract Price, and (4) has satisfied itself as to the conditions under which it will be obligated to operate. Except as expressly set forth in the Purchase Order, there is no condition at the Site that will adversely affect Contractor's ability to perform the Work in accordance with the terms of the Contract Documents. Any understandings or representations concerning such conditions made before a Purchase Order is issued shall not be binding on Buyer unless they are expressly stated in the Purchase Order.

**3.5     Permits, Fees and Notices.**

3.5.1     Unless otherwise specified in the Contract Documents, Contractor, at its expense, shall obtain in advance of performing the Work, and maintain during performance of the Work, all necessary licenses, permits, and authorizations required of Contractor, the Contractor Personnel, Subcontractors and any other person(s) to perform the Work under Contractor's direction, and Contractor shall be responsible for performance of the Work in accordance with the provisions of such licenses, permits, and authorizations. Any costs, fines, penalties, awards, damages, or other liabilities (including but not limited to fines assessed by any Governmental Authority) associated with any violations of this Section 3.5 shall be borne and paid by Contractor.

3.5.2     Contractor shall promptly tender to Buyer copies of all notices received from Governmental Authorities.

3.5.3     Contractor shall post all notices and postings required by Law at the worksite, including, without limitation, those for employees.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

3.6     Compliance with Laws and Buyer Policies and Procedures.

    3.6.1   All Work performed hereunder and all Work and Work Product (as hereinafter defined) generated in connection therewith shall fully comply with all applicable Laws. Contractor shall make all notifications relating to commencement and progress of the Work as required by applicable Laws. Additionally, where not in conflict with any other provision of this Section 3.6, Contractor will comply with Policies and Procedures. Contractor acknowledges that it has received or been provided electronic access to copies of the Buyer's Policies and Procedures listed in Exhibit B. Buyer reserves the right to revise or update the Policies and Procedures from time to time, with or without notice to Contractor. At the request of Buyer, Contractor shall acknowledge in writing which Policies and Procedures of Buyer it has reviewed.

    3.6.2   Contractor and Buyer each agree to fully comply with the laws and regulations of the United States relating to the exportation of commodities or technical data, including but not limited to 15 CFR Parts 730 et seq., 10 CFR Part 110 and 10 CFR Part 810, as issued from time to time, or any successor laws or regulations. In the event of any ambiguity or inconsistency between the provisions of this Section 3.6.2 and any other Section of these Terms and Conditions, this Section 3.6.2 shall be controlling. The receiving Party agrees to ensure that all receiving Party individuals who may have access to technical data that is controlled for export by the regulations noted above are generally or specifically authorized or licensed under such regulations. The receiving Party also agrees to contractually obligate any third party recipients of such information to comply with such regulations.

    3.6.3   Anti-Corruption Compliance. Contractor warrants that when dealing with any government official, political party, party official or candidate for any political office, Contractor shall, and shall cause each of its Subcontractors (of any tier), and Contractor Personnel of each of them to fully comply with the provisions of all applicable anti-corruption laws including the U.S. Foreign Corrupt Practices Act and all relevant other anti-corruption laws. Specifically, Contractor warrants that in connection with any Work under these Terms and Conditions, it shall not directly or indirectly give, offer, or promise anything of value to any Contractor Personnel, government official, official political party, party official or candidate for any political office for the corrupt purpose of influencing or inducing any act or decision by any Contractor Personnel, government official or agency, or for the purpose of securing any improper advantage on behalf of Buyer or Contractor. Contractor shall cause Contractor Personnel who perform Work under any Purchase Order outside of the United States to be trained annually regarding the requirements of all relevant anti-corruption laws and to annually certify the same.

    3.6.4   Service Organization Control ("SOC") Reports. In the event that Work being performed subject to these Terms and conditions involve contracting out of a business function which was previously performed in-house by Exelon ("Outsourcing Services" or "Outsourced Services"), Contractor shall be required to provide on an annual basis, at Contractor's sole expense, one of the following Service Organization Control Reports ("SOC") by an auditor of national reputation when applicable to the Service provided to Buyer: (i) SOC Report 1 Type 2 Report – Applicable to Services that are relevant to the Buyer's financial statements and controls over financial reporting; or (ii) SOC Report 2 Type 2 Report – Applicable to Services where the AICPA Trust Services Principles and Criteria of Security, Availability, Processing Integrity, Confidentiality, or Privacy are relevant.

3.7     Disaster Recovery and Business Continuity.

    Contractor shall provide back-up, disaster recovery and storage capabilities so as to maximize availability and progress of the Work during an event that would otherwise affect the performance or delivery of the Work. At a minimum, such capabilities will provide for restoration of Work within the timeframes set forth in the Disaster Recovery Plan. Contractor's responsibilities shall include the following:

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

3.7.1    Back-up and store Buyer Data (on tapes or other storage media as appropriate) on-site for efficient data recovery and off-site to provide protection against disasters and to meet file recovery needs.

3.7.2    Conduct incremental and full back-ups (in accordance with the Disaster Recovery Plan) to capture data, and changes to data.

3.7.3    Develop, maintain and submit a Disaster Recovery Plan to Buyer including plans, measures and arrangements to ensure the continuous delivery of critical products and services, which permits Contractor to recover its facility, data, assets and personnel.  In the event of a disaster, Contractor shall assume responsibility for providing the services in accordance with the Disaster Recovery Plan.

3.7.4    Generate a report following each and any disaster measuring performance against the Disaster Recovery Plan and identification of problem areas and plans for resolution.

## 3.8    Subcontractor Compliance.

Contractor shall require that all its Subcontractors comply with all requirements of this Article 3.  If Contractor is unable to provide to the Buyer data obtained or generated by its Subcontractors pursuant to this Article 3, Contractor shall grant the Buyer the right to collect such data directly from Contractor's Subcontractors.  To facilitate the transfer of such data, Contractor shall contractually obligate its Subcontractors to provide such data to Buyer.

## 3.9    Compliance with Legal Holds.

3.9.1.    Contractor, at its sole cost and expense, agrees to comply with any and all legal holds as issued by Buyer's Legal Department. A legal hold suspends all document destruction procedures in order to preserve appropriate records under special circumstances, such as litigation or government investigations. Buyer's Legal Department determines and identifies what types of records, documents, or data are subject to legal hold. Buyer's Legal Department will notify the Contractor if a legal hold is placed on records, documents, or data the Contractor or its Subcontractors controls. Contractor must then preserve and protect the specified records, documents, or data in accordance with instructions from Buyer's Legal Department. A legal hold remains effective until it is officially released in writing by Buyer's Legal Department. If Contractor is uncertain whether specific records, documents, or data is subject to a legal hold, those records, documents, or data should be preserved and protected until such time Buyer's Legal Department can confirm their relevancy.

3.9.2.    In the event records, documents, or data placed on legal hold are required for review by Buyer's Legal Department, Contractor, at its sole cost and expense, will work diligently to export all relevant records, documents, or data in a form that is reasonably reviewable.

## ARTICLE 4.
## WARRANTIES

## 4.1    Performance of Work.

4.1.1    Material.  Contractor warrants that the Material furnished to Buyer under these Terms and Conditions and all components thereof will comply with the Specifications contained in or developed in accordance with the Contract Documents, and will be: (1) of new manufacture, unless specifically noted otherwise in the Contract Documents, (2)free from defects in design, workmanship and materials, (3)conveyed to Buyer with good and merchantable title, free and clear of all security interests, Liens, encumbrances or claims of Contractor, Subcontractors and third party suppliers (4) suitable for its intended

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

purpose as specified in the Contract Documents, (5) fit for the particular purpose intended therefor to the extent such purpose is set forth in the Contract Documents or otherwise known to Contractor, (6) sourced, manufactured, sold and delivered in accordance with the then-prevailing applicable Laws, and industry standards and practices, and (7) fully tested in accordance with the Contract Documents.

    4.1.2    Services.  Contractor warrants that the Services furnished to Buyer under these Terms and Conditions will (1) comply with the Specifications contained in the Contract Documents, (2) be performed in accordance with the then prevailing applicable Laws, and industry standards and practices; and (3) be free and clear of all security interests, Liens, encumbrances or claims of Contractor, Subcontractors and third party suppliers.

**4.2    Remedies.**

    4.2.1    Material.  If any Material does not comply with the foregoing warranties and Buyer gives Contractor notice of such noncompliance within two (2) years (or such other period as may be specified in the Purchase Order), after Buyer has accepted or, where required by the Contract Documents, Buyer has signed a certificate of final completion for the Work related to the Material (excluding any period the Material is not available for use because of breach or non-conformity with any warranty), then Contractor shall (at its sole expense) promptly correct by repair or replacement any (i) non-conforming Material and (ii) any materials, equipment and other personal and real property damaged by the non-conforming Material or otherwise adversely affected by the performance of the Work ("Other Material").  The decision whether to repair or replace shall be made with the concurrence of Buyer and the repair or replacement shall be scheduled consistent with Buyer's operating requirements so as to minimize loss of production or use of the Material, Other Material or of any plant or equipment of which the Material is a part.  Notwithstanding any other provisions in these Terms and Conditions to the contrary, all costs and expenses associated with access to or repair or replacement of Material or the Other Material, including removal or replacement of systems, structures or other parts of Buyer's facility and all transportation costs, shall be paid by Contractor, and Buyer may charge Contractor all expenses of unpacking, examining, repacking and reshipping any rejected Material or Other Material.  All warranties for any repaired or replaced Material or Other Material shall be two (2) years from the date of Buyer's acceptance of the repaired or replaced Material or Other Material, or for the duration of the unused warranty period if such period is longer (excluding that period, if any, during which the Material or Other Material is not available for operation because of breach of the above warranties).

    4.2.2    Services.  If any of the Services do not comply with the foregoing warranties and Buyer notifies Contractor within two (2) years (or such other period as specified in the Contract Documents, or provided by a manufacturer, supplier, or Subcontractor) after the date Buyer has accepted or, where required by the Contract Documents, Buyer has signed a certificate of final completion for the Services, then Contractor shall (at its sole expense) promptly re-perform the nonconforming Services and repair or replace any (1) Material damaged or otherwise adversely affected thereby and (2) Other Material damaged or otherwise adversely affected thereby.  Notwithstanding any other provisions in these Terms and Conditions to the contrary, all costs and expenses associated with access to or repair or replacement of the Material or the Other Material, including removal or replacement of systems, structures or other parts of Buyer's facility and all transportation costs, shall be paid by Contractor, and Buyer may charge Contractor all expenses of unpacking, examining, repacking and reshipping any rejected Material or Other Material.  All such re-performed Services and repairs or replacement of Material or Other Material shall be performed on a schedule to be agreed upon by Buyer.  The warranty for any such re-performed Services  and for any repaired or replaced Materials or Other Materials pursuant to Section 4.1.1 shall be two (2) years from the date of Buyer's acceptance of such re-performed Services or the  repaired or replaced Materials or Other Materials, or for the duration of the unused warranty period if such period is longer (excluding that period, if any, during which the Material or Other Material is not available for operation because of breach of the above warranties).

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**4.3    Inspection.**

Buyer's inspection, testing, acceptance, payment, or use of any Material or Services shall not affect the warranties and obligations of Contractor under these Terms and Conditions or the Contract Documents, and such warranties and obligations shall survive any such inspection, testing, acceptance, payment, or use.

**4.4    Buyer's Right to Perform.**

In the event of Contractor's failure to repair or replace the Material or Other Material, or Contractor's failure to re-perform the Services, in accordance with the terms hereof, Buyer, after notice to Contractor, may correct any deficiencies in the Material or Services, or may purchase replacement Material or Services. Buyer may either invoice Contractor for the cost of correcting the deficiencies (including the costs directly attributable to other services that are required to be performed in connection with the correction of such deficiencies), invoice Contractor for the cost of replacement, or, deduct the cost associated with correction or replacement from any payments due or subsequently due Contractor.

**4.5    Assignment of Warranties.**

Contractor agrees that it will obtain and shall and does hereby assign to Buyer the benefits of any warranties provided by Subcontractors or suppliers of the Services, and for material or equipment incorporated into the Material, and will perform its responsibilities so that such warranties remain in full force and effect. Such assignment shall not relieve Contractor of its warranty obligations to Buyer under these Terms and Conditions or the Contract Documents.

**4.6    Non-infringement.**

Notwithstanding any contrary provisions in this Article 4 or elsewhere in these Terms and Conditions, Contractor warrants that its performance of the Work, its delivery to or use by Buyer of Material, or any of the Services hereunder, has not been claimed to constitute or involve, does not and shall not at any time constitute or involve infringement, misappropriation, unfair competition or violation of any third party right, including IP Rights.

**ARTICLE 5.**
**CONTRACT PRICE, INVOICING AND PAYMENT**

**5.1    Contract Price.**

In consideration for the Contractor's acceptable performance of the Work as set forth in the Purchase Order and other Contract Documents, Buyer will pay to Contractor the Contract Price provided in the Purchase Order.. Unless otherwise expressly provided in the Purchase Order, the Contract Price shall be a fixed price and include all costs associated with performance of the Work and compliance with the Contract Documents, including, but not limited to, labor and associated employment benefits, Materials, transportation and delivery charges, insurance, costs to obtain Permits or IP Rights necessary for Contractor's performance, and Buyer's use, of the Work, and all other fees, duties or charges. If a Purchase Order specifies payment on a time-and-materials basis, the Purchase Order shall set forth an estimate of the total amount to be invoiced and, unless otherwise agreed upon in the Contract Documents, Contractor shall not incur costs that exceed this estimated amount except upon Buyer's prior written consent. Except as otherwise expressly provided in the Purchase Order, the Contract Price shall be the sole and exclusive consideration for Contractor's satisfactory performance of the Work.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**5.2    Taxes.**

Except for United States state sales or use taxes or similar taxes that apply to this purchase, the Contract Price is inclusive of any and all taxes, fees, excises, and charges which are now or hereafter imposed by Governmental Authority with respect to the Work, and Buyer shall not be required or obligated to reimburse Contractor for any taxes or similar expenses which may arise or be incurred in connection with delivery of the Material or performance of the Services. The invoice shall separately list taxable and nontaxable charges where applicable. Unless Buyer provides Contractor an exemption certificate or notifies Contractor that Buyer will pay such taxes directly to the applicable Department of Revenue, then state sales and use tax, where applicable, shall be billed on the invoice if Contractor is authorized by applicable Law to collect such tax. To the extent Contractor fails to bill Buyer pursuant to this Section 5.2, then Contractor shall be responsible for all penalties and interest payments associated with such failure (whether assessed to Buyer or Contractor) and the payment of such tax if Section 5.8.5 is applicable. Buyer shall reimburse Contractor for any interest, penalties, or expenses Contractor may incur as a result of Buyer providing Contractor with an exemption certificate. Contractor will promptly furnish Buyer with all information Buyer requests for the purpose of determining the amount of any tax liability under these Terms and Conditions. Buyer shall have the right to direct the basis on which any taxes included in the prices or for which it may be responsible will be paid or contested and to control any contest, including the right to initiate any contest, in the name of Contractor. Notwithstanding the foregoing, Contractor shall pay sales and use taxes on the purchase of all construction materials unless specific evidence of exemption from such tax is provided by Buyer. At the request of Buyer, Contractor shall prepare, execute, and deliver to Buyer a Federal Form W-9 or the equivalent thereof. Contractor shall comply with the reporting requirements of all Governmental Authorities, and, upon the request of Buyer, will provide proof that Contractor has complied with such reporting requirements.

**5.3    Submission of Invoices.**

Contractor shall submit invoices as follows: (i) if Work is complete in less than thirty (30) days, then Contractor shall submit an invoice within thirty (30) days after completion of Work; or (ii) if Work is completed in more than thirty (30) days, then Contractor shall submit an invoice every thirty (30) days for Work performed during the previous thirty (30) day period. Unless otherwise specified in the Purchase Order, the invoice shall be submitted via Email to "AP-Invoices@exeloncorp.com" for Exelon companies and acctspayable@constellation.com for Constellation Energy Nuclear Group, LLC companies.

**5.4    Invoice Format and Copies.**

Contractor shall submit one original invoice to Buyer's accounts payable and, upon the request of Buyer's Designated Representative, one duplicate of each invoice shall be sent to Exelon's Buyer's Representative. Each invoice shall include Contractor's name, address, Purchase Order number, release number (if applicable), Exelon catalogue identification number (if applicable) and corresponding unit price, date, and total amount due for the time period covered by the invoice. If the Work is being performed pursuant to a cost-plus or time-and-material (or any variation thereof) Purchase Order, each invoice shall also include a detailed itemized list of the costs of Work covered by the invoice identifying the number of each class of employees, number of regular hours worked, number of overtime hours worked, rates charged, a copy of all Subcontractor itemized invoices, separately itemized charges for freight, for all material used, and for all special trucking and special heavy power tools, all adequately described, with all applicable sales and use taxes stated. No overtime hours shall be charged to Buyer without Buyer's prior written approval. Overtime hours shall be billed as such rather than as a greater number of regular hours. Each invoice shall also identify all authorized expenses incurred during the time period, and shall be accompanied by supporting documentation. All charges made pursuant to a Change Order issued in accordance with Article 12 (Delay And Acceleration), herein, shall be shown separately on Contractor's invoices, and shall not be included with

Case: 1:16-cv-00611 Document #: 1-1 Filed: 01/15/16 Page 22 of 77 PageID #:29

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

amounts applicable to the Contract Price as originally specified in the Purchase Order. All invoices covering additions to or credits due under these Terms and Conditions or a Purchase Order shall refer to the specific Change Order issued by Buyer with respect to the addition or credit, and will not be honored unless this reference is included. Invoices that Buyer deems inaccurate or incomplete, in Buyer's sole discretion, may be returned to Contractor for correction and re-submittal. Contractor's final invoice for each Purchase Order shall be marked "FINAL INVOICE," in any cover letter, forwarding email, and on each page of the final invoice, and an additional copy of this final invoice shall be submitted to Buyer's Designated Representative.

**5.5    Statement.**

For Works involving the construction of improvements to Buyer's property, with each request for payment, Contractor shall submit a sworn statement as provided by the Mechanics Lien Law of the state where the Site is located and in the form specified by Buyer. The statement shall state the names of all Subcontractors (regardless of tier), the nature of Work, amounts of Subcontracts (as defined in Section 23.2), amount paid to date, amount to be paid to complete the contract, amount due, contracts to be let, amount owed for labor to date, cost of labor to complete the job, and total amount to be paid to complete the Work.

**5.6    Payments and Retainage.**

Subject to Section 5.9 (Payment Not Waiver of Contractor's Breach), Buyer shall pay all undisputed invoices within forty-five (45) days after receipt of the invoice. Buyer may retain either (1) ten percent (10%) of each invoice, or (2) the amount of the final invoice until close-out documentation is received and deemed by Buyer, in its sole discretion, to be complete.

**5.7    Reports.**

5.7.1    If requested by Buyer, Contractor shall submit to Buyer on the first Day of each month following the month in which the Purchase Order is dated, a report dated up to the day before submission thereof, in such form as shall be specified by Buyer, showing the progress made by Contractor toward the completion of the Work to the date of each report. Each report shall include an updated Project Schedule, a list of Contractor Personnel performing Work at the Site, and a discussion of Contractor's planned activities for the next month. Contractor shall continuously monitor, report, forecast, and control the progress of the Work in accordance with the Project Schedule. Contractor shall provide increasing scheduling detail as the Work progresses. Contractor's reporting shall be sufficiently detailed to present to Buyer an accurate status of the Work's Project Schedule, variances from the Project Schedule and reasons therefor, and corrective action planned.

5.7.2    If Buyer requires a report pursuant to Section 5.7.1 for Work being performed on a cost-plus or time-and-material basis (or any variation thereof), Contractor shall submit a weekly report to Buyer. Each report shall include, in addition to the information required by Section 5.7.1, the following: (1) time sheets listing Contractor Personnel, with occupation descriptions and number of regular and overtime hours worked; (2) a list of all chargeable tools and equipment showing hours used; and (3) a list of chargeable material and quantities.

**5.8    Grounds for Not Paying Invoices.**

Buyer may decline to pay an invoice, in whole or in part, due to any of the following:

5.8.1    Material breach by Contractor of any of its obligations under these Terms and Conditions or Purchase Order, including the costs to Buyer of remedying the breach (whether by repairing or re-ordering the

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

Material or re-performing the Services or otherwise) and all other costs directly attributable to other services that are required to be performed in connection with remedying such breach;

      5.8.2   A notice of intent to lien or lien placed on the Work or Buyer's property because of Contractor's failure to properly pay Subcontractors;

      5.8.3   Reasonable evidence that the Material or Services will not be completed by the Milestones specified in the Purchase Order or Project Schedule;

      5.8.4   Unsubstantiated or unsupported amounts billed by Contractor;

      5.8.5   Contractor's failure to submit an invoice within one hundred and eighty (180) days of the applicable submission provisions of Section 5.3 (Submission of Invoices); or

      5.8.6   Buyer's purchase of insurance pursuant to Section 16.9 (Buyer's Right to Purchase).

**5.9    Final Payment.**

      Subject to the fulfillment of Contractor's obligations under the Contract Documents, final payment of all moneys due but not previously paid to Contractor hereunder shall be made within forty-five (45) days after receipt by Buyer of Contractor's final invoice ("Final Payment"), subject, however, to the condition precedent that Final Payment shall not be due until Buyer accepts the Work, in accordance with Section 3.3 of these Terms and Conditions; and, on Work involving the construction of improvements to Buyer's property, Contractor shall have given Buyer evidence satisfactory to Buyer that all liens, claims, obligations, and liabilities against Buyer (including the Work and the Site), or in respect to the Work or chargeable to Buyer have been fully paid, satisfied, and released. Such evidence shall include Contractor's final, unconditional lien waiver for the final cost of the Work performed by Contractor. Acceptance by Contractor of Final Payment shall constitute a waiver of all claims against Buyer under the Purchase Order for which the final invoice is issued.

**5.10   Payment Not Waiver of Contractor's Breach.**

      No partial payment or Final Payment made by Buyer or the execution of a certificate of final completion shall be construed as a waiver of any breach hereof by Contractor, forfeiture of Buyer's right to inspect and accept Work and its documentation, acceptance of defective portions of the Work or of any of the Work which does not strictly comply with all requirements of the Contract Documents, or preclude Buyer from pursuing any other rights or remedies it may have under these Terms and Conditions, in law or equity.

**5.11   Right to Setoff.**

      Buyer may setoff against any amount payable under a Purchase Order any and all present and future indebtedness of Contractor to Buyer (including any indebtedness for which Buyer may be primarily or contingently liable or ultimately responsible or which is or may become a lien on any property of Buyer).

**ARTICLE 6.**
**LIQUIDATED DAMAGES**

      The Parties may agree to apply liquidated damages to a Purchase Order as specified in such Purchase Order. In such case, in the event of a delay by Contractor in achieving Substantial Completion as specified in the Purchase Order or Project Schedule, for any reason which is not excused under Section 13.3

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

(Compensable Delay). Contractor shall pay to Buyer as liquidated damages the amounts specified in the Purchase Order without prejudice to Buyer's other rights and remedies under these Terms and Conditions or the Purchase Order or at Law and not as a penalty. The Parties agree that, if such Liquidated Damages are specified, it is because it would be extremely difficult and impracticable to ascertain and fix the actual damages Buyer would suffer should Contractor delay in completing the Work by the Milestones Dates identified in the Purchase Order or Project Schedule. It is acknowledged and agreed by the Parties that the liquidated damages in the Purchase Order relate solely to Contractor's delay in completing the Work as set forth in the Contract Documents and to no other obligation or duty of Contractor.

### ARTICLE 7.
### TERM

These Terms and Conditions shall be effective as of the Effective Date. Notwithstanding anything herein to the contrary, the termination of these Terms and Conditions shall not affect or excuse the performance of either Party pursuant to any then effective Purchase Order(s), except as otherwise provided in Article 18 (Termination And Suspension).

### ARTICLE 8.
### CONTRACTOR'S SUBMITTALS; SAMPLES

**8.1     Submittals.**

Contractor's Submittals shall include all information and documentation in Contractor's and Subcontractor's possession which are required by Buyer for the design, construction, licensing, maintenance, quality assurance, operation, and/or use of the Work. Any Submittals required by the Contract Documents to be submitted to Buyer for review prior to commencement of any stage of the Work shall be submitted by Contractor without unreasonable delay, and any Work affected thereby which started prior to written acceptance by Buyer shall be at Contractor's risk. Review by Buyer shall not relieve Contractor from fulfilling all of Contractor's obligations under these Terms and Conditions or the Contract Documents, including obligations relating to design and detailing. As far as practicable, each drawing Submittal shall bear a cross-reference note referring to the sheet number or numbers of Buyer's drawings showing the same Work. All Submittals shall become the property of Buyer, may be used by Buyer in connection with the installation, startup, maintenance, operation, and repair of the Work, and may be transferred by Buyer to any transferee of the Work.

**8.2     Samples and Mock-Ups.**

If Buyer has requested a sample or mock up of all or any portion of the Work, Contractor shall not commence the associated Work until Buyer has received such samples, or reviewed such mock up, and acknowledged in writing its acceptance of such samples or mock-up. All Work is required to conform to such samples or mock-up, and no change in the Work or its method of production shall be made without the written consent of Buyer.

### ARTICLE 9.
### BUYER'S PROPERTY

All tools, tooling, designs, patterns, dies, molds, drawings, and other materials supplied by Buyer or paid for by Buyer remain Buyer's property, and Contractor agrees to maintain a log upon receipt of such Buyer-furnished property which will be used for final disposal or return of such property based on instructions furnished by Buyer. Contractor shall at its expense maintain all such property in its possession in good condition and repair and indemnify Buyer for all damage or loss to such property (other than ordinary

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

wear and tear) and for liability arising as a result of fraudulent, illegal, inappropriate, or unauthorized use of such Buyer-issued property to Contractor Personnel including, but not limited to, Buyer Photo ID, keys, parking pass, documents, laptop and the like, either during the course of the assignment of any Contractor Personnel to perform the Work or after termination of such Contractor Personnel. Contractor agrees that use of any such Buyer property will not affect the warranties set forth in these Terms and Conditions or the Contract Documents.

**ARTICLE 10.**
**MATERIAL PROVISIONS**

**10.1    Advance Manufacture or Procurement.**

Except as otherwise agreed to by the Parties in the Contract Documents, Contractor shall not manufacture or procure Materials in advance of the dates specified in the Purchase Order or Project Schedule. In the event of termination of these Terms and Conditions pursuant to Article 18 or change in the Work, no claim will be allowed for manufacture or procurement in advance of the Project Schedule, except as was reasonably necessary to meet deliveries required by the Purchase Order or Project Schedule.

**10.2    Prefabricated Material.**

Buyer may require Contractor to use prefabricated Material provided by Buyer. Contractor shall not disassemble or rework any prefabricated Material, unless so directed by Buyer in a Purchase Order or a Change Order.

**10.3    Spare Parts.**

Contractor shall furnish to Buyer at least sixty (60) days prior to the delivery of the first Material supplied under a Purchase Order a recommended list of spare parts for the Material and, upon the request of Buyer, shall update such list during the term of these Terms and Conditions. The list shall contain a detailed identification of each part by part number and the manufacturer or supplier of the part if not manufactured by Contractor. The list shall also contain an identification of alternative spare parts, which may be used for the Material in lieu of those manufactured or provided by Contractor. The use by Buyer of spare parts identified in Contractor's list shall not void any warranties or guarantees. Except as may otherwise be agreed to by the Parties in writing, these Terms and Conditions shall apply to any future Purchase Orders between the Parties for spare or replacement parts for the Work; provided, nothing in these Terms and Conditions shall require Buyer to purchase spare or replacement parts from Contractor.

**10.4    Maintenance, Repair and Refurbishment Services.**

Except as may otherwise be agreed to by the Parties in writing, these Terms and Conditions shall apply to any future Purchase Orders between the Parties for maintenance, repair and refurbishment of the Work; provided, nothing in these Terms and Conditions shall require Buyer to purchase maintenance, repair and refurbishment Services from Contractor.

**10.5    Cessation of Production.**

Before procuring non-fungible Material for use in the Work, Contractor shall ask its suppliers whether the production of such Material is or will soon be discontinued ("Obsolete Material"). Contractor shall not use Obsolete Material without written approval of Buyer. If at any time prior to 1 year after the later of final delivery of the Material or Final Completion of the Work incorporating the Material, Contractor learns that production, manufacturing or availability of Material or components thereof has been discontinued,

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

or is expected to be permanently discontinued, Contractor shall give Buyer written notice prior to placing any orders for such Material or components and as soon after learning of such discontinuance as is practical.

**10.6    Counterfeit, Fraudulent and Substandard Items**

Contractor is hereby notified that the delivery of suspect/counterfeit parts is of concern to Buyer. If any parts covered by any Purchase Order hereunder are described using a manufacturer part number or using a product description and/or specifies an industry standard, Contractor shall be responsible to assure that the parts supplied by Contractor meet all requirements of the latest version of the applicable manufacturer data sheet, description, and/or industry standard. If Contractor is not the manufacturer of the goods, Contractor shall make all reasonable efforts to assure that the parts supplied under any Purchase Order hereunder are made by the original equipment manufacturer and meet the applicable manufacturer data sheet or industry standard. Should Contractor desire to supply a part that may not meet the requirements of this paragraph, Contractor shall notify Buyer of any exceptions and receive Buyer's written approval prior to shipment of the replacement parts to Buyer. If suspect/counterfeit parts are furnished under this order or are found in any of the goods delivered hereunder, such items will be dispositioned by Buyer and-/ or the supplier to Buyer, and may be returned to the Contractor. Contractor shall promptly replace such suspect/counterfeit parts with parts acceptable to Buyer, and Contractor shall be liable for all costs, including but not limited to Buyer's internal and external costs, relating to the removal and replacement of said parts.

**ARTICLE 11.**
**INSPECTION AND TESTING**

**11.1    Buyer Inspections.**

Buyer may at all reasonable times inspect and test the Work in process and the Sites where the Work is being performed, but such inspections, if made, shall not in any way relieve Contractor from its obligations under the Contract Documents. Contractor shall make all necessary arrangements and provide access for inspection and testing either at Contractor's shop or at the mills or shops where any part of the Material is being fabricated or manufactured. Buyer will inspect and accept or reject the Work as promptly as practicable after delivery, except as otherwise provided in the Contract Documents, but its failure to inspect and accept or reject the Work shall (1) not relieve Contractor from responsibility for Work which does not comply with the Contract Documents or (2) impose liability upon Buyer therefore.

**11.2    Testing.**

Both Contractor and Buyer have the right to be represented at any test, inspection or witness point ("Test") required under the Contract Documents, and to have copies of any Test results. Contractor shall give Buyer sufficient notice of and shall afford Buyer the opportunity to observe any inspection or Tests of any part of the Work which Contractor elects to or is required to conduct.

**11.3    Rejected Work.**

Prior to final acceptance of the Work, Buyer may reject any part of the Work found to be defective or not in accordance with the Contract Documents ("Rejected Work"), regardless of the state of its completion or the time or place of discovery of such errors, and regardless of whether Buyer's inspector has previously passed it without objection through oversight or otherwise, and (i) require Contractor to remove the Rejected Work from the Site at Contractor's expense (if applicable); and/or (ii) require Contractor to re-perform, repair, or replace the Rejected Work at Contractor's expense. Rejected Work that has been repaired shall not thereafter be tendered for acceptance unless the repair is disclosed to Buyer. If Contractor fails to promptly commence and diligently proceed to remove and/or re-perform, repair, or replace the Work as specified by

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

Buyer, Buyer may (i) by another contractor or otherwise, remove and/or re-perform, repair or replace the Rejected Work and charge to Contractor the cost thereof, or (ii) terminate the all or part of the Purchase Order pursuant to Article 18. of these Terms and Conditions.

### 11.4     Covering the Work.

No portion of the Work shall be enclosed or covered until inspected by Buyer other than temporary covers as required to protect the Work. If the Work is covered prior to Buyer's inspection, at the request of Buyer, the Contractor shall uncover at Contractor's expense for the purpose of Buyer's inspection. Buyer may further inspect any Work that it suspects may not be in compliance with the requirement sof the Contract Documents. If such inspection determines that the Work is in accordance with the Contract Documents,, Buyer shall pay Contractor all reasonable costs incurred by Contractor for the purpose of the re-examination and recovering of the Work. If that Work is determined to be non-compliant with the requirements of the Contract Documents, the costs incurred by the Contractor for the purpose of the re-examination and re-covering of the Work shall be at Contractor's expense.

**ARTICLE 12.**
**CHANGES IN THE WORK**

### 12.1     Buyer Changes.

Buyer shall have the right to order changes to be made in the Work through a written Change Order, including changes in the Specifications, Drawings, designs, and time and place of delivery. No Change Order that has the effect of changing the cost to Buyer or Contractor (whether because of a change in the prices for the Material or the Services, the amount or type of Material or the scope of the Services, or otherwise), or materially affecting the time for performance, warranties, or other obligations of the Parties (each a "Material Change") shall be binding upon the Parties unless the same is approved in writing by Buyer and Contractor.

### 12.2     Claims for Equitable Adjustments.

If a Change Order results in a Material Change, the Contract Price and/or other affected provisions of the Contract Documents shall be equitably adjusted by agreement between Contractor and Buyer (an "Equitable Adjustment"). Equitable Adjustments may result in either an increase or decrease in the Contract Price, time for performing the Work, or change to other material obligations of the Parties under the Contract Documents, as appropriate, based on the nature of the Material Change. Equitable Adjustments shall be reflected in the Change Order, except where the Parties expressly agree in the Change Order to address the issue of an Equitable Adjustment after the fact, e.g, due to emergent circumstances. If Contractor has any claim against Buyer for an Equitable Adjustment, notice of each such claim shall be submitted promptly in writing to Buyer. Each claim shall include Contractor's detailed proposal therefor. Unless otherwise agreed to in writing by Buyer, Contractor shall bear the costs of preparing such detailed proposal and any claim by Contractor shall be deemed waived unless made in writing within ten (10) days after the occurrence of the event which precipitated the claim. If Contractor reasonably believes that Buyer has made a change in the Work without issuing a written direction, Contractor shall give Buyer written notice within seventy-two hours after such purported change, and if Contractor intends to request an Equitable Adjustment, it shall follow the claims procedure described herein. If the Contractor fails to provide timely notice, any subsequent request for increase in the Contract Price or for an extension of time shall be waived, the Parties agree that Buyer shall be prejudiced as a result of late notice because of its inability to mitigate and/or substantiate any resulting costs or time extensions contemporaneously. Any resulting Equitable Adjustment shall be reflected in a revised Change Order. If the Parties cannot agree on an Equitable Adjustment within forty-five (45) days of Buyer's receipt of Contractor's proposal, either Party may refer the matter to dispute resolution under the provisions of

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

Article 29 herein. Notwithstanding anything to the contrary, no claim shall be allowed if asserted after Final Payment.

## ARTICLE 13.
## DELAY, ACCELERATION AND FORCE MAJEURE

**13.1   No Extension of Date for Final Completion.**

If Contractor is delayed at any time for any reason, other than reasons attributable to Buyer or Force Majeure, during the execution and completion of any portion of the Work, then Contractor shall employ additional personnel and Material as are necessary to accelerate the progress of the Work to meet the Milestone Dates identified in the Purchase Order or Project Schedule.  Subject to the provisions of Section 13.2, Buyer will not pay and Contractor shall bear Contractor's increased costs related to Contractor's accelerated performance.  Subject to the terms of the Contract Documents, Contractor acknowledges and agrees that no extension to the date for Final Completion or other Milestone Dates identified in the Purchase Order or Project Schedule shall be granted unless agreed to in writing by Buyer and Contractor.

**13.2   Compensable Delay Claim.**

If Contractor's need to accelerate its Work is caused by a Compensable Delay (as defined in Section 13.3 below), then subject to Contractor submitting a written claim to Buyer, Buyer shall pay Contractor for Contractor's increased costs resulting from the Compensable Delay.  Unless otherwise agreed between the Parties, such payment shall be on a reimbursable basis at the rates set out in the Purchase Order.  Payment of Contractor's claim for its increased costs shall be Contractor's sole remedy for such a Compensable Delay.

**13.3   Compensable Delay.**

For purposes of these Terms and Conditions, compensable delays ("Compensable Delay") shall include only the following events and only if they impact the critical path of the Work: (1) material delays attributable to Buyer; and (2) material change ordered in the Work not due to Contractor's fault.

**13.4   Force Majeure.**

13.4.1   Neither Party shall be in breach of a Purchase Order where its failure to perform or its delay in performing any obligation is due to a Force Majeure.

13.4.2   The Party claiming Force Majeure shall notify the other Party promptly of any failure to perform or delay in performing due to Force Majeure and shall provide an estimate as soon as practicable of the time when the obligation will be performed.

13.4.3   The Party claiming Force Majeure shall notify the other Party in writing as soon as practicable after the beginning of the occurrence and immediately at the termination of such occurrence.

13.4.4   The Party claiming Force Majeure shall exercise due diligence in time and effort in order to restore normal conditions and re-establish working schedules as soon as the Force Majeure has ceased.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## ARTICLE 14.
## DELIVERY TERMS; LOSS OR DAMAGE; TITLE

**14.1    Delivery Terms.**

The delivery terms for Material arriving from international locations shall be "DDP - Buyer Delivery Dock," unless otherwise specified in the Purchase Order. The delivery terms for Material originating domestically shall be FCA – Buyer Delivery Dock, unless otherwise specified in the Purchase Order. Buyer may expedite deliveries. Contractor shall notify Buyer promptly of any conditions affecting the date the Material is to be received at the "ship to" address specified in the Purchase Order (the "Delivery Date"). This notice shall be required for conditions affecting both late and early delivery. Buyer may, at its sole option, accept or return deliveries that vary from (a) the Delivery Date or (b) quantities specified in the Purchase Order except for authorized partial shipments.

**14.2    Risk of Loss.**

Risk of loss or damage to the Work or any property of Buyer in the custody of Contractor shall remain with Contractor until Buyer accepts the Work, or, if required by the Contract Documents, Contractor and Buyer execute a certificate of final completion. If any loss of or damage to the Work occurs prior to the date of acceptance or, where required, the date Contractor and Buyer execute a certificate of final completion, Contractor shall at its sole expense promptly repair or replace the portion of the Work affected. Unless otherwise provided in these Terms and Conditions, Buyer's insurance policies will not in any event cover property of Contractor unless such property is built into or intended to be built into the Work and may be subject, in each case, to substantial deductible amounts. When shipment is "FCA – Shipping Point," if Material is received at its destination in a damaged condition and a claim for such damage is denied by the carrier on the basis that such damage was attributable to Contractor, Contractor shall repair or replace such damaged Material at no cost to Buyer. In any event, Contractor shall assist Buyer without charge in establishing carrier liability for Material damage by supplying evidence that the Material was properly manufactured, packaged, and secured to withstand normal transportation condition. When materials, equipment, or apparatus are furnished by Buyer or by others for installation or erection by Contractor, Contractor shall receive, unload, protect, store, remove from storage and handle and assume responsibility for them as though these items were furnished by Contractor under these Terms and Conditions.

**14.3    Routing of Shipments; Shipping.**

14.3.1   Buyer may in its sole discretion, specify the route, carrier, and other details associated for all shipments of Material or any components or parts thereof. If Buyer exercises such right and any such specifications increase Contractor's transportation costs, Contractor shall immediately notify Buyer. If Buyer still specifies the more expensive route, Buyer shall reimburse Contractor for the amount of the difference between the less expensive and more expensive transportation costs.

14.3.2   Contractor shall wrap, pack, crate, load, enclose, and brace the Material on the carrier in a good, workmanlike manner and in accordance with applicable standard trade practice.

14.3.3   Contractor will provide technical and administrative personnel, if required by Buyer, to meet with Buyer's personnel no later than ten (10) Days prior to initial shipment of Material. This meeting shall determine itemization of Material, shipping papers, bills of lading, and all procedures required to provide a master listing of all shipped Material.

14.3.4   Contractor shall not make or effect delivery of any of the Material in advance of the dates specified in the Purchase Order or Project Schedule without the prior written consent of Buyer.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**14.4    Passage of Title.**

Title to any Material furnished by Contractor under a Purchase Order shall pass to Buyer at the time Buyer has accepted the Work related to the Material.

**ARTICLE 15.**
**CONTRACTOR'S INDEMNIFICATION**

**15.1    Indemnification.**

Contractor shall, to the fullest extent permitted by Law, indemnify, defend upon request, and hold harmless Buyer and its members, officers, directors, employees, agents, representatives, subsidiaries, affiliates, successors, and assigns ("Buyer Parties") against all losses, claims, damages, expense (including advance of reasonable attorneys' fees and other defense costs) and liabilities sustained or incurred by the Buyer Parties for any damage, harm, loss or injury of any kind, direct or indirect, to any property or person (including death), including without limitation, claims for injuries or loss to employees of the Buyer Parties, Contractor and/or any Subcontractor, arising out of any act, omission, conduct, negligence or default by Contractor or a Subcontractor or their respective officers, directors, employees, agents, representative, subsidiaries, successors, or assigns ("Contractor Parties") and/or arising out of or in any manner associated with the Work under these Terms and Conditions or any contact with or encountering of any property, equipment, vehicles,  Sites or personnel of the Buyer Parties, regardless of whether any such liability, damage, loss or injury is caused by, results from or arises out of the negligence, fault or other liability of the Buyer Parties or any other party to be indemnified.  Contractor shall further, to the fullest extent permitted by Law, indemnify, defend Buyer Parties harmless against any loss sustained or incurred by Buyer Parties (including reasonable attorneys' fees and expenses) for any breach or nonperformance by Contractor or its Subcontractors of any portion of these Terms and Conditions.  Buyer Parties' right to indemnification shall specifically include loss or damage to Buyer Parties' property.  Buyer Parties' right to indemnification under this Section 15.1 shall include, but not be limited to, advance of all loss, costs, legal fees and/or expenses associated with obtaining legal advice, prosecuting or defending any legal claim regarding insurance coverage, breach of these Terms and Conditions, contractual indemnity under these Terms and Conditions, or defense of any lawsuit filed by anyone for any claim relating either to the Work, or performance thereof, or these Terms and Conditions.  Contractor Indemnification of the Buyer Parties shall include any costs or expenses (including advance of reasonable attorneys' fees and other costs) incurred by any Buyer Parties subpoenaed or otherwise required to participate in any proceeding pertaining to or involving a claim brought by any third party or governmental agency against or involving Contractor and/or any Subcontractor.

**15.2    Limitations on Indemnity.**

Except as may be otherwise provided by applicable Law, Buyer Parties' right to indemnification shall not be impaired or diminished by any act, omission, misconduct, negligence or default of a Buyer Party or any employee or agent of an Buyer Party who may be alleged to have contributed thereto.  To the extent any Law may prohibit any application of all or any part of the indemnity obligations in these Terms and Conditions, it is the intent of the Parties that such provisions are severable, and shall be construed to impose the indemnity obligation in all circumstances, applications, and situations to the fullest extent permitted by Law.

**15.3    Indemnification for Claims by Governmental Authorities or Others.**

Contractor shall indemnify, hold harmless, and upon request, defend Buyer Parties from any claim, liability, damage, expense, suit, or demand (including advance of reasonable attorneys' fees and defense

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

costs) for claims by Governmental Authorities or others (including Subcontractors, Contractor Personnel, and Buyer Personnel) of any (1) failure of Contractor or any Subcontractor to comply with any Law, including without limitation failure of Contractor or any Subcontractor, or any employee thereof, to pay wages, compensation, taxes, duties, or fees or to comply with employee safety orders, safe place, or employment laws, or (2) any claims asserted against Buyer Parties alleging that any of the Buyer Parties is an employer, co-employer or joint employer of any Contractor Personnel; or (3) any claims asserted against Buyer Parties alleging that any of the Buyer Parties aided and abetted any Contractor or any Subcontractor in alleged or actual violation of any Law; or (4) any failure of a Buyer Party to comply with any Law by reason of any act, omission, conduct, negligence or default by Contractor.

**15.4    Pollution Indemnification.**

Contractor agrees to indemnify, hold harmless, and upon request, defend Buyer Parties from any claim, liability, damage, expense, suit, or demand (including reasonable attorneys' fees and court costs) for damage, harm, loss or injury of any kind arising out of actual or alleged contamination, pollution, exposure to any harmful substance, or public or private nuisance, including any request, demand or order that the Buyer Parties test for, monitor, clean up, contain, remove, treat or in any way respond to the existence or threat of any such contamination, pollution, harmful substance or nuisance, arising out of or in any manner related to, based upon, or in connection with, any operations, performance, breach, course or Scope of Work, act, omission, or presence upon, use, or other encountering of any property, Sites, personnel, vehicles, equipment, or operations of Buyer Parties or others by or involving Contractor or any Subcontractor or any of their employees, agents, representatives, Sites, Materials, equipment, or subcontractors, in any connection with these Terms and Conditions or a Purchase Order.

**15.5    Settlement of Claims.**

Contractor shall provide Buyer with reasonable advance, written notice, of the settlement of any claims pertaining to or arising out of the Work and shall include Buyer as a released party if requested by Buyer.

**15.6    Contractor Cooperation.**

Contractor agrees to cooperate fully with Buyer in any investigation, claim or proceeding involving Buyer, whether such investigation, claim or proceeding is initiated by Contractor Personnel, Buyer Personnel, a Governmental Authority, or Buyer.

**ARTICLE 16.**
**INSURANCE**

**16.1    Required Coverages.**

Contractor shall provide and maintain, and shall require each Subcontractor (regardless of tier) to provide and maintain, in effect during the performance of any Work under the Purchase Order minimum insurance coverage with carriers authorized to conduct business in the State in which the Work is to be done and otherwise satisfactory to Buyer, including:

16.1.1   Workers Compensation insurance with statutory limits, as required by the state in which the Work is to be performed.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

16.1.2   Employer's liability insurance with limits of not less than one million dollars ($1,000,000.00) each accident for bodily injury by accident, one million dollars ($1,000,000) each employee for bodily injury by disease, and one million dollars ($1,000,000) policy limit.

16.1.3   Commercial general liability (CGL) insurance (with coverage consistent with ISO Form CG 00 01 12 07 or its equivalent with a limit of not less than one million dollars ($1,000,000.00) per occurrence and per project or per location aggregate, covering liability for bodily injury and property damage, arising from premises, operations, independent contractors, personal injury/advertising injury, and products/completed operations for not less than three (3) years from the date Buyer and Contractor execute a certificate of final completion, if applicable, or the date Buyer accepts the Work. CGL insurance includes coverage for claims against Buyer for injuries to Contractor Personnel.

16.1.4   Automobile liability insurance coverage (including coverage for claims against Buyer for injuries to Contractor Personnel) for owned, non-owned, and hired autos with a limit of not less than two million dollars ($2,000,000.00) per accident.

16.1.5   Excess or Umbrella liability insurance coverage (including coverage for claims against Buyer for injuries to Contractor Personnel) with a limit of not less than four million dollars ($4,000,000.00) per occurrence and per project or per location aggregate.   These limits apply in excess of each of the above mentioned policies.   Excess coverage shall be follow form.

16.1.6   The liability limits under 16.1.2, 16.1.3 and 16.1.4 may be met with any combination of primary and Excess or Umbrella Insurance policy limits totaling five million dollars ($5,000,000).

16.1.7   If the Purchase Order involves or includes Contractor providing or performing design, engineering, consulting, or any professional service, professional liability insurance with a combined single limit of not less than three million dollars ($3,000,000.00) per occurrence.

16.1.8   If the Purchase Order involves or includes Contractor handling, transporting, disposing, or performing work or operations with Hazardous Substances, Contractor's pollution liability insurance applicable to bodily injury; property damage, including loss of use of damaged property or of property that has not been physically injured or destroyed; cleanup costs; and defense, including costs and expenses incurred in the investigation, defense, or settlement of claims, with a combined single limit of not less than five million dollars ($5,000,000.00) per occurrence, automobile pollution liability coverage at least as broad as that provided under the ISO pollution liability – broadened coverage for covered auto endorsement (CA 99 48) shall be provided, and the Motor Carrier Act Endorsement (MCS 90) shall be attached to your automobile liability policy as required in 16.1.4.

16.1.8.1 Coverage as required in 16.1.8 shall apply to sudden and non-sudden pollution conditions resulting from the escape or release of smoke, vapors, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants, or pollutants.

16.1.9   If any policy is written on a claims made basis, the retroactive date may not be advanced beyond the date of these Terms and Conditions and coverage shall be maintained in full force and effect for three (3) years after termination of these Terms and Conditions, which coverage may be in the form of tail coverage or extended reporting period coverage if agreed by the Parties.

16.1.10   Contractor shall be responsible for any deductibles or self-insured retentions applicable to the insurance provided in compliance with Article 16.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

16.1.11 Insurance coverage provided by Contractor under this Article 16 shall not include any endorsement limiting coverage available to Buyer which is otherwise required by this Article 16.

16.1.12 To the extent permitted by applicable Laws, all above-mentioned insurance policies shall provide the following:

16.1.12.1 Be primary and non-contributory to any other insurance carried by Buyer; 16.1.12.2 Contain cross-liability coverage as provided under standard ISO Forms' separation of insureds clause;

16.1.12.3 Provide for a waiver of all rights of subrogation which Contractor's insurance carrier might exercise against Buyer; and

16.1.12.4 Any Excess or Umbrella liability coverage will not require contribution before it will apply.

**16.2     Additional Coverages.**

Buyer reserves the right to require Contractor to provide and maintain additional coverages in the event that the particular Work involves unusual risks or a change in the characteristics of the risks subject to these Terms and Conditions.

**16.3     Additional Insured Endorsement.**

All liability insurance policies shall name Buyer and its Affiliates and their officers, directors, employees, agents, representatives, Affiliates, subsidiaries, successors, and assigns, as additional insureds, shall be primary to any other insurance carried by Buyer, and shall provide coverage consistent with ISO Form CG 2026 (11/85), or the combination of ISO Form CG 20 10 04 13 and CG 20 37 04 13, or their equivalents, and shall maintain the required coverages (including but not limited to coverage for claims against Buyer for injuries to Contractor Personnel), for a period of not less than three (3) years from the date Buyer and Contractor execute a certificate of final completion, if applicable, or the date Buyer accepts the Work.

**16.4     Evidence of Insurance.**

Contractor shall provide evidence of the required insurance coverage and file with Buyer a Certificate of Insurance acceptable to Buyer prior to commencement of the Work. The Insurance and the insurance policies required by this Article 16 shall contain a provision that coverages afforded under the policies will not be canceled, allowed to expire or the limits in any manner reduced until at least thirty (30) days prior written notice (ten (10) days in the case of nonpayment of premium) has been given to Buyer. The Certificate of Insurance must state whether or not the Contractor's commercial general liability policy and/or excess liability policy contain any exclusions. Buyer may inspect any or all policies of insurance at any time.

**16.5     Waiver of Subrogation.**

Contractor shall waive all rights of subrogation against Buyer under those policies procured in accordance with these Terms and Conditions.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**16.6    Ratings.**

All insurance coverage shall be provided by insurance companies acceptable to Buyer and having ratings of A-/VII or better in the Best's Key Rating Insurance Guide (latest edition in effect at the latest date stated in the Certificate of Insurance referred to in Section 16.4).

**16.7    Breach of Terms and Conditions.**

Failure to obtain and maintain the required insurance shall constitute a breach of these Terms and Conditions and Contractor will be liable for any and all costs, liabilities, damages, and penalties (including attorneys' fees, court, and settlement expenses) resulting to Buyer from such breach, unless a written waiver of the specific insurance requirement is provided to Contractor by Buyer.

**16.8    Non-Waiver.**

Failure of Contractor to provide insurance as herein required or failure of Buyer to require evidence of insurance or to notify Contractor of any breach by Contractor of the requirements of this Article 16 shall not be deemed to be a waiver by Buyer of any of the terms and conditions of these Terms and Conditions, nor shall they be deemed to be a waiver of the obligation of Contractor to defend, indemnify, and hold harmless Buyer Parties as required herein. The obligation to procure and maintain any insurance required is a separate responsibility of Contractor and independent of the duty to furnish a copy or certificate of such insurance policies.

**16.9    Buyer's Right to Purchase.**

In the event of any failure by Contractor to comply with the insurance requirements of these Terms and Conditions, Buyer may, without in any way compromising or waiving any right or remedy at law or in equity, upon five (5) days written notice to Contractor, purchase such insurance, at Contractor's expense, provided that Buyer shall have no obligation to do so and if Buyer shall do so, Contractor shall not be relieved of or excused from the obligation to obtain and maintain such insurance amounts and coverages. All such costs incurred by Buyer shall be promptly reimbursed by Contractor and/or may be withheld from any payment due Contractor.

**16.10    Contractor's Commencement of Work Without Insurance.**

Commencement of Work without the required Certificates of Insurance, or without compliance with any other provision of these Terms and Conditions, shall not constitute a waiver by Buyer of any rights under these Terms and Conditions.

**16.11    Contractor Obligations Not Limited.**

None of the requirements contained herein as to types, limits, or Buyer's approval of insurance coverage to be maintained by Contractor are intended to and shall not in any manner limit, qualify, or quantify the liabilities and obligations assumed by Contractor under these Terms and Conditions, any other agreement with Buyer, or otherwise provided by law.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## ARTICLE 17.
## LIMITATION OF LIABILITY

**17.1    Limitation of Liability.**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER BASED ON CONTRACT, INDEMNITY, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, BUYER SHALL NOT BE LIABLE TO CONTRACTOR FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHATSOEVER.

**17.2    Contractor Liability.**

Should Contractor Personnel sue Buyer for any injury allegedly received while performing Work under these Terms and Conditions and/or any Purchase Order, Contractor agrees to waive in any suit filed by Buyer any limitation or cap imposed by any Laws, case law or Governmental Authority on the damages that Buyer can recover against Contractor in a third party action by Buyer against Contractor.

## ARTICLE 18.
## TERMINATION AND SUSPENSION

**18.1    Termination With Cause.**

If either Party breaches any provision of the Purchase Order or other Contract Documents (including the failure by Contractor to adhere to the performance standards set forth in these Terms and Conditions or the Purchase Order), the other Party may give notice of such breach to the defaulting Party in writing. If the breach is not cured within ten (10) days of receipt of such notice by the defaulting Party, the defaulting Party shall be in default hereunder and the non-defaulting Party may elect to terminate the Purchase Order effective upon delivery of written notice of such termination to the defaulting Party within ten (10) days of such failure to cure, or to continue the Purchase Order subject to satisfaction of any assurances of performance from the defaulting Party. In the event either Party terminates a Purchase Order pursuant to this Section 18.1, Buyer shall not be required to make any payments to Contractor with respect to Material that has not been delivered or Services that have not been performed as of the date of termination. If the sum of all previous deposits and payments under the applicable Purchase Order with respect to the Work so terminated exceeds the amount owed to Contractor with respect to Material that has been delivered and Services that have been performed as of the date of termination, the excess shall be immediately refunded to Buyer.

**18.2    Termination Without Cause.**

Buyer may upon written notice to Contractor terminate a Purchase Order or other Contract Documents, in whole or part, for Buyer's convenience ("Termination for Convenience").

**18.3    Suspension of Work.**

18.3.1    Suspension for Non-compliance with Law or Terms and Conditions. In the event that it is determined by Buyer or a Governmental Authority that the Work fails to comply with any Law or with any of these Terms and Conditions (including but not limited to Work performed by Contractor Personnel not deemed to be qualified) and Buyer is required to re-inspect and correct such Work, Buyer shall have the right to direct that all Work be suspended and direct that the Work be performed in a manner that complies with such Law or Governmental Authority and the Contractor shall be liable to Buyer for all direct costs associated with such inspections including but not limited to excavation and re-performance of the Work, if required, to inspect or meet applicable Law.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

18.3.2   Suspension for Convenience.  Buyer may at any time on written notice to Contractor extend, suspend, or delay Contractor's performance of the Work for Buyer's convenience ("Suspension for Convenience").

18.3.3   Contractor's Duties upon Suspension.  Upon receipt of Buyer's  notice of suspension, Contractor shall immediately stop all Work under the Purchase Order and immediately cause its suppliers and subcontractors to suspend such Work, unless Contractor is directed otherwise in the notice of suspension.

**18.4    Termination Charges.**

18.4.1   If Buyer terminates a Purchase Order pursuant to Section 18.1 (Termination With Cause), Contractor shall not be entitled to receive any further payments under such Purchase Order until all Work has been fully performed by Buyer or by some other person on behalf of Buyer, as follows.  Buyer shall have the right to complete the Work by means other than the use of Contractor, and in doing so Buyer shall have the right to exercise its sole discretion as to the manner, method, and reasonableness of the costs of completing the Work. Contractor shall bear any extra expenses incurred by Buyer in completing the Work, including all increased costs.  After all Work has been completed, Buyer shall calculate the total expenses for the completed Work.  If the total expenses exceed any unpaid balance due Contractor, Contractor shall be liable to Buyer and shall pay the difference to Buyer on demand.

18.4.2   If Buyer terminates the Purchase Order in accordance with Section 18.2 (Termination Without Cause), or if Contractor terminates the Purchase Order pursuant to Section 18.1 (Termination With Cause),  Buyer will pay Contractor for all reasonable and unavoidable disbursements and expenses that Contractor has incurred or become obligated for prior to the date of the notice of termination.  Buyer shall be entitled to all Material specially accumulated for the Work terminated, shipped at its expense to a place designated by Buyer.  In no event shall the aggregate termination charges plus payment for the Work exceed the Contract Price of the Work set forth in the relevant Purchase Order and Change Orders thereto.  Payments by Buyer hereunder will be credited with: (1) prior amounts deposited or paid by Buyer under the Purchase Order, and (2) the amount of any salvage or resale value which may be realized with respect to any Material purchased or manufactured for the purpose of performing the Work and identified prior to termination, which Buyer does not elect to take.  If the sum of all previous deposits and payments under the Purchase Order and salvage and/or resale with respect to the Work terminated exceeds the amount owed to Contractor hereunder, the excess shall be immediately refunded to Buyer.  Contractor agrees to take reasonable steps to minimize termination expenses.

**18.5    No Overhead Costs or Profits.**

Whether Buyer terminates the Purchase Order with or without cause or suspends Contractor's Work, in no event shall Buyer be responsible for overhead costs associated with Work not performed by Contractor, for any profits Contractor would have earned if it had completed Work, or for any special, consequential, incidental, or indirect damages.

**18.6    Disputed Termination.**

If Buyer terminates these Terms and Conditions or a Purchase Order pursuant to this Article 18, and Contractor disputes Buyer's right or grounds for such termination, the issue shall be resolved in accordance with the Dispute Resolution Procedure in Article 29 (Dispute Resolution).  If it is ultimately found, or agreed to by the Parties, that Buyer had no right or grounds for such termination, then the termination by Buyer shall be conclusively presumed in law to have been Termination for Convenience, and the damages for which Buyer may be liable shall be no more than those specified in Section 18.4.2.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

18.7    **Contractor's Duties Upon Termination.**

If Buyer terminates a Purchase Order, as provided in this Article 18, Contractor shall immediately discontinue the Work, and Buyer shall be entitled to take possession of the Site and all or any part of the Material not owned by Contractor, delivered or in transit to the Site. If requested by Buyer, Contractor shall make every reasonable effort to cancel any existing orders, Subcontracts and contracts specified by Buyer upon commercially reasonable terms satisfactory to Buyer. Contractor, upon request, shall also deliver and assign to Buyer, and Buyer may at its discretion assume, any and all contracts, Subcontracts, purchase orders, and options made by Contractor in performance of the Work. Contractor shall deliver to Buyer true and correct originals thereof and all copies of the Contract Documents in Contractor's possession except that Contractor may retain photocopies of all relevant documents for its own files, and all other materials relating to governmental permits, orders placed, bills, invoices, lien waivers, and financial management under these Terms and Conditions. Notwithstanding any termination, Contractor shall take such steps as are reasonably necessary to preserve and protect Work completed and in progress and to protect Material at the Site, stored off-site, or in transit. No action taken by Buyer after termination shall prejudice any other rights or remedies of Buyer provided by law, by the Contract Documents, or otherwise upon such termination. Should Buyer's termination of Contractor be partial, Contractor shall proceed to complete the portions of the Work, including Work pursuant to other Purchase Orders not terminated.

18.8    **Completion of Fabrication.**

If Buyer delays or suspends Contractor's performance under Section 18.3 (Suspension of Work) and Contractor determines that any of the Work is in such state of manufacture or fabrication that interruption of that Work would result in substantially increased manufacturing costs, Contractor may complete and store that portion of the Work after notice to Buyer, unless Buyer directs Contractor to interrupt its Work.

18.9    **Resumption of Work.**

If Buyer extends, delays, or suspends Contractor's performance under Section 18.3 (Suspension of Work), Contractor shall thereafter resume such Work as soon as is practicable when directed to do so by Buyer. Any dates for performance by Contractor which are affected by an extension, delay, or suspension of Buyer shall be extended for a period not to exceed the time lost by reason of the extension, suspension, or delay. The payment schedules contained in these Terms and Conditions or Purchase Order shall be adjusted to reflect the effect of the extension, suspension, or delay on Contractor's rate of expenditures for performance hereunder, and performance schedules for Buyer's other obligations under these Terms and Conditions which are affected shall be extended for a period not to exceed the time lost by reason of the extension, suspension, or delay. With the exception of extensions, suspensions, or delays resulting from a Force Majeure event,Contractor shall also be entitled to an increase in the Contract Price for the Work to cover Contractor's incremental direct costs by reason of the extension, suspension, or delay and for which Contractor is not compensated by any price adjustment provisions in the Contract Documents. Contractor shall take all reasonable steps to minimize these costs.

18.10    **Temporary Deferment of Services.**

Contractor shall, without cost to Buyer, temporarily defer the execution of any portion of the Work when such action may be necessary in the opinion of Buyer for the proper advancement of the work of other contractors or for the installation of machinery, equipment, or other work by Buyer, when the deferment may be accomplished without unreasonable interference with Contractor's schedule or arrangements, or when the Work interferes or threatens to interfere with the operation of Sites including any Exelon Generating Site.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**18.11   Subcontractors.**

Contractor agrees to bind every Subcontractor to whom it subcontracts any of the Work by the provisions of this Article 18 as far as applicable to the Work of the Subcontractor.

### ARTICLE 19.
### CONTRACTOR'S INTELLECTUAL PROPERTY AND INFRINGEMENTS

**19.1   Buyer's License to Use Intellectual Property Incorporated in the Work.**

Unless otherwise agreed to in writing by Buyer, in the event and to the extent that any of the Work Product produced by Contractor contains any Contractor intellectual property, Contractor hereby grants to Buyer an irrevocable, perpetual, paid-up, non-exclusive, royalty-free, world-wide license to use Contractor's intellectual property incorporated in the Work Product. Contractor shall pay all royalties and license fees which are necessary for Contractor's performance of the Work and Buyer's use of any third party IP Rights incorporated into the Work. Except as provided in this Section 19.1, Buyer shall receive no right or interest in and to Contractor's intellectual property.

**19.2   Buyer's Access to Intellectual Property Used in Performance of the Work.**

Subject to the provisions of Article 28 (Confidentiality), Contractor shall make available to Buyer Contractor intellectual property incorporated into the Work, before and after Final Completion, in order to permit Buyer to secure or maintain in effect any license or permit for the Site or facility for which the Work is intended, or otherwise to use or obtain the full benefits of the Work ("Material Information". Buyer and Contractor agree that this Material Information provided will only be for Buyer's internal use but may be provided to third parties engaged by Buyer to assist with use of or to provide service to Buyer for or upon the Work. Any third party having access to such Material Information shall agree in writing to be bound to the nondisclosure and use provisions substantially similar in all material respects to those in Article 28. Buyer may disclose Contractor's intellectual property to any Governmental Authority for the purposes set forth herein, provided that Buyer shall provide Contractor with notice of Buyer's intent to disclose Contractor's intellectual property and cooperate fully with Contractor to secure a protective order governing such disclosure.

**19.3   Indemnity Against Infringement.**

Contractor shall at its own expense defend any claim brought by others against a Buyer or its successors and assigns because the sale or use of the Material or performance of the Work infringes, or is alleged to infringe, directly or contributorily, on IP Rights or is the basis for a claim of unfair competition resulting from similarity in design, trademark, or appearance of goods by reason of the sale or use of the Work; and Contractor shall indemnify and hold the Buyer harmless from any liability of any nature or kind (including advancement of all costs or expenses including attorneys' fees), arising out of any infringement or alleged infringement or claim of unfair competition. In addition, Contractor shall indemnify and hold the Buyer harmless against, and shall pay all awards of damages assessed and all costs of suit adjudged against such Buyer in such suits or proceedings, provided such Buyer promptly gives Contractor such information and assistance as is readily available to such Buyer, and authority as may be necessary to enable Contractor so to do. At Buyer's or such Buyer's expense (as determined between Buyer and such Buyer), a Buyer may be represented by and actively participate through its own counsel in any such suits and proceedings if it so desires.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**19.4    Remedies.**

In case any part of the Work is held in any such suit to constitute infringement, misappropriation or violation of any IP Rights and its use is enjoined, or at any time after a claim of infringement arises, Contractor, in addition to its indemnification obligations herein, shall (at Buyer's option), promptly either (1) secure for Buyer the perpetual right to continue the use of such part of the Work by procuring for Buyer a royalty-free license or such other permission as will enable Contractor to secure the suspension of any injunction, (2) replace at Contractor's own expense such part of the Work with an adequate non-infringing part or modify it so that it becomes non-infringing, but only if the replacement or modification does not adversely affect Buyer's acquisition costs, operating or maintenance costs, construction or operating schedules, operation or maintenance procedures, public relations, employee relations, any license or permit affecting Buyer's property or any other matter relating to Buyer's property or its operation, or (3) refund the entire Contract Price relating to the Work affected.

**ARTICLE 20.**
**WAIVER OF LIEN**

**20.1    Lien Waivers in Jurisdictions Which Do Not Permit No-Lien Contracts.**

For Work involving the construction of improvements to Buyer's property, in jurisdictions which do not permit contracts containing a provision providing that the Contractor and its Subcontractors may not file a Lien on the Work ("No-Lien Contracts," as a condition precedent to payment, Contractor shall submit with each invoice an unconditional partial lien waiver for the amount requested in the current invoice as well as, if applicable, lien waivers from its Subcontractors for the preceding payment. Both Contractor and its Subcontractors shall provide Buyer a final lien waiver as a condition precedent to payment by Buyer of the final invoice.

**20.2    Lien Waivers in Jurisdictions Which Permit No-Lien Contracts.**

For Work involving the construction of improvements to Buyer's property, in jurisdictions which permit "No-Lien Contracts," Contractor, for itself and for its Subcontractors and for its and their Contractor Personnel and for all other persons performing any labor and/or furnishing any Material for the Work hereunder, hereby waives the right to file mechanics' or other liens for or on account of the labor performed or Material furnished, and agrees that all labor and Material furnished, and the improvements or structures wherein the same may be incorporated, and the land to which they are appurtenant, shall at all times be free and clear of all such liens. Prior to Contractor performing any construction or other work on or about Buyer's property for which a lien could be filed, Contractor shall execute a Waiver of Mechanics' Lien satisfactory to Buyer, and file same with the appropriate authority of the county in which the property is located and provide Buyer with a signed copy of the same, time stamped by such appropriate authority.

**20.3    Lien Free Work.**

In all jurisdictions, Contractor agrees to keep Buyer's property free and clear of, and shall promptly release or cause the release of, all liens, lien claims, recorded notices, claims for nonpayment, or lis pendens filed of record by any Subcontractor. Contractor agrees to indemnify and hold Buyer Parties harmless from all liens and lien claims made, recorded, asserted, or filed on the Work or on any property on which it is being performed, on account of any labor performed or Material furnished by Contractor, Subcontractors (regardless of tier) and other persons in connection with the Work. Contractor further agrees to keep Buyer, the Work, the Site, and any fund from which construction costs are to be paid free and clear of all liens and lien claims arising from the performance of any of the Work covered by these Terms and Conditions. Contractor's

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

obligation hereunder includes advancing and paying for any attorneys' fees, court, and other costs incurred by Buyer in connection with any such lien claims and liens.

**20.4     Buyer's Right to Discharge Liens.**

Should any lien or lien claim described in this <u>Article 20</u> be so asserted, whether due to nonpayment of the claimant or otherwise, and whether contested or not, Buyer may at its sole discretion and without limiting or waiving any rights or remedies of any other interested person (1) pay the amount of such lien or lien claim either directly to the claimant or by issuance of joint payment to Contractor and the claimant, (2) retain from payments then due or which thereafter become due to Contractor, whether under these Terms and Conditions or otherwise, an amount sufficient to discharge the claimed amount and to hold Buyer harmless from any cost, expense, loss, or damage incurred in connection with the claim, including reasonable attorneys' fees, (3) require Contractor to obtain and record a properly executed release of lien satisfactory to Buyer, (4) require Contractor to execute a title indemnity agreement acceptable to Buyer or to record a properly executed bond (provided by a surety acceptable to Buyer) in the minimum amount of one and one-half (1½) times the amount of the recorded lien or lien claim or such other greater amount as may be required by Buyer, (5) where permitted by law, require Contractor to petition a court to discharge or satisfy such lien and to post a bond or other security as the court shall require.  This obligation shall survive early termination of these Terms and Conditions or Final Completion of the Work or any component thereof.

### ARTICLE 21.
### LABOR RELATIONS

**21.1     Notice of Potential Labor Disputes.**

Contractor shall immediately notify Buyer, in writing, of any Labor Dispute or anticipated Labor Dispute that may reasonably be expected to affect or delay the performance of the Work.  Written notice shall include, at a minimum, identification of the organizations involved in the Labor Dispute together with any relevant information regarding the Labor Dispute and its background, or other information as requested by Buyer.  Contractor shall immediately notify Buyer, in writing, of: the representation of any Contractor Personnel, who are assigned to the Work, by a union; its negotiation and/or execution of any collective bargaining agreement covering the Work in whole or in part; any organizing activities among Contractor Personnel assigned to the Work; or, any Unfair Labor Practice charges filed with the National Labor Relations Board, or any state agency, pertaining to the Work.

**21.2     Jurisdictional Disputes.**

If any union jurisdictional disputes arise involving Work performed by Contractor, Contractor shall be held solely responsible for pursuing all available remedies under applicable state and federal law, or under any existing labor agreements, to remedy the dispute and to ensure the performance of the Work or the work being performed by other Buyer contractors without disruption or delay.

**21.3     Prevent Stoppage or Slowdown.**

Contractor shall be responsible for taking any and all actions reasonably necessary, which may include filing charges with the National Labor Relations Board and pursuing injunctive relief in federal and/or state courts, to prevent or end any stoppage or slowdown of the Work prior to, during, or subsequent to any labor dispute or activity.  Further, Contractor shall arrange, if necessary, for a substitute or supplementary work force in the event of a stoppage or slow down in the Work.  Contractor shall be responsible to Buyer for any delay, disruption, obstruction, or hindrance in the Work, and damages and extra costs resulting from such

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

disputes. Contractor shall not make any claim for a modification of the Contract Price or the Milestone Dates as a result of any labor dispute or activity.

**21.4    Indemnification.**

Contractor shall indemnify, hold harmless and, at the Buyer Parties' request, defend Buyer Parties from all claims, liability, damages, and expenses (including advancement of reasonable attorneys' fees and other defense costs) arising out of (i) a Labor Dispute, (ii) the filing of any grievances and/or arbitrations under any applicable collective bargaining agreement, or (ii) claims under a collective bargaining agreement or labor agreement.

**21.5    Contractor's Rights.**

Subject to Buyer's right to approve Subcontractors, nothing in these Terms and Conditions shall limit Contractor's right to negotiate or execute labor agreements on terms and conditions within Contractor's sole discretion consistent with Contractor's responsibilities and obligations under these Terms and Conditions or any Purchase Orders.

## ARTICLE 22.
## CONTRACTOR'S PERSONNEL

**22.1    Competent Workers.**

Contractor shall employ and cause each Subcontractor to employ competent, appropriately trained, and experienced Contractor Personnel for the Work to be performed. Contractor shall have full responsibility for the conduct of all Contractor Personnel employed on or in connection with the Work and will ensure that there is adequate, daily supervision of all Work. Contractor shall be familiar with and observe established and accepted labor practices, procedures, and agreements applicable to the Work. Continuous coordination between Buyer and Contractor is essential in order to provide for efficient operations and ensure the safety of all assigned personnel. Contractor's Designated Representative shall be responsible for overseeing the Work and administering any Purchase Order issued under these Terms and Conditions. In addition, the Contractor's Designated Representative must be proficient in written and spoken English and able to translate to assigned personnel as needed. Except as otherwise provided in the Purchase Order, Contractor's Designated Representative shall be in attendance at the Site during the performance of the Work. Contractor may change its representative at any time. However, a fully qualified replacement must be ready to assume responsibility for Contractor's Designated Representative and is subject to prior approval of Buyer's Designated Representative, which shall not be unreasonably withheld.

**22.2    Qualification.**

Contractor Personnel shall maintain all professional qualifications, licenses, permits, certifications and skills and appropriately complete all training required by applicable Laws or necessary for the performance of the Work. Contractor shall only employ, and shall take reasonable steps to ensure that its Subcontractors only employ, persons who are lawfully eligible to perform the Work. Contractor shall obtain, verify, and maintain evidence of the identity and employment eligibility under U.S. immigration laws for all Contractor and Subcontractor Personnel performing Work at Sites. This shall include compliance with the U.S. Citizenship and Immigration Service's I-9 process.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**22.3**     **Compliance with Exelon GPPMA**

22.3.1   In connection with a Purchase Order and except as otherwise expressly provided by Buyer, if Contractor (1) performs (or plans to perform) any craft Work at an Exelon Generating Site or (2) hires (or plans to hire) any craft labor to perform Work at an Exelon Generating Site, then Contractor (or if applicable, such Subcontractor performing the Work and/or hiring craft labor) shall execute a Letter of Assent, which represents such signatory's agreement to the terms and conditions set forth in the Exelon Generation Company, LLC Generating Facility Amendment to the General Presidents Project Maintenance Agreement, dated April 14, 2005 (the "Exelon GPPMA") prior to commencement of Work at such Exelon Generating Site.

22.3.2   Contractor shall perform the Work described above in <u>Section 22.3.1</u> pursuant to the Exelon GPPMA and terms, conditions and covenants contained therein, including employing, or contracting with, individuals represented by the appropriate craft unions.

22.3.3   If Contractor breaches the provisions of this <u>Section 22.3</u>, Contractor shall indemnify, defend upon request and hold harmless Buyer Parties from all claims, liability, damages, and expenses (including advancement of reasonable attorneys' fees and defense costs) arising out of such breach.

**22.4**     **Use of Contractor Personnel**

22.4.1   Contractor shall comply with Buyer's Policies and Procedures pertaining to use of contractors as specified in Exhibit B hereof, or the Contract Documents.  For purposes of this <u>Section 22.4</u>, all terms with initial capitalization that are not otherwise defined herein, shall be as defined in such Policies and Procedures. Contractor represents and warrants that (i) Contractor and all suppliers, Subcontractors and agents involved in the production or delivery of Materials hereunder strictly adhere, and shall continue throughout the term of these Terms and Conditions to strictly adhere, to all applicable Laws in the jurisdictions in which the Materials are produced or delivered with respect to the operation of their production and manufacturing facilities and their other business and labor practices, including laws, regulations and prohibitions governing the working conditions, wages, hours and minimum age of the workforce; (ii) the Materials have not been, and shall not be, produced or manufactured, in whole or in part, by child labor or by convict or forced labor; and (iii) the Materials shall not have been transshipped for purposes of avoiding compliance with labor laws. Contractor further agrees promptly upon Buyer's request to furnish such documentation as may be required by Buyer to evidence compliance with the foregoing.

22.4.2   Contractor, in furnishing the Work, is acting as an independent contractor, and Contractor has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all Work to be provided by Contractor under these Terms and Conditions.  All Contractor Personnel who perform any portion of the Work hereunder for Contractor shall be, and remain, employees of Contractor, and Contractor will be solely responsible for payment of compensation to such persons as well as all applicable federal, state and local income and employment tax withholding and reporting for all such Contractor Personnel.  Buyer Parties, including those in Exhibit A are, or shall be construed to be, an employer (common law or otherwise), co-employer or joint employer of any Contractor Personnel.  Neither Contractor (or its Subcontractors) or any Contractor Personnel is an agent of the Buyer Entities, and no such party or person has any authority to represent the Buyer Parties as to any matters, except as expressly authorized in the Contract Documents.  Contractor will assume full responsibility for payment of all federal, state, provincial and local taxes, withholding or contributions imposed or required under unemployment insurance, social security and income tax laws with respect to all Contractor Personnel.  Should any of the Buyer Entities be required to pay any amount to a governmental agency for failure by Contractor (or its Subcontractors) to withhold any such amount as may be required by Law, Contractor shall indemnify each of the Buyer Parties for any such amount so paid, including interest, penalties and fines.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

22.4.3   Neither Contractor nor its Subcontractors will: (1) assign either (a) any Contractor Personnel to perform Staff Augmentation Work for the Buyer Entities, or (b) any Retiree to perform any Work for the Buyer Entities, for a total period of time (including time under these Terms and Conditions or any other agreement or through Contractor, its Subcontractors or any other third party employer and without regard to hours worked), in excess of 1 year, unless Buyer grants a written exception for such Contractor Personnel to the time limit; or (2) report income for any of its Contractor Personnel performing Staff Augmentation work to the Buyer Entities, to the IRS on Form 1099; or (3) allow any Contractor Personnel to commence Work for the Buyer Entities until an executed Third Party Personnel Acknowledgement (as defined below) has been received by Contractor.

22.4.4   Prior to commencement of Work by any Contractor Personnel, Contractor (or its Subcontractor), shall obtain from such Contractor Personnel, either directly or through its Subcontractors, a written acknowledgement from all proposed such Contractor Personnel, or its Subcontractor, substantially in the form of Exhibit C attached hereto (the "Third Party Personnel Acknowledgement" or "TPPA"). Contractor shall maintain the original of each TPPA for Contractor Personnel for a period of six (6) years following the termination of Contractor Personnel.

22.4.5   Based upon such executed Third Party Personnel Acknowledgements and prior to commencement of any Work by any such proposed new Contractor Personnel, Contractor shall provide to Buyer's Designated Representative a written notice that identifies the names (and if possible the former Exelon or Affiliate Employee identification number) of Contractor Personnel assigned to provide Work to Buyer who identify themselves as a former employee of one of the Buyer Entities or a Retiree of one of the Buyer Entities (a "Notice of Former Employees/Retirees"). Notwithstanding any other provision of these Terms and Conditions, Buyer reserves the right, to request additional information about any Contractor Personnel, to reject any proposed Contractor Personnel, and to request the removal (with or without replacement) of any or all Contractor Personnel from performing Work for Buyer hereunder and/or from any Buyer worksite at any time at its sole discretion. In the event Exelon rejects any proposed Contractor Personnel or requests the removal of any Contractor Personnel from any Work and/or Exelon worksite Contractor shall promptly remove such Contractor Personnel from providing Work to Buyer and provide a suitable replacement that meets all requirements of the Contract Documents. In the event Buyer requires the removal of any Contractor Personnel, Contractor shall also ensure a prompt and smooth transition of all knowledge, information and data from such Contractor Personnel to his or her replacement. The rejection or removal of any Contractor Personnel shall not be deemed a request or demand by Buyer that Contractor (or its Subcontractor) suspend or terminate the employment of any Contractor Personnel.

22.4.6   In addition to any other audit rights under these Terms and Conditions, Contractor agrees that Buyer, or any of its authorized representatives acting on Buyer's behalf, may upon reasonable request, audit Contractor's files and records regarding the utilization of Contractor Personnel hereunder, including, without limitation all TPPA's, personnel, employment eligibility verification, background investigations, and wage and hour records. This section shall survive termination of these Terms and Conditions, and any Purchase Order issued hereunder, for a period of six (6) years. Contractor shall promptly remedy any violation and shall certify the same to Buyer in writing. The fact that Buyer inspects, or fails to inspect, or has the right to inspect, Contractor's books and records shall not relieve Contractor of its responsibility to comply with the terms of these Terms and Conditions and with such laws, nor shall Buyer's: (i) failure to detect or (ii) detection, but failure to notify Contractor or require Contractor's remediation of any unsatisfactory practices constitute acceptance of such practice or a waiver of Buyer's enforcement rights under these Terms and Conditions.

22.4.7   At Buyer's request, Contractor agrees to participate in Buyer-provided training regarding Buyer rules, policies, and requirements. Contractor shall not charge Buyer for such training time, provided Buyer pays for the training course(s).

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## 22.5    Background Investigation.

22.5.1    Contractor will be required to conduct background investigations in accordance with this Section ("Investigation") for any Contractor Personnel who will (1) have access to any Buyer or its Affiliates' assets, including buildings, properties, computer systems, trade secrets, confidential data and/or employee or customer information, and/or (2) have contact with any Buyer or its Affiliates' customers. Such Investigations must be completed for each Contractor Personnel prior to the first day upon which such Contractor Personnel begins to provide the Services.  The purpose of the background investigation is to ensure application of an appropriate level of security to Contractor Personnel who may affect the reliability, safety and integrity of Buyer's business and assets.  At a minimum, the Investigation must include the items set forth in Exhibit F.

Contractor is responsible for initiating, evaluating and completing all background investigations in accordance with the Fair Credit Reporting Act and any applicable Laws.

22.5.2    Additionally, any Contractor Personnel who will have access to Personal Information, as defined below, of an employee of Buyer or of a customer of Buyer; trade secrets related to business strategy or business plans; or non-public financial information related to the Buyer's financial or strategic direction will be required to have a credit check. Any requirement for a Contractor Personnel to have a credit check as set forth in this Section 22.5.2 will be addressed in the applicable Purchase Order between the Parties.

"Personal Information," as used in this Section 22.5, is defined as information about a person that could be used to distinguish, trace or assume the identity of a person and includes any combination of the employee of Buyer's or customer of Buyer's first name and last name or first name initial and last name with any one of the following identifiers: social security number, date of birth, driver's license or state ID number, place of birth, mother's maiden name, or biometric records).

22.5.3    The Investigation shall be a minimum requirement, and some Buyer business units or departments may have more stringent background investigation requirements for particular roles as permitted or required by applicable Law, including: (1) license or professional certification verifications; (2) physical and psychological examinations, including random drug testing; (3) education verifications; and/or (4) driver's license/MVR check. Any requirement to have the additional background investigation set forth under paragraph (c) will be addressed in the applicable Statement of Work between the parties.

22.5.4    Contractor shall not permit any Contractor Personnel to perform the Services hereunder if a background investigation shows any items that would likely have a negative impact upon the Services. For each Contractor Personnel, Contractor will submit a written background investigation certification (letter or affidavit) confirming that the Investigation has been conducted in accordance with the requirements of this Section and that no material items were discovered in the Contractor Personnel's Investigation which would impact performance of the Services to Buyer. In all situations, Contractor will evaluate the eligibility of all Contractor Personnel in accordance with all applicable Laws, including but not limited to federal guidance related to the use of criminal records issued by the Equal Employment Opportunity Commission and the Office of Federal Contract Compliance Programs. An individual with a history of one or more convictions of a crime may be deemed to pose an unacceptable safety or security risk to Contractor or Buyer or its Affiliates and therefore may be removed from further consideration for the position in question. At a minimum, Contractor will consider the nature and gravity of the offense or conduct; the nature of the duties of the job the individual would be assigned; the number of offenses for which the individual was convicted; the age of the individual at the time of conviction, or release from incarceration; evidence that the individual has performed the same type of work, post conviction, with no known incidents of criminal conduct; the length and consistency of employment history before and after the offense or conduct; rehabilitation efforts, e.g., education/training; employment or character references; whether the individual is bonded under a federal, state, or local bonding program and any other information regarding fitness for the particular position. At all

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

times, the guiding principle shall be whether *this particular applicant/employee* based on all of the factors set out above, presents an unacceptable safety or security risk. Contractors shall not consider arrests that do not result in findings of guilt unless Contractor has evidence that the individual has engaged in the conduct for which he or she was arrested. Similarly, where a credit report is required, Contractor shall make an individualized assessment whether *this particular applicant/employee* represents an unacceptable safety or security risk. Applicants shall not be rejected based merely on evidence that, through no fault of their own, they have been unable to pay their bills.

22.5.5   If required by Buyer, Contractor will provide a photograph of each Contractor Personnel to Buyer prior to the start of the Services onsite meeting the requirements set forth in Exhibit F.

22.5.6   Contractor shall immediately notify Buyer in writing when any Contractor Personnel: (i) no longer requires access to Buyer's or its Affiliates' assets, (ii) a Contractor Personnel is terminated or his or her employment is otherwise ended, or (iii) the Services are either completed or terminated, so that Buyer can discontinue access for such Contractor Personnel. Contractor shall immediately notify Buyer to terminate access to Sites for any Contractor Personnel that is: (i) suspended or terminated from employment for cause, or (ii) that Contractor reasonably believes may pose a threat to the safe working environment at or to any Site, including to employees, customers, buildings, assets, computer systems, trade secrets, confidential data, and/or employee or customer information and Contractor shall take all steps reasonably necessary to immediately deny such Contractor Personnel access to the Site and its customers, and return to Buyer any Buyer-issued property including, but not limited to, Buyer photo ID badge, keys, parking pass, documents, or laptop in the possession of such Contractor Personnel.

22.5.7   Except for background investigations performed by Buyer, Contractor will be responsible for conducting the Investigation at its own expense and shall not be entitled to recover costs thereof unless both Parties agree, in writing, in advance of the background investigation.

22.5.8   Buyer may perform a background check on Contractor Personnel, at Buyer's expense, if Buyer determines that Contractor performs any work or Services relating to the Critical Cyber Assets of Company, and Contractor will fully cooperate with Buyer including but not limited to obtaining consent from such Contractor Personnel, Contractor agrees that Buyer may provide such information to NERC, FERC, or an entity with authority delegated from them in order for Buyer to demonstrate its compliance with all legal and regulatory requirements under the NERC Reliability Standard Requirements applicable to Critical Cyber Assets.

22.5.9   Buyer reserves the right to terminate the applicable Purchase Order(s) as set forth in Section18.1 herein in the event of failure to comply with the requirements set forth in this Section.

22.5.10 Buyer shall have the right to audit Contractor's compliance with the requirements of this Section at any time and from time to time upon reasonable notice. Contractor shall fully and promptly comply with such audit by Buyer or any Governmental Authority, and shall provide written evidence of its compliance with the terms herein.

22.6   **Key Personnel.**

The Purchase Order shall designate any Contractor Personnel assigned to perform Work under a Purchase Order as Key Personnel. Contractor shall take reasonable steps to ensure Key Personnel will remain available to perform the Work until Final Completion. Should Key Personnel become unavailable to perform the Work assigned to them, for any reason, and Contractor cannot provide an equally qualified replacement acceptable to the Buyer, Buyer reserves the right to terminate these Terms and Conditions for Cause as set forth in Section18.1 herein.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## ARTICLE 23.
## SUBCONTRACTUAL RELATIONS

**23.1    Subcontractual Relations.**

Subject to these Terms and Conditions, Contractor may employ Subcontractors in connection with the Work only upon prior written approval by Buyer. Buyer may withhold any such permission in its sole discretion and, in any event, if the Subcontract does not provide to Buyer's satisfaction for the confidentiality of the Confidential Information and the assignment to Contractor or Buyer of all rights in the Work.

**23.2    Subcontracts.**

Any portion of the Work to be performed for Contractor by a Subcontractor shall be performed pursuant to an appropriate written subcontract between Contractor and the Subcontractor ("Subcontract"). Any such agreement shall identify Buyer by name as a "third party beneficiary." No Subcontract shall relieve Contractor of its obligations under the Contract Documents.

**23.3    Assignment of Subcontracts.**

Each Subcontract shall provide for the assignment of the Subcontract to Buyer at Buyer's election upon termination of these Terms and Conditions or a Purchase Order by Buyer. Such assignment shall provide that if Buyer fulfills Contractor's obligations to Subcontractor, then Subcontractor will perform the Subcontract on behalf of Buyer, its successors and assigns.

**23.4    Contractor's Payments to Subcontractors.**

Contractor shall pay each Subcontractor promptly in accordance with the terms of the Subcontract. Buyer has no obligation to pay Subcontractors or to ensure Contractor pays Subcontractors.

**23.5    Disputes with Subcontractors.**

Contractor shall inform Buyer of any material dispute arising between Contractor and any of its Subcontractors or between any Subcontractor and another Subcontractor that could affect the performance of the Work. Contractor shall use its best efforts to avoid disputes regarding the Work and shall resolve such disputes as they arise. Contractor shall comply with Article 21 regarding any Subcontractor labor disputes.

**23.6    Compliance with Laws and Buyer Policies and Procedures.**

Contractor shall cause any and all of its Subcontractors to comply with all applicable Laws and Buyer's Policies and Procedures in the performance of the Work hereunder.

## ARTICLE 24.
## SAFETY, SECURITY AND ENVIRONMENTAL
## REQUIREMENTS; COMPLIANCE WITH LAWS

**24.1    Acknowledgement of Hazardous Conditions and Applicable Laws.**

Contractor represents and warrants that it understands and acknowledges that the Work performed hereunder may involve Hazardous Substances and Health and Safety Laws and Environmental Laws related thereto. Contractor understands the potential risks to persons, property and the environment associated with the Work and Contractor knowingly and voluntarily assumes all risk of injury and damage to Contractor,

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

Contractor Personnel and property caused by exposure to such Hazardous Substances while at the Site. Contractor agrees to advise fully all of its Subcontractors, Contractor Personnel and others working at the Site, of the risks and all necessary environmental, safety, and health procedures required by Governmental Authorities. Contractor shall perform the Work in such a manner as to ensure that all potentially Hazardous Substances will be removed and/or treated in such a manner which causes no contamination of the Site at which the Work is performed, endangers none of the workers performing the Work, and creates no short or long term threat to the health of other persons or the environment. Further, Contractor shall continuously inspect the Work to identify any unsafe conditions and shall promptly take action to correct any condition which presents such a risk. Contractor warrants that it is technically, physically, financially, and legally ready, willing, and able to perform the Work hereunder and that it is familiar with and knowledgeable about the applicable Health and Safety Laws and Environmental Laws to the extent necessary to carry out its duties in a professional, complete and competent manner.

**24.2    Safety.**

24.2.1    If Contractor has been designated by Buyer as a Designated Safety Contractor, then Contractor shall comply with the Buyer Safety Policy training requirements as provided to Contractor by Buyer.

24.2.2    Contractor shall be responsible for safety with respect to Contractor's Work at the Site and shall initiate and maintain an overall safety program (the "Contractor's Safety Program"). In order to protect persons and property from damage, injury, or loss, Contractor shall comply with, and cause all Contractor Personnel performing any portion of the Work to comply with, all applicable Safety Laws, or Buyer's safety requirements, whichever is more stringent. Contractor shall review and monitor the safety programs of Subcontractors to confirm that such safety programs are consistent with Contractor's Safety Program. Buyer shall not be in charge of, or in any way responsible for Contractor's Safety Program. Contractor shall promptly notify Buyer, in writing, of any material changes in Contractor's Safety Program or if Contractor discovers any conflicts between Buyer's and and any applicable safety laws and safety requirements. Contractor shall be responsible for all fines or penalties assessed due to Contractor's failure to comply with applicable Health and Safety Laws and Environmental Laws, including any fines or penalties assessed against Buyer. Contractor shall indemnify and hold Buyer Parties harmless from any claim, liability, loss, or expense (including reasonable attorneys' fees and court costs) resulting from Contractor's failure (or that of its Subcontractors or Contractor Personnel) to comply with applicable Health and Safety Laws and Environmental Laws. Contractor's duties and responsibilities for ensuring safety and protection of the Work shall continue until such time as all the Work, including warranty Work after final payment, is completed.

24.2.3    Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury, or loss to: (i) All Contractor Personnel on the Site and all other persons who may be affected thereby; (ii) the Work and all Material to be incorporated therein, whether in storage on or off the Site, under the care, custody, or control of Contractor or any of its Subcontractors; and (iii) other property at the Site or adjacent thereto, including Buyer's existing facility (if any).

24.2.4    Contractor shall erect and maintain, as required by existing conditions and progress of the Work, all necessary or appropriate safeguards for safety and protection, including posting danger signs and other warnings against hazards and notifying owners and users of adjacent utilities.

24.2.5    Contractor shall notify owners of adjacent property and of underground facilities and utility owners when prosecution of the Work may affect them, and shall cooperate with them in the protection, removal, relocation, and replacement of their property.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

24.2.6   Contractor shall designate a responsible member of its organization at each Site whose duty shall include enforcement of Contractor's Safety Program. This person shall be Contractor's Designated Representative unless otherwise designated by Contractor in writing to Buyer.

24.2.7   Contractor shall notify Buyer and post appropriate signs when the Work is going to affect Buyer's operations or employees.

**24.3   Security.**

24.3.1   Contractor shall inform Contractor Personnel of, and enforce their compliance with, all applicable Laws and Buyer Policies and Procedures pertaining to access to, and security of, the Site which Contractor and Subcontractor Personnel may have occasion to visit. Site-specific requirements will be identified in the Contract Documents. Contractor shall use its best efforts to ensure that Contractor and Subcontractor Personnel do not pose a threat to the safe working environment at any Buyer Site or the integrity of Buyer's business operations.

24.3.2   Contractor shall take precautions acceptable to Buyer to keep all portions of the Work and the Site secure in every material respect, decrease the likelihood of accidents from any cause, and avoid vandalism and other contingencies which are liable to delay the Work or give rise to any claims or liabilities. Contractor shall furnish and install all necessary equipment to provide safe means of access to all locations where Work is being performed. Contractor is responsible for receiving, storing, and securing all materials necessary to complete the Work that are delivered to the Site.

**24.4   Reports of Accidents.**

Contractor shall report promptly to Buyer any accident or unusual occurrence during performance of the Work, including personal injury or death to any employee or any member of the public, or any damage to any of Buyer's property, the Site, or adjacent property. Reports of personal injury or death to any person shall be made verbally within three (3) hours to Buyer's Designated Representative. Contractor shall submit a copy of all accident reports to Buyer's Designated Representative within twenty-four (24) hours after an accident. Upon discovery of the occurrence of any event that may constitute an emergency situation or an immediate endangerment to public health, welfare, or the environment, Contractor shall immediately verbally notify all parties required by Health and Safety Laws and Environmental Laws, including the National Response Center, and shall also immediately notify (but in any event no later than eight (8) hours after discovery of the event) Buyer's Designated Representative. In the event Buyer's Designated Representative is unavailable, and in any event, Contractor shall provide written notice to Buyer to be received no later than twenty-four (24) hours after the occurrence or discovery of the event. The written notice shall include a detailed description of the event, including the time and location at which the event occurred or was discovered, and any known causes of the event, any actions taken, or to be taken, to stop or mitigate the event.

**24.5   Environmental Requirements.**

24.5.1   All notifications regarding environmental requirements should be sent immediately to Buyer's Designated Representative.

24.5.2   If Contractor has been designated by Buyer as a Designated Environmental Contractor, then Contractor shall comply with the Buyer Environment Policy training requirements as provided to Contractor by Buyer.

24.5.3   Contractor shall furnish Buyer a complete list of all Hazardous Substances and all petroleum products, whether or not excluded from the definition of Hazardous Substances in CERCLA, contained in the

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

Material brought onto the Site in connection with the Work and the amounts thereof. To the extent applicable, for all such Hazardous Substances, Contractor shall supply Buyer with warning labels and instructional material appropriate to warn persons coming in contact therewith of the hazard and its effects. Contractor shall, when available, recommend use of alternative non-hazardous and recycled/recyclable materials.

24.5.4   In the event that Contractor or others performing any portion of the Work encounter in the soil, air, or water at the Site, materials reasonably believed to be or contain Hazardous Substances., including those wastes and substances which are brought to the Site by Contractor, in levels in excess of any applicable standards set forth under any Health and Safety Laws or Environmental Laws, Contractor shall immediately stop the Work in the area affected and report the condition to Buyer's Designated Representative and confirm such report within twenty-four (24) hours in writing. Contractor shall take appropriate actions to prevent or contain the release, movement, spread, or disturbance of such Hazardous Substances and to protect persons and property and shall notify Buyer immediately of such actions.

24.5.5   Contractor shall not bring, nor permit Subcontractors, or others performing the Work to bring onto the Site any Hazardous Substances except as specified in, or permitted by, the Contract Documents. If the Work requires the transfer to Buyer by Contractor of any chemical substance or mixture. or any material which may generate or release a chemical substance or hazardous material, Contractor shall provide, before or with each such transfer, a Material Safety Data Sheet (OSHA Form 20 or equivalent ("MSDS")) and container labels, which include current, accurate, and complete information relating to product hazards and precautions for safe use. Should Hazardous Substances be specified in the Contract Documents, a copy of the MSDS must remain with the material at the Site for the duration of the Work. Any excess or surplus Hazardous Substances which Contractor or a Subcontractor brings to the Site shall be disposed of as soon as possible by Contractor in accordance with all applicable Health and Safety Laws and Environmental Laws and the requirements of the Contract Documents. Contractor shall take precautions to prevent accidental releases or spills of material, including chemicals, petroleum products, gases, and litter. Contractor shall report promptly to Buyer's Designated Representative any spills or releases of any Hazardous Substances or Hazardous Substances and any petroleum products.

24.5.6   All Hazardous Substances which must be disposed of or treated, stored, or removed from the Site, shall be collected, handled, transported, treated, stored, disposed of, or otherwise remediated in accordance with all Health and Safety Laws and Environmental Laws and the Contract Documents and procedures approved in advance by Buyer and delivered to a disposal site or other facility, acceptable to Buyer, at Buyer's sole discretion. In the event that the Hazardous Substances existed at the Site prior to the commencement of the Work, and unless Buyer has retained Contractor to perform as the Work the collection, handling, transportation, treatment , storage and disposal of such Hazardous Substances, Buyer shall be responsible for arranging for the collection, handling, transportation, treatment, storage, and disposal of such Hazardous Substances in accordance with Buyer's procedures and the Law. In the event that Buyer has retained Contractor to collect, handle, transport, treat, store, and dispose of such Hazardous Substances as the Work. or in the event that the Hazardous Substances were introduced at the Site by Contractor, Subcontractors. or any other person or entity performing any portion of the Work, Contractor shall collect, handle, transport, treat, store, and dispose of such Hazardous Substances in accordance with such Buyer procedures and Health and Safety Laws and Environmental Laws. Contractor shall perform the Work to minimize improper activities by Subcontractors, and any other person performing any portion of the Work, in connection with any Hazardous Substances. Contractor shall coordinate the Work with the entities that collect, handle, transport, treat, store, and dispose of such Hazardous Substances. Copies of all waste manifests for waste to be disposed of by Contractor shall be furnished to Buyer.

24.5.7   Contractor shall not under any circumstances apply to, or enter into negotiations with. any Governmental Authority for acceptance of variations from or revisions to  Health and Safety Laws or

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

Environmental Laws relating to these Terms and Conditions or a Purchase Order or to the performance thereof, without Buyer's prior written consent.

**24.6    Compliance Audits.**

Buyer shall have the right to audit Contractor's compliance with the requirements of this Article at any time and from time to time upon reasonable notice. Contractor shall fully and promptly comply with such audit by Buyer or any Governmental Authority, and shall provide written evidence of its compliance with the terms herein.

**24.7    Site Control.**

Buyer may immediately stop Work and/or remove, and deny access to the Site, incluidng any Exelon Generating Site, to any person for whom Contractor is responsible under the Contract Documents and who is suspected by Buyer of: (i) committing a criminal offense; (ii) violating the Site-specific safety and security policies, practices and procedures, including the Safety Program and policies adopted by Contractor; or (iii) otherwise posing a threat to the safety and security of the Site or other Buyer facility.

## ARTICLE 25.   WASTE MATERIALS ASSOCIATED WITH WORK

**25.1    Disposal Facilities.**

Contractor shall handle any waste materials generated in the performance of the Work in full compliance with all applicable Health and Safety Laws and Environmental Laws and all Buyer policies and procedures. Contractor shall use only disposal facilities which have proper permits and are in full compliance with all Health and Safety Laws and Environmental Laws. Contractor shall promptly notify Buyer in the event any disposal facility being used by Contractor loses its permitted status during the term of these Terms and Conditions, and Contractor will immediately discontinue use of the facility for the disposal of such waste. Buyer has the right to reject, for any reason, Contractor's use of any particular disposal facility.

**25.2    Environmental Records/Waste Manifests.**

Contractor shall only transport waste materials from the Site to an off-site facility (or facilities) for treatment and/or disposal which has been issued, at the time of treatment and/or disposal of waste materials from the Site, all permits, licenses, certificates, or approvals, required by valid and applicable statutes, ordinances, orders, rules, and regulations of the federal, state and local governments in which such facility is located, necessary to allow such facility to accept, store, treat, process, and dispose of the waste materials in question. Contractor shall handle and preserve all waste material samples, cuttings, and Hazardous Substances taken for analysis or other like reasons in a manner consistent with the level of care and skill exercised by other contractors under similar circumstances at the time the samples are obtained.

**25.3    Hazardous Substance Vendors.**

Contractor shall prepare contingency plans and obtain satisfactory vendors to handle, treat, and/or dispose of Hazardous Substances encountered during the Work when such Hazardous Substances are required by applicable Health and Safety Laws and Environmental Laws and the Contract Documents to be handled, treated, and/or disposed off-site. Contractor shall submit for Buyer's approval the names and qualifications of proposed vendors in such form as Buyer may reasonably request.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

**25.4     Use of Laboratories.**

Unless otherwise required by Buyer, Contractor shall use only certified laboratory technicians and laboratories accredited by the American Industrial Hygiene Association in performing all laboratory Work required pursuant to the Contract Documents.

**25.5     Recycling Material.**

Contractor shall inform Buyer's Designated Representative of programs that Contractor provides for reusing and/or recycling Material, including waste from packaging and containers, used chemicals and equipment. Buyer, at its sole discretion, may direct Contractor to take back used material, packaging, and/or containers for reuse or recycling, in accordance with such Contractor's program. Any cost adjustments associated with the reuse or recycling of Material shall be identified in the Purchase Order.

## ARTICLE 26.  AGENCY PROVISION FOR MANIFESTS

**26.1     Agency.**

Except as Buyer may instruct Contractor in writing to the contrary and subject to the provisions of Section 26.2.2, Contractor has specific written authority to act on Buyer's behalf with respect to waste manifests, as those manifests may be necessary to transport or dispose of waste materials at or from the Site. The authority granted herein shall be solely for the purposes of signing industrial or Hazardous Substance manifests required by Governmental Authorities for materials resulting from the Work at the Site during the term of these Terms and Conditions. Contractor shall sign each such manifest as "the agent of [Buyer's Legal Name]." No other agency relationship shall be created by these Terms and Conditions.

**26.2     Generator Identification.**

26.2.1   Subject to the provisions of Section 26.2.2, Buyer agrees that any waste manifest that Contractor is authorized hereunder to sign will utilize Buyer's U.S. Environmental Protection Agency ("EPA") Generator Identification Number, if required.

26.2.2   Contractor agrees to use its own EPA Generator Identification Number, if required, for any waste manifest involving the removal of Hazardous Substances introduced at the Site by Contractor.

**26.3     No CERCLA Liability.**

Subject to the provisions of Section 26.2.2, each of the Parties agrees that the agency relationship created under this Article 26 does not constitute an agreement to arrange for transport, treatment, or disposal of Hazardous Substances under Section 107 of CERCLA, or any state analog thereof, as amended.

**26.4     Limited Indemnity.**

Subject to the provisions of Section 26.2.2, with the exception of Contractor's gross negligence or willful misconduct, for purposes of this Article 26 only and without modifying Contractor's indemnity obligations under these Terms and Conditions, Buyer shall defend and indemnify Contractor against and for any claim based upon CERCLA or any state analog thereof to the extent arising from Contractor's signing, within the scope and authority of this Article 26, of waste manifests on behalf of Buyer, which obligation shall survive the termination of these Terms and Conditions.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## ARTICLE 27.
## WORK PRODUCT

The Work Product shall be the sole and exclusive property of Buyer. Contractor agrees to disclose to Buyer the existence of any Work Product of which Buyer would not otherwise be aware promptly upon its creation. Contractor agrees to assign and hereby does assign to Buyer the sole and exclusive right, title and interest in all Work Product. Contractor shall execute and deliver to Buyer, and shall cause Contractor Personnel to execute and deliver to Buyer, any and all documents that Buyer may reasonably request to convey to Buyer any interest Contractor or Contractor Personnel may have in any Work Product, or that are otherwise necessary to protect and perfect Buyer's interest in such Work Product. Contractor shall take and cause its Subcontractors and Contractor Personnel to take such other actions as Buyer may reasonably request to perfect and protect Buyer's interest in any Work Product. Contractor shall be compensated at the hourly rate last in effect between the Parties for any time expended in connection with assistance rendered by its personnel under this Section 27.1.

## ARTICLE 28.
## CONFIDENTIAL INFORMATION

### 28.1    Definition.

The term "Confidential Information" shall mean all information  marked or identified as "confidential," "proprietary," or with words of similar import, and all information which relate to past, present, and future research, development, and business activities of Buyer and its Affiliates, including inventions, discoveries, formulas, processes, devices, methods, compositions, compilations, system plans, flow charts, source codes, algorithms, procedures, data and other proprietary information of Buyer, regardless of the form or medium contained or stored in (including hard copy, electronic, or digital form).  Such Confidential Information shall include any such information not generally known by the trade or public, even though such information has been disclosed to one or more third parties pursuant to confidentiality agreements, disclosure agreements or other agreements or collaborations entered into by Buyer. Confidential Information shall also mean any information owned in whole or in part by Contractor or a third party that has been entrusted to Buyer by Contractor or a third party under obligations of confidentiality.

### 28.2    Exclusions.

Confidential Information shall not include:

28.2.1   Information lawfully known to Contractor prior to the performance of such Work other than through other work with or for Buyer or its Affiliates; or

28.2.2   Information that is publicly disclosed through no act of Contractor, Subcontractors or any of the Contractor Personnel, either prior or subsequent to Buyer's disclosures of such information to Contractor.

Information shall not be deemed to fall within these exclusions merely because it is included with information that does fall within such exceptions.

### 28.3    Contractor's Obligations.

During the term of these Terms and Conditions and thereafter, except as Buyer may authorize in writing, Contractor shall and shall cause its Subcontractors and Contractor Personnel to:

28.3.1   treat and cause to be treated as confidential all Confidential Information;

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

    28.3.2 use Confidential Information only in connection with the performance of Work pursuant to these Terms and Conditions or the Purchase Order;

    28.3.3 make copies of any tangible embodiment of Confidential Information only as necessary for the performance of such Work;

    28.3.4 remove any tangible embodiment of Confidential Information from the Site only with the express written permission of Buyer; and

    28.3.5 return any and all tangible embodiments of Confidential Information to Buyer promptly following the request of Buyer, and in any event upon completion of Work pursuant to these Terms and Conditions or the Purchase Order.

**28.4 Disclosure Pursuant to Order of Governmental Authority.**

    Notwithstanding the foregoing, Contractor may disclose Confidential Information to the extent that disclosure is ordered by a Governmental Authority of competent jurisdiction, provided that Contractor shall provide notice to Buyer of the order for such disclosure promptly upon receiving it and that Contractor shall fully cooperate with Buyer in any effort by Buyer to seek reconsideration or appeal of such order, or to secure a protective order governing such disclosure.

**28.5 Irreparable Harm.**

    Contractor acknowledges that the breach of any of the covenants contained in this <u>Article 28</u> will result in irreparable harm and continuing damages to Buyer and Buyer's business, and that Buyer's remedy at law for any such breach or threatened breach would be inadequate. Accordingly, in addition to such remedies as may be available to Buyer at law or in equity in the event of any such breach, any court of competent jurisdiction may issue an injunction (both preliminary and permanent), without bond, enjoining and restricting the breach or threatened breach of any such covenant, including an injunction restraining Contractor from disclosing, in whole or in part, any Confidential Information. Contractor shall pay all of Buyer's costs and expenses, including advance of reasonable attorneys' fees, accountants' fees, and other costs incurred in enforcing such covenants.

**28.6 Buyer's Obligations.**

    Buyer shall restrict access to Confidential Information to Buyer Personnel who have a need to know the Confidential Information in connection with the Work ("Reviewing Representatives"). Buyer shall take commercially reasonable steps to safeguard Confidential Information and prevent its inadvertent disclosure to unauthorized persons.

**28.7 Personally Identifiable Information**

    If Contractor will have access to personal identifable information of any type or kind of any Buyer customer or employee, then Buyer's ***Special Terms and Conditions for Personally Identifiable Information*** shall be incorporated into these Terms And Conditions to afford additional protections for such information.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## ARTICLE 29.
## DISPUTE RESOLUTION

29.1    **Step Negotiations.**

The Parties shall attempt in good faith to resolve all disputes under the Contract Documents ("Disputes") promptly by negotiation as follows. Any Party may give the other Party written notice of any Dispute not resolved in the normal course of business. Executives of both Parties at levels one level above the individuals who have previously been principally involved in the Dispute shall meet at a mutually acceptable time and place within ten (10) days after delivery of such notice, and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the Dispute. If the matter has not been resolved within thirty (30) days from the referral of the Dispute to senior executives or if no meeting of senior executives has taken place within fifteen (15) days after such referral, either Party may initiate such legal action as it deems appropriate. If a negotiator intends to be accompanied at a meeting by an attorney, the other negotiator shall be given at least three (3) Days notice of such intention and may also be accompanied by an attorney. All negotiations pursuant to this Section 29.1 are confidential and protected from subsequent testimonial disclosures, and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

29.2    **Work to Continue.**

In the case of any Dispute, Contractor shall continue to perform the Work pending final determination of the Dispute, and Buyer shall continue to make payments to Contractor in accordance with the Contract Documents for those portions of the Work completed that are not the subject of Dispute.

29.3    **Waiver of Jury Trial.**

EACH PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THESE TERMS AND CONDITIONS.

## ARTICLE 30.
## MISCELLANEOUS

30.1    **Complete Agreement.**

The Purchase Order, these Terms and Conditions, any Change Orders, and any other Contract Documents specifically referenced in any of the foregoing sets forth the entire contract of the Parties, and supersedes any and all prior agreements, arrangements, or understandings, relating to the subject matter hereof.

30.2    **Notices.**

Any notice pertaining to the Work performed or a Purchase Order shall be in writing (unless in an emergency and then promptly thereafter in writing) and sent via facsimile transmittal, registered or certified mail (postage prepaid), or by commercial overnight courier, to Buyer's Designated Representative or Contractor's Designated Representative as appropriate, at their respective addresses appearing in the Purchase Order, or if no Purchase Order has been issued, to the party designated in these Terms and Conditions. Notices shall be effective only when received.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

30.3    **Captions.**

Captions used herein and in the attached Exhibit(s) and Schedule(s) and the other Contract Documents, are for the convenience of the Parties and shall not be used in construing the meaning of these Terms and Conditions.

30.4    **Execution; Counterparts.**

The execution, delivery and performance by the Parties of these Terms and Conditions and the transactions contemplated hereby have been duly authorized by all necessary corporate actions of the Parties. These Terms and Conditions may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same Agreement, and it shall not be necessary in making proof of these Terms and Conditions to produce or account for more than one such fully executed counterpart.

30.5    **Survivability.**

The provisions of the Contract Documents, and rights and obligations therein and in these Terms and Conditions, including with respect to indemnification, limits of liability, intellectual property and confidentiality, shall survive expiration (by performance) or termination of these Terms and Conditions or a Purchase Order and shall survive indefinitely, except to the extent that such provision by its express terms ends sooner.

30.6    **No Third-Party Beneficiaries.**

No provision of these Terms and Conditions is intended or shall be construed to be for the benefit of any third party (other than Buyer Parties in connection with Contractor's indemnification obligations hereunder and a joint owner of a plant or facility, whether as a tenant-in-common or otherwise, for which the Work is intended).

30.7    **Publicity.**

With the sole exception of publication of such information within Contractor's corporate entity and subject to the Confidentiality provisions of these Terms and Conditions, Contractor shall not refer to Buyer or any company affiliated with Buyer in any advertising or other publication in connection with Work performed by Contractor, without the prior written approval of Buyer. Contractor shall not, either directly or indirectly, publish or disclose any photographs, images, logos, copyrighted or trademark protected information of Buyer, Affiliates or their subsidiaries; or use such Information for the benefit of itself or any other person without the prior written consent of Buyer.

30.8    **Assignment.**

Subject to the provisions of these Terms and Conditions, Contractor shall not assign its interest (including any interest in or claim to monies owed) in these Terms and Conditions or a Purchase Order, or delegate any obligation under these Terms and Conditions or a Purchase Order, without the prior written consent of Buyer. An assignment shall include any transfer of a majority interest in Contractor by merger or otherwise. Any attempted assignment or delegation by Contractor shall be wholly void and totally ineffective for all purposes. No assignment or delegation made by Contractor with the consent of Buyer shall relieve Contractor of any of its obligations under these Terms and Conditions or the other Contract Documents. Buyer reserves the right, without the consent of Contractor, to assign these Terms and Conditions or any Purchase Order, in whole or in part, to a third party to be selected by Buyer.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

30. 9    **Choice of Law; Interpretation; Severability.**

The Contract Documents shall be construed and interpreted, without giving effect to principles of conflict of law, in accordance with the laws of the Commonwealth of Pennsylvania unless: (i) Commonwealth Edison Company is the contracting Party under the Purchase Order giving rise to the claim, in which case these Terms and Conditions, as it relates to that Purchase Order, shall be construed and interpreted in accordance with the laws of the State of Illinois, (ii) Baltimore Gas and Electric Company is the contracting Party under the Purchase Order giving rise to the claim, in which case these Terms and Conditions, as it relates to that Purchase Order, shall be construed and interpreted in accordance with the laws of the State of Maryland; (iv) Constellation Energy Nuclear Group, Inc., or one of its subsidiaries is the contracting Party under the Purchase Order giving rise to the claim, in which case these Terms and Conditions, as it relates to that Purchase Order, shall be construed and interpreted in accordance with the laws of the State of Maryland, or (iv) the Work involves construction, in which case these Terms and Conditions shall be construed in accordance with the laws of the state where the Site is located. The provisions of these Terms and Conditions, as it relates to that Work, shall be interpreted where possible in a manner to sustain their legality and enforceability. The unenforceability of any provision of these Terms and Conditions in a specific situation shall not affect the enforceability of that provision in another situation or the remaining provisions of these Terms and Conditions. Unless the context of the Contract Documents clearly requires otherwise, (i) "including" and "include" have the inclusive meaning frequently identified with the phrase "but not limited to" and (ii) references to the plural include the singular, the singular the plural, the part, the whole.

30.10    **Amendments.**

The terms of these Terms and Conditions shall be modified only by a written amendment. An amendment is a written document signed by an authorized representative of each party, which authorizes a change in these Terms and Conditions. No purported oral modification, waiver, or rescission of these Terms and Conditions by an employee or agent of Buyer shall operate as a modification, waiver, or rescission of any of the provisions of these Terms and Conditions. No course of prior dealing, usage of trade and course of performance shall be used to modify, supplement, or explain any terms of these Terms and Conditions. No waiver of any provision of these Terms and Conditions shall be binding on Buyer unless set forth in a writing signed by an authorized agent of Buyer. No Affiliate shall be bound by an amendment executed by any other Affiliate.

30.11    **Bankruptcy or Insolvency.**

Contractor shall promptly notify Buyer in writing of the filing of any voluntary or involuntary petition for bankruptcy and/or of any insolvency of Contractor or any of its Subcontractors. No Purchase Order shall be deemed an asset of Contractor.

30.12    **Audit.**

Purchase Orders, all payments received pursuant to such Purchase Orders, and Contractor's Work and workplace area and related offices shall be subject to audit and inspection by Buyer or any of its authorized representatives acting on Buyer's behalf. Contractor shall comply with all reasonable requests by Buyer to make available books and records necessary to substantiate Contractor's charges and invoices for reimbursement. Such records shall include, without limitation hereby: all invoices billed to Buyer; payroll records, timesheets and canceled payroll checks; third party invoices for purchases; paid invoices and canceled checks for purchased materials, subcontractor and third party charges; records relating to air freight and ground transportation. Contractor shall also include in all Subcontracts issued in conjunction with any Purchase Order the right of Contractor and/or Buyer to audit the records of the Subcontractor. This Section 30.12 shall survive termination of the Purchase Order for a period of two (2 )years, or the warranty

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

period, whichever is longer. Additionally, an audit may be conducted on any other records, such as environmental, safety, security, background examinations, or such other records as are necessary to ensure compliance with the Contract Documents and applicable Laws. The Parties agree that each shall bear its own internal and external costs incurred in conducting and supporting the audit process, except that all Contractor documents to be reviewed by Buyer will be copied by Buyer or Contractor at Contractor's expense. Notwithstanding the foregoing, in the event that the Buyer audit indicates any willful misconduct or gross negligence on the part of the Contractor, Contractor shall reimburse Buyer for all costs associated with the audit.

**30.13    Non-Waiver.**

The failure of Buyer to insist upon strict performance by Contractor or Buyer's failure or delay in exercising any rights or remedies provided in the Contract Documents or by law shall not be deemed or construed as a waiver of any claims. No waiver by Buyer of a breach of any provision of the Contract Documents shall constitute or be construed as a waiver of any other breach or of that provision. No payment or certificate, final or otherwise, nor the acceptance of any design, shall be construed as (1) an acceptance of defective Work, (2) relieving Contractor of its obligations to make good any defects or consequences for which Contractor may be responsible, or (iii) a waiver of any obligations of Contractor under these Terms and Conditions.

**30.14    Cumulative Remedies.**

Each of Buyer's rights and remedies under these Terms and Conditions shall be cumulative and additional to any other or further rights or remedies provided in Law or equity or otherwise. Buyer shall specifically retain all rights of legal action in tort under these Terms and Conditions on all issues relating to contribution, insurance coverage, and contractual indemnity.

**30.15    Domain Names.**

Contractor shall not, either directly or indirectly, claim, record, purchase or otherwise establish any right of ownership or interest in any domain name or other registry of any type or kind using, referencing or incorporating the name, logos or trademarks of Buyer, its Affiliates or their subsidiaries.

**30.16    Nondiscrimination and Affirmative Action.**

Contractor shall, unless exempt, comply with the federal regulations pertaining to nondiscrimination and affirmative action (generally part 60-1 of Title 41 of the Code of Federal Regulations), including the following: (i) Affirmative Action Compliance Program (41 CFR 60-1.40); (ii) Affirmative Action - Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250.4); (iii) Affirmative Action - Disabled Veterans, Recently Separated Veterans, Other Protected Veterans, and Armed Forces Service Medal Veterans (41 CFR 60-300.4) (iv) Affirmative Action - Handicapped Workers (41 CFR 60-741.4); (iv) Equal Opportunity (41 CFR 60-1.4); (v) Employer Information Report SF-100, annual filing (41 CFR 60-1.7); (vi) Fair Labor Standards Act of 1938, as amended; (vii) Prohibition of Segregated Facilities (41 CFR 60-1.8); (viii) Small Business Concerns, Small Disadvantaged Business Concerns, and Women Owned Business Concerns (48 CFR Chapter 1, Subpart 19.7); and (ix) union-related postings and contract clause requirements under Executive Order 13201 (29 CFR, part 470), Executive Order 13496, or other applicable Law. Contractor shall also comply, unless exempt, with any applicable state laws pertaining to nondiscrimination and affirmative action.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS  Exelon

Minority Business Enterprise Council - City of Philadelphia; Bureau of Contract Administration and Business Development - Commonwealth of Pennsylvania; Maryland/DC Minority Supplier Development Council; Maryland Department of Transportation; City of Baltimore, Maryland; Anne Arundel County, Maryland. Recognition for certifications held by any other Diversity Supplier accreditation organization must be submitted to Buyer's Diversity Manager for approval.

30.18  Employee Rights Notification.

Refer to 29 CFR Part 471 – Notification of Employee Rights Under Federal Labor Laws. During the term of these Terms and Conditions, Contractor agrees to post a notice, of such size and in such form, and containing such content as the Secretary of Labor shall prescribe, in conspicuous places in and about its plants and offices where Contractor Personnel covered by the National Labor Relations Act engage in activities relating to the performance of Work governed by these Terms and Conditions, including all places where notices to employees are customarily posted both physically and electronically. The notice shall include the information contained in the notice published by the Secretary of Labor in the Federal Register (Secretary's Notice" as set forth in 29 CFR Part 471, Appendix A to Subpart A).

IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to sign these Terms and Conditions effective as of the Date on the cover page.

Exelon Business Services Company, LLC

By: _____

Kelly L. Gaunce

Title: Senior Category Manager

Address for Notices issued pursuant to these Terms and Conditions or prior to the execution of a Purchase Order

J Lincoln Center, Oakbrook Terrace. IL 60181

Attn:

Facsimile No. _____-_____-_____


Pelco Structural, LLC

By: _____

Kasey Scott

Title: Vice President of Sales

Address for Notices issued pursuant to these Terms and Conditions or prior to the execution of a Purchase Order

1501 N. Industrial Blvd., Claremore, OK 74017

Attn:

Facsimile No. 918- 283-4005

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

3 Lincoln Center, Oakbrook Terrace, IL 60181                    _____

                                                               _____

Attn:                                                          Attn:

Facsimile No. _____-_____-_____                                Facsimile No. _____-_____-_____

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## EXHIBIT A - BUYER AFFILIATES*

Baltimore Gas and Electric Company ("BGE")

Calvert Cliffs Nuclear Power Plant, LLC ("CCNPP")

Commonwealth Edison Company

Constellation Energy Nuclear Group, LLC ("CENG")

Constellation Energy Resources, LLC and its subsidiaries

Constellation Energy Resources ("CER") – Quail Run Energy Partners LP

CER – Colorado Bend Energy Partners LP

Constellation Mystic Power, LLC

Constellation NewEnergy, Inc. and its subsidiaries ("CNE")

CNEGH Holdings, LLC and its subsidiaries ("CNEGH")

Constellation Power Source Generation, Inc. and its subsidiaries ("CPSGI")

Criterion Power Partners, LLC

Exelon Business Services Company, LLC

Exelon Generation Company, LLC and its subsidiaries

Exelon Transmission Company, LLC

Exelon Wind, LLC

Exelon Enterprises Company, LLC (and its subsidiaries)

Handsome Lake Energy, LLC

MXenergy Holdings, Inc. and its subsidiaries

Nine Mile Point Nuclear Station, LLC ("NMPNS")

PECO Energy Company

R.E. Ginna Nuclear Power Plant, LLC ("REGNPP")

* Including their subsidiaries.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## EXHIBIT B – BUYER POLICIES AND PROCEDURES

Contractor shall comply with, and ensure Contractor Personnel familiarized themselves and comply with, the following policies and procedures applicable to Exelon and its Affiliates as indicated below, in addition to such other Buyer Policies and Procedures as set out in the Contract Documents. THE FAILURE OF EXELON TO LIST ANY POLICIES AND PROCEDURES APPLICABLE TO THE PERFORMANCE OF THE WORK OR CONTRACTOR'S OBLIGATIONS UNDER THE CONTRACT DOCUMENTS IN THIS EXHIBIT SHALL NOT EXCUSE CONTRACTOR FROM ITS OBLIGATIONS UNDER ARTICLE 3 OF THESE TERMS AND CONDITIONS.

**Exelon and All Affiliates (except for CENG, CCNPP, NMPNS, and REGNPP)**

- Exelon Code of Business Conduct (available at http://media.corporate-ir.net/media_files/irol/12/124298/corpgov/exc_codebusconduct_061013.pdf or in booklet form upon request.)

- Exelon's Use of Contractor Policy (HR AC 70)

- Exelon Drug & Alcohol Policy (HR-AC-16)

- Exelon Non-Discrimination Harassment Free Work Environment Policy (HR-AC-15)

- Exelon Acceptable Use of Electronic Information Assets Policy (IT-AC-550-1)

- Exelon Diversity Suppliers Procedure (SM-AC-4001)

**BGE – Only**

- BGE Safety Conditions of Contract

**CENG, CCNPP, NMPNS, REGNPP – Only**

- CENG Industrial Safety Manual

- CENG Fleet Administrative Procedure, "Corrective Action Program," CNG-CA-1.01-1000

- CENG Fleet Administrative Procedure, "Physical Examination Process for Employees and Contractors," CNG-MD-1.01-3000

- CENG Fleet Administrative Procedure, "Human Performance," CNG-HU-1.01-1000

- CENG Fleet Administrative Procedure, "Human Performance, Tools and Verification Practices" CNG-HU-1.01-1001

- CENG Fleet Administrative Procedure, "Pre-Job Briefings and Post-Job Critiques," CNG-HU-1.01-1002

- CENG Fleet Administrative Procedure, "Human Performance Tools for Non-Field Technical Activities" CNG-HU-1.01-1003

- CENG Fleet Administrative Procedure, "Foreign Material Exclusion," CNG-MN-1.01-1001

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

- CENG Fleet Administrative Procedure, "Load Handling," CNG-MN-1.01-1003

- CENG Fleet Administrative Procedure, "Oversight of Supplemental Personnel," CNG-MN-1.01-1006

- CENG Fleet Administrative Procedure, "Safety Conscious Work Environment and Employee Concerns Program, CNG-QL-3.01-1001

- CENG Fleet Guideline, "Extra, Deletion and Delay ("EDD") Process," CNG-SC-1.01-GL006

- CENG Fleet Administrative Procedure, "Access Authorization Program," CNG-SE-1.01-1000

- CENG Fleet Administrative Procedure, "Nuclear Safety Culture," CNG-NS-2.01-1000

- CENG Fleet Administrative Procedure, "Fitness for Duty Program," CNG-SE-1.01-1001

- CENG Fleet Administrative Procedure, "Fatigue Management and Work Hour Controls," CNG-SE-1.01-1002

- CENG Fleet Guideline, "Use of Cameras and Photographic Equipment. CNG-Se-1.01-GL004

**Commonwealth Edison Company and PECO Energy Company - Only**

- Contractor Compliance and Management of Contractors (PC-ED-2016)

- Contractor Orientation (PC-ED-2017)

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS  Exelon

## EXHIBIT C - THIRD PARTY PERSONNEL ACKNOWLEDGEMENT

I Kasey Scott ("Contractor Personnel"), acknowledge that I am an employee of Pelco Structural, LLC ("Contractor"). I acknowledge that my relationship with Exelon ("Buyer"), its Affiliates, their subsidiaries or any of their successors (the "Buyer Entities"), including those listed on Exhibit A, is that of an independent contractor, not an employee of any of the Buyer Entities, and that all services performed by me for one or more of the Buyer Entities is pursuant to an Agreement between Buyer and Pelco Structural, LLC ("Contractor"), as an employee of Contractor or one if its Subcontractors, as applicable. I also acknowledge that during the period I perform services for or on behalf of the Buyer Entities pursuant to an arrangement with Contractor, I am not entitled to compensation of any kind from Buyer or to participate in any employee benefit plan or program of any kind offered to any employee of the Buyer Entities, and I expressly waive any and all such compensation and benefits. I understand that the preceding sentence will not prohibit me from receiving any earned and vested pension or retiree health care benefits from the Buyer Entities to which I may already be entitled as a former employee of one of the Buyer Entities. In addition, I represent the following:

1. Check one:          X I am not a former employee of any of the Buyer Entities. OR

          ___ I am a former employee of these Buyer Entities _____

2. If I am a former employee of one of the Buyer Entities:

     A. My Buyer Entities' Employee ID number (if available) was: _____

     B. Check one: ___ I am not eligible to receive (and am not currently receiving) a benefit under any Buyer Entity's pension plan. OR

          ___ I am eligible to receive benefits under a Buyer Entity's pension plan.

3. I am not currently employed by any Buyer Entities and will not accept employment with any Buyer Entity that commences during the period I am employed by Contractor.

4. If (a) I am a Buyer Entities Retiree, I have not and will not provide any services on Buyers Entities matters, or (b) I am not a Buyers Entities Retiree, I have not provided, and will not provide, Services designated by a Buyer Entity as "Staff Augmentation" Services on Buyer Entities' matters, regardless of whether such Services were provided by me as an employee of Contractor or any other third party employer or regardless of hours worked, for a total period in excess of one year, unless Buyer or an authorized Affiliate has granted me a written exception to such one-year period prior to reaching the one year aggregate period.

CONTRACTOR PERSONNEL

Signed: _____          Print Name: Kasey Scott

                                                            Date: January 27, 2014

Note: An executed acknowledgement shall be provided to Contractor named above.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## EXHIBIT D - FOREIGN MATERIAL EXCLUSION ADDENDUM

### INTRODUCTION

Foreign Material Exclusion (FME) is one of the most important responsibilities for Contractors. That is why under the terms of this Addendum and the Terms and Conditions to which it is appended the Contractor puts part of its payment from Exelon at risk if the Material delivered to Exelon contains foreign material or introduces foreign material into Exelon's plant systems. If the evaluation of a foreign material event is determined to be the responsibility of the Contractor, the payment to Contractor will be considered at risk, with the specific impact outlined in the 'Calculations of Payment at Risk and Additional Requirements' section of this document.

The objective of the foreign material exclusion program is to have the Contractor provide Material to Exelon free of any foreign materials. Foreign material (FM) is anything that enters equipment or systems where it doesn't belong. When this happens it is known as Foreign Material Intrusion (FMI). FM can damage parts and cause equipment or systems to fail.

FM can be something tiny, like a speck of dirt or it can be large, like an entire hand tool or other large objects. Other examples include pens, lanyards, nuts and bolts, washers, broken parts, rags, paint chips, documents, paper clips, trash, chemicals, grinding particles, and sealing compounds. It can even include devices intended to prevent Foreign Material from entering systems.

Foreign Material Intrusion can create safety hazards for workers, cause extensive damage to plant equipment, and result in lost generation time. Foreign Material Exclusion (FME) is the process of preventing FM from entering equipment being manufactured or repaired and systems when they are open for maintenance, modifications, tests, or inspections. This process helps ensure that equipment will work the way it was designed. FME keeps the plant and its people safe.

### PERFORMANCE REVIEW

Contractor and Exelon (or its Site designee) shall meet to discuss foreign material event(s) within 3 days of Exelon's written notice. Both Parties shall devise a plan to determine the responsibility and accountability and root cause of the event and the application of the payment at risk, as well as other requirements to eliminate foreign material events in the future. In addition to the payment at risk assessment the Contractor is responsible for all expenses to remove foreign materials from the Material and/or Exelon systems or equipment.

When a Contractor has one foreign material event, they shall be required at their own expense, to have each subsequent Material order inspected and certified by a third party as foreign material free. Upon delivery of 5 successive foreign material free orders, Exelon shall no longer require the 3rd Party inspection.

### Appeals Process

In the event of a disagreement on the responsibility for a foreign materials event or the application of the payment at risk assessment, Exelon Corporate Supply shall facilitate a meeting to resolve all dispute(s) between Exelon and the Contractor. If no resolution can be reached Exelon Corporate Supply Management shall elevate the dispute and mediate it between the Supply Management Vice President and Contractor's home office. The expectation is to resolve any disputes within a six-week time frame.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

<u>Non-Implementation and/or implementation of ineffective corrective actions</u>

Exelon (or its Site designee) and the Contractor shall evaluate the effectiveness of all corrective actions put in place to prevent FMI events. The Contractor shall be required to provide new or modified corrective actions for all corrective actions deemed not effective and the same must be approved by Exelon in writing prior to their implementation.

## CALCULATIONS OF PAYMENT AT RISK AND ADDITONAL REQUIREMENTS

**Level 1 FME Event – <u>FME discovered during Exelon receipt inspection</u>**

Non-Safety related order –
1. Contractor shall take all necessary actions and pay all expenses associated with the removal of the foreign material and ensure that the Material is working properly.
2. Contractor shall develop a root cause analysis with effective corrective actions to ensure that the event will not occur in the future. The corrective action shall be approved by Exelon.
3. Contractor shall contract at their own expense with a third party to inspect and certify that all future orders are foreign material free. The Contractor shall be required to provide the certification with each future delivery. Exelon and Contractor shall jointly agree on the third party selection, along with any subsequent changes to that selection.
4. A payment at risk assessment of 5% of the total invoice value shall be applied to this transaction. Exelon shall pay the Contractor 95% of the invoice value.

Safety related order –
1. Same as 1 thru 4 above (Non-Safety related).

## CALCULATIONS OF PAYMENT AT RISK AND ADDITONAL REQUIREMENTS

**Level 2 FME Event – <u>FME discovered after component is installed in the plant either during installation or PMT (Post Maintenance Testing).</u>**

Non-safety related order
1. Contractor shall take all necessary actions and pay all expenses associated with the removal of the foreign material and ensure that the Material is working properly.
2. Contractor shall develop a root cause analysis with effective corrective actions to ensure that the event will not occur in the future. The corrective action shall be approved by Exelon.
3. Contractor shall contract at their own expense with a third party to inspect and certify that all future orders are foreign material free. The Contractor shall be required to provide the certification with each future delivery. Exelon and Contractor shall jointly agree on the third party selection, along with any subsequent changes to that selection.
4. A payment at risk assessment of 10% of the total invoice value shall be applied to this transaction. Exelon shall pay the Contractor 90% of the invoice value.
5. If component is unusable Contractor shall pay all expenses associated with removal of bad component and reinstallation of new component.
6. If FME cannot be removed from a system, Contractor shall pay for an analysis to justify why the FME is acceptable to be left in the system.

Safety Related order –
1. Same as 1 thru 6 above (Non-Safety related).

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

CALCULATIONS OF PAYMENT AT RISK AND ADDITONAL REQUIREMENTS

**Level 3 FME Event** – FME is discovered in the system and determined to come from Contractor component (not a component failure)

Non-safety related order:
1. Contractor shall take all necessary actions and pay all expenses associated with the removal of the foreign material and ensure that the Material is working properly.
2. Contractor shall develop a root cause analysis with effective corrective actions to ensure that the event will not occur in the future. The corrective action shall be approved by Exelon.
3. Contractor shall contract at their expense with a third party to inspect and certify all future orders are foreign material free. The Contractor shall be required to provide the certification with each future delivery. Exelon and Contractor shall jointly agree on the third party selection, along with any subsequent changes to that selection.
4. A payment at risk assessment of 30% of the total invoice value shall be applied to this transaction. Exelon shall pay the Contractor 70% of the invoice value.
5. Contractor shall pay for the cost of analysis to determine impact of
   a. FME while it was in the system
   b. FME still lost in the system

Safety Related order

1. Contractor shall take all necessary actions and pay all expenses associated with the removal of the foreign material and ensure that the Material is working properly.
2. Develop a root cause analysis with effective corrective actions to ensure that the event will not occur in the future. The corrective action shall be approved by Exelon.
3. The Contractor shall contract at their expense with a third party to inspect and certify all future orders are foreign material free. The Contractor shall be required to provide the certification with each future delivery. Exelon and Contractor shall jointly agree on the third party selection, along with any subsequent changes to that selection.
4. A payment at risk assessment of 30% of the total invoice value shall be applied to this transaction. Exelon shall pay the Contractor 70% of the invoice value.
5. Contractor shall pay for the cost of analysis to determine impact of
   a. FME while it was in the system
   b. FME still lost in the system
6. Contractor shall pay cost of replacement of any other equipment impacted by the FME as determined by the analysis in item 5 or negotiate with Exelon the level of compensation for impacted components that cannot be replaced (for example: Reactor Vessel; nuclear fuel; etc.).

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## EXHIBIT D - NUCLEAR SPECIAL TERMS AND CONDITIONS

### ARTICLE 1
### DEFINITIONS

1. **"Act"** means the Atomic Energy Act of 1954, as amended
2. **"Contractor"** means the party identified in these Terms and Conditions which is to deliver the material and perform the services pursuant to Purchase Orders, and includes (unless the context of these Terms and Conditions clearly requires otherwise) subcontractors (as approved by Buyer pursuant to the terms and conditions of the Purchase Order, "Subcontractors") and their respective employees and agents.
3. **"NRC"** means the Nuclear Regulatory Commission.
4. **"Nuclear Energy Hazard"** means the radioactive, toxic, explosive or other hazardous properties of Nuclear Material.
5. **"Nuclear Material"** means the "source material, special nuclear material or byproduct material," which themselves have the meanings given them in the Act.

### ARTICLE 2
### BUYER NUCLEAR FACILITIES

2.1. Nuclear Provisions. In the event that any work is to be incorporated or performed in a nuclear facility owned (or jointly owned as a tenant-in-common or otherwise) by Buyer, the following provisions shall apply:

2.2 <u>Decontamination</u>. In the event that Contractor is required by the terms of these Terms and Conditions to repair or replace any Work, Buyer shall perform any required decontamination of the facility to radiation levels required by the applicable governmental authorities to the extent reasonably necessary to permit access to such nuclear facility by Contractor for such repair, replacement, or re-performance. If Buyer, using installed equipment or normally available maintenance equipment, is unable to decontaminate to required levels, Contractor shall perform the repair or replacement using necessary radiation protection equipment and procedures.

2.3 <u>Special Requirements</u>. All employees of Contractor and any Subcontractor (regardless of tier) who are involved in the performance of the Work at such nuclear facility shall comply with all applicable regulations of Buyer and any governmental authority regarding examinations, including, without limitation, physical and psychological examinations, and no employee who fails to meet the requirements of any examination shall be permitted to perform any such Work.

2.4 <u>Contractor Work Practices</u>. Prior to commencing with on-site testing, troubleshooting and/or installation activities at Buyer nuclear facilities the Contractor shall provide their work practices, procedures and processes to Buyer for review to ensure they comply with Buyer standards. Review by Buyer shall not relieve Contractor from fulfilling the Contractor's entire obligation under these Terms and Conditions. These documents shall be provided to the Buyer Representative without unreasonable delay and submittal shall not impact the agreed upon start date. Any work started prior to acceptance by Buyer shall be at the Contractor's risk.

2.5 <u>No Indemnity for Nuclear Incidents</u>. Notwithstanding anything in the Purchase Order and/or these Terms and Conditions to the contrary, Contractor shall not be required to indemnify, defend, or hold harmless Buyer from or against any losses, claims, damages, expenses, or liabilities arising out of or based upon bodily injury, death and/or property damage to the extent that such bodily injury, death and/or property damage

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

results from or is caused in whole or in part directly or indirectly by an actual or alleged "nuclear incident" as defined in the Atomic Energy Act of 1954, as amended (as used in this Article, the "Act").

2.6     Indemnification and Nuclear Liability Insurance.  Buyer will, without cost to Contractor, obtain, and except as provided in Section 2.7 of this Article, maintain in effect with respect to such nuclear facility from the first arrival of nuclear fuel at such nuclear facility, through decommissioning of such nuclear facility:

2.6.1    An agreement of indemnification as required by Section 170 of the Act; and

2.6.2    Nuclear liability insurance in such form and in such amount as will meet the financial protection requirements of the Nuclear Regulatory Commission pursuant to Section 170 of the Act.

2.6.3    To the extent permitted by applicable law, such Nuclear liability insurance shall authorize Buyer to waive of all rights of subrogation that Buyer's insurance carrier might exercise against Contractor.

2.6.4    Buyer hereby waives all rights of subrogation against Contractor under such policies procured in accordance with this Article.

2.7     Replacement Liability Protection.  If the nuclear liability protection system provided by Section 170 of the Act is repealed, modified, or expires, or because Buyer is permanently ceasing operations, Buyer will, without cost to Contractor, maintain in effect, to the extent available on reasonable terms and to the extent customarily maintained by nuclear plant owners, liability protection through government indemnity, limitation of liability or liability insurance in order to minimize impairment of the protection afforded Contractor and its Subcontractors by Section 170 of the Act and the provisions of this Article.

ARTICLE 3
CONTRACTOR NUCLEAR LIABILITY INSURANCE

        In the event that any work is to occur outside the confines of an Buyer Nuclear generating station and (i) exposure to the Nuclear Energy Hazard that is or alleged to be incorporated in or performed in a non-Buyer facility exists (including, without limitation, decontamination, recycling, treatment or disposal), or (ii) where the scope of work includes the transportation of Nuclear Material, then the following provisions shall apply in addition to the other insurance requirements set forth in the Purchase Order and other applicable contract documents:

3.1     For a Contractor subject to subsection (i) above, any work to be performed in a non-Buyer facility shall by performed in a facility that is licensed and regulated by the NRC and/or applicable federal or state governmental agency.  Such non-Buyer facility shall be completely owned and/or operated by Contractor and shall comply with all applicable industry standards in connection with its operations and licensing.  Contractor promptly shall notify Buyer in writing if any such facility is (a) under investigation for violations that may reasonably jeopardize such facility's license or operations or (b) included as part of a possible sale or transfer (whether merger, stock, asset or otherwise involving Contractor and its affiliates).

3.2     No Indemnity for Nuclear Incidents or Exposure to Nuclear Energy Hazard.  Notwithstanding anything in the Purchase Order and/or other contract documents to the contrary, Buyer shall not be required to indemnify, defend, or hold harmless Contractor from or against any losses, claims, damages, expenses, or liabilities arising out of or based upon bodily injury, death and/or property loss or damage to the extent that such bodily injury, death and/or property loss or damage results from or is caused (in whole or in part, directly or indirectly, actual or alleged) by a  "nuclear incident" as

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

defined by the Act or exposure to a Nuclear Energy Hazard, to the extent such "nuclear incident" and/or exposure to a Nuclear Energy Hazard occurs outside of an Buyer Nuclear generating station.

3.3     Contractor Indemnification. To the extent that an alleged or actual "nuclear incident" as defined by the Act or exposure to a Nuclear Energy Hazard occurs outside of an Buyer Nuclear generating station when Buyer has provided the Contractor with care, custody and control of the Buyer Material, then Contractor shall, to the fullest extent permitted by law, indemnify, defend upon request and hold harmless Buyer and its officers, directors, employees, agents, representatives, subsidiaries, affiliates, successors, and assigns ("Buyer Parties") against all losses, claims, damages, expense (including reasonable attorneys' fees and costs) and liabilities sustained or incurred by the Buyer Parties for any damage, harm, loss or injury of any kind, direct or indirect, to any property or person (including death), including claims for injuries to employees of the Buyer Parties, Contractor and/or any Subcontractor, arising directly or indirectly out of such alleged or actual nuclear incident or exposure to a Nuclear Energy Hazard, regardless of whether any such liability, damage, loss or injury is caused by, results from or arises out of the negligence, fault or other liability of the Buyer Parties or any other party to be indemnified. Except as may be otherwise provided by applicable Law, Buyer Parties' right to indemnification shall not be impaired or diminished by any act, omission, misconduct, negligence or default of an Buyer Party or any employee or agent of an Buyer Party who may be alleged to have contributed thereto. To the extent any Law may prohibit any application of all or any part of the indemnity obligations in these Terms and Conditions, it is the intent of the Parties that such provisions are severable, and shall be construed to impose the indemnity obligation in all circumstances, applications, and situations to the fullest extent permitted by Law.

3.4     Contractor Insurance. For a Contractor subject to subsection (i) above, Contractor shall maintain Nuclear Energy Liability Insurance (Facility and Worker Form) in an amount no less than $200,000,000 in the aggregate with respect to upstream work (e.g. enrichment and fuel fabrication) and no less than $50,000,000 for downstream work (e.g. processing waste, maintenance of radioactive parts, storage of parts and/or waste, and waste disposal). For a Contractor subject to subsection (ii) above only, Contractor shall require its shipping Subcontractor to maintain Nuclear Energy Liability Insurance (Suppliers & Transporters) in an amount no less than $5,000,000 in the aggregate.

3.5     Contractor shall maintain such Nuclear Energy Liability Insurance policies in effect until Contractor has permanently ceased operation of the facility and such facility can no longer be considered a facility whose licensing is governed by the NRC or applicable federal or state governmental agency. If Contractor proposes to cancel the policy, let the policy expire or change the limits of the policy to below such originally agreed upon amounts, then Contractor promptly shall notify Buyer in writing at least 30 days prior to such actions (10 days in the case of nonpayment of premium). In order to effectuate any such change or cancellation, Contractor must obtain Buyer's prior written consent. If such policy is being canceled or terminated because Contractor or its affiliate is being sold and/or the facility is being sold in whole or in part (whether by asset sale, stock sale, merger or otherwise), then Contractor shall require that the new owner of the facility maintain this insurance and comply with the requirements of this Article as if such sale had not occurred. Notwithstanding anything to the contrary contained in the Contract Documents, the total protection on Buyer's behalf shall not at any time be less, either in scope of coverage or amount, than was required contractually immediately prior to the change.

3.6     To the extent permitted by applicable law, such Nuclear liability insurance shall authorize Contractor to waive of all rights of subrogation that Contractor's insurance carrier might exercise against Buyer.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

3.7    Contractor hereby waives all rights of subrogation against Buyer under such policies procured in accordance with this Article.

3.8    Failure to obtain and maintain the required insurance shall constitute a breach of these Terms and Conditions, and Contractor will be liable for any and all costs, liabilities, damages, and penalties (including reasonable attorneys' fees, court, and settlement expenses) resulting to Buyer from such breach, unless a written waiver of the specific insurance requirement is provided to Contractor by Buyer.

3.9    In the event of any failure by Contractor to comply with the insurance requirements of these Terms and Conditions, Buyer may, without in any way compromising or waiving any right or remedy at law or in equity, upon five (5) days written notice to Contractor, purchase such insurance or such insurance available to Buyer for purchase, at Contractor's expense, provided that Buyer shall have no obligation to do so and if Buyer shall do so, Contractor shall not be relieved of or excused from the obligation to obtain and maintain such insurance amounts and coverages. All such costs incurred by Buyer shall be promptly reimbursed by Contractor and/or may be withheld from any payment due Contractor.

3.10   Contractor shall not remove from the non-Buyer facility any Materials that are considered Nuclear Material or exposed to the Nuclear Energy Hazard unless such materials have been properly screened for shipment and/or disposal, including, without limitation, any Material upon which services related to the scope of work have been or were to be performed. Notwithstanding the previous sentence, Contractor may return Materials to customers if the scope of work includes repairing and/or cleaning Material (e.g. equipment or laundry) and returning the Materials to such customer upon completion of the services. In addition, Contractor shall not sell, lease or otherwise transfer (or agree to the same) any interest in such Materials without Buyer's consent and without the potential buyer or transferee of such Materials providing Buyer and Exelon Parties Nuclear Energy Liability Insurance protections and contractual protections at least as equivalent to the protections provide pursuant to the Contract Documents.

3.11   With respect to the Workers Compensation, Commercial general liability, Automobile liability and Excess liability insurance policies required to be maintained pursuant to the Purchase Order and/or other contractual requirements, no nuclear exclusion other than the exclusion generally consistent with ISO Broad Form Nuclear Liability Exclusion endorsement IL 0021 shall apply to such policies.

3.12   Contractor shall provide evidence of the required insurance coverage and file with Buyer a Certificate of Insurance acceptable to Buyer prior to commencement of the work. The insurance and the insurance policies required by this Article will not be canceled, or allowed to expire or the limits in any manner reduced until at least thirty (30) days prior written notice (ten (10) days in the case of nonpayment of premium) has been given to Buyer by Contractor.

3.13   Contractor shall permit Buyer and its insurance representatives, including ANI, to inspect Contractor's facilities involving Buyer's materials and/or waste during normal working hours.

3.14   Contractor shall require that all its Subcontractors comply with all applicable insurance coverage requirements of this Article. This includes, without limitation, those Subcontractors retained to transport materials to Buyer (e.g., returning repaired equipment or cleaned laundry).

## ARTICLE 4
## INCORPORATION BY REFERENCE

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

4.1     <u>Radioactive Material</u>. Radioactive material shall not be accepted at Buyer facilities unless radiation levels are less than or equal to eighty percent (80%) of the limits as stated in Federal Regulation 49 CFR173.441. Exceptions may be granted if Contractor provides prior notification of shipment dose levels and obtains approval to ship the material by the Buyer Radioactive Material Specialist or Radiation Protection Manager (RPM).

Contractor shall submit their radioactive shipping licensee to Buyer's Radioactive Material Specialist or RPM before shipment arrives to a facility.

4.2 <u>Authorization for Facility Access.</u> Contractor shall comply with the latest versions of the following Buyer policies and procedures with respect to work performed at nuclear facilities, and such policies and procedures are incorporated herein by reference.

      a)   Policy SY-AA-102-229 "Issuing & Documenting Acceptance Of The Exelon Fitness For Duty And Unescorted Access Program Requirements For Contractors And Vendors."
      b)   Policy SY-AA-101-130 "Security Responsibilities For Station Personnel".
      c)   Policy SY-AA-101-107 "Control And Confiscation Of Contraband Or Prohibited Items"
      d)   Policy SY-AA-103-513 "Continual Behavioral Observation Program"
      e)   Policy SY-AA-103-517 "In processing Of Personnel (Employee And Contractor)"
      f)   Policy SY-AA-103-518 "Out processing Of Personnel (Employee And Contractor)"
      g)   Procedure LS-AA-119 "Fatigue Management and Work Hour Limits"
      h)   Procedure LS-AA-119-1005 "Contractor/Vendor Compliance with Fatigue Management and Work Hour Limits"

Contractor shall obtain the policies and procedures referenced above from the Buyer hiring manager.

Contractor will provide a written job task analysis or job description upon request from Buyer Nuclear Security for each person/position who is seeking authorized unescorted access at any nuclear facility. The Contractor will not charge Buyer's third party background vendor entity hired to perform the background investigations a fee to conduct an employment check on Contractor individuals currently or previously employed. Contractor will answer suitable inquiry questions to complete a background investigation on all of its personnel who have unescorted access to a Buyer nuclear facility.

Buyer requires a minimum of 72 hours' notice, unless otherwise approved, for escorted access notification to security. Contractor personnel are required to provide name, social security number, in advance to the cognizant escort and present an approved photo ID (driver's license typ.) at time of escorted access.

4.3     <u>Safeguards Information.</u> All Contractor's personnel that need to access, hold, or create Safeguards Information (SGI) including Safeguard Information –Modified Handling (SGI-M) relating to Buyer facilities are to follow and acknowledge the requirements set forth in Buyer procedure SY-AA-101-106, "Control and Classification of SGI" and meet the requirements of 10 CFR 73.21, 10 CFR 73.22, and 10 CFR 73.23. This includes but is no limited to the following responsibilities:

      •   All SGI including SGI-M needs to have classification information - Name, Title, Organization, Date of Classification.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

- All newly created SGI including SGI-M to have the classification information incorporated into the first page of the document.
- Only crosscut shredders producing a piece size of ¼" or less can be used to destroy SGI including SGI-M.
- SGI including SGI-M can only be created, revised, viewed electronically and/or printed on computers and printers that do not have a network connection and are approved for usage as a "stand-alone" machine.
- SGI including SGI-M must be stored in a manner approved by Buyer and in approved cabinets with approved locks.
- SGI including SGI-M must be packaged per procedure for transportation.
- SGI including SGI-M found unattended must NOT BE READ, quarantined, and Security must be immediately notified.

4.4 Control of Portable Devices and Portable Media to be Used with Critical Digital Assets. Contractor shall comply with the latest version of Buyer procedure MA-AA-716-235 "Control of Critical Digital Asset (CDA) Portable Media and Portable Devices" with respect to work performed at nuclear facilities, and such procedure is incorporated herein by reference. This procedure implements NRC requirements specified in 10 CFR 73.54. Contractor shall obtain the referenced procedure from the designated Buyer Contract Administrator.

4.5 Chemicals. All chemicals intended to be delivered to a Buyer facility for Work must be approved by each Exelon facility's Chemical Control Coordinator regardless of hazard and before shipping to that facility. Buyer will not be responsible for Contractor's cost for delays if chemicals are brought to a facility without approval.

4.6 Samples. If Buyer has requested a sample or "mock-up" of all or any portion of the Work, Contractor shall not commence the associated Work until Buyer has received such sample or reviewed such mock-up and acknowledged in writing its acceptance of such sample or mock-up. Any sample or mock-up brought on site by Contractor shall be clearly marked as a sample or mock-up. All Work is required to conform to such sample or mock-up, and no change in the Work or its method of production shall be made without the written consent of Buyer; provided, however, no sample or mock-up shall be installed or delivered as the final Work.

4.7 Costs. Buyer will not be responsible for costs due to delays or reimbursement thereof arising out of Contractor's non-compliance with the provisions of this Article 4.

MASTER TERMS AND CONDITIONS FOR SERVICES AND MATERIALS

## EXHIBIT F – BACKGROUND INVESTIGATIONS

Background investigations must include the following:

- Use as Investigation search components the applicant's date of birth and all names/aliases provided or identified during the investigation

- SSN Verification and Trace

- Searches of:

  - National criminal database, such as the National Crime Information Center (NCIC) or the Widescreen Plus National Criminal Search
  - 7 year county and, if available, local municipality criminal database search using addresses from the previous seven years
  - 7 year Federal District Court criminal database search using addresses from the previous seven years
  - 7 year State Law Enforcement Verification using addresses from the previous seven years
  - The National Sex Offender & Violent Abuse Registry
  - Global OFAC
  - 7 year Employment Verification
  - Education Verification – Highest completed
  - 5-panel Drug Test

If required by Buyer, Contractor will provide a photograph of each Contractor Personnel to Buyer prior to the start of the Services. Photo requirements for identification badges:

- The image must be in color and must be clear with no distortions of any kind
- The image should be taken against a white background
- The image should be centered in the photo from the top of the shoulders to the top of the head. Do not include anything below the shoulders in the photo
- No sunglasses or headwear of any kind, unless for religious purposes
- Must be sent in JPEG format
- Image files must be named for the badge holder and in JPEG format (e.g., badge holder name.jpg) with pixel resolution set to 640 pixels wide by 480 pixels tall

# SCOPE OF WORK FOR PELCO

## SECTION 1.
## SUMMARY

1.1. Exelon is issuing this Scope of Work as part of a Services and Materials Agreement, with an Effective Date of January 31, 2014 through December 31, 2016. Purchase Order Transactions (Blankets, PO's, PCard transactions, etc.) will be issued for/by Exelon in accordance with the executed Services and Materials Agreement in order for the Contractor to provide items classified by Exelon as Transmission & Substation Material and Equipment.

1.2 Any and all straight PO buys or buys executed through means other than the Blanket Order(s) are auditable.

1.3 It should be clearly understood that the Contractor must be able to respond on a 24/7/365 availability schedule. No days are exempt from the availability of response requirement.

1.4 Contractor alignment is expected on the following Exelon initiatives:

      2.1. Project Pricing
      3.1. Lead Time
      4.1 Payment Terms
      5.1 Liquidated Damages
      6.1 Technical Support
      7.1 Business Continuity Plan
      8.1 General Agreement

## SECTION 2.
## PROJECT PRICING

2.1 Project Pricing

The Contractor agrees to provide fixed pricing of *Redacted* for a purchase of a total of 11 galvanized steel poles and 11 anchor bolt cages for ComEd's EOWA Elgin – O'Hare Toll way extension project. Any freight charges associated with the delivery of these structures will be included in the overall project price.

Any changes on the price will be mutually agreed upon between Exelon and Pelco before being implemented.

## SECTION 3.
## LEAD TIME

3.1. Lead Time

The Contractor agrees to follow the below delivery schedule as communicated by Exelon:

a. Calculations with comments submitted to Pelco – 2/5/14
b. Revised calculations returned to ComEd on – 2/12/14
c. Approval drawings to be submitted to ComEd on – 2/21/14
d. Approval drawings to be returned to Pelco on – 3/7/14
e. Delivery of 11 anchor bolts on – 1/1/14



   f.  Delivery of 11 galvanized steel poles to begin – 8/4/14 ~~July 13,~~ ꞋꞋ, ꞋꞋ

      a.  Detailed delivery schedule to be agreed between ComEd and Pelco.

      b.  Delivery requirements are to contact ComEd 48 hours prior to delivery.


## SECTION 4.
## PAYMENT TERMS

4.1 Payment Terms

The Contractor will extend payment terms of 2% 10 NET 45 days.


## SECTION 5.
## LIQUIDATED DAMAGES

5.1 Contractor agrees to pay Liquidated Damages in the amount of *Redacted* per day not to exceed *Redacted* of total order value of the late item for any late deliveries beyond the project lead time (dates as stated in section 3 of the SOW). Liquidated damages do not go into effect if all the poles aren't delivered within the lead times stated in section 3. As long as the deliveries begin within the lead times stated in section 3 and continue through the project without causing any delay's or work stoppage, liquidated damages would not be invoked. Liquidated damages will be applied if there are project delays caused by Pelco not delivering poles on time.

5.2 Acceptable Material:

Contractor shall provide only materials approved by Exelon. Substitute material is not acceptable unless agreed upon by authorized Exelon personnel (ex: Engineering, Project Management). Contractor agrees to adhere with the designs and specifications provided by ComEd for this project.

5.3 Expectations

Contractor is responsible for proactively communicating delays in material availability to Exelon as soon as they arise.


## SECTION 6.
## TECHNICAL SUPPORT

6.1 Technical Service and Training Support

Both Exelon and Contractor will cooperate in exchanging information that will enable Contractor to provide timely technical service and training to support the business needs of both companies.


## SECTION 7.
## BUSINESS CONTINUITY PLAN

7.1 Contractor shall provide a Business Continuity Plan (BCP) to Exelon on a yearly basis or as requested by Exelon based on specific requirements and procedural changes. The initial BCP plan will be provided to Exelon one hundred and eighty (180) days following the start date of this Agreement. Guidelines for the Business Continuity Plan (BCP) include:

      7.1.1  Plans, measures, and arrangements to ensure the continuous delivery of critical materials and Services, which permits the organization to recover its facility, data, and personnel.

7.1.2    Identification of necessary resources to support business continuity, including personnel, information, equipment, financial allocations, legal counsel, infrastructure protection and accommodations.

7.2 Objective is alignment of Contractor's BCP with Exelon requirements

## SECTION 8.
## GENERAL AGREEMENT

8.1  This SOW as attached to an executed SMA document shall be the only document governing the overall agreement with Contractor. No memos, letters, verbal agreements, or pricing outside of the terms of this document are binding upon either party or any of its affiliates, locations or subsidiaries. Any changes to this SOW must be documented in writing and attached as an amendment to the SMA agreement to be deemed part of this agreement.

The parties have in good faith agreed upon this Scope of Work and as such, their duly authorized representatives are signing the Scope of Work as evidence of such mutual agreement.

**Exelon Business Services Company, LLC**

By: _____

Kelly Gaunce

**Pelco Structural, LLC**

By: _____

Kasey Scott

Title: Senior Category Manager

Title: Vice President of Sales

# P U R C H A S E   O R D E R

Exelon

**Mail Invoice To:**
EXELON BUSINESS SERVICES CO.
An Exelon Company
P. O. Box 17456
BALTIMORE MD 21297

| | | | |
|---|---|---|---|
| Purchase Order | : | **01135575** |
| Revision | : | |
| Release | : | |
| Printed | : | **01/12/2015** |
| Page | : | **1** |

---

**Please Direct Inquiries to:**
STEVEN KIOLBASA
Title:  SR. PROCUREMENT SPEC
Phone:  630-576-6170
Fax  :  630-576-6355
eMail:  **steven.kiolbasa@ComEd.com**

**Vendor:**
**DON EAGLETON**
**PELCO STRUCTURAL LLC**
**1501 N. INDUSTRIAL BLVD**
**CLAREMORE OK 74017**

---

| | | |
|---|---|---|
| **Payment Terms**    2.00  %   10  Days   Net   45  Days | **Transit Type** | |
| ERS N       Reference Contract | **Carrier Name** | |
| FOB   DESTINATION, PPA | **FOB Point**     DESTINATION | |

---

**Primary Ship To:**   JOB SITE DELIVERY (ComEd only)
                      specify IL 60181-4260

**Instructions:**   EOWA Elgin - O'Hare Steel Pole RFP
                    per Event 5537
                    REFERENCE QUOTE: Engineered pole stats
                    summary v1 0(R3-w-o Agile).XLS
                    *
                    Payment Terms = 2% Net 45 Days
                    *

*Redacted*

                    *
                    15% Tier 2 Diverse Spend
                    *
                    Delivery: Mid - July Delivery; Pelco
                    Structural, LLC would like to build,
                    store and invoice prior to July 2014.
                    *
                    CONTACT INFO:
                    LRE: CHO LEUNG F. TAM @ 630-437-2840
                    PROJECT MANAGER: MARK BARTOLAMEOLLI @
                    630-576-7020
                    DASHIELL PROJECT ENG.:  FRANK MORRISSEY
                    @ 630-613-3382
                    DELIVERY:
                    CONTACT PM 72 HOURS PRIOR TO DELIVERY
                    775 N PROSPECT AVE
                    ITASCA, IL. 60143
                    EAST SIDE OF PROSPECT AVENUE AND 0.25

**EXHIBIT**

tabbies

C

# PURCHASE ORDER

 Exelon

**Mail Invoice To:**
EXELON BUSINESS SERVICES CO.
An Exelon Company
P. O. Box 17456
BALTIMORE MD 21297

| | |
|---|---|
| Purchase Order : | 01135575 |
| Revision : | |
| Release : | |
| Printed : | 01/12/2015 |
| Page : | 2 |

MILE SOUTH OF THORNDALE AVENUE
*********************
MR 01998255
*********************
MASTER TERMS AND CONDITIONS
FOR THE PURCHASE OF MATERIALS AND
SERVICES
Between
Exelon Business Services Company, LLC
and
Pelco Structural, LLC
Dated as of February 3, 2014

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|------|----------|----|-----------------|-----------|-----------|
| 0001 | 2 | EA | Catalog ID: | *Redacted* | ) TAXABLE |

  Schedule:        Quantity              2      Delivery Date 05/09/2014

  Description:    160' EM10429 ANCHOR BOLT CAGE, PER
                 ENGINEERED POLE STATS SUMMARY V1
                 0(R3-W-O AGILE).XLS FROM PELCO
                 Deliver To: TSS 101 ITASCA - TLINE STEEL
                 POLE Anchor Cages (See Notes)

                 Vendor : PELCO STRUCTURAL LLC
                 Model  :
                 Part   :

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|------|----------|----|-----------------|-----------|-----------|
| 0002 | 1 | EA | Catalog ID: | *Redacted* | ) TAXABLE |

  Schedule:        Quantity              1      Delivery Date 05/09/2014

  Description:    135' LS1494 ANCHOR BOLT CAGE, PER
                 ENGINEERED POLE STATS SUMMARY V1
                 0(R3-W-O AGILE).XLS FROM PELCO
                 Deliver To: TSS 101 ITASCA - TLINE STEEL
                 POLE Anchor Cages (See Notes)

                 Vendor : PELCO STRUCTURAL LLC
                 Model  :
                 Part   :

# PURCHASE ORDER

Exelon

Mail Invoice To:
EXELON BUSINESS SERVICES CO.
An Exelon Company
P. O. Box 17456
BALTIMORE MD 21297

| | | |
|---|---|---|
| Purchase Order | : | 01135575 |
| Revision | : | |
| Release | : | |
| Printed | : | 01/12/2015 |
| Page | : | 3 |

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|---|---|---|---|---|---|

0003        2   EA  Catalog ID:                          *Redacted*

                                                                    **TAXABLE**

Schedule:        Quantity         2      Delivery Date 05/09/2014

Description:  130' LS1495 ANCHOR BOLT CAGE, PER
              ENGINEERED POLE STATS SUMMARY V1
              0(R3-W-O AGILE).XLS FROM PELCO
              Deliver To: TSS 101 ITASCA – TLINE STEEL
              POLE Anchor Cages (See Notes)

              Vendor : PELCO STRUCTURAL LLC
              Model  :
              Part   :

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|---|---|---|---|---|---|

0004        2   EA  Catalog ID:                          *Redacted*

                                                                    **TAXABLE**

Schedule:        Quantity         2      Delivery Date 05/09/2014

Description:  140' LS1495 ANCHOR BOLT CAGE, PER
              ENGINEERED POLE STATS SUMMARY   V1
              0(R3-W-O AGILE).XLS FROM PELCO
              Deliver To: TSS 101 ITASCA – TLINE STEEL
              POLE Anchor Cages (See Notes)

              Vendor : PELCO STRUCTURAL LLC
              Model  :
              Part   :

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|---|---|---|---|---|---|

0005        4   EA  Catalog ID:                          *Redacted*

                                                                    **TAXABLE**

Schedule:        Quantity         4      Delivery Date 05/09/2014

Description:  170' LS1496 ANCHOR BOLT CAGE, PER
              ENGINEERED POLE STATS SUMMARY  V1
              0(R3-W-O AGILE).XLS FROM PELCO
              Deliver To: TSS 101 ITASCA – TLINE STEEL

Case: 1:16-cv-00611 Document #: 1-2 Filed: 01/15/16 Page 5 of 9 PageID #:89

# PURCHASE ORDER

Exelon

Mail Invoice To:
EXELON BUSINESS SERVICES CO.
An Exelon Company ,
P. O. Box 17456
BALTIMORE MD 21297

| | | |
|---|---|---|
| Purchase Order : | 01135575 |
| Revision | : | |
| Release | : | |
| Printed | : | 01/12/2015 |
| Page | : | 4 |

POLE Anchor Cages (See Notes)

Vendor  :  PELCO STRUCTURAL LLC
Model   :
Part    :

*Purchase Order Total Amount*

TOTAL THIS PO:                          *Redacted*

AUTHORIZED SIGNATURE

## End of Purchase Order



# PURCHASE ORDER
## REVISION

Mail Invoice To:
EXELON BUSINESS SERVICES CO.
An Exelon Company
P. O. Box 17456
BALTIMORE MD 21297

| | | |
|---|---|---|
| Purchase Order | : | 01135579 |
| Revision | : | 001 |
| Release | : | |
| Printed | : | 01/12/2015 |
| Page | : | 1 |

---

Please Direct Inquiries to:
STEVEN KIOLBASA
Title: SR. PROCUREMENT SPEC
Phone: 630-576-6170
Fax : 630-576-6355
eMail: steven.kiolbasa@ComEd.com

Vendor:
DON EAGLETON
PELCO STRUCTURAL LLC
1501 N. INDUSTRIAL BLVD
CLAREMORE OK 74017

**** DUPLICATE COPY ****

| Payment Terms 2.00 % 10 Days Net 45 Days | Transit Type |
|---|---|
| ERS N Reference Contract | Carrier Name |
| FOB DESTINATION, PPA | FOB Point DESTINATION\ |

Primary Ship To:     JOB SITE DELIVERY (ComEd only)
                     specify IL 60181-4260

Instructions:     EOWA Elgin – O'Hare Steel Pole RFP
                  per Event 5537
                  REFERENCE QUOTE: Engineered pole stats
                  summary vl 0(R3-w-o Agile).XLS
                  *
                  Payment Terms = 2% Net 45 Days
                  *

*Redacted*

                  *
                  15% Tier 2 Diverse Spend
                  *
                  Delivery: Mid – July Delivery; Pelco
                  Structural, LLC would like to build,
                  store and invoice prior to July 2014.
                  *
                  CONTACT INFO:
                  LRE: CHO LEUNG F. TAM @ 630-437-2840
                  PROJECT MANAGER: MARK BARTOLAMEOLLI @
                  630-576-7020
                  DASHIELL PROJECT ENG.:  FRANK MORRISSEY
                  @ 630-613-3382
                  DELIVERY:
                  CONTACT PM 72 HOURS PRIOR TO DELIVERY
                  775 N PROSPECT AVE
                  ITASCA, IL. 60143

# PURCHASE ORDER

## REVISION

Mail Invoice To:
EXELON BUSINESS SERVICES CO.
An Exelon Company
P. O. Box 17456
BALTIMORE MD 21297

| | |
|---|---|
| Purchase Order : | **01135579** |
| Revision : | **001** |
| Release : | |
| Printed : | **01/12/2015** |
| Page : | **2** |

EAST SIDE OF PROSPECT AVENUE AND 0.25
MILE SOUTH OF THORNDALE AVENUE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
MR 01996860
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
MASTER TERMS AND CONDITIONS
FOR THE PURCHASE OF MATERIALS AND
SERVICES
Between
Exelon Business Services Company, LLC
and
Pelco Structural, LLC
Dated as of February 3, 2014
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|------|----------|-----|------------------|------------|-----------|
| 0001 | 2 | EA | Catalog ID: | *Redacted* | TAXABLE |

| | | | |
|---|---|---|---|
| Schedule: | Quantity | 2 | Delivery Date 08/04/2014 |

Description: 160' EM10429 STRUCTURE, PER ENGINEERED
POLE STATS
SUMMARY V1 0(R3-W-O AGILE).XLS FROM
PELCO
Deliver To: TSS 101 ITASCA - TLINE STEEL
POLE Structures (See Notes)

Vendor : PELCO STRUCTURAL LLC
Model :
Part :

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|------|----------|-----|------------------|------------|-----------|
| 0002 | 1 | EA | Catalog ID: | *Redacted* | TAXABLE |

| | | | |
|---|---|---|---|
| Schedule: | Quantity | 1 | Delivery Data 08/04/2014 |

Description: 135' LS1494 STRUCTURE, PER ENGINEERED
POLE STATS
SUMMARY V1 0(R3-W-O AGILE).XLS FROM
PELCO
Deliver To: TSS 101 ITASCA - TLINE STEEL
POLE Structures (See Notes)

Case: 1:16-cv-00611 Document #: 1-2 Filed: 01/15/16 Page 8 of 9 PageID #:92

# P U R C H A S E   O R D E R

## R E V I S I O N

Exelon

Mail Invoice To:
EXELON BUSINESS SERVICES CO.
An Exelon Company
P. O. Box 17456
BALTIMORE MD 21297

| | |
|---|---|
| Purchase Order : | 01135579 |
| Revision      : | 001 |
| Release       : | |
| Printed       : | 01/12/2015 |
| Page          : | 3 |

Vendor : PELCO STRUCTURAL LLC
Model  :
Part   :

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|------|----------|-----|------------------|------------|-----------|
| 0003 | 2 | EA | Catalog ID: | | |

**TAXABLE**

Schedule:     Quantity          2     Delivery Date 08/04/2014

Description:  130' LS1495 STRUCTURE, PER ENGINEERED
              POLE STATS
              SUMMARY V1 0(R3-W-O AGILE).XLS FROM
              PELCO
              Deliver To: TSS 101 ITASCA - TLINE STEEL
              POLE Structures (See Notes)

Vendor : PELCO STRUCTURAL LLC
Model  :
Part   :

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|------|----------|-----|------------------|------------|-----------|
| 0004 | 2 | EA | Catalog ID: | *Redacted* | |

**TAXABLE**

Schedule:     Quantity          2     Delivery Date 08/04/2014

Description:  140' LS1495 STRUCTURE, PER ENGINEERED
              POLE STATS
              SUMMARY V1 0(R3-W-O AGILE).XLS FROM
              PELCO
              Deliver To: TSS 101 ITASCA - TLINE STEEL
              POLE Structures (See Notes)

Vendor : PELCO STRUCTURAL LLC
Model  :
Part   :

| Line | Quantity | UP | Item Description | Unit Price | Extension |
|------|----------|-----|------------------|------------|-----------|
| 0005 | 4 | EA | Catalog ID: | *Redacted* | |

**TAXABLE**

Case: 1:16-cv-00611 Document #: 1-2 Filed: 01/15/16 Page 9 of 9 PageID #:93

# PURCHASE ORDER

## REVISION

Exelon

Mail Invoice To:
EXELON BUSINESS SERVICES CO.
An Exelon Company
P. O. Box 17456
BALTIMORE MD 21297

| | | |
|---|---|---|
| Purchase Order | : | 01135579 |
| Revision | : | 001 |
| Release | : | |
| Printed | : | 01/12/2015 |
| Page | : | 4 |

Schedule:     Quantity     4     Delivery Date 08/04/2014

Description:     170' LS1496 STRUCTURE, PER ENGINEERED
               POLE STATS
         SUMMARY V1 0(R3-W-O AGILE).XLS FROM
         PELCO
         Deliver To: TSS 101 ITASCA - TLINE STEEL
         POLE Structures (See Notes)

         Vendor   :   PELCO STRUCTURAL LLC
          Model   :
           Part   :

*Purchase Order Total Amount*

PO Previous Total   :
TOTAL THIS PO:       *Redacted*

AUTHORIZED SIGNATURE

## End of Purchase Order

