### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EXELON BUSINESS SERVICES COMPANY, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-00611 |
| | ) | |
| v. | ) | Judge Robert M. Dow |
| | ) | |
| PELCO STRUCTURAL, LLC | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT PELCO STRUCTURAL, LLC'S PRE-TRIAL MEMORANDUM

COMES NOW, Defendant PELCO STRUCTURAL, LLC, by and through its counsel, Franco Moroney Buenik, LLC, and for its Pre-Trial Memorandum, states as follows.

**I.    INTRODUCTION:**

On February 3, 2014, Pelco Structural, LLC, contracted with Exelon Business Services Company, LLC, to supply sixty-four (64) conductor arms for use in high-voltage transmission towers by Exelon's affiliate, Commonwealth Edison Company ("ComEd"), on the Illinois Tollway's Elgin/O'Hare Project. Attached for the Court's reference as Exhibit A are photographs provided by ComEd of some of the now-completed Towers. On December 5, 2014, one of the Pelco arms failed due to a manufacturing defect. The existence of the defect is not at issue: Pelco admits that the partial penetration welds used on the arm failed to achieve the desired penetration. Instead, the threshold issue is whether ComEd gave Pelco its contractually-guaranteed opportunity to cure the manufacturing defect. Thereafter, the issue is the reasonable quantum of repair costs, with ComEd's claim being unreasonable, overstated, and excessive.

The engineering issue in this case is the difference between partial penetration welds compared to full penetration welds. The industry standard is the use of partial penetration welds.

Partial penetration welds cannot be fully tested to determine the amount of penetration achieved – only full penetration welds can be tested. As the evidence will show, ComEd was unable to determine the root cause of the arm failure until January 2, 2015. Once Pelco was informed on that date that the bracket to arm and relief welds had failed to achieve the desired penetration, the contract between ComEd and Pelco called for Pelco to "promptly correct by repair or replacement" any non-conforming product. It was clear, and the evidence will show, that full penetration welds would have cured the issue, and Pelco was ready, willing, and able to manufacture any desired replacement arms with full penetration welds. Despite being in contact with ComEd for several weeks regarding finalizing any desired replacement arms to ComEd's satisfaction, ComEd terminated its contract with Pelco without providing the opportunity to cure and instead chose an alternative supplier for manufacturing the replacement arms. Because ComEd breached its contract with Pelco, Pelco cannot be held liable for the costs ComEd incurred as a result of the arm failure.

Even in the event this Court finds that ComEd did not breach its contract with Pelco, ComEd's damage claim is grossly excessive as ComEd failed to mitigate its damages in connection with its replacement of the Pelco arms by ComEd's subcontractor, M.J. Electric ("MJE"). ComEd failed to exercise appropriate construction management standards over MJE's work, which resulted in an overcharge to ComEd. To the extent that any of the claimed remediation expense is not reasonable or is related to the failure to mitigate, those costs are not claimable against Pelco.

## II.   ISSUES AT TRIAL

### A. IN VIOLATION OF ITS CONTRACT, PELCO WAS NOT GIVEN A CHANCE TO CURE THE MANUFACTURING DEFECTS IDENTIFIED BY COMED.

On Friday, December 5, 2014, one of the conductor arms supplied by Pelco suffered a complete weld failure at the arm-to-clamp weld joint and fell to the ground, damaging another Pelco arm in the process. Pelco was informed of the failure no later than Saturday, December 6, and in response it began manufacturing two additional arms as substitute for the two damaged arms. Pelco's inspection team arrived to the site on Monday, December 8, and began to examine the arm that failed, as well as the remaining arms on site.

After an inspection by Pelco personnel on site, the parties believed that the failure occurred due to Pelco's improper use of a "reverse bevel," which did not allow proper penetration into the base metal of the shaft. Attached for the Court's reference as Exhibit B is an illustration showing the reverse bevel condition. The reverse bevel resulted in little penetration into the groove portion of the weld, which was believed to have ultimately led to the arm failure.

Pelco's inspection of fourteen arms on site revealed reverse bevel conditions in four total arms (including the arm that initially failed). At that time, a decision was made by ComEd for Pelco to provide fourteen additional conductor arms for added assurance to ComEd that the reverse bevel condition was corrected. Pelco thereafter manufactured and delivered these arms to the job site by December 12, 2014, with Pelco's inspection team confirming that no reverse bevel condition existed on the newly-provided arms.

At the same time Pelco's field inspection report was being generated and the fourteen additional arms were being manufactured, ComEd hired TEAM Industrial Services, a third-party vendor, to inspect Pelco's bracket to arm welds and relief cut welds on the original arms as well as the fourteen additional arms using visual and ultrasonic inspection methods. This was intended to provide ComEd with another point of reference as to the root cause of the failure.

Unbeknownst to Pelco, while TEAM was busy investigating the strength of Pelco's welds, ComEd actively began shopping on December 13 for alternative vendors to manufacture whatever replacement arms it needed for the Project. It quickly settled on working with Valmont Industries, Inc., as a backup option for the replacement arms, with Valmont being provided the relevant engineering designs on December 15.

On that same date, ComEd engaged in a conversation with Pelco and TEAM to discuss TEAM's preliminary findings. TEAM informed Pelco that of 43 arms tested, it appeared that 50% would be rejected due to incomplete penetration and lack of fusion. Pelco requested the final test report once it was completed, and ComEd promised a follow-up call with Pelco once the final report had been received and reviewed. At ComEd's request, Pelco was directed to begin manufacture on 21 replacement arms with a fabrication hold at the fit/weld connection (i.e. the point of failure for the defective arm). This would have allowed ComEd to direct any desired changes in the welding procedure, including the use of full penetration welds.

While waiting for the final report from TEAM, Pelco continued to engage in communications with ComEd regarding the manufacture of the replacement arms and providing any assistance and support it could. Representatives from Pelco spoke with Mark Bartolameolli of ComEd on December 15-16 regarding ComEd's interest in manufacturing replacement arms to best fit ComEd's schedule (such as which transmission towers' arms to manufacture first). In response to Mr. Bartolameolli's request to have Pelco follow ComEd's third-party testing procedures regarding the validation of welds, Pelco offered to fly ComEd and its third-party inspectors to its plant in Oklahoma so that ComEd could personally inspect the welding process for the replacement arms. Mr. Bartolameolli confirmed with Pelco that the plan was to have

ComEd and TEAM representatives at the Pelco factory site to observe the process of fitting the steel and the welding.

On December 18, TEAM finalized its report and contacted ComEd. Its preliminary estimate of 21 rejected arms was incorrect: instead, only *two arms* were rejected -- the one that actually failed in the field, plus the arm that was damaged by the falling arm. This was because TEAM was unable to determine the amount of penetration achieved on any bracket to shaft arm weld. However, all relief welds *were confirmed* to have achieved the desired penetration.

Due to the inconclusive results of the bracket to arm welds, ComEd decided to seek additional testing by Landow Metallurgical Consulting, which would perform destructive analysis of several weld locations on two of Pelco's arms (one of the original arms, and one of the fourteen additional arms with a corrected bevel condition), as destructive testing was the only way to determine the degree of penetration achieved by a partial penetration weld. Despite still not knowing what the root cause of the failure was, and despite directing Pelco to begin manufacture of the replacement arms, internally, ComEd's Transmission Engineering Group was moving towards ordering any desired replacement arms from Valmont. At ComEd's request and direction, Valmont began working on the design engineering and drawings. However, in part because Valmont indicated it would not be able to produce any replacement arms prior to the week of January 19, 2015 (which was later than expected), ComEd waited to see the final test results before making a final determination about using Valmont instead of Pelco.

Pelco, armed with the TEAM report and with no reason to believe ComEd was actively working with another supplier, continued to contact ComEd regarding finalizing the requested replacement arms. On December 18, Pelco informed ComEd that it was ready to finish manufacturing the replacement arms and host ComEd's inspection team. On December 22, Pelco

again asked ComEd for guidance in proceeding with the replacement arms ComEd had requested: ComEd responded that it was still waiting on the test results from Landow and that, after ComEd's Transmission Engineering group had reviewed them, ComEd would let Pelco know how it should proceed. On December 23, Pelco informed ComEd that it would proceed with the completion of the replacement arms subject to confirmation as to whether ComEd wanted to be personally present during the welding process or if it would like to have its third-party inspectors in for final testing. ComEd once again advised Pelco to hold off until the test results were in, which ComEd expected would be on December 24. ComEd indicated it would have an internal call on December 26 to discuss these test results and determine ComEd's next steps. Pelco then contacted ComEd on December 29 to see how ComEd's internal December 26th meeting went and once again requested guidance on how to proceed with manufacturing the replacement arms.

Kept from Pelco, however, was that as of December 19, ComEd was receiving indications from Landow that the welds being tested were showing minimal penetration. The final report, whose findings were delivered to ComEd during the week ending January 2, 2015, indicated that the two arms tested did not achieve the desired penetration, whether in the bracket to arm welds or the relief welds. Despite having previously directed Pelco to begin manufacturing 21 replacement arms, and despite the Landow Report concerning only two arms, ComEd's Transmission Engineering group made the decision to replace *all sixty-four Pelco arms* on the Project with replacement arms provided by Valmont.

ComEd informed Pelco of its decision to terminate its contract on January 2, while providing no opportunity for Pelco to provide replacement product with full penetration welds. Pelco asked ComEd to reconsider Pelco's previous offers to pay for ComEd and its inspection teams to supervise the manufacture of the replacement arms. Pelco reiterated that the arms were

6

already fabricated to the point of weld and were being held at the weld stations so the process could be observed by ComEd. ComEd denied Pelco's request, and instead purchased Valmont replacement arms for the Project.

> **1.    The Contract entered into between ComEd and Pelco gave Pelco the right to cure any defect after it had received notice of noncompliance from ComEd.**

The Contract Terms and Conditions require ComEd to give Pelco the opportunity to cure any defect:

> 4.2 Remedies.
>
> 4.2.1 Material. If any Material does not comply with the foregoing warranties *and Buyer gives Contractor notice of such noncompliance* within two (2) years (or such other period as may be specified in the Purchase Order), after Buyer has accepted . . . , *then Contractor shall (at its sole expense) promptly correct by repair or replacement any (i) non-conforming Material and (ii) any materials, equipment and other personal and real property damaged by the nonconforming Material or otherwise adversely affected by the performance of the Work ("Other Material").* The decision whether to repair or replace shall be made with the concurrence of Buyer and the repair or replacement shall be scheduled consistent with Buyer's operating requirements so as to minimize loss of production or use of the Material, Other Material or of any plant or equipment of which the Material is a part. Notwithstanding any other provisions in these Terms and Conditions to the contrary, all costs and expenses associated with access for repair or replacement of Material or the Other Material, including removal or replacement of systems, structures or other parts of Buyer's facility and all transportation costs, shall be paid by Contractor, and Buyer may charge Contractor all expenses of unpacking, examining, repacking and reshipping any rejected Material or Other Material.

(Emphasis added). The Contract is clear that Pelco has the right to cure, which ComEd violated by its decision to terminate Pelco and purchase replacement arms from another vendor.

> 4.4 Buyer's Right to Perform.
>
> In the event of *Contractor's failure to repair or replace the Material or Other Material, or Contractor's failure to re-perform the Services*, in accordance with the terms hereof, Buyer, after notice to Contractor, may correct any deficiencies in the Material or Services, or may purchase replacement Material or Services. Buyer may either invoice Contractor for the cost of correcting the deficiencies (including the costs directly attributable to other services that are required to be performed in

connection with the correction of such deficiencies), invoice Contractor for the cost of replacement, or, deduct the cost associated with correction or replacement from any payments due or subsequently due Contractor.

(Emphasis added). Section 4.4 is further indication of Pelco's right to cure, as ComEd has the

right to repair or replace only in the instance of Pelco's failure to cure.

> 11.3 Rejected Work.
>
> *Prior to final acceptance of the Work, Buyer may reject any part of the Work found to be defective or not in accordance with the Contract Documents ("Rejected Work"),* . . . and (i) require Contractor to remove the Rejected Work from the Site at Contractor's expense (if applicable); and/or (ii) *require Contractor to re-perform, repair, or replace the Rejected Work at Contractor's expense.* Rejected Work that has been repaired shall not thereafter be tendered for acceptance unless the repair is disclosed to Buyer. *If Contractor fails to promptly commence and diligently proceed to remove and/or re-perform, repair, or replace the Work as specified by buyer, Buyer may (i) by another contractor or otherwise, remove and/or re-perform, repair or replace the Rejected Work and charge to Contractor the cost thereof, or (ii) terminate the all or part of the Purchase Order pursuant to Article 18. of these Terms and Conditions.*

(Emphasis added). This provision confirms that for defects such as the ones found here, ComEd's

remedy under the contract is to have Pelco re-perform and replace the rejected work. Pelco was

not given this opportunity.

    **2.**     **Pelco's provision of fourteen additional arms at ComEd's request immediately following the arm failure does not excuse ComEd's failure to provide Pelco an opportunity to cure the later-identified root cause of the failure.**

After Pelco's investigation revealed a possible reverse bevel condition on four arms,

ComEd requested that Pelco provide fourteen additional arms to ensure the reverse bevel condition

was corrected, as that was the suspected cause of the resulting failure. These arms were delivered

to the site by December 12, at which time ComEd began its own third-party testing (through

TEAM Industrial Services) to ensure that the suspected root cause of the failure (reverse bevel)

was correct. It turned out not to be, but that was only discovered on January 2, 2015, after destructive testing was performed on two of the arms by Landow.

At that point in time, with the root cause of the failure finally identified after numerous false leads, Pelco for the first time had notice of its noncompliance with the Contract Documents and/or Specifications. Under the plain language of the contract, Pelco had the right to cure the identified defect by repairing and replacing the impacted arms in accordance with ComEd's weld specifications and guidelines, which it was prepared to do through the use of full penetration welds. Unfortunately, Pelco was never given that opportunity, and, instead, ComEd terminated its relationship with Pelco and contracted with Valmont to manufacture the replacement arms.

Pelco's provision of fourteen arms at the direction of ComEd to support the Project cannot remove Pelco's contractually-guaranteed right to cure the later-identified defect. The above timeline shows that the parties were unable to identify the root cause of the failure (i.e. the noncompliance) until January 2, 2015. Prior to that time, the root cause of the failure kept changing (or disappearing, as was the case of the December 18 TEAM report which determined that the relief welds had all achieved the desired penetration), and Pelco cannot lose its right to cure the later-identified defect by complying with ComEd's directive to supply fourteen additional arms based upon a preliminary failure analysis that later turned out to be incorrect.

### 3. The existence of "Tiger Stripes" on the Pelco's arms is a red herring: ComEd did not notice the existence of these relief welds until after the fourteen additional arms were provided, and the root cause of the failure of these welds, like the other welds at issue, was not identified until January 2, 2015.

Pelco used longitudinal welds to create a bend in the arm – these relief welds are referred to by ComEd as "Tiger Stripes." ComEd did not notice the presence of Tiger Stripes until after Pelco provided the fourteen additional arms requested by ComEd following Pelco's initial

investigation. Attached for the Court's reference as Exhibit C is a diagram showing relief welds as well as a photograph provided by ComEd of the relief welds. Like the other welds at issue, it was not until January 2, 2015, that it was first determined that the Tiger Stripes had failed to achieve the desired penetration. Therefore, it is evident that Pelco did not get a chance to cure any defect associated with the Tiger Stripes.

ComEd only raised the presence of the Tiger Stripes as a justification for its termination of Pelco in after-the-fact communications with Pelco: it was not raised as a disqualifying issue prior to or at the time of the issuance of the Landow Report. In these later communications, ComEd claimed that the Tiger Stripes were a type of miter joint. ComEd's specifications for the Project provided that "all tubular arms shall have a uniform taper without flanges or miters."

First, the Tiger Stripes used on the Pelco arms are not "miter" joints, and Pelco has retained an expert to testify on that – he is the only opinion witness to address this issue. In the steel pole industry, a miter involves cutting a plate, tube, or shape at a skewed angle into *two separate pieces*, and then rejoining the two pieces as a single welded connection. Attached for the Court's reference as Exhibit D is a representative diagram showing a miter joint.

According to Pelco's expert, the Tiger Stripes are not miters: they are "kerf cuts." A "kerf" is a slit or notch made by a saw or cutting torch. The slit or notch *does not* separate the singular part into two parts as is the case with a miter. When used in a pipe or other tubular member, as here, the slit or notch facilitates the bending of the part into the desired radius with minimal consequence of wrinkling to the compressive face of the tubular member. The use of "kerf cuts" is a standard technique used to assist in the bending of metal or wood, and there is nothing in the specification which prohibits the use of them.

ComEd's design drawings and specifications clearly show a tapered arm, as that is the only way the arms can be "upswept" by the proper degree without using a miter. Each of ComEd's engineer's specification drawings show a geometry exactly like the Pelco design, and all submittals provided by Pelco were reviewed and approved by ComEd's engineer.

Second, on numerous previous jobs between ComEd and Pelco, Pelco had used kerf cuts, all of which were accepted by ComEd, thus establishing a custom and practice by ComEd of allowing these welds that they are now estopped from arguing against. Last, there is no evidence that the arm that failed in the field failed due to any supposed lack of weld penetration in these relief welds – this, like the other welds tested, was simply a non-compliance identified by ComEd on January 2, 2015, that Pelco was not given a chance to cure, whether under the contract or under Section 2-608 of the Uniform Commercial Code.

Because ComEd breached its contract with Pelco by not giving Pelco a chance to cure the lack of required penetration found in its welds as identified in the Landow Report, Pelco cannot be held liable for the costs ComEd incurred as a result of the arm failure. Simply put, a party in breach of contract cannot claim contract damages against the other party to the contract.

## B. COMMONWEALTH EDISON FAILED TO MITIGATE ITS DAMAGES IN CONNECTION WITH ITS REPLACEMENT OF PELCO PRODUCT.

ComEd is claiming damages of $2,165,164.32 related to the Pelco arm failure, including (1) $1,017,204.49 for costs related to emergency site security, safety and maintenance of the site, and failure investigation; (2) $872,912.12 for costs related to the removal and replacement of the installed Pelco arms; (3) $15,781.06 for testing costs; and (4) $259,266.65 for the costs of the Valmont Replacement Arms. In the event this Court finds that ComEd did not breach its contract with Pelco, ComEd is still not entitled to the costs it is claiming due to its failure to mitigate its

damages by not exercising appropriate construction management standards and cost controls over M.J. Electric and the Project.

Pelco has produced a former project manager for ComEd with significant experience on transmission line projects. He finds the damage claim to be excessive and attributes much of the overcharging to poor project management. The Project was originally scheduled for 2015 but was accelerated into 2014. There had been a project management practice in place within ComEd that required a management sponsor and readiness reviews to be completed on a frequent basis in order to accelerate the installation of a project not ready for work - this was not done here. ComEd also failed to control design documents by not mandating use of a revision number and date, instead including multiple documents/drawings for the same product which lead to inefficiencies in the manufacture and erection processes. These are both deviations from standard practice. Moreover, the successful completion of this Project was based upon the ability of ComEd to take outages on the lines listed in the MJE purchase order on the dates shown. Part of ComEd's knowledge base is that changes in system conditions frequently preclude taking outages when scheduled. The award of a lump sum contract by ComEd to MJE, without a clearly defined scope of work and based upon outages that are system dependent, would open ComEd to the submittal of Scope Change Requests from the construction contractor. All of this is evidence of poor project management, which resulted in excessive costs.

ComEd also billed Pelco for schedule impacts unrelated to the arm failure and idle time for both labor and equipment, and double-billed for work done under lump sum and time/material contracts. ComEd has no legitimate claim for expense over its original budget.

1. **M.J. Electric staffed the Project with too much personnel, resulting in excess labor charges to ComEd.**

In the days after the initial arm failure, MJE staffed the Project with an average of fifteen workers each day and billed regular and overtime hours even though there was little to no work required. Pelco's expert testimony indicates an average of nine workers would have been more than sufficient to support the work during this time. By failing to properly manage and oversee MJE's work, ComEd allowed MJE to bill excessive labor charges to the Project.

2. **M.J. Electric incurred excessive equipment costs by failing to demobilize its equipment in a timely manner and/or by not negotiating monthly rates for equipment it was not actively using on site.**

The job site was shut down from December 20, 2014, until January 5, 2015. During this time, as well as later in the project, idle equipment that remained on site was still being billed at hourly rates. As Pelco's experts will testify, it is common industry practice to charge monthly equipment rates if the rental period is longer than two weeks, as it was here. Monthly equipment rates are generally at least 50% less than hourly rates for the same equipment, and ComEd failed to mitigate the costs by not requiring MJE to negotiate more favorable rates. Additionally, after January 5, 2015, MJE maintained idle equipment at the job site until the replacement arms by Valmont arrived on February 12, 2015, once again billing all equipment at an hourly rate. ComEd should have directed MJE to demobilize/remobilize nearly all of its equipment during this period, which would have resulted in tremendous cost savings to Pelco. In the alternative, MJE should have negotiated improved billing rates for all of its equipment.

3. **Assuming that ComEd did not need to replace the remaining Pelco arms with arms manufactured by Valmont, ComEd should only be able to claim the original budgeted costs from Pelco.**

On January 20, 2015, ComEd asked MJE to provide a cost for installing the replacement arms for the structures already in service and the one in the current outage. On January 21, MJE submitted a letter that transmitted a lump sum price of $872,912.12. A review of the scope listed in the lump sum proposal indicates that the removal of guard structures ($28,542.08) is the only

13

scope of work in the proposal that needed to be done even if the replacement of the arms was not done. As such, the remaining cost should not be able to be claimed against Pelco.

### 4. Even had Valmont arms needed to be used, ComEd failed to negotiate a fair and reasonable amount for this work.

ComEd should have adequately reviewed MJE's lump sum proposal prior to approving it. ComEd should have negotiated a fair and reasonable lump sum proposal for all of the remedial work. Failing to obtain a reasonable lump sum price, ComEd should have requested that MJE perform the work on a time and material basis, or a time and material with a not-to-exceed price. In the latter case, ComEd should have monitored the time and material work to ensure that MJE was not performing base contract work while charging it to the failure. That ComEd failed to monitor MJE's costs appropriately is borne out by ComEd's own emails, as it was not until Pelco started questioning the remediation expense that ComEd began questioning MJE's costs.

### 5. Neither the Testing Costs nor the Costs for the Valmont Replacement arms are compensable under the ComEd-Pelco contract.

Section 4.4 of the ComEd-Pelco contract states that only direct costs are compensable in the event of Pelco's failure to perform:

> Buyer may either invoice Contractor for *the cost of correcting the deficiencies* (including *the costs directly attributable to other services that are required to be performed in connection with the correction of such deficiencies*), invoice Contractor for the cost of replacement, or, deduct the cost associated with correction or replacement from any payments due or subsequently due Contractor.

(emphasis added). The expense of TEAM Industrial Services, Inc., in the amount of $15,781.06, is not recoverable. This inspection is not a "direct cost" attributable to the replacement work, and therefore the cost does not fall within the allowable costs under Section 4.4. Furthermore, the inspection by TEAM confirmed and also duplicated the inspection work performed by Pelco and is thus not recoverable on that basis.

14

As for the Valmont replacement arms, ComEd breached its duty to allow Pelco to cure. Accordingly, it had no right to terminate Pelco's contract, meaning that the $259,266.65 being sought from Pelco for the Valmont replacement arms is not compensable.

## III.  CONCLUSION:

Due to ComEd's failure to allow Pelco an opportunity to cure the identified non-compliance following the January 2, 2015 Landow Report, Pelco will be asking for this Court to find that ComEd breached its contract with Pelco and that Pelco cannot be held liable for the costs ComEd incurred as a result of the arm failure. Pelco will also seek a reduction in the installation costs for Valmont's delays in delivering product to the site. Further, given that ComEd gave MJE a blank check to perform its work without normal and customary cost controls, Pelco will ask this Court to reduce the claim amount to reflect the reasonable costs of repair.

**PELCO STRUCTURAL, LLC**

By:   /s/ Robert J. Franco
        Robert J. Franco: ARDC # 6187971
        Andrew P. Lesko: ARDC # 6307961
        Franco Moroney Buenik, LLC
        500 West Madison St., Suite 2440
        Chicago, Illinois 60661
        Telephone: (312) 469-1000
        robert.franco@francomoroney.com
        andrew.lesko@francomoroney.com











**ARM BENDING (RELIEF CUT METHOD)**

1. WHEN ARM BENDING EXCEEDS THE CAPACITY OF THE ARM BENDING MACHINE, ARMS SHALL BE BENT VIA THE RELIEF CUT METHOD

2. THE BEND START DISTANCE WILL BE DIMENSIONED ON THE DRAWING AS WELL AS THE DESIRED BEND RADIUS

3. THE RELIEF CUTS SHOULD REMOVE 1/2" OF MATERIAL AT THE BOTTOM OF THE SECTION. THE CUT SHALL TAPER TO 0" AT THE BEND TANGENT OF THE TOP BEND

4. SUBSEQUENT CUTS ARE ADDED IN APPROXIMATELY 4" INCREMENTS ALONG THE BEND RADIUS. A TYPICAL 12" BEND CAN BE MADE USING 4 RELIEF CUTS. ADDITIONAL CUTS MAY BE ADDED AS REQUIRED BY THE BEND ANGLE

5. CUT EDGES ARE TO BE PREPARED FOR WELD BY GRINDING ALL SLAG AND TACK WELDING THE RELIEVED CROSS SECTION IN PLACE

6. THE GROOVE ANGLE SHALL BE 60° +10°/-5°

7. EXCESS GALVANIZING SHALL BE REMOVED FROM THE WELD, AND GALVANIZING REPAIRED AS REQUIRED.

**EXHIBIT C**





**ARM BENDING (MITER JOINT METHOD)**

1. WHEN ARM BENDING EXCEEDS THE CAPACITY OF THE ARM BENDING MACHINE, ARMS SHALL BE BENT VIA THE MITER JOINT METHOD

2. THE ARM RISE AND ANGLE WILL BE DIMENSIONED ON THE FABRICATION DRAWING

3. WELDS SHALL BE CCMPLETE JOINT PENETRATION AND REQUIRE UT INSPECTION

EXHIBIT

D