# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EXELON BUSINESS SERVICES COMPANY, LLC, | |
| Plaintiff, | Case No.: 1:16-cv-00611 |
| v. | Hon. Robert M. Dow, Jr. |
| PELCO STRUCTURAL, LLC, | |
| Defendant. | |

## PLAINTIFF EXELON BUSINESS SERVICES COMPANY, LLC'S
## TRIAL BRIEF

Heather H. Harrison (#6296693)
Tracy A. Hannan (#6281834)
EXELON CORPORATION
10 S. Dearborn St., 49th Floor
Chicago, Illinois 60603
Telephone: (312) 394–8164
Facsimile: (312) 394–8322
heather.harrison@exeloncorp.com
tracy.hannan@exeloncorp.com

Mariangela M. Seale (#6293433)
Brian O. Watson (#6304248)
Lauren Jaffe (#6316795)
Joy Anderson (#6320219)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
Telephone: (312) 471–8700
Facsimile: (312) 471–8701
mseale@rshc-law.com
bwatson@rshc-law.com
ljaffe@rshc-law.com
janderson@rshc-law.com

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................................... 2

    I.      The Elgin-O'Hare Project    2

          A.      The Master Contract ................................................................................. 2

          B.      The Specifications and Drawings ............................................................ 3

          C.      Delivery and Installation ........................................................................... 5

    II.     The Pelco Arm Failure    5

    III.    The Emergency Work and Inspections    6

    IV.    The Failed Attempt to Cure    7

    V.     The Initial Weld Tests    8

    VI.    The Destructive Weld Tests    8

    VII.   The Replacement Work    9

LAW AND ARGUMENT .......................................................................................................... 10

    I.      Pelco Breached the Master Contract by Delivering Arms with Pervasive Welding Defects Resulting in Catastrophic Failure.    10

    II.     Exelon Is Entitled to Damages Under the Master Contract Because Pelco Delivered Defective Arms and Failed to Cure.    12

    III.    Exelon Would Be Entitled to the Same Damages Under the UCC Because It Properly Revoked Acceptance of the Defective Arms.    14

CONCLUSION ........................................................................................................................... 15

## INTRODUCTION

This breach of contract case arises from pervasive welding defects in steel transmission arms manufactured and sold by Pelco to Exelon for a Tollway transmission project. One of those defects resulted in a catastrophic failure that caused a 1,000-pound steel arm to break apart and crash from a 135-foot tower near a busy, four-lane highway. Pelco does not dispute that it is responsible for that failure. And the evidence indisputably shows that Pelco's welding defects were not limited to that arm alone—even after Exelon afforded Pelco the opportunity to cure. Accordingly, there should be no dispute that Pelco is liable to Exelon for breach of contract and responsible for the damages that resulted therefrom.

Exelon seeks to recover, pursuant to the parties' contract, the damages it incurred to respond to and address the arm that fell, as well as the costs to purchase and install replacement arms. Immediately following the arm failure, Exelon took the reasonable and necessary steps to safely finish its project. Exelon secured the site and evaluated all of the Pelco arms. Exelon then gave Pelco an opportunity to cure, allowing Pelco to inspect its original arms, make corrections, and deliver replacements to Exelon. Pelco failed to cure. Destructive testing confirmed *both* the original and replacement arms were riddled with welding defects. Exelon, left with no reasonable alternative, bought arms from another company and completed the project. Altogether, Exelon was forced to pay more than $2,165,164.32 to replace the arms and fix the project.




**THE COMPLETED TRANSMISSION PROJECT**      **THE FAILED ARM**

Exelon runs a high-stakes business. If a single transmission circuit fails, its grid must reroute electricity instantaneously, or other circuits and equipment may also fail. When Pelco showed not only once, but twice, that its welding could not be trusted, Exelon made the reasonable choice to avoid another tremendously dangerous failure and to finish the project using a different company's arms. Exelon is thus entitled to its full damages, plus interest and costs.

## FACTUAL BACKGROUND

### I. The Elgin-O'Hare Project

In 2013, Exelon planned a critical, multimillion-dollar transmission project at the request of the Illinois Tollway to accommodate the new Elgin-O'Hare Expressway.[1] The project was to replace the current transmission structures, install new transmission poles, and ultimately raise the height of the transmission circuits over the new expressway. In November 2013, Exelon sought bids for eleven new transmission poles with sixty-four arms.[2] Its request included specifications and drawings, and directed bidders in their responses to list any "exceptions"—requirements they could not meet.[3] Pelco, a custom steel pole manufacturer, submitted its bid on December 5, 2013, and, in part because of Pelco's stated ability to manufacture the poles without any "exceptions" to the specifications, Exelon awarded Pelco the contract.

#### A. The Master Contract

Exelon and Pelco's contracts are not in dispute. In February 2014, Exelon and Pelco entered into a Master Terms and Conditions for the Purchase of Materials and Services ("Master

---

[1] Exelon and its affiliate, Commonwealth Edison Company ("ComEd"), each had roles in the project. For ease of reference, Exelon refers to both simply as "Exelon."

[2] A succinct recitation of these facts, with references, is in the report of Exelon's damages expert, Mark Hosfield. *See* Ex. 1, Mark Hosfield Report.

[3] Ex. 2, Request for Proposal at B2. The RFP made clear that "[a]ll exceptions to the Scope of Work/Technical Specifications must be listed together, specifically identified, and attached[.]" *Id.* In response, Pelco marked that it "accepts and will comply with the scope of work without exceptions." *Id.*

2

Contract").[4] The Master Contract governed all purchase orders and other contract documents.[5] Exelon and Pelco then entered into a purchase order for the transmission poles and arms in the amount of $973,211.00.[6]

The Master Contract had critical provisions. Pelco agreed to "perform the work as set forth in the Purchase Order and other [Master] Contract Documents"[7] and "to adhere with the designs and specifications provided by [Exelon] for this project."[8] Pelco also expressly warranted that the material it furnished "will comply with the Specifications contained in or developed in accordance with the [Master] Contract Documents, and will be … (2) free from defects in design, workmanship and materials, … (4) suitable for its intended purpose as specified in the [Master] Contract Documents, (5) fit for the particular purpose intended … , and (7) fully tested in accordance with the [Master] Contract Documents."[9]

### B. The Specifications and Drawings

The project specifications and drawings are essential in any Exelon transmission project. Designed to hold up in extraordinary weather conditions, Exelon's transmission system delivers power to millions of customers and supports the nation's electrical grid. Exelon's engineers review every aspect of a project's specifications and drawings knowing the tensions required to keep its electrical wires from sagging too low and the potential risks of a power outage.

---

[4] Ex. 3, Pelco Ans. First Am. Compl. at ¶¶ 15–16.

[5] Ex. 4, Purchase Order at 1–4. Master Contract Documents include, among others, "the Purchase Order, any Change Orders thereto, these Terms and Conditions, and any other documents identified [therein]," Ex. 5, Master Contract at 7, as well as the "Project Schedule; . . . Special Terms and Conditions; Software License Agreements; . . . Drawings; [and] Specifications[.]" *See* Ex. 5, Master Contract at § 2.4.

[6] Ex. 3, Pelco Ans. First Am. Compl. at ¶ 16; Ex. 4, Purchase Order at 1–4.

[7] Ex. 5, Master Contract at § 3.1.

[8] Ex. 6, Scope of Work at § 5.2.

[9] Ex. 5, Master Contract at § 4.1.1.

3

Here, Exelon and Pelco agreed to specifications and drawings for the transmission poles and arms. Exelon sent its detailed specifications[10] to Pelco, and Pelco converted Exelon's specifications into drawings, which Exelon approved.[11] The specifications required that all welding "conform to the best recommended practice of American Welding Society (AWS D1.1)"[12] and be "fabricated in accordance with drawings approved by [Exelon]."[13] In its drawings, Pelco was also required to detail "[c]omplete information regarding … location, type, size, and extent of all welds[.]"[14] Before delivery to Exelon, Pelco was required to ensure "that the size, length, and location of all welds conform to the requirements of [AWS D1.1] and to the detail drawings," and that "no unspecified welds have been added without the approval of the Engineer."[15]

Pelco's approved drawings had specific welding details. The drawings showed welds in two locations: the arm-to-clamp weld, which joins the armshaft to the clamp that is later bolted to the pole, and the arm-to-conductor weld. But critically, they showed no welds at the arm bend:[16]



---

[10] Exelon's specifications included drawings, but for simplicity will be referred to as "specifications."

[11] Ex. 7, Pelco Approved Design Drawings.

[12] ComEd Specification EM10361, Steel Pole Transmission Structures, at 6.6.1.

[13] ComEd Specification EM10361, Steel Pole Transmission Structures, at 6.1.1.

[14] Ex. 8, American Welding Society (AWS) D1 Committee on Structural Welding, AWS D1.1/D1.1M:2010 at 5, § 2.3.1; *see also* ComEd Specification EM10361, Steel Pole Transmission Structures, at 7.2.2.5.

[15] Ex. 8, American Welding Society (AWS) D1 Committee on Structural Welding, AWS D1.1/D1.1M:2010 at 220, § 6.5.1; *see also* Ex. 9, Pelco Welding Specifications and Procedures 2.1.1, at 13, § 8.2.1.

[16] Ex. 7, Pelco Approved Design Drawing at COMED_PELC000005001.

4

Exelon also approved specific levels of welding penetration, a critical measure of the weld's strength. The higher the penetration, the stronger the weld. Exelon and Pelco's agreed upon drawings and specifications required at least 80% penetration.[17] The drawings and specifications also prohibited cracks in the welds.[18]

### C. Delivery and Installation

In June 2014, Pelco delivered the eleven transmission poles with sixty-four arms. To install Pelco's poles and arms and remove the existing transmission structures, Exelon hired one of its longstanding contractors of choice, MJ Electric.



"D" SERIES   "F" SERIES   "E" SERIES

The work was scheduled to occur during carefully planned outages beginning in November 2014, and was divided into three series ("D," "E," and "F" Series). MJ Electric installed the first set of Pelco poles and arms in November 2014 ("E" Series). On December 1, 2014, MJ Electric began installing the second set of Pelco poles and arms ("D" Series).

## II. The Pelco Arm Failure

On December 5, 2014, four days into the work on the "D" Series, one of Pelco's 1,000-pound arms snapped off the pole (the "Failed Arm") and crashed more than 80 feet to the ground.[19] At the time of the failure, MJ Electric was installing new conductor wires on the poles, and two MJ Electric employees were working in a basket attached to a crane directly below the Failed Arm. On its way down, the Failed Arm crashed into another arm (the "Damaged Arm"), hit the boom of

---

[17] ComEd Specification EM10361, Steel Pole Transmission Structures, at 6.6.2.1, 6.6.2.2, 6.6.3, 6.6.4; Ex. 7, Pelco Approved Design Drawings at COMED_PELC000004995.

[18] *Id*.

[19] Ex. 3, Pelco Ans. First Am. Compl. at ¶ 3.

5

the crane holding the MJ Electric employees, and flipped 360 degrees before hitting the ground. In addition to tearing open the crane's hydraulic fluid reservoir, the Failed Arm also damaged other equipment on the transmission system. It was a miracle no one was hurt or killed.

### III. The Emergency Work and Inspections

In the aftermath of the failure, Exelon secured the scene and inspected all of the Pelco arms. There was a lot to protect: MJ Electric had already installed forty-four of Pelco's sixty-four arms. When the Failed Arm crashed to the ground, MJ Electric immediately pivoted from its installation work in order to secure the site, assess the damage, install guard structures to protect traffic, stabilize and secure the wires, and deal with the broken crane. The next day, December 6, Exelon employees continued the emergency work, developed a remediation plan, and notified Pelco of the failure. By December 7, MJ Electric had secured most of the construction site and removed the Damaged Arm from the pole.

On Monday, December 8, Pelco arrived to conduct its own inspections. Pelco found that the Failed Arm suffered a **"[c]omplete weld failure"** on the arm-to-clamp weld.[20] This weld, according to Pelco, had "virtually no weld penetration[.]"[21] But it was not only the Failed Arm with virtually no weld penetration—the Damaged Arm, too, had **"virtually no penetration"** in the arm-to-clamp weld.[22] Pelco also found that the Damaged Arm suffered **"[s]evere cracking"** on the clamp.[23] Pelco attributed these faulty penetrations to an "incorrect bevel position"— meaning Pelco beveled the wrong side of the arm shaft before welding it to the clamp. Pelco

---

[20] Ex. 10, Pelco Field Inspection Report at 3 (emphasis in original).

[21] *Id.*

[22] *Id.*

[23] *Id.*

6

identified this defective bevel placement on at least two more arms,[24] and informed Exelon that at least fourteen of its sixty-four arms needed to be replaced.[25]

### IV. The Failed Attempt to Cure

After the initial inspections uncovered welding defects in several of the arms, Pelco tried to cure under the Master Contract.[26] Pelco delivered fourteen replacement arms to Exelon: two on December 9, and twelve on December 10.[27] But these arms also had welding problems.



**RELIEF CUT WELDS**

In addition, when Exelon and MJ Electric received Pelco's replacement arms, they noticed multiple places that had been cut and re-welded along the bends of the arm shafts. These welds—referred to as "relief cut" or "tiger stripe" welds—were not identified anywhere on the drawings or specifications. Pelco claimed these cuts were made because the arms were too big for its machines to bend properly. Exelon was shocked to learn from Pelco that these cuts had *also* been made in the original arms—except the welds on those arms had been carefully sanded and galvanized to appear smooth, leaving no visible trace of their existence. Worse still, when Exelon asked Pelco for the weld detail and procedure, Pelco had to create them after the fact.[28] As it turns out, Pelco's engineers were not even involved in the design, manufacture, or inspection of the

---

[24] *Id.* at 7.

[25] Ex. 3, Pelco Ans. First Am. Compl. at ¶ 32.

[26] Under the Master Contract, "[i]f any Material does not comply with [Pelco's] warranties . . . , then [Pelco] shall (at its sole expense) promptly correct by repair or replacement any (i) non-conforming Material and (ii) any materials, equipment and other personal and real property damaged by the non-conforming Material or otherwise adversely affected by the performance of the Work ('Other Material')[.]" Ex. 5, Master Contract at § 4.1.2.

[27] Ex. 11, Pelco Answer to Interrog. 5.

[28] Ex. 12, Dec. 12, 2014 Email from Kasey Scott, 000680PELCO–000682PELCO; *see also* Ex. 13, Dec. 12, 2014 Email from Matt Krafft, 000683PELCO–000684PELCO (collecting information to submit to Exelon).

7

relief cut welds; they, like Exelon, had no idea these welds were added until *after* one of Pelco's arms catastrophically failed.[29]

## V. The Initial Weld Tests

Upon delivery of the replacement arms, Exelon hired an expert, Team Industrial, to do ultrasonic testing to determine whether the welding in Pelco's arms was suitable according to Exelon's specifications. On December 14, Team Industrial analyzed both the arm-to-clamp welds (also known as "shaft-to-clamp" or "bracket-to-shaft" welds) and the relief cut welds on approximately forty arms using non-destructive, ultrasonic testing. Team Industrial discovered an arm-to-clamp welding defect (a "crack like indication") in yet another arm.[30]

But Team Industrial could not verify the penetration levels of all welds because Pelco had designed its welds using partial penetration, i.e., welds with less than 100% penetration. To conclusively test the welds and determine the penetration levels, destructive testing was necessary.[31] Team Industrial therefore consulted a metallurgist to do destructive testing.

## VI. The Destructive Weld Tests

To perform these tests, seven samples, called "coupons," of Pelco's welds were cut out of the arms and sent to the metallurgist, Landow Metallurgical Consulting, for study under a microscope. Landow examined samples from Pelco's original and replacement arms. In both arms, samples were taken from the arm-to-clamp weld and the relief-cut welds.

Of these seven samples (taken from two arms), *zero* arm-to-clamp welds met the required 80% weld penetration.[32] And *zero* relief-cut welds met Pelco's after-the-fact 66% standard.[33] Not

---

[29] Ex. 14, James Sutphen Dep. at 73:24–74:6.

[30] Ex. 15, Team Ind'l Report at 000891PELCO.

[31] Ex. 14, James Sutphen Dep. at 34:13–15.

[32] Ex. 16, Mark Landow Report at 1, 4.

[33] Ex. 14 James Sutphen Dep. at 76:8–17.

8

only did Pelco's welds fail to meet these standards, its weld penetrations varied from a devastating 14 to 63%.[34]

As shown in Exelon, Pelco, Team Industrial, and Landow's inspections, the original and replacement arms suffered from pervasive and material welding defects: (1) deficient weld penetrations at both the arm-to-clamp welds and the relief-cut welds; (2) faulty bevels, which resulted in virtually no weld penetration; (3) cracked welds; and/or (4) hidden relief cut welds, which were not made to any specification at all.

### VII. The Replacement Work

At this point, Exelon had no reasonable choice but to revoke its acceptance of Pelco's arms and to finish the project using arms from another company. As the Master Contract permitted,[35] Exelon bought replacements from a custom pole and arm manufacturer, Valmont, which, like Pelco, had originally bid for the project. MJ Electric then replaced the Pelco arms and finished the project with Valmont arms.

Exelon tracked all the work through "change orders" with MJ Electric.[36] Change order "X002" tracked all emergency work to address the catastrophic failure, and change order "X003" tracked the costs for removing and replacing the Pelco arms. As shown below and in his report, Exelon's expert, Mark Hosfield, calculated the total damages:[37]

---

[34] Ex. 16, Mark Landow Report at 2.

[35] Since Pelco failed to cure under Section 4.., the Master Contract provided that "[Exelon], after notice to [Pelco], may . . . purchase replacement Material[.] [Exelon] may . . . invoice [Pelco] for the cost of . . . replacement" Master Contract § 4.4. In addition, "all costs and expenses associated with access to or repair or replacement of Material or the Other Material, including removal or replacement of systems, structures or other parts of [Exelon's] facility and all transportation costs, shall be paid by [Pelco][.]" Ex. 5, Master Contract at § 4.1.2.

[36] Ex. 1, Mark Hosfield Report at 15–23.

[37] *Id.* Notably, Exelon has elected not to purse more than $1 million from Pelco in internal labor, payroll, administrative, and other costs, as well as the amount it paid Pelco under the Master Contract and purchase order for the arms.

> i. Costs Related to X002 – Emergency site security, safety and maintenance of the site, and investigation of the failure of $1,017,204.49;
> ii. Costs Related to X003 – Removal and replacement of the installed Pelco arms of $872,912.12;
> iii. Testing Costs of $15,781.06; and
> iv. Cost of the Valmont Replacement Arms of $259,266.65.[79]
>
> These costs are summarized in the chart below:
>
> | Summary of Exelon Damages | |
> |---|---|
> | **Damages Component** | **Damages** |
> | Costs Related to X002 | $ 1,017,204.49 |
> | Costs Related to X003 | 872,912.12 |
> | Testing Costs | 15,781.06 |
> | Cost of Valmont Replacement Arms | 259,266.65 |
> | **Total Exelon Damages** | **$ 2,165,164.32** |

## LAW AND ARGUMENT

Exelon is entitled to recover its damages under the Master Contract and Illinois law.[38] By furnishing materially defective arms and failing to cure, Pelco breached its contract with Exelon. Pelco owes Exelon the damages that it incurred as a result.[39]

### I. Pelco Breached the Master Contract by Delivering Arms with Pervasive Welding Defects Resulting in Catastrophic Failure.

Pelco's material breaches of the Master Contract are myriad: (1) failing to perform the work as set forth in the purchase order, specifications, and drawings;[40] (2) failing to furnish arms in compliance with the specifications;[41] (3) failing to furnish arms free from defects in design, workmanship and materials;[42] (4) failing to furnish arms suitable for their intended purpose;[43] (5)

---

[38] Exelon and Pelco agree that Illinois law governs this case and that a valid and enforceable contract exists. *See* Ex. 3, Pelco Ans. First Am. Compl. at ¶¶ 15–17; Pelco Counterclaim at ¶¶ 5–6, 11; *see also* Ex. 5, Master Contract at § 30.9(iv).

[39] *See Dual-Temp of Illinois, Inc. v. Hench Control, Inc.*, 821 F.3d 866, 869 (7th Cir. 2016) (breach of contract elements).

[40] Ex. 5, Master Contract at § 3.1.

[41] *Id.* at § 4.1.1.

[42] *Id.* at § 4.1.1(2).

[43] *Id.* at § 4.1.1(4).

failing to furnish arms fit for the particular purpose intended;[44] (6) failing to furnish arms that were fully tested in accordance with the specifications and drawings;[45] (7) failing to adhere with the designs and specifications provided by Exelon;[46] and (8) failing to supply and cure with conforming replacement arms.[47]

As detailed above, Pelco's original arms were rife with welding defects. Despite Pelco's contractual promise to make arms with 80% weld penetration, Pelco admitted that its Failed Arm had "virtually no weld penetration"[48] and snapped off and fell more than 80 feet to the ground.[49] As it fell, the Failed Arm struck the Damaged Arm, which Pelco's testing revealed also had deficient welding at the arm-to-clamp weld and suffered severe cracking.[50] Indeed, according to Pelco itself, this arm also had virtually no weld penetration.[51] Pelco's tests then revealed defective bevel locations, which it concluded contributed to the lack of weld penetration, in the welds on the Failed Arm, Damaged Arm, and at least two more arms.[52]

Pelco's replacements were similarly defective. When Exelon commissioned destructive testing, it found that *not one* weld was adequate when compared with Exelon's arm-to-clamp weld specifications or Pelco's after-the-fact specifications for the relief cut welds. Instead of 80% or even 66% penetration, Pelco's welds only achieved 14 to 63%.[53] Furthermore, Pelco's failure to disclose the relief cut welds on any drawing or specification at the start of the project, and the

---

[44] *Id.* at § 4.1.1(5).

[45] *Id.* at § 4.1.1(7).

[46] *Id.* at Scope § 5.2.

[47] *Id.* at § 4.2.1.

[48] Ex. 10, Pelco Field Inspection Report at 3; *see also* Ex. 14, James Sutphen Dep. at 49:20–50:9.

[49] *Id.*; *see also* Ex. 3, Pelco Ans. First Am. Compl. ¶ 3.

[50] Ex. 10, Pelco Field Inspection Report at 3.

[51] *Id.*

[52] *Id.* at 7.

[53] Ex. 16, Mark Landow Report at 2–3.

absence of any engineer involvement in their creation, were clear violations of the welding standard (AWS D1.1), which required both disclosure and inspection of all welds.[54]

In short, the evidence is overwhelming that Pelco breached the Master Contract when it failed to cure its pervasive welding defects.

## II. Exelon Is Entitled to Damages Under the Master Contract Because Pelco Delivered Defective Arms and Failed to Cure.

Exelon's damages are clear under the Master Contract. Under § 4.2.1, Pelco must promptly correct by repair or replacement any nonconforming material.[55] If Pelco fails to do so, Exelon, after notice to Pelco, may purchase replacement material and invoice Pelco for the cost of replacement.[56] Under § 4.2.1, Pelco then must pay all costs and expenses associated with access to or repair or replacement of material or the other material, including removal or replacement of systems, structures or other parts of Exelon's facility and all transportation costs.[57] Exelon properly followed these provisions of the Master Contract.

As explained above, Pelco's welding was unquestionably nonconforming and defective. After the first arm broke and fell, Pelco, Team Industrial, Landow, and Exelon found that the original and replacement arms were rife with problems. Critically, *not one* destructively tested weld came close to the required weld penetration level. Pelco admittedly used the same welding process for each of its welds.[58] Indeed, rather than correct its welding process after its catastrophic

---

[54] *See* supra at section I(B).

[55] Ex. 5, Master Contract at § 4.2.1.

[56] *Id.* at § 4.4.

[57] *Id.* at § 4.2.1

[58] Ex. 14, James Sutphen Dep. at 89:10–16 (**Q**: Jim, would the welding procedure be any different for the relief cuts than it would be for any of the groove welds? **A**: No, same weld procedures. **Q**: So there are, what, five groove weld procedures, they would all be the same? **A**: Yes.)

12

failure and later investigation, Pelco built its replacement arms "the same way as [it] built them before."[59]

Pelco's argument that it was entitled to multiple opportunities to cure is wrong, both factually and legally. Factually, Pelco knew the welding defect was "virtually no weld penetration" resulting in "complete weld failure" before it delivered replacement arms.[60] Legally, neither the Master Contract nor the law gives Pelco multiple attempts at cure. The Master Contract is clear that Pelco must "promptly correct" non-conforming material, and, if it fails to do so, Exelon may purchase replacements.[61] This is exactly what happened. Pelco's desire for multiple chances is not the law; buyers are not required to show manufacturers, like Pelco, how to make or fix their own product.[62] Pelco's job was to weld properly, and it failed twice. Pelco also admitted it could not bend the arms because of its limited machine capability, so it simply could not cure the relief cuts.[63]

Exelon therefore appropriately purchased replacement arms from Valmont and invoiced Pelco for the related costs.[64] Pelco's attempt to Monday-morning quarterback the costs Exelon incurred in the emergency created by Pelco also falls flat. Exelon solved the emergency in a

---

[59] Ex. 14, James Sutphen Dep. at 49:18–19; *see also id*. at 55:4–56:19 ("**Q**: Okay. So one arm that's fallen and four arms that are incorrect, that's not enough for you to know? [objections] **A**: We began the process of replacing the arms. **Q**: Okay. But you did nothing differently when you made those replacement arms? [objections] **A**: I believe -- I'm not sure. I believe that's the case, yes."); *id.* at 54:10–16 (admitting that Pelco's weld problem was not isolated to the four arms it determined were prepared incorrectly).

[60] Ex. 10, Pelco Field Inspection Report at 3.

[61] Ex. 5, Master Contract at §§ 4.2.1, 4.4.

[62] *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 783 (7th Cir. 2011) ("[A] buyer does not have to wait indefinitely for the seller to cure."); 4 *Anderson U.C.C.* § 2–608:109 (3d. ed.) ("A buyer is not required to provide a seller with an unlimited number of opportunities to cure a nonconformity before revoking acceptance." (citation omitted)).

[63] Ex. 14, James Sutphen Dep. at 70:15–20.

[64] Ex. 5, Master Contract at §§ 4.1.2, 4.4; *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 518 (7th Cir. 2011) (breach of contract damages require "both the correct measurement of damages and the final computation of damages based on that measurement. Plaintiffs are not required to prove damages to the exact cent; they must merely establish a reasonable basis for computing damages, and may do so in any reasonable manner." (quotations and citations omitted)).

13

reasonable manner. It hired a trusted and longstanding contractor, MJ Electric, using pre-emergency negotiated rates for labor and equipment.[65] The uncertainty of the situation—when replacement arms would arrive, whether another arm would break, the timing of outages in which the work could be done, and the equipment's high demand—required equipment to remain onsite. And, although Exelon was forced to incur hundreds of thousands in additional costs, such as unnecessary labor and its own administrative costs, it has not passed these on to Pelco.[66] Exelon's damages are more than reasonable under the circumstances.

### III. Exelon Would Be Entitled to the Same Damages Under the UCC Because It Properly Revoked Acceptance of the Defective Arms.

Not only is Exelon entitled to its damages under the Master Contract, it also properly revoked acceptance of the defective Pelco arms and would be entitled to the *same* damages under the UCC. Under § 2-608(1)(b), a "buyer may revoke his acceptance of a lot or commercial unit" if the following elements are met: (1) the "nonconformity substantially impairs its value" to the buyer; (2) the buyer accepted "without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances"; and (3) the buyer notifies seller of its revocation "within a reasonable time after the buyer discovers or should have discovered the ground for it[.]"[67]

Because the elements of UCC § 2-608 are met, Exelon appropriately revoked its acceptance as to all of Pelco's arms. First, the value of the arms to Exelon was substantially impaired by the defective welding.[68] Indeed, when "a person's faith is shaken in a major investment, the item not

---

[65] Ex. 1, Mark Hosfield Report at 10, 13–22.

[66] *Id.*

[67] 810 ILCS 5/2–608(b)(1), (2).

[68] *See N. Am. Lighting, Inc. v. Hopkins Mfg. Corp.*, 37 F.3d 1253, 1258 (7th Cir. 1994). All of Pelco's welded arms were nonconforming. To the extent that Pelco argues otherwise, the UCC makes clear that, despite nonconformities in only some of the goods, "the buyer may revoke his acceptance, in appropriate cases, as to the entire lot or any commercial unit thereof." UCC § 2–608 n.7; *see also Econ. Folding Box*

14

only loses its actual value in the buyer's eyes, but also becomes an article whose integrity has been substantially impaired and whose operation is fraught with apprehension."[69] Second, the welding defects were difficult to detect as it was impossible to test them without destroying the arms, and Exelon necessarily accepted the arms on Pelco's assurances that the welding conformed to the required specifications and drawings. Third, Exelon notified Pelco, and Pelco attempted, but failed, to cure the welding defects. Therefore, the UCC makes clear that Exelon may revoke its acceptance of the defective arms and recover reasonable damages of approximately $2.1 million from Pelco.[70]

## CONCLUSION

For these reasons, Exelon is entitled to a judgment in its favor and against Pelco in the amount of $2,165,164.32, plus interest and costs.

---

*Corp. v. Anchor Frozen Foods, Corp.*, No. 04 CV 4485, 2007 WL 844878, at *12–13 (N.D. Ill. Mar. 19, 2007), aff'd, 515 F.3d 718 (7th Cir. 2008).

[69] *Econ. Folding Box Corp.*, 2007 WL 844878, at *9–10.

[70] *See Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d at 518.

15

Dated: July 26, 2019 Respectfully submitted,

**EXELON BUSINESS SERVICES COMPANY, LLC**

*/s/ Mariangela M. Seale*
Heather H. Harrison (#6296693)
Tracy A. Hannan (#6281834)
EXELON CORPORATION
10 S. Dearborn St., 49th Floor
Chicago, Illinois 60603
Telephone: (312) 394–8164
Facsimile: (312) 394–8322
heather.harrison@exeloncorp.com
tracy.hannan@exeloncorp.com

Mariangela M. Seale (#6293433)
Brian O. Watson (#6304248)
Lauren Jaffe (#6316795)
Joy Anderson (#6320219)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St, Ste. 2900
Chicago, Illinois 60602
Telephone: (312) 471–8700
Facsimile: (312) 471–8701
mseale@rshc-law.com
bwatson@rshc-law.com
ljaffe@rshc-law.com
janderson@rshc-law.com

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that these papers were filed and served on all counsel of record via the Court's CM/ECF electronic filing system on July 26, 2019.

*/s/ Brian O. Watson*
