# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EXELON BUSINESS SERVICES | ) | |
| COMPANY, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:16-cv-00611 |
| | ) | |
| v. | ) | Hon. Robert M. Dow, Jr. |
| | ) | |
| PELCO STRUCTURAL, LLC | ) | |
| | ) | |
| Defendant. | ) | |

**PELCO'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM
TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

NOW COMES the Defendant, PELCO STRUCTURAL, LLC ("Pelco"), by and through

its attorneys, Franco & Moroney, LLC and for its Answer, Affirmative Defenses and Counterclaim

to the First Amended Complaint of Plaintiff Exelon Business Services Company, LLC ("Exelon"),

states as follows:

**ANSWER**

**NATURE OF ACTION**

1.      This is a breach of contract and breach of warranty action arising from Pelco's

manufacture and supply of defective conductor cross arms to Exelon for use by Exelon's affiliate,

Commonwealth Edison Company ("ComEd"), on the Illinois Tollway's Elgin/O'Hare project in

2014 ("Tollway Project"). ComEd and Exelon will be referred to collectively hereafter as "Exelon."

**ANSWER:**   This paragraph makes no allegations against the Defendant, PELCO
STRUCTURAL, LLC ("Pelco"), and Pelco makes no response thereto or in the
alternative, denies such allegations and demands strict proof thereof.

2.      Exelon's role in the Tollway Project was to raise the height of six existing

transmission circuits to accommodate the new Elgin/O'Hare expressway.

1

**ANSWER:**     This paragraph makes no allegations against Pelco, and Pelco makes no response thereto or in the alternative, denies such allegations and demands strict proof thereof.

3.      After installation, one of the Pelco cross arms broke apart at its weld and crashed approximately 80 feet to the ground, breaking another arm on its way down and causing damage to other equipment on the transmission circuit.

**ANSWER:**     Pelco admits that one of its conductor arms failed and fell to the ground, colliding with another conductor arm. All other allegations are denied.

4.      Inspections and testing conducted immediately following the arm failure revealed pervasive defects in not only the cross arm that failed but throughout the cross arms manufactured and supplied by Pelco.

**ANSWER:**     Pelco admits that testing and inspections performed afterward showed an incomplete weld penetration in the failed conductor arm. All other allegations are denied.

5.      Exelon afforded Pelco the opportunity to cure defects, but the replacement cross arms supplied by Pelco were likewise defective.

**ANSWER:**     Denied.

6.      Thereafter, in order to complete the time-sensitive Tollway Project, Exelon exercised its right to purchase replacement cross arms from a third party and to remove the defective Pelco arms and install the conforming replacement arms.

**ANSWER:**     Pelco admits that Exelon engaged a new supplier, but denies all other allegations and states that Exelon engaging a new supplier was a violation of the Contract.

7.      Through this action, Exelon seeks recovery from Pelco of the costs and expenses incurred to remedy Pelco's breaches of contract and warranty.

**ANSWER:**     This paragraph makes no allegations against Pelco, and Pelco makes no response thereto or in the alternative, denies such allegations and demands strict proof thereof.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and because the amount of controversy exceeds the sum of $75,000.00.

**ANSWER:**      Admitted.

9.      Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391, because a substantial portion of the transactions giving rise to this cause of action occurred within the Northern District of Illinois.

**ANSWER:**      Admitted.

## PARTIES

10.      Exelon Business Services Company, LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Illinois, Exelon Corporation is the sole member of the LLC and is a corporation organized under the laws of the State of Pennsylvania.

**ANSWER:**      This paragraph makes no allegations against Pelco, and Pelco makes no response thereto or in the alternative, denies such allegations and demands strict proof thereof

11.      Pelco Structural, LLC is a limited liability company organized under the laws of the State of Oklahoma with its principal place of business on Oklahoma.  On information and belief, Pelco Products, Inc. is the sole member of the LLC and is a corporation also organized under the laws of the State of Oklahoma.

**ANSWER:**      Denied.  Pelco Products, Inc., is not a member of Pelco Structural, LLC.  Defendant admits that Pelco Structural, LLC is a limited liability company organized under the laws of Oklahoma with its principal place of business in Oklahoma.

## FACTUAL BACKGROUND

3

**Exelon's Request for Proposal**

12.     Exelon issued a Request for Proposal ("RFP") in or about November 2013 for the supply of transmission poles and conductor cross arms for use on the Tollway Project.

**ANSWER:**     Admitted.

13.     Pelco submitted a Response to RFP on or about December 5, 2013 ("RFP Response").  A copy of Pelco's RFP Response is attached here as Exhibit A.

**ANSWER:**     Admitted.

14.     Exelon awarded the Project to Pelco in or about January 2014.

**ANSWER:**     Admitted.

**The Contract**

15.     On or about February 3, 2014, Exelon and Pelco entered into Master Terms and Conditions for the Purchase of Materials and Services ("Master T&Cs"), a copy of which is attached hereto as Exhibit B, pursuant to which Exelon would be the Buyer and Pelco the Contractor.

**ANSWER:**     Pelco admits that it entered into the Purchase Order dated February 5, 2014, which included the Master Terms and Conditions.  All other allegations are denied.

16.     Exelon and Pelco thereafter entered into Purchase Order No. 001135575 (the "Purchase Order") for the purchase by Exelon, in part, of 64 conductor cross arms for the Tollway Project.  A copy of the Purchase Order is attached hereto as Exhibit C.

**ANSWER:**     Pelco admits that it entered into Purchase Order No. 001135575.  All other allegations are denied.

17.     The Purchase Order expressly provides that it is governed by the Master T&Cs.

**ANSWER:**     Admitted.

**Pelco's Representations and Warranties**

4

18.     The conductor cross arms requested for the Tollway Project were tubular arms.

**ANSWER:**     Admitted.

19.     The RFP included the Tollway Project Specifications, which stated, in part, "All tubular arms shall have a uniform taper without flanges or miters."

**ANSWER:**     Pelco admits that the RFP contains the quoted language.  All other allegations are denied.

20.     In its RFP Response, Pelco represented that it "accepts and will comply with the scope of work [Specifications] without exception."

**ANSWER:**     Pelco admits that the RFP Response contains the quoted language.  All other allegations are denied.

21.     Pelco further represented and warranted under the Master T&Cs that:

    a.     It would perform any work assigned to it in a competent manner, consistent with the ordinary degree of skill and care required for the applicable business, craft, industry, profession or trade, and to furnish all materials necessary for the complete, proper and timely completion of the work. (Master T&Cs, § 3.1.)

    b.     Any material it furnished to Exelon would (1) comply with the agreed upon Specifications, (2) be free from defects in design, workmanship and materials, (3) be suitable for its intended use, and (4) fit for the particular purpose intended. (Master T&Cs, § 4.1.1.)

    c.     It would provide Submittals, which "shall include all information and documentation in [Pelco's] possession which are required by [Exelon] for the design, construction, licensing, maintenance, quality assurance, operation and/or use of the Work…Review by [Exelon] shall not relieve [Pelco] from fulfilling all of [Pelco's] obligations under [the Master T&Cs] or the Contract Documents, including obligations relating to design and detailing. (Master T&Cs, § 8.1.)

**ANSWER:**     Denied.  Pelco agreed to follow the requirements of the Contract, as did Exelon. Pelco denies that the description set forth is accurate as it is incomplete, fails to address the Contract as a whole, and is a misleading summary of the Contract provisions.

5

22.     Before manufacturing began, Pelco submitted drawings of the cross arms to Exelon for approval.

**ANSWER:**     Admitted.

23.     Through the submitted drawings, Pelco represented that the cross arms would have a bend without any transitional breaks and cuts at the bend location. A copy of an approved design drawing for the cross arms submitted by Pelco is attached as Exhibit D.

**ANSWER:**     Pelco admits that the approved design drawing was submitted as stated. All other allegations are denied.

24.     At no time during the Project did Pelco inform Exelon that it would fabricate the cross arms with any transitional breaks and/or cuts at the arm bend location.

**ANSWER:**     Denied. The Pelco arms contained a taper, consistent with what had been provided to Exelon on prior occasions. The Pelco design was fully and/or substantially compliant with the Exelon specification.

**Remedy Provisions**

25.     The parties contractually agreed that if any material supplied by Pelco did not comply with section 4.1.1 of the Master T&Cs, then Pelco would promptly correct by repair or replacement any non-conforming material and any other materials or equipment damaged by the non-conforming material. The Master T&Cs required that all costs and expenses associated with the repair or replacement be paid by Pelco. (Master T&Cs, § 4.2.1.)

**ANSWER:**     Denied. Pelco agreed to follow the requirements of the Contract, as did Exelon. Pelco denies that the description set forth is accurate as it is incomplete, fails to address the Contract as a whole, and is a misleading summary of the Contract provisions.

26.     In the event Pelco was unable or unwilling to repair or replace the non-conforming material, then Exelon had the right to correct the non-conforming materials or purchase replacement materials. The Master T&Cs required that all costs and expenses associated with

6

correcting or replacing the non-conforming materials likewise be paid by Pelco. (Master T&Cs, § 4.4.)

**ANSWER:** Denied. Pelco agreed to follow the requirements of the Contract, as did Exelon. Pelco denies that the description set forth is accurate as it is incomplete, fails to address the Contract as a whole, and is a misleading summary of the Contract provisions.

27. Pelco agreed that time was of the essence in completing the work assigned to it.

(Master T&Cs, § 3.2.)

**ANSWER:** Denied. Pelco agreed to follow the requirements of the Contract, as did Exelon. Pelco denies that the description set forth is accurate as it is incomplete, fails to address the Contract as a whole, and is a misleading summary of the Contract provisions.

**The Initial Arm Failure**

28. Pursuant to the Purchase Order, Pelco delivered 64 conductor cross arms to Exelon in or about August 2014.

**ANSWER:** Admitted.

29. On or about December 5, 2014, one of the installed cross arms supplied by Pelco suffered a complete failure at the arm-to-clamp weld and crashed to the ground. The failed arm caused damage to another conductor arm on its way down and to other equipment on the transmission line.

**ANSWER:** Pelco admits that on or about December 5, 2014, one of its conductor arms failed and fell to the ground, damaging another of the Pelco conductor arms. All other allegations are denied.

30. The site was immediately secured and precautions taken to protect the surrounding structures and workers on site.

**ANSWER:** This paragraph makes no allegations against Pelco, and Pelco makes no response thereto or in the alternative, denies such allegations and demands strict proof thereof.

31.     Exelon timely notified Pelco of the arm failure, and, within a few days, Pelco conducted visual inspections and ultrasonic testing of both the failed and remaining conductor arms.

**ANSWER:**     Admitted.

32.     Following its inspection, Pelco confirmed in writing to Exelon that at least 14 of the 64 arms needed to be replaced.

**ANSWER:**     Admitted.

33.     On or about December 11, 2014, Pelco provided two replacement arms followed shortly thereafter by an additional twelve replacement arms.

**ANSWER:**     Admitted.   Further answering, the twelve replacement arms were provided to support the project, in the event they were needed.  They were not provided because of non-conformances in the installed project arms.

**The Defects**

34.     Exelon's inspection of the original and replacement Pelco cross arms revealed two types of material defects in both sets of arms:

   a.     The original and replacement arms had defective arm-to-clamp welds.

   b.     The larger cross arms had relief-cut-welds – or transitional cuts – at the arm bend location. Pelco had cut the arms in several places along the bend location and welded the cut pieces back together in order to achieve the bend.

**ANSWER:**     Denied.

35.     The relief cuts were not shown in any of the approved drawings for the Project. Moreover, because the cuts resulted in joints along the arm bend, they did not comply with the Specifications.

**ANSWER:**     Denied.

36.     To test whether the original or replacement cross arms would still have adequate design strength, despite their non-compliance with the Specifications, Exelon engaged a metallurgist to perform destructive testing on a sampling of the arms from both the original and replacement batches supplied by Pelco.

**ANSWER:**     Pelco admits that Exelon engaged a metallurgist, and denies the remaining allegations of this Paragraph.

37.     Two arms were selected for testing: one from the original batch of Pelco arms, all of which had been designed and manufactured in the same manner, and one from the replacement batch of Pelco's arms, all of which had been designed and manufactured in the same manner.

**ANSWER:**     Denied.

38.     In a report dated January 5, 2015, the metallurgist reported that the tested arms failed to achieve Pelco's own weld penetrations at both the arm-to-clamp welds and relief cut welds.

**ANSWER:**     Denied.

39.     Accordingly, both the original and replacement arms contained material defects that rendered them unsuitable for the Tollway Project.

**ANSWER:**     Denied.

40.     Exelon timely provided Pelco with a copy of the metallurgist report.

**ANSWER:**     Denied.

**Exelon's Purchase of Conforming Replacement Arms from a New Supplier**

41.     Because the destructive testing revealed that both the original and replacement cross arms were defective and unsuitable for their intended purpose, Exelon engaged a new supplier to manufacture replacement cross arms.

**ANSWER:**     Pelco admits that Exelon engaged a new supplier, and denies the remaining allegations of this Paragraph.

9

42.     The replacement arms were provided by the new supplier on or about February 1, 2015, and installed from mid-February to mid-March by Exelon's contractor.

**ANSWER:**     This paragraph makes no allegations against Pelco, and Pelco makes no response thereto or in the alternative, denies such allegations and demands strict proof thereof.

43.     Exelon seeks through this action to recoup the costs and expenses it incurred to (1) address the original arm failure, (2) purchase the replacement arms, (3) remove the defective Pelco arms, and (4) install the replacement arms.

**ANSWER:**     This paragraph makes no allegations against Pelco, and Pelco makes no response thereto or in the alternative, denies such allegations and demands strict proof thereof.

## COUNT I
### (Breach of Contract)

44.     Exelon restates and realleges the allegations set forth in paragraph 1-43 above as if fully set forth herein.

**ANSWER:**     Pelco re-states and re-alleges its answers for Paragraphs 1-43, as and for Paragraph 35 as though the same were fully set forth herein.

45.     Exelon and Pelco contracted for the purchase and sale of 64 conductor cross arms, pursuant to the Purchase Order and Master T&Cs, for use in the Tollway Project.

**ANSWER:**     Admitted.

46.     Exelon fully performed all of its obligations under the Purchase Order and Master T&Cs.

**ANSWER:**     Denied.

47.     Pelco materially breached the terms of the parties' Purchase Order and Master T&Cs by supplying conductor cross arms that failed to meet the agreed upon Project Specifications and were neither free from defects nor suitable for their intended use.

**ANSWER:**    Denied.

48.    Despite being given the opportunity to do so, Pelco failed to cure its breach.

**ANSWER:**    Denied.

49.    As a direct and proximate result of Pelco's foregoing breach of contract, Exelon has sustained damages in an amount in excess of $2,000,000.00.

**ANSWER:**    Denied.

WHEREFORE, the Defendant, PELCO STRUCTURAL, LLC prays this honorable Court to dismiss this cause and tax costs against the Plaintiff.

## COUNT II
## (Breach of Warranty)

50.    Exelon refers to and incorporates by reference paragraph 1-43 as though fully set forth herein.

**ANSWER:**    Pelco re-states and re-alleges its answers for Paragraphs 1-43, as and for Paragraph 35 as though the same were fully set forth herein.

51.    Exelon and Pelco contracted for the sale of goods; specifically, conductor cross arms for use by Exelon in the Tollway Project.

**ANSWER:**    Admitted.

52.    Pelco made several representations and warranties to Exelon relating to the cross arms, including:

      a.    Pelco expressly represented and warranted that the cross arms would comply with the Tollway Project Specifications;

      b.    Through the submittal of design drawings, Pelco represented and warranted that the cross arms would conform to those drawings and, *inter alia*, be free of transitional cuts, breaks, and/or joints at the arm bend location.

      c.    Pelco expressly represented and warranted that the cross arms would be free from defects;

    d.    Pelco expressly represented and warranted that the cross arms would be suitable for their intended use; and

    e.    Pelco expressly represented and warranted that the cross arms would be fit for their intended purpose.

**ANSWER:**    Denied.

53.    Exelon reasonably relied upon these representations and warranties in purchasing the Pelco cross arms.

**ANSWER:**    Denied.

54.    At the time of sale and delivery, Pelco breached these representations and warranties by supplying cross arms that:

    a.    failed to conform to the Project Specifications and design drawings;

    b.    were defective; and

    c.    were unsuitable and unfit for their intended purpose and use.

**ANSWER:**    Denied.

55.    Exelon fully performed its obligations under the Master T&Cs and Purchase Order and timely notified Pelco of the defects identified in the cross arms.

**ANSWER:**    Denied.

56.    Exelon afforded Pelco the opportunity to cure the defects in the cross arms, but Pelco failed to do so.

**ANSWER:**    Denied.

57.    Exelon thereafter exercised its right to purchase conforming cross arms from a new supplier.

**ANSWER:**    Denied.

58.     As a direct and proximate result of Pelco's foregoing breach of warranty, Exelon has sustained damages in excess of $2,000,000.00.

**ANSWER:**     Denied.

WHEREFORE, the Defendant, PELCO STRUCTURAL, LLC prays this honorable Court to dismiss this cause and tax costs against the Plaintiff.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### Failure to Mitigate Damages

1.     Upon the failure of the Pelco conductor arm, Exelon had the duty in equity, under law and by Contract to mitigate its damages.

2.     Exelon failed to mitigate its damages in one or more of the following ways:

    a.     Failed to put processes and protocols in place to ensure that the project remained on schedule, thereby delaying the remediation plan and increasing the costs being claimed against Pelco,

    b.     Failed to keep Pelco advised of the remediation schedule, the testing and the remedial plan,

    c.     Engaged contractors without adequate controls over price and scope leading to outrageous costs for the replacement arms and the installation expense,

    d.     Failed to work with Pelco relating to the provision of replacement conductor arms,

    e.     Failed to use a project delivery consistent with its own practices and guidelines,

    f.     Failed to manage its own forces leading to outrageous charges from Exelon, and,

    g.     Failed to manage the engineering and installation process for the conductor arms leading to Exelon making the wrong decisions relating to its own specifications.

Case: 1:16-cv-00611 Document #: 92 Filed: 07/15/19 Page 15 of 21 PageID #:594

WHEREFORE, PELCO STRUCTURAL, LLC prays this honorable Court to either dismiss this cause, or to reduce any claim by Exelon for the outrageous and extreme costs/expenses being asserted.

**<u>Second Affirmative Defense</u>**
**Anticipatory Breach/Failure of Condition Precedent**

3.      Upon the failure of the conductor arm, Exelon had the duty in equity, under law and pursuant to the Contract to permit Pelco to cure any alleged non-conformances in the conductor arms.

4.      Exelon breached its duty to permit Pelco to supply replacement conductor arms, and proceeded to purchase replacement conductor arms from an alternative supplier at a significantly higher cost.

WHEREFORE, PELCO STRUCTURAL, LLC prays this honorable Court to either dismiss this cause, or to reduce any claim by Pelco for the outrageous and extreme costs/expenses being asserted by virtue of Exelon purchasing conductor arms from an alternative supplier.

**<u>Third Affirmative Defense</u>**
**Estoppel**

5.      In issuing the submittals to Exelon for approval, Pelco was not only following the Contract requirements, but was ensuring that its design and its product met with Exelon's approval.

14

6.     Despite the Contract requirements and specifications, the Contract provisions allowed Exelon to change, modify and/or alter the Contract requirements including the specification.

7.     By approving the design and the product to be supplied by Pelco under the submittal process, Exelon approved what was depicted in the submittal, *viz.* the tapered design.

8.     In approving the tapered design of the Conductor arms, the Pelco design became a part of the Contract.

9.     Pelco relied on the Exelon approval of its design and its product, and entered production based upon those approvals.

10.     To the extent that Exelon is now claiming that the tapered design is nonconforming, Pelco relied on the approval of its design and its product by Exelon, to Pelco's detriment.

11.     Exelon had accepted the Pelco design on prior procurements, evidencing that the Pelco design was conforming.

12.     Exelon's actions in approving the Pelco design and/or its product became binding, and Exelon is now estopped to deny that the tapered design was approved.

13.     Pelco has been damaged and prejudiced by its reliance on Exelon's approval.

WHEREFORE, PELCO STRUCTURAL, LLC prays this honorable Court to find that Exelon approved the Pelco design, and that Pelco relied on Exelon's approval such that the tapered design is conforming to the revised Contract requirements.

## COUNTERCLAIM

NOW COMES the Defendant-Counter Plaintiff, PELCO STRUCTURAL, LLC by and through its attorneys, Franco & Moroney, LLC and for its Counterclaim against Exelon Business Services Company, LLC ("Exelon"), states as follows:

15

## The Parties

1.      Upon information and belief, and based solely upon the allegations in Plaintiff's Complaint, Exelon Business Services Company, LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Illinois. Exelon Corporation is the sole member of the LLC and is a corporation organized under the laws of the State of Pennsylvania.

2.      Pelco Structural, LLC is a limited liability company organized under the laws of Oklahoma with its principal place of business in Oklahoma.

## Jurisdiction And Venue

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is diversity of citizenship between the parties and because the amount in controversy exceeds the sum of $75,000.00.

4.      Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. §1391, because a substantial portion of the transactions giving rise to this cause of action occurred within the Northern District of Illinois.

## The Contract

5.      On or about February 5, 2014, Exelon and Pelco entered into a Purchaser Order "Purchaser Order" for the supply of various conductor arms.

6.      The Purchase Order was subject to Master Terms and Conditions for the Purchase of Materials and Services ("Master T&Cs") dated February 3, 2014. Both the Purchase Order and the Master T&Cs are attached to the Exelon Complaint and are incorporated herein. The Purchase Order and the Master T&Cs are referred to herein as the "Contract."

Case: 1:16-cv-00611 Document #: 119-3 Filed: 07/26/19 Page 18 of 21 PageID #:567

7.     Under the terms of the Contract, Pelco was given a set of design requirements and specifications for the supply of the conductor arms. Exhibit "A."

8.     Pelco prepared a response to the Exelon specifications and submitted these documents to Exelon for approval ("Submittals"). Exhibit "B."

9.     The Contract distinguishes between remedies for non-conformances in materials and non-conformances in services. For non-conformances in materials, the Contract remedy is as follows:

> 4.2:   Remedies: Material
>
> If material does not comply with above warranties (4.1.1.) and Exelon gives Pelco notice of noncompliance within 2 years of acceptance or certificate of final completion (3.3), *then Pelco shall at its sole expense correct by repairing or replacing non-conforming materials and anything damaged by it. The decision whether to repair or replace is made with Exelon's concurrence.* Access costs and the costs of repair or replacement are borne by Pelco. Exelon can charge Pelco for unpacking, examining, reshipping, etc. of the rejected material. The new material is warranted for 2 years or the remainder of the warranty period (excluding the period during which the warranty was not available because the original material was not in use), whichever is greater.

(emphasis added).

10.    The Contract also contains "cure" provisions, which provides Pelco with the right to cure any non-conformances, including the following:

> 4.4   Buyer's Right to Perform
>
> If Pelco does not repair or replace the supplied or damaged material or re-perform the improperly performed services, Exelon after notice to Pelco may correct deficiencies in materials or services or purchase replacement material or services. Exelon can invoice Pelco or can deduct these costs from amounts owed.

11.    The Contract and the relationship between the Parties is governed by Illinois law.

12.     The Uniform Commercial Code is deemed to be part of all supply contracts in Illinois.

13.     The Uniform Commercial (the "UCC") per sec. 2-608, 810 ILCS 5/2-608, provides that Pelco should be permitted to cure:

"Revocation of acceptance in whole or in part" provides as follows:

> (1)     The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
>
> > (a)     on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured;

14.     Exelon approved the Pelco design and products, and never raised an issue with the Pelco design.

15.     Pelco relied on the approval of its design and its product.

16.     Exelon made the unilateral decision to replace the conforming Pelco products, without the opportunity to cure any alleged non-conformances, in breach of the Contract.

17.     That the Exelon specification is ambiguous on its face, and as interpreted by Exelon.

18.     The Exelon specification did not permit the use of "miter joints" in the conductor arms. Miter joints are shown on the drawing attached as Exhibit "C."

19.     The conductor arms used by Pelco were "tapered joints," as depicted on Exhibit "D."

20.     After the conductor arms were installed, Exelon for the first time asserted that the joints were "miter" joints, and therefore non-conforming.

21.     Exelon used the allegation of "miter joints" to wrongfully terminate the Pelco contract and engage an alternative supplier.

22.     If the Pelco conductor arm is deemed to be "miter joint," as contended by Pelco, then it is non-conforming subject to the defenses of substantial compliance and estoppel.

23.     If the Pelco conductor arm is deemed to be a "tapered joint," then it is in compliance with the Exelon specification meaning that Exelon's use of an alternative supplier is wrongful and a violation of the Contract.

24.     Under the Declaratory Judgment Act, 28 USC §2201(a), in the case of an actual controversy, this Court may declare the rights, legal relations, duties and obligations of interested parties seeking a declaration which shall have the force and effect of a final judgment or decree.

25.     Under 28 USC §2202 and Rule 57 of the Federal Rules of Civil Procedure, this Court may grant relief based on a declaratory judgment.

26.     The conductor arm referenced in Plaintiff's complaint, par. 3, did not fail at the taper, meaning the specification had nothing to do with the failure.

27.     Pelco claims that its conductor arm was conforming, which allegations Exelon denies which can only be resolved by an order of this Court.

28.     Based on the evidence to be adduced, Pelco seeks this Court to enter a declaratory judgment that:

a.     The tapered conductor arm was conforming to the specification,

b.     That in the alternative, the tapered conductor arm was substantially conforming, or was in substantial compliance with, the specification,

c.     That by virtue of Exelon accepting the submittal put forth by Pelco showing the tapered arm, Exelon accepted the tapered conductor arm as conforming to the specification,

d.     Exelon is estopped to deny that that Pelco design and manufacture was conforming to the contract requirements, and

d.     To enter all other just and equitable relief.

WHEREFORE, the Counter-Defendant, PELCO STRUCTURAL LLC prays this honorable Court to enter a Declaratory Judgment in its favor and against Exelon finding that the Pelco product was conforming together with an award of costs.

Respectfully submitted,

___/s/ Robert J. Franco_____
One of the Attorneys for Defendant, Pelco Structural, LLC

Robert J. Franco
Christopher M. Cano
Franco & Moroney, LLC
500 West Madison St., Suite 2440
Chicago, Illinois 60661-2510
312-469-1000
312-469-1011 – fax
robert.franco@francomoroney.com
chris.cano@francomoroney.com