**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

EXELON BUSINESS SERVICES
COMPANY, LLC,

                 Plaintiff,

     v.

PELCO STRUCTURAL, LLC,

                 Defendant.

Case No.: 1:16-cv-00611

Hon. Robert M. Dow, Jr.

**PLAINTIFF EXELON BUSINESS SERVICES COMPANY, LLC'S**
**OPENING POST-TRIAL BRIEF**

Heather H. Harrison (#6296693)
Tracy A. Hannan (#6281834)
EXELON CORPORATION
10 S. Dearborn St., 49th Floor
Chicago, Illinois 60603
Telephone: (312) 394–8164
Facsimile: (312) 394–8322
heather.harrison@exeloncorp.com
tracy.hannan@exeloncorp.com

Mariangela M. Seale (#6293433)
Brian O. Watson (#6304248)
Lauren Jaffe (#6316795)
Joy Anderson (#6320219)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
Telephone: (312) 471–8700
Facsimile: (312) 471–8701
mseale@rshc-law.com
bwatson@rshc-law.com
ljaffe@rshc-law.com
janderson@rshc-law.com

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD..........................................................................................................2

ANALYSIS..........................................................................................................................3

I.    Pelco Breached the Contract. .......................................................................................3

    A.    Pelco Delivered Arms with Defective Welding, and One Catastrophically
        Failed and Crashed to the Ground. .........................................................................3

    B.    Pelco's Own Expert, Quality Assurance Manager, and Engineer Agree that
        Its Welding Process Was Unsound..........................................................................5

    C.    Pelco Failed to Cure Its Defective Welding, and Exelon Substantially
        Performed Under the Contract. ...............................................................................6

II.   Exelon Is Entitled to $2,154,664.32 in Damages Under the Contract and Has Paid
    Significantly More as a Result of Pelco's Breaches. .....................................................8

    A.    MJ's Emergency Costs Were Reasonable (X002)...................................................9

        1.    Time and Equipment Rates Were Reasonable Based on a Heavily
            Negotiated, Contractor-of-Choice Agreement...........................................10

        2.    Labor Costs Were Reasonable and Essential for Worksite Safety and
            the Integrity of the Power Grid. ................................................................12

        3.    Equipment and Miscellaneous Costs Were Reasonable and Essential
            to Mitigate Hazards Due to the Defective Pelco Arms..............................14

        4.    Matting Costs Were Reasonable and Essential to Provide Access to
            the Worksite and Protect the Gas Main and Golf Course Below. .............16

    B.    MJ's Replacement Costs Were Reasonable (X003). .............................................17

        1.    Lump Sum Costs Were Reasonable Based on a Heavily Negotiated,
            Contractor-of-Choice Agreement. ............................................................18

        2.    Replacement Costs Were Reasonable and Essential to Remove the
            Defective Pelco Arms and Complete the Transmission Project. ..............18

    C.    TEAM Industrial's Inspection and Metallurgical Testing Costs Were
        Reasonable. ...........................................................................................................19

    D.    Valmont's Replacement Arm Costs Were Reasonable. .........................................20

    E.    The Testimony of Pelco's Damages Experts, James Lafontaine and Richard
        Conklin, Is Not Credible, and James Lafontaine's Is Inadmissible......................21

        1.    James Lafontaine Is Not Qualified to Render Expert Opinions and His
            Opinions, Lacking Proper Substantiation, Are Inadmissible....................21

        2.    Richard Conklin's Opinions, Based on False Hypotheticals, Mr.
            Lafontaine's Inadmissible Opinions, and Faulty Data, Are Not
            Credible......................................................................................................22

III.     Exelon Would Be Entitled to the Same or More Damages Under the UCC Because It Properly Revoked Acceptance of the Defective Pelco Arms. .........................................23

IV.     Exelon Is Entitled to Five Percent Prejudgment Interest. ..................................24

CONCLUSION ..........................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Accettura v. Vacationland, Inc.*,
--- N.E.3d ---, 2019 IL 124285 (Ill. 2019) ......................................................... 7, 24

*Am. Fid. Fire Ins. Co. v. Gen. Ry. Signal Co.*,
184 Ill. App. 3d 601 (1st Dist. 1989) ........................................................... 17

*Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*,
325 F.3d 924 (7th Cir. 2003) ........................................................................ 25

*Ameritech Info. Sys., Inc. v. Bar Code Res., Inc.*,
331 F.3d 571 (7th Cir. 2003) ........................................................................ 25

*Anderson v. Gulf Stream Coach, Inc.*,
662 F.3d 775 (7th Cir. 2011) ........................................................................... 7

*Aprin v. United States*,
521 F.3d 769 (7th Cir. 2008) ........................................................................... 2

*Arthur v. Catour*,
216 Ill. 2d 72 (Ill. 2005) ............................................................................... 3, 8

*Balfour v. Dohrn Transf. Co.*,
328 Ill. App. 163 (3d Dist. 1946) ..................................................................... 3

*Castellano v. Marion Partners by Morris*,
960 F.2d 636 (7th Cir. 1992) ......................................................................... 23

*Clark v. Takata Corp.*,
192 F.3d 750 (7th Cir. 1999) ..................................................................... 21, 22

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ...................................................................................... 21

*Dual-Temp of Illinois, Inc. v. Hench Control, Inc.*,
821 F.3d 866 (7th Cir. 2016) ........................................................................... 2

*Dynegy Mktg. & Trade v. Multiut Corp.*,
648 F.3d 506 (7th Cir. 2011) ........................................................................... 2

*Econ. Folding Box Corp. v. Anchor Frozen Foods, Corp.*,
No. 04 CV 4485, 2007 WL 844878 (N.D. Ill. Mar. 19, 2007),
*aff'd*, 515 F.3d 718 (7th Cir. 2008) ............................................................... 24

*Guillory v. Domtar Indus.*,
95 F.3d 1320 (5th Cir. 1996) ........................................................................ 19

*Iconco v. Jensen Const.*,
622 F.2d 1291 (8th Cir. 1980) ...................................................................... 19

*James McHugh Constr. Co. v. Int'l Fid. Ins.*,
    No. 1:14-cv-02399, 2016 WL 8451862, ECF No. 91 (N.D. Ill. filed Dec. 5, 2016) .................. 3

*Lewis v. CITGO Petroleum Corp.*,
    561 F.3d 698 (7th Cir. 2009) ........................................................................................... 21

*N. Am. Lighting, Inc. v. Hopkins Mfg. Corp.*,
    37 F.3d 1253 (7th Cir. 1994) ........................................................................................... 24

*Owens v. Auxilium Pharm.*,
    895 F.3d 971 (7th Cir. 2018) ........................................................................................... 19

*Roboserve, Inc. v. Kato Kagaku Co.*,
    78 F.3d 266 (7th Cir. 1996) ............................................................................................... 2

*Sitnick v. Glazer*,
    11 Ill. App. 2d 462 (1st Dist. 1956) ............................................................................. 2, 8

*Smith v. Champaign-Urbana City Lines, Inc.*,
    116 Ill. App. 2d 289 (4th Dist. 1969) ............................................................................... 3

*United States v. Noel*,
    581 F.3d 490 (7th Cir. 2009) ...................................................................................... 21, 22

**Statutes**

810 ILCS 5/2–608 ..................................................................................................................... 24

810 ILCS 5/2–714 ..................................................................................................................... 24

815 ILCS 205/2 ......................................................................................................................... 25

**Rules**

Fed. R. Civ. P. 52 ................................................................................................................... 2, 23

Fed. R. Evid. 702 ..................................................................................................................... 21

Fed. R. Evid. 702 Advisory Committee Notes ......................................................................... 21

## INTRODUCTION[1]

Exelon Business Services Company, LLC ("Exelon") hired Pelco Structural, LLC ("Pelco") to provide steel transmission arms for an important Tollway project. Exelon chose Pelco over other vendors because, in part, Pelco promised to provide a product that met Exelon's specifications with no exceptions. Far from the conforming product Pelco promised, Pelco's arms were riddled with severe and dangerous defects. One defect was so severe that it caused a Pelco-supplied arm, weighing 1000 pounds, to break clean apart at its weld and crash down more than 80 feet, striking another Pelco arm and a crane holding two workers on its way down.

Exelon incurred significant damages as a result of Pelco's failure, paying first for inspectors to test Pelco's defective arms and contractor MJ Electric, LLC ("MJ") for emergency remediation work. The emergency work, which MJ tracked under a project change order called "X002," included securing the safety of the site and wires, assessing all of Pelco's arms in the air, removing defective Pelco arms from the air, assisting with Pelco and third-party inspections, unloading tension from bad arms, replacing broken insulators discovered hundreds of yards away, installing guard structures to protect workers and the public, changing a dead-end structure, and providing the equipment to perform these and many other tasks.

Because Pelco, despite its efforts, including providing fourteen replacement arms, failed to cure the severe defects in its arms, Exelon also had to purchase arms from another vendor and pay MJ for the labor and equipment needed to replace the remaining Pelco arms. MJ billed replacement costs under a lump-sum project change order called "X003."

---

[1] This introduction contains a brief summary of the case. A more fulsome factual recitation is contained in the parties' Joint Statement of Undisputed Facts and Exelon's Separate Statement of Facts, which Exelon incorporates by reference. Exelon and its affiliate, Commonwealth Edison Company ("ComEd"), each had roles in the project. For ease of reference, Exelon refers to both simply as "Exelon."

1

Exelon is entitled to a judgment in its favor for these damages, in the amount of $2,154,664.32,[2] plus prejudgment interest and prevailing party costs, because Pelco breached the parties' contract by furnishing arms with pervasive welding defects, using defective welding processes, failing to cure, and causing this catastrophic failure on a critical transmission project.

## LEGAL STANDARD

Federal Rule of Civil Procedure 52 governs "an action tried on the facts without a jury" and requires the district court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). Thus, the district court must explain the grounds of its decision and otherwise show a "reasoned, articulate adjudication imposed by Rule 52(a)." *Aprin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008) (citation omitted).

To recover for breach of contract, Exelon must prove: (1) the existence of a valid and enforceable contract; (2) Exelon's substantial performance; (3) Pelco's breach; and (4) resulting damages. *Dual-Temp of Illinois, Inc. v. Hench Control, Inc.*, 821 F.3d 866, 869 (7th Cir. 2016).[3]

Exelon's damages are the amount that will put Exelon in as good a position as it would have been in had the contract been performed as agreed. *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 278 (7th Cir. 1996). Exelon may establish its damages, including their "correct measurement" and a final computation from that measurement, "in any reasonable manner," using "a reasonable basis." *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 518 (7th Cir. 2011) (quotations and citations omitted). The amount that Exelon paid is presumed reasonable under the law. *Sitnick v. Glazer*, 11 Ill. App. 2d 462, 469 (1st Dist. 1956); *Arthur v. Catour*, 216

---

[2] These costs are broken down in the "Conclusion" Section, below.
[3] Exelon and Pelco agree that Illinois law governs this case and that a valid and enforceable contract exists in the Master Terms and Conditions for the Purchase of Materials and Services, as well as several incorporated Contract Documents. Ex. 413, Ans. First Am. Compl. at ¶¶ 15–17, Pelco Counterclaim at ¶¶ 5–6, 11; *see also* Ex. 320 § 30.9(iv).

Ill. 2d 72, 82 (Ill. 2005) ("The *prima facie* reasonableness of a paid bill can be traced to the enduring principle that the free and voluntary payment of a charge for a service by a consumer is presumptive evidence of the reasonable or fair market value of that service.").[4]

## ANALYSIS[5]

### I.  Pelco Breached the Contract.

The parties do not dispute that Pelco breached its Contract with Exelon.  Indeed, Pelco's material breaches of the contract are myriad: failing to perform the work as set forth in the purchase order, specifications, and drawings, Ex. 320 § 3.1; failing to furnish arms in compliance with the specifications, *id.* ¶ 4.1.1; failing to furnish arms free from defects in design, workmanship and materials, *id.* ¶ 4.1.1(2); failing to furnish arms suitable for their intended purpose, *id.* ¶ 4.1.1(4); failing to furnish arms fit for the particular purpose intended, *id.* ¶ 4.1.1(5); failing to furnish arms that were fully tested in accordance with the specifications and drawings, *id.* ¶ 4.1.1(7); failing to adhere with the designs and specifications provided by Exelon, Ex. 329 § 5.2; and failing to supply and cure with conforming replacement arms, Ex. 320 § 4.2.1. These breaches, which Pelco failed to cure, span both product and process.

#### A.  Pelco Delivered Arms with Defective Welding, and One Catastrophically Failed and Crashed to the Ground.

As Pelco admits, its arms—both original and replacement—were rife with welding defects.  Despite its contractual promise to produce arms with strong welds, measured in terms of "weld penetration" and proper bevel conditions, Pelco delivered arms that it admitted had

---

[4] Pelco's counsel agree that "paid bills are presumed reasonable."  Pl.'s Mem. at 11, *James McHugh Constr. Co. v. Int'l Fid. Ins.*, No. 1:14-cv-02399, 2016 WL 8451862, ECF No. 91 (N.D. Ill. filed Dec. 5, 2016) (citing *Arthur*, 216 Ill. 2d at 82; *Smith v. Champaign-Urbana City Lines, Inc.*, 116 Ill. App. 2d 289, 291 (4th Dist. 1969); *Balfour v. Dohrn Transf. Co.*, 328 Ill. App. 163, 166–67 (3d Dist. 1946)).
[5] For the citations in this section, Exelon cites the transcript by witness, page, and line, *e.g.*, Mahoney 43:4–5; exhibits by number and page or section, as appropriate, e.g., Ex. 320 § 3.1 or Ex. 320-0005; and deposition testimony by exhibit number, with witness, page and line, e.g., Ex. 284 (Nelson) 4:13–16.

"virtually no weld penetration" and improper bevels. Ex. 301-0003; Ex. 413 at ¶ 3; Ex. 284 (Nelson) at 54:4–10. Pelco's own expert, Wesley Oliphant, agreed that Pelco's welding was defective. Oliphant 758:22–759:10, 773:15–774:1 (agreeing that Pelco's welds had inadequate penetration and improper bevels). The defects were severe—one,1000-pound arm snapped off at the arm-to-clamp weld and fell more than 80 feet to the ground. Ex. 277 ¶ 3; Ex. 284 at 57:3–5; Ex. 301-0002; Ex. 413 ¶ 3. On its way down, it struck another arm, which Pelco found suffered from the same defects. Ex. 301-0002. Pelco's tests found defective bevels in at least two more arms, Ex. 301-0007, and inspections and replacement operations revealed cracking, lack of fusion, or weld separation in at least four more arms, one of which had been holding energized, high-voltage transmission lines. Ex. 310; Ex. 367; Ex. 372; Ex. 486-0004, 0014; Ex. 505.

Pelco provided replacement arms, but, as Exelon confirmed through destructive testing, these too were defective and lacked adequate weld penetration and proper bevels. Vaca 576:15–577:5; Landow 509:15–19; Ex. 505. Exelon's weld specifications required 80% penetration at the arm-to-clamp weld (which is the weld that failed), but *not one* weld tested, in Pelco's original or replacement arms, came close to the specification. Landow 509:5–19; Ex. 505 (arm-to-clamp weld penetration ranging from 43.9% to 63%).

In addition, contrary to Pelco's own contract drawings, Exelon's specifications and the industry welding guidelines incorporated therein, and without informing Exelon or even its own engineers, Pelco added multiple, fracture-critical welds to its arms, called "relief cut" or "tiger stripe" welds. *See* Petersen 423:19–424:2. When destructively tested, these welds did not meet Exelon's specifications, industry guidelines, or the specifications Pelco created after their manufacture, which required bevels and 66% penetration. Landow 509:15–19; Ex. 505. These welds also had incorrect bevels, and some had penetration levels as low as 14% and 15%. *Id.*

**B.     Pelco's Own Expert, Quality Assurance Manager, and Engineer Agree that Its Welding Process Was Unsound.**

Process is critical in welding, particularly for partial penetration welds, which cannot be nondestructively tested with 100% reliability. Sutphen 976:2–4; Oliphant 747:11–24, 751:1–752:5. According to Oliphant, Pelco's welding expert, a controlled welding process is key to ensuring the safety and quality of welds. *See* Oliphant 751:1–752:5, 752:23–25, 753:17–18. An integral part of this procedure is for an engineer, through welding symbols and details on drawings, to instruct welders on how to create the welds. *Id.* 713:9–714:5, 737:23–738:1, 738:18–739:1, 743:16–19. Welders and fitters, like bakers following "a recipe for a cake," must carefully follow weld procedures. *Id.* 751:1–752:5, 752:3–4, 23–25. Inspectors must compare welds to the procedures. *See Id.* 781:14–16. Pelco's welding process was deficient at all levels—engineers, welders, fitters, inspectors, and quality assurance.

In violation of Exelon and industry requirements, Pelco's engineer, Mr. Sutphen, made no drawing of the relief cut welds before the arms' manufacture, nor did he calculate whether Pelco's arms could withstand loads if they had relief cut welds, including loads for typical conditions like wind, snow and ice. *See, e.g.*, Ex. 353-0004; Sutphen 988:13–20; Ex. 284 (Nelson) 130:10–14. Mr. Sutphen did not even know the relief cut welds existed until Exelon discovered the extra welds and questioned Pelco. Sutphen 985:5–8, 990:12–13, 25–991:2; Ex. 353-0004. When Mr. Sutphen finally created a drawing for the relief cut welds, after the arms' manufacture, his drawing lacked necessary information for welders to follow, like weld size and location. Sutphen 990:12–13, 25–991:2; Ex. 353-0004. Mr. Sutphen's after-the-fact calculations never accounted for Exelon's load requirements. Sutphen 989:23–25.

Without any proper drawings, Pelco's welders and fitters made unilateral decisions on whether, where, how, and how deep to weld the relief cuts. Ex. 284 (Nelson) 109:24–110:9,

5

130:10–14. In addition, Pelco's welders created welds with insufficient weld penetration, and its fitters created improper bevel conditions. Neither the weld penetration nor bevel conditions conformed with engineering's after-the-fact drawings. *See* above § 1(A). Pelco's inspectors, tasked with comparing welds to welding procedures and flagging improper bevel conditions, did neither. Ex. 284 (Nelson) 48:16–22, 49:5–8, 50:25–51:3, 83:6–10, 128:10–17, 130:10–14. Pelco's inspectors did not even raise the fact that they lacked a relief cut welding procedure for comparison. *Id.* 48:16–22, 49:5–8, 50:25–51:3, 128:10–17, 130:10–14. Pelco's quality assurance manager allowed Pelco to produce replacement arms using heavier material but without disclosing the material's use to Exelon or seeking new load calculations from Pelco's engineer, even though weight and material are important factors in loadbearing. *Id.* 94:23–95:2, 96:2-6; Sutphen 985:2–13, 999:25–1000:5.

As the record makes clear, Pelco delivered defective arms to Exelon because Pelco's entire welding process was fatally flawed.

### C. Pelco Failed to Cure Its Defective Welding, and Exelon Substantially Performed Under the Contract.

Under the contract, Pelco was required to promptly correct by repair or replacement any nonconforming material. Ex. 320 § 4.2.1. When Pelco failed to do so, Exelon, after notice to Pelco, was entitled to purchase replacement material and invoice Pelco for the cost of replacement. *Id.* § 4.4. Exelon properly followed these provisions of the contract.

As explained above, Pelco delivered arms with defective and nonconforming welds. Exelon timely notified Pelco of these defects and allowed Pelco extensive access to review and investigate the defects. But rather than correct its welding process following the catastrophic failure and discovery of its welding defects, Pelco built its replacement arms "the same way as

[it] built them before."[6] Sutphen 1002:22–24; *see also* Ex. 284 (Nelson) 68:18–69:3. In other words, Pelco admitted using the same welding process to weld its original and replacement arms, despite knowing: (1) the arm that fell, and the arm it struck on the way down, had incorrect bevels that did not match Pelco's welding procedures, and that led to virtually no weld penetration; (2) two more arms had incorrect bevels; (3) another arm had a cracked weld; and (4) it had inserted undisclosed relief cut welds without any approved drawings or weld calculations. Sutphen 985:5–8, 989:23–990:3, 994:13–21, 1002:22–1003:5, 14–16, 1003:23–1004:3, Ex. 383.

Pelco was not entitled to iterative opportunities to cure, factually or legally. Factually, Pelco knew about and should have corrected the inadequate penetration and bevel defects in its welds *before* it delivered replacement arms.[7] Ex. 301 at 3. Legally, neither the contract nor the law gives Pelco multiple attempts at cure. The contract is clear that Pelco must "promptly correct" non-conforming material, and, if it fails to do so, Exelon may purchase replacements. Ex. 320 §§ 4.2.1, 4.4. And the law does not require Exelon to give Pelco multiple opportunities to cure. *Accettura v. Vacationland, Inc.*, --- N.E.3d ---, 2019 IL 124285, ¶ 25 (Ill. 2019); *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 783 (7th Cir. 2011) (buyer of good need not give seller *any* opportunity to cure before revoking acceptance under UCC § 2-608(1)(b)); 4 *Anderson U.C.C.* § 2–608:109 (3d. ed.) ("A buyer is not required to provide a seller with an unlimited number of opportunities to cure a nonconformity before revoking acceptance.").

---

[6] Pelco actually did not build the arms exactly the same way it had before, because it used a thicker material for its replacement arms, thus adding *another* known nonconformity to its replacement arms. Ex. 284 (Nelson) 94:23–95:2, 96:2–6. As noted above, Pelco failed to disclose this alteration or provide new load calculations to Exelon.

[7] Nothing stopped Pelco from delivering replacement arms with full penetration welds. *See* Sutphen 1007:2–16. Even if it had done so, there was no guarantee that the welds would be good, Oliphant 785:22–23; Petersen 447:14, and Pelco's process indicates otherwise. *See* above, Section I(B).

Nor could Pelco have cured. Despite trying its "hardest" with the replacement arms, Pelco admitted that its best effort was not good enough. Sutphen 1008:2–16. Pelco also admitted it could not bend the arms without relief cuts because of its limited machine capability, *id.* 985:19–22, and that it was impossible to make a full penetration weld at the relief cuts, *id.* 1000:24–1001:3. In other words, Pelco could neither cure nor even properly test its relief cut welds. Pelco's obligation was to weld according to specifications, and it failed repeatedly.

## II. Exelon Is Entitled to $2,154,664.32 in Damages Under the Contract and Has Paid Significantly More as a Result of Pelco's Breaches.

Under the contract and Illinois law, the amount that Exelon actually paid to remedy Pelco's breaches is presumed reasonable. *Sitnick*, 11 Ill. App. 2d at 469; *Arthur*, 216 Ill. 2d at 82; *see also* n.4, above. Exelon has actually paid significantly more than $2,154,664.32 as a result of Pelco's breaches, summarized as follows:

| Category | Amount Paid | Damages Sought | Evidence |
|---|---|---|---|
| **Pelco** | | | |
| Pelco Poles & Arms | $1,072,915.00 | - | Ex. 321, 322; Hosfield 585:18–22; Bartolameolli 172:6–10 |
| **MJ's Emergency Costs (X002)** | | | |
| Labor | $282,522.58 | $266,524.87 | Exs. 378, 398–411, 504; Hosfield 593:8–594:5; Bartolameolli 172:13–173:13; Erbach 300:10–13 |
| Equipment | $544,080.97 | $539,873.45 | Exs. 378, 412; Hosfield 591:1–592:9; Bartolameolli 161:4–12; Erbach 279:9–11 |
| Matting | $174,343.05 | $174,343.05 | Exs. 378, 412; Hosfield 592:7–9, 594:14-23; Erbach 283:3–13 |
| Emergency Locates | $2,596.12 | $2,596.12 | Exs. 378 412-0002, 0006, 0012; Hosfield 588:5–15, 683:15–18; Bartolameolli 160:6–11; Erbach 278:9–22, 283:6–8 |

| | | | |
|---|---|---|---|
| Miscellaneous | $25,865.00 | $23,367.00 | Ex. 412-0002, 0006, 0012; Hosfield 588:5–15, 683:15–18; Bartolameolli 160:6–11; Erbach 278:9–22 |
| **TEAM Industrial's Testing Costs** | | | |
| Destructive and Nondestructive Testing | $15,781.06 | $15,781.06 | Ex. 298; Hosfield 597:1–15; Bartolameolli 173:22–25 |
| Helicopter for Inspections | - | - | Bartolameolli 165:23–166:6 |
| **MJ's Replacement Costs (X003)** | | | |
| Lump Sum Labor and Equipment | $872,912.12 | $872,912.12 | Ex. 388; Bartolameolli 168:15–17, 169:18–20; Erbach 299:13–22; Hosfield 588:19–589:1 |
| **Valmont's Replacement Costs** | | | |
| Replacement Arms | $259,266.65 | $259,266.65 | Ex. 394; Bartolameolli 174:4–7; Hosfield 597:24–598:1 |
| **Total** | $3,250,282.55[8] | $2,154,664.32 | |

As detailed below, Exelon seeks four categories of reasonable damages: (A) MJ's costs to address the emergency caused by Pelco's defective arms (X002); (B) MJ's costs to replace Pelco's defective arms (X003); (C) TEAM Industrial's costs to inspect Pelco's defective arms; and (D) Valmont's costs to provide replacement arms.

## A. MJ's Emergency Costs Were Reasonable (X002).

Exelon is entitled to the reasonable costs it paid MJ to remediate the failure and make the site safe. Exelon proved these costs, tracked through change order X002 and incurred at competitive rates set in 2011, in excruciating detail, through Joseph Mahoney (MJ's general superintendent), Mark Bartolameolli (Exelon's senior project manager), Karen Erbach (MJ's senior project manager and current director of operations), Ed Mowry (MJ's general foreman), and Mark Hosfield (Exelon's damages expert). Mahoney 76:13–18; Bartolameolli 145:5–12,

---

[8] For efficiency at trial, Exelon chose not to present evidence on costs it incurred but does not seek, such as its use of a helicopter for inspections.

147:14–24, 149:9–25, 157:19–161:1, 184:6–24; Erbach 276:15–286:1, 290:5–18; Mowry 333:20–334:5, 336:6–340:19, 341:8–346:2; Hosfield 592:17–596:12.

### 1. Time and Equipment Rates Were Reasonable Based on a Heavily Negotiated, Contractor-of-Choice Agreement.

When the Pelco arm failed, Exelon made the reasonable decision to continue to use MJ for the emergency work at time-and-equipment ("T&E") rates set years earlier in their contractor-of-choice agreement. Pelco does not suggest that using T&E was inappropriate. *See* LaFontaine 824:21–826:6. Nor does it attack MJ's rates for labor. *See id.* 789–877; Conklin 878–960. Instead, Pelco suggests that Exelon could have renegotiated even more favorable equipment rates during the emergency, such as "idle" or "monthly" rates. Conklin 899:1–24, 900:14–15. These suggestions lack any proof and, even in hindsight, are not based in reality.

Exelon had in fact already negotiated heavily discounted equipment rates with MJ, years before the Pelco failure, in connection with their contractor-of-choice agreement. Mahoney 43:17–22; *see also* Bartolameolli 159:2–160:1. Because equipment rates were to remain fixed for the duration of the agreement—three to five years—negotiations were hotly contested and lasted almost three months. Erbach 274:1–10; Mahoney 54:22–23; Holtz 381:13–19; Ex. 412. During this process, Exelon "did a very thorough job of making sure that the pricing they got was fair and reasonable." Holtz 381:13–19; *see also* Lafontaine 861:11–14 ("the ComEd procurement group always looks at billing rates and attempts to establish something that would get them the best billing rate available"). For ease of calculation under many scenarios, the rates were expressed as hourly. Erbach 274:20–275:10. The rates applied year-round, for emergency and routine work, regardless of whether MJ had to rent the equipment from third parties for Exelon's use. *Id.* They also included all the discounts that would inhere in a monthly rate. *Id.*

The rates were set as of March 7, 2011, Bartolameolli 160:12–22, and using these rates was commercially reasonable to address emergency work in December 2014 and January 2015.

Pelco's speculation that Exelon could have obtained lower "idle," "monthly," or other rates for its equipment is just that—speculation. For this proposition, Pelco hired two proposed experts, Richard Conklin and James Lafontaine.[9] Neither Mr. Conklin nor Mr. Lafontaine had any understanding of MJ's heavily-discounted, contractor-of-choice rate agreement with Exelon. Conklin 941:1–20, 944:7–9; Lafontaine 861:8–14. For example, neither knew that monthly rate discounts were already included in MJ's hourly rates, *id.*; Erbach 274:20–275:4, or that, during peak season, "historically the monthly rates aren't much of a discount from the hourly rates because of the demand for the equipment." Holtz 383:15–16; Conklin 941:1–20, 944:7–9; Lafontaine 861:8–14.

Messrs. Conklin and Lafontaine offered no competent testimony that Exelon could have renegotiated lower rates with MJ, in peak season, in the middle of an emergency. *See* Conklin 939:15–17 (equipment rates are determined at the outset of a contract). Mr. Conklin invented discounts not by comparing the December 2014 and January 2015 market rates for the equipment MJ had onsite with the rates MJ charged, but rather by consulting generic reference material. *See id.* 899:1–24 (monthly rates are generally lower than hourly rates); *id.* 953:11–12 ("It is very difficult to find exact lineups for every piece of equipment there. You have to make certain assumptions."); *id.* 952:25–953:9 (Conklin did not discount based on Blue Book monthly rates for the equipment onsite, instead taking a blanket 50% reduction); *id.* 953:25–954:17 (Conklin did not calculate "idle" rates by comparing any equipment actually utilized, opting instead to take a blanket 34% deduction); *id.* 942:5–8 (Conklin did not check market rates for December

---

[9] For reasons discussed below in Section II(E), their testimony is not admissible.

2014 for the equipment used, like a 150-foot crane). Like Mr. Conklin, Mr. Lafontaine also did

not know or research prevailing market equipment rates at the time of the failure, and he did not

compare these rates with MJ's 2011 rates. Lafontaine 859:24–25, 860:5–9, 21–22, 861:8–11.

Contrary to Messrs. Conklin and Lafontaine's testimony, Pelco benefitted from MJ's flat,

2011 equipment rates because the Pelco failure arose on an emergency basis in peak season in

December 2014. Mahoney 118:18–19, 24–25. Even though MJ had to rent equipment at

additional cost, it did not (nor could it under the contractor-of-choice agreement) pass these costs

on to Exelon. *See* Erbach 275:5–10, 1055:8–17, Ex. 412. Mere speculation cannot overcome the

presumption and the extensive evidence at trial that Exelon's costs incurred were reasonable.

### 2. Labor Costs Were Reasonable and Essential for Worksite Safety and the Integrity of the Power Grid.

Exelon is entitled to recover $266,524.87 of the labor costs that it paid to MJ to remediate

the emergency. Indeed, Pelco does not dispute that MJ had to use extra labor to address the arm

failure and make the worksite safe. *See* Lafontaine 808:12–14. Nor does Pelco dispute that

Exelon had to act quickly, both for safety and because prolonged outages cause strain in the

electrical grid. Bartolameolli 156:25–157:14; *see also* Conklin 905:16–906:6, Scott 1052:4–22.

Instead, Pelco challenges the number of crewmembers (also referred to as "crews") onsite on

December 9–12, 2014. Conklin 896:21–897:1. This argument, based on "premium time" in a

proposal for the original work, Ex. 218, Lafontaine 812:10–21, Conklin 895:23–897:8, and on

daily job briefings, Ex. 16-0007-0014, is deeply flawed.

MJ did not have extra crewmembers onsite when the Pelco arm failed. *See* Mowry

344:10–15 (one crew onsite on December 13). While the proposal for the original work notes

that MJ "[h]ad to bring in additional crews, equipment and work more premium time" to

complete its work during a shortened outage on the "E" series, that work had been completed

12

prior to the arm failure. Pursuant to the original scope of work, MJ did not include additional crews during the "D" series work where the Pelco arm failed. Ex. 218-0003. For its work on the "D" series, MJ indicated only "[c]rews to work more premium time." *Id.* Premium time, or having existing crews work overtime, is not the same as adding additional crews. Mr. Lafontaine glosses over this distinction in his testimony:

> Q One of the things I have seen in looking at the reports is the term 'premium time.' Is premium time and overtime the same?
>
> A Yes.
>
> Q And, of course, that calls for a higher rate?
>
> A Yes, sir.
>
> Q After the arm failure, in all of the documents that you reviewed, did you see any indication that there was a discussion between MJ and ComEd about reducing the manpower loading on this project?
>
> A I saw nothing in any of the documents I reviewed that indicated there should be a reduction in manpower.

Lafontaine 812:10–21.[10]

Messrs. Lafontaine and Conklin did not even know how many MJ crews were onsite on December 9–12, 2014. Mr. Conklin, relying on Mr. Lafontaine, admitted at trial to miscounting Exelon, Pelco, and TEAM Industrial employees as MJ employees, as well as to double-counting MJ employees. Conklin 949:21–950:2, 951:8–17. In fact, Mr. Conklin did not know how many people are in a standard transmission-overhead crew, let alone how many are needed to address an overhead transmission emergency. *Id.* 929:11–13, 944:14–15. Neither did Mr. Lafontaine. *See* Lafontaine 805:22–806:1, 851:11–13. His only experience with a transmission arm failure

---

[10] At the same time, Mr. Lafontaine argues that Exelon should have *added* labor—a full-time construction manager. Lafontaine 842:13–17. Not only would this increase cost, but this argument fails to take into account the existing construction manager, Ed Ongenae, who was onsite on December 5, *id.* 857:20–24; Hosfield 603:6–8; Ex. 16-0002, and the existing project manager, Mark Bartolameolli, who was onsite on December 6, 9, and 10, Lafontaine 857:25–858:3, Bartolameolli 143:1–2; Ex. 16-007-010.

13

was as an assistant project manager on a site in Texas with a 20-man crew that was not reduced after the failure. *Id.* 850:23–851:25. Although Mr. Lafontaine never opined on the proper crew size for this work, MJ's crew never reached 20 men. Conklin 945:10–13, 949:4–951:17; *see also* Lafontaine 810:9–10, 811:19–20; 812:3–4.

### 3. Equipment and Miscellaneous Costs Were Reasonable and Essential to Mitigate Hazards Due to the Defective Pelco Arms.

Exelon is also entitled to recover the amount of the costs it paid to MJ for emergency equipment and other miscellaneous expenses, as follows:

| Category | Amount | Evidence |
|---|---|---|
| Equipment | $539,873.45[11] | Exs. 378, 412; Hosfield 591:1–592:9; Bartolameolli 161:4–12; Erbach 279:9–11 |
| Emergency Locates | $2,596.12 | Exs. 378 412-0002, 0006, 0012; Hosfield 588:5–15, 683:15–18; Bartolameolli 160:6–11; Erbach 278:9–22, 283:6–8 |
| Miscellaneous (dumpsters, sanitary facilities, per diems, hotels) | $23,367.00[12] | Exs. 378 412-0002, 0006, 0012; Hosfield 588:5–15, 683:15–18; Bartolameolli 160:6–11; Erbach 278:9–22 |
| **Total** | $565,836.57 | |

Pelco argues that the equipment charge is too high because Exelon should have demobilized (removed) equipment between December 22, 2014 and February 12, 2015. Conklin 888:7–12, 897:9–898:20, 905:14–907:8.[13] Pelco does not seriously contend that Exelon should have removed equipment before December 22, 2014, *id.* 934:3–5, 932:3–9, nor does it take issue with the reasonable emergency locates and other miscellaneous expenses. *See* Ex. 266-0002.

---

[11] This figure accounts for a discount of $115,496.68 for equipment due to overlap with work anticipated before the arm failure, and $2,005.84 due to a "transfer" difference. Ex. 378.

[12] This figure accounts for a discount of $2,498.00 for miscellaneous costs related to the week ending January 11, 2015. Ex. 378; Ex. 385; Hosfield 595:18–20.

[13] As an alternative, Pelco argues that Exelon should have taken the equipment "off rent" or demobilized it "in place." *See* Conklin 898:12–20; Lafontaine 863:12–13. These options provide no more assurance of availability than demobilization, because the equipment's owner can take it offsite at any time should that owner need it for another project. Lafontaine 821:17–822:2, 862:15–18.

Pelco's demobilization argument is built on hindsight and not reality. First, it fails to account for the fact that MJ *did* demobilize a significant portion of the equipment onsite between December 22, 2014 and February 12, 2015. *See* Conklin 892:23–893:3, 897:9–898:8; Lafontaine 864:11–14. Of the 63 pieces of equipment onsite, MJ removed 30 for at least part of the period between December 22, 2014 and February 15, 2015—including, among many others, a 47' digger, a 30 ton Manitex crane, a 100' bucket truck, a TS-608D trailer (crane weights), a 72" BW tensioner, a 4 drum puller 75, a 48' drop deck trailer, a 50 ton Manitex crane, a 20K hardline, a generator (25kW), and a D4 dozer. Ex. 383; Ex. 527-0059. Many of these items were demobilized for the entire disputed period.[14] *Id.*

Second, Pelco's argument conflates Exelon's *planned* work with the emergency here. Ex. 218. During peak season for transmission work, key equipment is in high demand and must be secured in advance.[15] MJ's work was not a routine transmission project, or even a shifted outage, which would allow for ordering equipment in advance.[16] Exelon and MJ were learning the emergency's scope, timing, and resource needs in real time. *See* Bartolameolli 166:13–18.

Third, Pelco's demobilization argument ignores the volatile situation that its defective arms created—specifically, no one knew whether or when another arm would fail. *See* Mahoney 71:4–18; Petersen 425:15–23. By December 22, after weeks of testing, Exelon was still assessing the risks lurking in Pelco's other arms. By December 29, 2014, preliminary

---

[14] MJ also demobilized 20 pieces of equipment during the weeks ending December 7, 14, and 21, Ex. 383, but demobilization during this time frame is not at issue. *See* Conklin 897:9–898:8.

[15] Both parties agree that the failure occurred during peak season for transmission work. Holtz 382:11–13; Lafontaine 818:21–819:6, 819:15–17; 820:3–12.

[16] Offhand comments, made by Messrs. Mowry and LaFontaine, that they never had trouble procuring equipment, were made in the context of planned work. Lafontaine 859:8–11; Mowry 356:10–24. And Mr. Lafontaine's inadmissible, generic telephone call to United Rentals in March 2018 and drive-by of a Pennsylvania equipment yard in July 2019, say nothing of the availability of a specific set of equipment in December 2014/January 2015. *See* Lafontaine 819:15–17; 820:3–12, 859:12–25, 860:5–16, 862:3–8.

15

destructive test results found pervasive defects in Pelco's arms, many of which held electrified, high-voltage wires spanning a busy, multi-lane highway. Bartolameolli 153:1–7; Petersen 390:3–11, 427:15–20, 428:25–429:6; Hosfield 601:4–7. This destructive testing, completed on January 5, 2015, underscored Pelco's pervasive welding defects and crystalized the need for equipment to remain onsite until Pelco's defective arms could be replaced. Bartolameolli 153:1–9, 183:14–19, 184:1–12; Petersen 427:15–20, 428:25–429:6; Hosfield 601:4–7. Knowing this risk, it would have been unacceptable for Exelon to give up critical equipment.[17] If another arm fell and caused an outage or injury, the time needed to transport essential heavy equipment from across the country could come at enormous cost to the electrical system, or even to lives.

Finally, in addition to safeguarding from the risk of another Pelco arm failure, Exelon needed the equipment onsite to remove Pelco's defective arms and install replacements. But Exelon had no certainty when replacements would arrive. Bartolameolli 156:16–22. In mid-December, Exelon expected to install Pelco's replacement arms, which were still in testing. Petersen 428:25–429:6. On December 19, in the event Pelco's arms failed testing, Exelon secured an estimate from Valmont that it could deliver replacements by January 19. Hosfield 601:3–12; Bartolameolli 150:22–151:15. In January, after the irreparable defects in Pelco's arms and welding process were fully revealed, Exelon ordered replacements from Valmont. Ex. 394. These arms were not delivered until February 12. Bartolameolli 143:5–16; Hosfield 601:13–22.

### 4. Matting Costs Were Reasonable and Essential to Provide Access to the Worksite and Protect the Gas Main and Golf Course Below.

Exelon is entitled to recover the $174,323.05 that it paid to MJ to rent emergency matting. Exs. 378, 412; Conklin 901:10–21. Without matting, the high-pressure gas main and

---

[17] MJ rented, at its own cost, 28 of the 63 pieces of equipment onsite during the X002 work from other companies. Ex. 383; Ex. 412; Erbach 1055:10–17; *see also* Mahoney 125:24–126:3, 128:5–7.

golf course below the site would be exposed to the wheels and tracks of heavy equipment.
Mahoney 49:25–50:4.  Pelco argues that Exelon could have saved $86,159.85 in matting, *if* Pelco
could have delivered conforming arms by January 12, *and* Exelon could have obtained
consecutive outages in January.  Conklin 905:14–907:8, 922:15–924:19, 924:10–19.[18]

Pelco's matting argument has no factual or legal basis.  Per Pelco's witnesses' own
testimony, Pelco could not have delivered arms that actually conformed by January 12, *see* above
§ I(A)–(C), and there is no evidence that Exelon could have obtained a single outage (let alone
three) in January.  In fact, Exelon's previous November attempt to obtain a January outage
resulted in an outage in February.  Bartolameolli 141:16–142:1.  Moreover, Exelon was not
required to accept Pelco's offer to deliver more arms (indeed, it would have been unreasonable to
do so), and Pelco may not reduce its damages by such an offer.  *Am. Fid. Fire Ins. Co. v. Gen.
Ry. Signal Co*., 184 Ill. App. 3d 601, 614 (1st Dist. 1989) (victim of breach not required to accept
breacher's offer to perform the original contract on new or modified terms, and breacher "cannot
. . . limit . . . damages to only those which would have resulted if its offer had been accepted.").

### B.      MJ's Replacement Costs Were Reasonable (X003).

Exelon is entitled to recover the amount it paid to MJ to remove defective Pelco arms
from the energized "E" series and replace them with conforming Valmont arms; to remove the
remaining Pelco arms from the "D" series and replace these, too, with Valmont arms; and to
remove guard structures, change out i-strings, and load and unload the arms.  *See*, *e.g.*, Hosfield
588:19–589:1.  MJ's reasonable lump-sum costs of $872,912.12 to do so were tracked through
change order X003, set using the competitive rates from 2011, and proved by Joseph Mahoney,
Mark Bartolameolli, Karen Erbach, Ed Mowry, and Mark Hosfield.  Mahoney 77:1–78:18,

---

[18] Exelon's matting costs account for a discount of $257,583.37 for matting due to overlap with work anticipated before the arm failure, and $10,500 due to a typo.  Ex. 389; Ex, 412; Conklin 901:10–21.

101:11–21; Bartolameolli 164:13–21, 165:21–22, 168:16–169:24; Erbach 291:5–292:11, 296:12–
14; Mowry 346:6–24; Hosfield 588:22–589:1, 596:17–597:10, 638:6–12.

### 1. Lump Sum Costs Were Reasonable Based on a Heavily Negotiated, Contractor-of-Choice Agreement.

The rate structure and scope of MJ's replacement work was reasonable.  Because
replacing Pelco's defective arms and installing Valmont's replacement arms involved a detailed
scope of work, MJ and Exelon negotiated, and Exelon paid, a reasonable lump sum.  Mahoney
77:8–10; Ex. 221, 388; Bartolameolli 169:18–24; 173:12–13.  Like all of MJ's work for Exelon
under its contractor-of-choice agreement, the costs were predicated on rates established years
before.  *See above* § II(A)(1); *see also* Ex. 412; Bartolameolli 160:12–161:1; Erbach 281:16–23.
MJ properly excluded costs under X002—such as matting, among others—from the scope of its
replacement work under X003.  Ex. 221-0001; Ex. 388-0001.

### 2. Replacement Costs Were Reasonable and Essential to Remove the Defective Pelco Arms and Complete the Transmission Project.

For the replacement work, Pelco again does not challenge MJ's rates or its lump sum
basis. Ex. 266; Conklin 903:1–11.  Pelco argues that, had Exelon *hypothetically* left the
defective Pelco arms in the air and completed the project with more defective Pelco arms, Exelon
would have saved most of X003.[19]  Conklin 903:1–11, 904:2–905:8, 920:4–921:2.  Pelco's
damages expert, Mr. Conklin, concedes that this opinion is based solely on a hypothetical posed
by defense counsel, *id.*, and does not account for defects in even *one* of Pelco's arms.  *Id.*
915:12–19, 918:23–25, 919:22–24, 920:13–18, 920:22–921:7.

The evidence is overwhelming that Pelco's arms suffered from pervasive welding defects
that could and did cause catastrophic failure.  *See above* § I(A)–(B).  Leaving them in the air was

---

[19] Pelco concedes that X003 would include, at a minimum, costs to take down the temporary guard
structures placed during the emergency X002 work.  Conklin 903:1–11, 905:3–8.

not an option. Thus, Mr. Conklin's hypothetical opinion fails as matter of law. *See Owens v.*

*Auxilium Pharm.*, 895 F.3d 971, 973 (7th Cir. 2018) (Expert "hypotheticals … did not fit the

facts of the case."); *Guillory v. Domtar Indus.*, 95 F.3d 1320, 1114 (5th Cir. 1996) ("[N]othing in

Rule 703 requires a court to admit an opinion based on facts that are indisputably wrong.");

*Iconco v. Jensen Const.*, 622 F.2d 1291, 1301 (8th Cir. 1980) ("A hypothetical should include

only such facts as are supported by the evidence.").

The cost of replacement was reasonable. Hosfield 596:13–24; Erbach 291:14–22. Due

to the volatility of Pelco's defective arms, replacing them—including arms from the "E" series,

which had already been put back in service and energized, and the "D" series, many of which

were suspended eight stories or more in the air—required special safety precautions. Mowry

376:25–377:9, 345:25–14 (it was like working with a "grenade"). In addition, MJ's cost for

unstringing tensioned wires from potentially fragile arms, removing and replacing arms in the

air, and re-stringing conductor wire was more expensive and complicated than erecting the poles

in the first place. Bartolameolli 143:11–16. Pelco has put forth no contrary evidence.

### C. TEAM Industrial's Inspection and Metallurgical Testing Costs Were Reasonable.

Exelon is entitled recover $15,781.06 it paid TEAM Industrial to test Pelco's defective

arms. *See* Ex. 503. Under the contract, Exelon may charge Pelco all expenses for "examining . .

. any rejected Material or Other Material." Ex. 320 § 4.2.1. Section 4.2.1 clearly encompasses

TEAM Industrial's costs to test the Pelco arms that Exelon rejected. *Id.* Exelon proved these

reasonable costs through Mr. Vaca (operations manager at TEAM Industrial), Mr. Hosfield, and

Mr. Bartolameolli. Vaca 566:25–567:1; Hosfield 597:11–23; Bartolameolli 173:22–25.

Pelco's argument against paying inspection costs—that, in hindsight, nondestructive

testing did not determine the precise extent of the welding issues in its arms—is not cogent. *See*

19

Pelco closing 1079:12–21. Nondestructive testing, which Pelco itself *also* immediately attempted in this case, can provide valuable information with respect to weld quality. Oliphant 747:17–24; Petersen 420:5–9; Vaca 529:24–530:17; Ex. 301. Moreover, Pelco has no contrary evidence—neither of its damages experts had an opinion about the testing costs. Lafontaine 864:21–23; Ex. 266-0002. Finally, the alternative to nondestructive testing is destructive testing; if Exelon had tested all of Pelco's arms by destroying them, testing would have cost much more.

### D. Valmont's Replacement Arm Costs Were Reasonable.

Exelon is entitled to recover its payment to Valmont for replacement arms in the amount of $259,266.65. Ex. 375; Ex. 394-0004, 0009, 0012; Bartolameolli 174:1–7. Since Pelco failed to cure, the contract makes clear that Exelon may purchase "replacement Material" and invoice Pelco for the replacement costs. Ex. 320 § 4.4. Along with the contract, the testimony of Mr. Petersen (Exelon's senior engineer), Mr. Landow, Mr. Vaca, and Mr. Hosfield, proves the replacement costs were reasonable. Petersen 428:25–429:6, 432:2–433:9; Landow 509:15–19; Vaca 550:1–9, 551:7–16, 553:5–18, 559:25–560:7; Hosfield 597:24–598:9.

Neither of Pelco's damages experts offered any opinion as to the cost of the Valmont arms. Lafontaine 864:24–865:2; Conklin 926:22–927:2. Pelco argued that Exelon need not have bought any replacement arms because it should have used Pelco's defective arms. For the myriad reasons explored in Sections I & II(B), this argument fails. Pelco also argues that Exelon could have saved costs by finding Valmont arms at a used arm store. Lafontaine 842:18–843:1. There can be no serious argument that Valmont's arms, custom-built to fit Pelco's clamps, and which Valmont rushed to design and build from scratch, could be sourced from a used arm store.

### E. The Testimony of Pelco's Damages Experts, James Lafontaine and Richard Conklin, Is Not Credible, and James Lafontaine's Is Inadmissible.

Pelco also failed to carry its burden to show that Messrs. Lafontaine and Conklin's testimony was admissible. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702 & *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). If a witness "is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee Notes. The proponent may not say simply to "tak[e] the expert's word for it." *Id.*

Expert witness testimony must also be substantiated with a rigorous methodology. *Clark v. Takata Corp.*, 192 F.3d 750, 757–58 (7th Cir. 1999) (citations omitted). "Nothing . . . requires a district court to admit . . . the *ipse dixit* of the expert." *Id.* at 758 (citations omitted). Where the witness "eschews reliance on any rigorous methodology and instead purports to base his opinion merely on 'experience' or 'training,'" his expert testimony is properly excluded. *Id.* "[A]n expert's opinion that lacks proper substantiation [i]s worthless." *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (quotations and citations omitted).

### 1. James Lafontaine Is Not Qualified to Render Expert Opinions and His Opinions, Lacking Proper Substantiation, Are Inadmissible.

Mr. Lafontaine is not qualified, by training or experience, to give expert testimony on the labor and equipment needed for emergency overhead transmission work, and his methodology does not indicate any intellectual rigor whatsoever. For training, Mr. Lafontaine has an associate degree and a management diploma, neither of which applies here. Lafontaine 789:19–24. For experience, Mr. Lafontaine has never managed even routine overhead transmission work, and he has certainly not managed an emergency like the arm failure here. *See id.* 845:22–24; 846:7–847:12, 850:23–851:7. Mr. Lafontaine's experience with a transmission arm failure is limited to

anecdotes from one project in Texas that he neither managed nor completed. *Id.* 797:22–25; 850:23–851:7. Mr. Lafontaine should be disqualified.

In addition, as described above, Mr. Lafontaine's methodology, far from "rigorous," rests on estimates, irrelevant telephone calls, assumptions, and his elusive "experience," and should be excluded. For example, Mr. Lafontaine estimated, based on "experience" but literally zero evidence, that 10% of the charges in change order X003 overlapped with the base-scope purchase order. *Id.* 876:9–18. He also estimated the number of MJ crewmembers onsite— before criticizing MJ for using too many—by double-counting MJ employees and also counting employees from Pelco, Exelon, and TEAM Industrial. *Id.* 811:19–20, 812:3–4, 951:6-17. Mr. Lafontaine formed his opinions on the availability of equipment in December 2014 and January 2015 by calling one rental company in March 2018 without asking about any specific machine, and by driving by one equipment yard in summer 2019. *Id.* 859:12–15. He opined that Exelon may have found custom Valmont arms at the used arm store based on a similar phone call. *Id.* 866:23–867:5. Mr. Lafontaine concludes that his opinions have been "tested by experience," *id.* 796:6–8, although these opinions actually require more than experience—they also require sufficient facts and reliable methods. *See id.* 875:7–19, 859:12–15. Mr. Lafontaine's methodology, like the expert disqualified in *Clark*, is "unclear at best" and lacks proper substantiation. *Clark*, 192 F.3d at 757–58; *Noel*, 581 F.3d at 497. His testimony is inadmissible.

### 2. Richard Conklin's Opinions, Based on False Hypotheticals, Mr. Lafontaine's Inadmissible Opinions, and Faulty Data, Are Not Credible.

Mr. Conklin, although experienced in auditing construction costs for errors, had no understanding of welding defects, the labor and equipment needed to address the Pelco arm failure, or prevailing equipment rates in 2014 and 2015. Conklin 879:14–25, 919:22–920:3,

944:14–15, 929:7–10.  Mr. Conklin offered opinions on four disputed topics: four days' labor costs, equipment demobilization, equipment rates, and the need to replace Pelco's arms. [20]

For his opinions on the first two topics, Mr. Conklin, who is not an expert on the labor and equipment needed for this type of worksite, relied on Mr. Lafontaine.  *Id.* 896:21–897:8, 898:12–22, 921:17–18, 928:22–929:13, 955:15–19.  As described above in Section II(E)(1), Mr. Lafontaine's opinions are baseless.  Mr. Conklin's failure to test them resulted in his being forced to admit that his labor opinion was "a mistake."  *Id.* at 951:2–17.

Mr. Conklin's opinions on the third and fourth topics are based on estimates and assumptions.  His equipment rates opinion was not based on a comparison of rates for the equipment actually used or an informed analysis of Exelon and MJ's rate arrangement; rather, he made blanket reductions from eyeballing industry publications.  *Id.* 942:16–945:5, 944:7–9, 952:14–954:17.   And his opinion that Pelco's arms did not need to be replaced was based on an assumption that the arms had no defects.  *Id.* 915:12–25; 917:4–8.  This assumption, which he did not test, is clearly wrong.  *See* above § I(A)–(B); Conklin 916:4–6.  Mr. Conklin's opinions are not credible and should be discounted.  Fed. R. Civ. P. 52(a)(6) (deference on appellate review to trial court's credibility assessments); *Castellano v. Marion Partners by Morris*, 960 F.2d 636, 639 (7th Cir. 1992) (affirming court's finding that expert was not credible).

III.    **Exelon Would Be Entitled to the Same or More Damages Under the UCC Because It Properly Revoked Acceptance of the Defective Pelco Arms.**

Not only is Exelon entitled to its damages under the contract, it also properly revoked acceptance of the defective Pelco arms and would be entitled to the *same* damages under the UCC.  Under § 2–608(1)(b), a "buyer may revoke his acceptance of a lot or commercial unit" if

---

[20] These costs are enumerated in Mr. Conklin's report in line items (2) – (4) and (8) – (9).  Ex. 266-0002. Exelon does not seek the costs associated with items (1), or (5) – (7) in Mr. Conklin's report.  *Id.*

the following elements are met: (1) the "nonconformity substantially impairs its value" to the buyer; (2) the buyer accepted "without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances"; and (3) the buyer notifies seller of its revocation "within a reasonable time after the buyer discovers or should have discovered the ground for it[.]" 810 ILCS 5/2–608(1)(b), (2). The UCC does not provide a right to cure. *Accettura*, 2019 IL 124285, ¶ 26.

Because the elements of UCC § 2–608 are met, Exelon appropriately revoked acceptance of Pelco's arms. First, the value of the arms to Exelon was substantially impaired by defective welding. *See N. Am. Lighting, Inc. v. Hopkins Mfg. Corp*., 37 F.3d 1253, 1258 (7th Cir. 1994).[21] Indeed, when "a person's faith is shaken in a major investment, the item not only loses its real value in the buyer's eyes, but also becomes an article whose integrity has been substantially impaired and whose operation is fraught with apprehension." *Econ. Folding Box Corp*., 2007 WL 844878, at *10. Second, the welding defects were difficult to detect as it was impossible to conclusively test for them without destroying the arms, and Exelon necessarily accepted the arms on Pelco's assurances that its welding conformed to the contract. Third, Exelon notified Pelco of its revocation within days of discovering the pervasive defects revealed by destructive testing. Therefore, the UCC makes clear that Exelon may revoke its acceptance of the defective arms and recover the same reasonable damages of $2,154,664.32. 810 ILCS 5/2–714(1), (3).

**IV.    Exelon Is Entitled to Five Percent Prejudgment Interest.**

Prejudgment interest "is an element of complete compensation" meant "to put a party in the position it would have been in had it been paid immediately. It is designed to ensure that a

---

[21] All of Pelco's arms were nonconforming. Even if there are nonconformities in only some goods, "the buyer may revoke his acceptance, in appropriate cases, as to the entire lot or any commercial unit thereof." UCC § 2–608 n.7; *see also Econ. Folding Box Corp. v. Anchor Frozen Foods, Corp.,* No. 04 CV 4485, 2007 WL 844878, at *12–13 (N.D. Ill. Mar. 19, 2007), *aff'd*, 515 F.3d 718 (7th Cir. 2008).

party is fully compensated for its loss." *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc*., 325 F.3d 924, 935 (7th Cir. 2003). Illinois law sets prejudgment interest at the rate of five percent. 815 ILCS 205/2; *Ameritech Info. Sys., Inc. v. Bar Code Res., Inc*., 331 F.3d 571, 574–75 (7th Cir. 2003). In federal litigation, "compound prejudgment interest is the norm," *Am. Nat. Fire Ins. Co.*, 325 F.3d at 937–38, and it "typically accrues from the date of the loss or from the date on which the claim accrued," *id.* at 935–36 (the claim of an insured who received damaged cigars would have accrued from "the date it received the damaged cigars"); 815 ILCS 205/2 (interest accrues on "all moneys after they become due").

Exelon's loss accrued by February 19, 2015, when it first sought costs from Pelco. Ex. 518. Therefore, Exelon is entitled to five percent prejudgment interest, compounded annually, from February 19, 2015. To date, prejudgment interest will include more than $637,203.15.

## CONCLUSION

For these reasons, Exelon is entitled to a judgment in its favor and against Pelco in the amount of $2,154,664.32, plus prejudgment interest and prevailing party costs:

| Category | Amount |
|---|---|
| **MJ's Emergency Costs (X002)** | |
| Labor | $266,524.87 |
| Equipment | $539,873.45 |
| Matting | $174,343.05 |
| Emergency Locates | $2,596.12 |
| Miscellaneous | $23,367.00 |
| **MJ's Replacement Costs (X003)** | |
| Lump Sum Labor and Equipment | $872,912.12 |
| **TEAM Industrial's Testing Costs** | |
| Destructive and Nondestructive Testing | $15,781.06 |
| **Valmont's Replacement Costs** | |
| Replacement Arms | $259,266.65 |
| **Total, Exclusive of Prejudgment Interest and Prevailing Party Costs** | $2,154,664.32 |

Dated: June 12, 2020          Respectfully submitted,

**EXELON BUSINESS SERVICES COMPANY, LLC**

*/s/ Lauren Jaffe*
Heather H. Harrison (#6296693)
Tracy A. Hannan (#6281834)
EXELON CORPORATION
10 S. Dearborn St., 49th Floor
Chicago, Illinois 60603
Telephone: (312) 394–8164
Facsimile: (312) 394–8322
heather.harrison@exeloncorp.com
tracy.hannan@exeloncorp.com

Mariangela M. Seale (#6293433)
Brian O. Watson (#6304248)
Lauren Jaffe (#6316795)
Joy Anderson (#6320219)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St, Ste. 2900
Chicago, Illinois 60602
Telephone: (312) 471–8700
Facsimile: (312) 471–8701
mseale@rshc-law.com
bwatson@rshc-law.com
ljaffe@rshc-law.com
janderson@rshc-law.com

**<u>CERTIFICATE OF SERVICE</u>**

     The undersigned attorney certifies that these papers were filed and served on all counsel of record via the Court's CM/ECF electronic filing system on June 12, 2020.

<em>/s/ Lauren Jaffe</em>          