UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EXELON BUSINESS SERVICES COMPANY, LLC, | |
| Plaintiff, | |
| v. | Case No.: 1:16-cv-00611 |
| PELCO STRUCTURAL, LLC, | Hon. Robert M. Dow, Jr. |
| Defendant. | |

**PELCO STRUCTURAL, LLC'S RESPONSE BRIEF**

NOW COMES Pelco Structural, LLC ("Pelco"), by and through its counsel FRANCO MORONEY BUENIK, LLC, and for its Response to Exelon Business Services Company, LLC's (hereinafter "ComEd's") Post-Trial brief, states as follows:

I. **INTRODUCTION**

ComEd seeks $2,154,664.32 in damages in response to the failure of single weld of a single arm. Replacing 64 arms in response was disproportionate and unnecessary as cheaper fixes were available including having Pelco develop replacement arms under the supervision of a ComEd weld inspector[1] and providing arms with full penetration welds. As Pelco argues in its Post-Trial Brief, ComEd is not entitled to any damages because it terminated Pelco in violation of the contract. In the alternative, ComEd's claimed damages are not reasonable and must be reduced

---

[1] ComEd's claim that Pelco could not have cured its kerf cuts is irrelevant as kerf cuts are allowed under the contract. Even ComEd admits there is no requirement to bend the arm without kerf cuts. Moreover, the type of weld required to be used at the kerf cuts is also irrelevant as ComEd admitted its inspector would be able to provide ComEd the assurance that any weld had the proper penetration, regardless of what type of weld was used. PSF ¶¶ 81-82. Lastly, Pelco was never given the opportunity to cure any issues with the kerf cuts, so ComEd's baseless speculation about how Pelco's attempt to cure would have been implemented is meaningless.

The thickness of additional arms provided by Pelco is a red herring, as ComEd has not pointed to any testimony that these were a concern to ComEd. Further, thicker steel plate would be a betterment. Regardless, ComEd admitted Pelco had the right to cure following its provision of additional arms regardless of the issues with those arms (*See* PSF ¶ 64). None of these distractions can mask that Pelco had the right to cure, and was denied that right by ComEd.

1

because it mismanaged the remediation and repair work of MJ Electric which resulted in excessive costs to be incurred against Pelco and otherwise failed to mitigate its damages.

ComEd admits over 28% of what MJ charged for its remediation work was improper. These costs were either part of its original scope or ComEd directed MJ to charge these costs to Pelco all the while knowing they weren't related to the arm failure. This alone removes any presumption of reasonableness. MJ's cobbling together of the claim after the fact also forced ComEd's damages expert to make assumptions regarding the X002 costs and to accept estimated charges as final values. This occurred because MJ failed to produce any backup or support for its X002 costs despite being in possession of the relevant timesheets and invoices making up those costs. These assumptions destroy any credibility in ComEd's damage claim. ComEd/MJ's failure to provide this support at Trial bars ComEd's ability to claim these damages under Fed. R. Evid. 1006.

## II. LEGAL ANALYSIS

ComEd must establish "both the correct measurement of damages and the final computation of damages." *Sherwood Commons Townhome Owners Ass'n. v. Dubois*, 2020 IL App (3d) 180561, ¶ 33 (citation omitted). "Proof of a bill for a particular amount, without more, is not evidence of the value of services rendered or materials furnished. Without any detailed breakdown of costs, there is no way to determine the extent, if any, of recovery to which [plaintiff] is entitled." *Keno & Sons Const. Co. v. La Salle Nat'l Bank*, 574 N.E.2d 151, 153-54 (Ill. App. Ct. 1991) (internal citation omitted). The presumption that paid bills are *prima facie* reasonable may be challenged by "proper evidence casting suspicion upon the transaction." *Arthur v. Catour,* 833 N.E.2d 847, 854 (Ill. 2005) (citation omitted). ComEd must mitigate its damages and "cannot recover losses that could have reasonably been avoided." *Boyer v. Buol Properties, LLC*, 22 N.E.3d 389, 404 (Ill. App. Ct. 2014).

### III. ARGUMENT

#### A. ComEd Directed MJ To Charge Excessive X002 Costs Against Pelco

Mark Bartolameolli has never found a charge by a subcontractor to be excessive and has never challenged a subcontractor for overcharging or otherwise sought a deduct. PSF ¶¶ 152-53. Asked why, he claims ComEd has "many checks and balances in our system." Barto 163:24-164:4. ComEd did nothing to vet MJ's invoices or assess the appropriateness of MJ's work and was forced to admit $408,289.12 paid to MJ for its X002 work was improper. *See* PSF ¶¶ 172-74, 179-83, 187. By failing to oversee MJ's costs and being forced to admit to these errors, ComEd's claim is entitled to no presumption of reasonableness. MJ was complicit in these efforts: they just "wanted to get reimbursed." PSF ¶ 191. This is the definition of bad project management. PSF ¶¶ 192-93. MJ overbilled ComEd, and ComEd did nothing to challenge those costs.

#### B. MJ's X002 Cost Spreadsheet is Inaccurate and Unreliable

Ex. 412 was relied upon by ComEd to prove its X002 damages. As ComEd now admits, 28.85% of the Ex. 412 costs were improper. Ex. 412 is so inaccurate ComEd's damages expert could not explain whether any of the charges relating to "Actual MJE Labor & Equipment" were accurately represented in Ex. 412. PSF ¶¶ 172-73; *see also* Hosfield 647:5-16 ("I don't know which weeks it came out of."). Ex. 412 contains additional errors that call into question its accuracy. On January 5-6, 2015, MJ showed up on site because ComEd failed to contact them. Mr. Bartolameolli admitted that during this time MJ "weren't working, but they had crews there on site." PSF ¶ 182. Despite not working over two days, MJ *charged overtime hours* for that week. PSF ¶ 184. Consider the import of that evidence. ComEd contends that overtime hours were necessary, but ComEd allowed MJ to charge overtime hours when MJ's employees sat idle, which cannot be necessary. Meanwhile, all of MJ's other employees claimed an excessive number

3

of hours worked.² *Id.* And despite not having any labor on site for the week ending 12-28-14, MJ's "Notes and Comments" for that entry claim MJ: "Made sure everything was safe specifically around the holiday season." PSF ¶ 176. That rhetoric makes absolutely no sense.

Of the 15 charges comprising Ex. 412, ComEd admitted inaccuracies in six 'Actual MJE Labor & Equipment' charges (PSF ¶¶ 172-74), and two Stevenson Crane charges (PSF ¶¶ 179-80). Five of the remaining charges (the "Forecasts" for equipment for the weeks ending 01-18-15 through 02-15-15) are estimated costs ComEd's damages expert never verified. Exs. 412:0012; 383:0002 ("I understand that equipment costs for the weeks ending January 18, 2015 through February 15, 2015 are estimated."). There is no justifiable reason for ComEd to be using estimated costs five years after MJ's X002 work ended unless there is something terribly wrong with ComEd's claim. ComEd's failure to provide this information means it has failed to meet its burden of proof to show these charges were incurred as a result of the failure. In *Pyramid Development, LLC v. Dukane Precast, Inc.*, 40 N.E.3d 1185, 1195 (Ill. App. Ct. 2014), plaintiff's architect submitted "a cost estimate based on the 2009 RS Means guide, which is used in bidding construction jobs, so [his] testimony did not reflect plaintiff's actual payments for repairs." The court found this evidence of damages to be insufficient because: "Basic contract law requires that the plaintiff prove damages with reasonable certainty and precludes damages based on conjecture or speculation." *Id.* at 1195-96. The same reasoning bars ComEd's use of estimates here.

Ex. 412 is inaccurate because Ms. Erbach, MJ's senior project manager responsible for budget and oversight, did not begin developing Ex. 412 until several months after the X002 costs were incurred, and only then because Pelco questioned MJ's claimed costs. *See* PSF ¶¶ 169-70; Exs. 52, 239, 60, 61; Erbach 320:10-322:17 ("after the fact" she was trying to put together a

---

² MJ and ComEd did not produce *any* time sheets or the All Crew Daily Job Briefing for the January 5-6 time period, making it impossible to verify how many employees were on site during this time. PSF ¶¶ 185-86.

4

number which is "difficult to put together."). Ex. 412 is also inaccurate because MJ simply made up the values contained within it. On December 16, 2014, Ms. Erbach provided Mr. Bartolameolli with estimated scope change notices for X001 ($690,031.22) and X002 ($723,931.87) totaling $1,413,963.09. Ex. 219; Barto 243:11-245:22. MJ referred to this as the "December Accrual." Ex. 219. At the end of January 2015, ComEd began discussing X002. *See* Ex. 52:0002-03. Mr. Bartolameolli wrote Ankita Malhotra and noted X003 costs are "in addition to the approximately $1.4 million spent in December by MJ." Ex. 52:0002. Mr. Bartolameolli admitted this $1.4 million included X001 and X002 costs. Barto 247:5-248:8. Ankita confirmed the $1.4 million related to December costs and noted "we will need an itemized breakdown of the $1.4MM so we can explain to Pelco how we came up with those costs." Ex. 52. Mr. Bartolameolli admitted ComEd didn't know where the $1.4 million was from. Barto 248:2-8. A multi-billion-dollar utility should not be "making up" or estimating its damages after the fact when it had the ability to assess actual costs.

In response to a call from Mr. Bartolameolli (*see* Ex. 239) in late May 2015, MJ provided ComEd with a purported breakdown of its X002 costs and noted "once the work was completed, we compiled the hours, etc. and came up with the total of $1,414,993.61." Ex. 60. MJ's claimed total for X002 was only $1,030.52 different than its "December Accrual" number. At trial, ComEd's own expert was forced to concede that "it's possible" the new value provided by Ms. Erbach was the same as the $1.4 million being discussed by ComEd in January 2015 which included X001 costs. Hosfield 672:21-675:13; Exs. 52 and 219. In other words, it was an estimate. Lending more credence that MJ's X002 amount from Ex. 412 was just its "December Accrual" amount from Ex. 219 is that ComEd has admitted Ex. 412 contained approximately $400,000 dollars in X001 costs. *See* PSF ¶¶ 173-174, 179; Hosfield 676:8-14. This confirms the concern raised by Mr. LaFontaine that, without a construction manager in the field who understood the

5

differences between the X001/X002 costs, "the subcontractor would bill everything to the T&E job and not the lump sum job." LaFontaine 825:18-826:13. ComEd would have this Court believe MJ's Ex. 412 X002 costs just so happen to be within $1,000 of its December Accrual amounts, and just so happen to *also* contain X001 costs, but are otherwise totally unrelated. ComEd has not earned that presumption in this case. ComEd gave MJ a blank check for its X002 work and didn't question any of MJ's totals. Simply accepting MJ's costs does not meet the duty to mitigate.

Notably, the December Accrual included $690,000 of X001 costs in its total while Ex. 412 included nearly $400,000 of X001 costs in its total. That raises the question: where is the additional $250,000+ of X001 costs that MJ hid in Ex. 412? ComEd never answers that question.

### i. Mark Hosfield Assumed $255,000 of X001 Costs Should be Included in X002

The starting value Mr. Hosfield used for MJ's X002 costs was $2,005.84 lower than what MJ claimed. *Compare* Ex. 519:0008 *to* 519:0015. He intentionally hid this change from the Court, as his demonstrative exhibit did not show there was an adjustment, s*ee* Ex. 519:0015, and he never brought up this changed value on direct, *see* Hosfield 577-606; 658:13-659:10. When asked if "there [was] a disagreement or discrepancy between what MJ and ComEd were saying should happen to a charge, where you had to make a judgment determination about where to put it," Mr. Hosfield replied that he "can't recall any situations like that." Hosfield 658:8-12.

The Project ID for X001 is 12FRT009 and for X002 is 14FRT012. Erbach 297:15-21. In March 2015, Sarwath Munawar of ComEd emailed Ms. Erbach about an invoice. Ex. 236:0001-02. Mr. Munawar is in accounts payable at ComEd, but Mr. Hosfield never spoke with him. Hosfield 660:12-18. Mr. Munawar told Ms. Erbach that "we need to move $220,085.68 from [X001] to [X002] in March, please accrue only the difference on [X002] that you are owed." Ex. 236:0002. In the invoice (Ex. 410), MJ only transferred $218,079.84 from [X001] to [X002],

which is $2,005.84 less than what Mr. Munawar directed. However, when MJ developed its X002 costs, it still used the full $220,085.68 amount despite the discrepancy: Mr. Hosfield caught this and removed the $2,005.84 difference from MJ's claimed X002 costs. Hosfield 663:8-21. Pressed on his decision, Mr. Hosfield justified using $218,079.84 instead of $220,085.68 by stating: "*There was a discrepancy and I used the lower number so as to be more conservative*." Hosfield 664:6-15 (emphasis added). However, the fact is that he had no support for this claim element.

Mr. Munawar later reached out to Ms. Erbach concerning another invoice and told her the invoice was being split up as follows: "[X001]: $397,850; [X002]: $147,150." Ex. 236:0001. Mr. Munawar attached a spreadsheet which shows these amounts rounded off and in opposite buckets as to what he directed. Ex. 236:0003. When MJ issued its invoice, MJ used the wrong values as well, with Ex. 408 showing X001 at $145,000 and X002 at $400,000. Mr. Hosfield admitted he used the $400,000 for MJ's X002 costs. Hosfield 665:4-24. Asked about this discrepancy, Mr. Hosfield speculated it was possible Mr. Munawar typed the numbers in backwards, but he never spoke to Mr. Munawar to resolve this issue. Hosfield 666:15-667:1. Mr. Hosfield also never spoke to Ms. Erbach about these discrepancies or apparently any other issue. *See* Hosfield 616:1-10 ("If there is a mistake in [Ex. 519], I am not aware of it."); Ex. 519:0005 (Not listing Ms. Erbach as someone he talked to); *see also* Hosfield 617:1-15, 641:6-642:4, 664:6-15. Mr. Hosfield tried to argue the $400,000 was an accrual, which is irrelevant as the $2,005.84 adjustment also concerned an accrual. *See* Ex. 236:0001-02 ("Since we need to move $220,085.68 from [X001] to [X002] in March, *please accrue only the difference* on [X002] that you are owed." (emphasis added)). Mr Hosfield could not explain why he used $400,000 instead of $145,000, and Ex. 377, a schedule created by Mr. Hosfield, states: "*I have assumed* the $400,000 billed for [14]FRT012 on March 2, 2015 is related to X002." *See* Ex. 377 FN 4 (emphasis added); Hosfield 668:7-670:12. Mr.

7

Hosfield was unable to explain what this $400,000 relates to or how it should be accounted for. Even Mr. Hosfield could not clean up ComEd's numbers.

Mr. Hosfield faced two discrepancies between MJ's invoices and ComEd's direction. When it involved $2,005, he wanted to be conservative and not overcharge Pelco: when it involved $255,000, he "assumed" ComEd should get paid it. He never spoke to Mr. Munawar or Ms. Erbach concerning these discrepancies. It is ComEd's burden to prove it incurred the claimed damages. By Mr. Hosfield's own admission, he was unable to prove where $400,000 should be charged and he did nothing to resolve this discrepancy. *See Fieldcrest Builders, Inc. v. Antonucci,* 724 N.E.2d 49, 58 (Ill. App. Ct. 1999) (noting the party seeking damages bears the burden of separating costs incurred to correct defective work from costs related to completion of original work). MJ's X002 costs from Ex. 412 contain an unaccounted for $250,000+ in X001 costs. Mr. Hosfield's assumptions in favor of ComEd represent those missing, unjustified X001 charges.

### C. Ex. 412 is Inadmissible as Evidence of ComEd's X002 Damages

There was no backup support provided by MJ or ComEd for the charges claimed in Ex. 412. PSF ¶ 186. Under Fed. R. Evid. 1006, summaries of documents are admissible if "[t]he originals or duplicates [are made] available for examination or copying, or both, by other parties at a reasonable time and place." A "reasonable time and place" means "the opposing party has adequate time to examine the records to check the accuracy of the summary." *U.S. v. Rangel,* 350 F.3d 648, 651 (7th Cir. 2003). Pelco subpoenaed MJ and propounded discovery on ComEd demanding time sheets, overtime records, and financial documents relating to MJ's work and ComEd's damages. *See* Ex. 67 (Exelon's Responses to Pelco's Requests to Produce, #'s 4, 6, 9-13); Attachment A (Subpoena Rider to MJ). ComEd and MJ failed to produce these documents.

The harm caused is clear. Take MJ's claimed Subcontractor costs of $445,022.54 for

8

example. Ex. 412:0012. Ex. 412 has a separate tab related to matting. *See* Ex. 412:0018. Only one matting charge (the $257,583.37 charge) is listed and that only contained enough information to prove it was an X001 cost. The remaining two Stevenson Crane matting charges contain no underlying information whatsoever, and the Badger 12/07/14 invoice was not produced. This evidences $445,000 in charges without any support which violates Fed. R. Evid. 1006. ComEd committed another violation by not providing invoices or final costs for the $274,650 in forecasted equipment costs. For the largest portion of costs, "Actual MJE Labor & Equipment," MJ's failure to provide any time sheets or other supporting information leaves Pelco unable to verify these costs. This is especially concerning considering the numerous inaccuracies contained therein. PSF ¶¶ 172-74. Even from what scant information MJ provided, MJ was improperly charging overtime hours to ComEd for the two days they showed up and "weren't working." PSF ¶¶ 181-84. Without timesheets, Pelco has no way of knowing whether the 652 additional hours of OT or the 367 DT hours charged by MJ between December 5-22 are proper. ComEd cannot rely on MJ's summaries to prove costs when MJ admitted it didn't make the underlying support available for inspection and where ComEd has admitted 28% of MJ's costs were improper. For these reasons, Ex. 412 is inadmissible and ComEd had failed to meet its burden to prove its claimed X002 costs.

### D. ComEd Failed to Mitigate its Claimed Equipment Damages

ComEd seeks $539,873.45 in X002 equipment costs. Mr. Bartolameolli admitted there are no exhibits indicating ComEd considered reducing equipment costs during the relevant timeframe. Barto 183:14-25, 185:3-12. Ed Mowry testified MJ left the equipment on site because they didn't have instruction on what to do from ComEd. PSF ¶ 251. The trial testimony also contradicts ComEd's after-the-fact justifications for its failures to mitigate as the record shows: 1) the emergency was over the first weekend; 2) there was no concern with getting back equipment; 3)

MJ had the ability to reduce its equipment rates; and 4) MJ was already preparing to demobilize its equipment prior to the arm failure. ComEd's failure to mitigate its equipment costs by either demobilizing and/or reducing the rates means those damages cannot be recovered against Pelco.

ComEd and MJ admit the site emergency was over by December 7. PSF ¶ 209. MJ's daily job briefings confirm, with the December 7 briefing stating "Secure wire, set guard poles" and the next job briefing (December 9) stating: "Assist ComEd and Pelco" with inspections. PSF ¶¶ 208, 210. This meant a transition from safety into inspections. PSF ¶ 211. ComEd's claim there was an emergency until the Valmont arms arrived months later is not supported by any testimony. Remember that ComEd was so "concerned" about another arm failure they ordered MJ to demobilize its labor by 12-21-14 and did not have MJ back out to test a single arm or to otherwise check the site until the Valmont arms arrived on February 15. There simply was no emergency.

Neither was there a concern with getting equipment back on site. With offices all over the country, MJ has the ability to bring in equipment from other states to meet the needs of the project and will "pay what it cost[s] to get" any emergent pieces of equipment that a job requires. PSF ¶¶ 238-39, 244. Prior to the emergency, MJ had equipment from Minnesota on site. PSF ¶ 240. Ed Mowry, the lead field staff for MJ, testified that in his career there have only been "a few" occasions where equipment has not reached him in a timely fashion: even during these rare times, the equipment was available, it just might take a few extra days to get to him. PSF ¶¶ 241-42. As long as MJ's fleet managers are doing their jobs, Mr. Mowry would have equipment when he needed it. PSF ¶ 243. Equipment being available during this time was proven by the fact that, immediately after the arm failure, MJ "*ordered some equipment* to hold the tension of the wire." JSF ¶ 112 (emphasis added). ComEd would also have this Court believe all equipment left on site was necessary to secure it. Even a cursory glance at equipment left after the week ending 12-21-

14 shows it was not specialized: *See* Ex. 412-0016 (equipment left on site until 02-15-15 included portable light generators, dump trucks, forklifts, bulldozers, etc.). Jim LaFontaine[3] reviewed the equipment and testified that in his expert opinion only three pieces of equipment should have been retained in case of emergency: the rest should have been demobilized. LaFontaine 817:13-20; Ex. 266:0011. No one from ComEd undertook a similar analysis and ComEd's failure to even consider viable options to reduce MJ's equipment costs bars them from being able to claim its costs in full.

MJ should have renegotiated equipment rates for equipment on site following the failure. John Holtz admitted MJ can use monthly rates during the busy season "if there is a job that has consistent work for an established period of time." PSF ¶ 224. Ms. Erbach admitted using hourly rates is easier "if you're only working on a job for … a few hours, it's easier to break it out that way." PSF ¶ 225. MJ used the highest rate (hourly) for work projected to take months. And ComEd did nothing to challenge these excessive costs on equipment owned by MJ.[4] Richard Conklin opined[5] that MJ's equipment costs would have been reduced 50% by going to a monthly rate and an additional 34% of that had it switched to an idle rate by marking equipment off rent following MJ's labor demobilization. PSF ¶ 232. Joseph Mahoney admitted MJ had the ability to take equipment off rent but did not do so here. PSF ¶ 233. He also admitted MJ did not call rental companies to ask about equipment availability even though doing so would have shown equipment was available. PSF ¶¶ 229, 248. MJ did not attempt to reduce its equipment rates because ComEd

---

[3] This Court has "broad latitude when it decides *how* to determine reliability" of an expert. *Bogatha v. Union Pac. R.R.*, Case No. 17-cv-4290, 2020 WL 419406, at *2 (N.D. Ill. Jan. 24, 2020) (citation omitted). Mr. LaFontaine has 30 years of transmission experience, has served as the assistant PM on overhead transmission work, and trained the PM on the transmission arm failure in Texas. He tested equipment availability by asking about specific pieces of equipment MJ billed for: his testimony is reliable. LaFontaine 790:8-794:21, 843:15-852:23, PSF ¶¶ 148, 248.
[4] MJ has not produced the invoices to prove which equipment it owns vs which equipment it rents.
[5] Mr. Conklin has extensive construction experience in the field (including experience serving as a PM) and has worked as a construction cost consultant for 30 years. He tested ComEd's claim of the reasonableness of its equipment rates by comparing it to the Bluebook, which is a "very realistic pricing guide." Conklin 943:1-5; PSF ¶ 232. His testimony is reliable. PSF ¶¶ 148, 164, 226-28, 232, 252.

directed MJ to leave all its equipment on site. PSF ¶ 230. This was pure profiteering.

Additionally, ComEd should have demobilized MJ's equipment from December 22 until February 14. Prior to the arm failure, MJ was prepared to perform two demobilizations (two weeks and 8.5 weeks) as part of its X001 work. PSF ¶ 245. ComEd cannot now claim it was concerned about equipment availability. ComEd had opportunities to demobilize on December 19, January 5, and January 15, *see* PSF ¶¶ 212-14, but never considered doing so. Barto 183:14-25, 185:3-12.

For every week the Court finds equipment should have remained on site, ComEd should only be entitled to 50% of its costs to reflect the monthly rates it should have negotiated. For every week after December 21 (when MJ removed its personnel) the Court finds equipment should have remained on site, ComEd should only be entitled to 34% of the monthly costs to reflect the idle rates it should have negotiated. For every week after the Court finds ComEd should have demobilized MJ's equipment, it would only be entitled to $768.60/week to reflect the adjusted rates for the equipment Pelco concedes should have stayed on site.[6] Had ComEd demobilized on December 19, its equipment costs would be $94,009.92. Had ComEd demobilized on January 5, its costs would be $120,010.32. Had ComEd demobilized on January 15, its costs would be $128,579.82. If the Court finds ComEd should not have demobilized but should have utilized monthly rates, its equipment costs would be $269,936.72. If the Court finds ComEd should not have demobilized but should have utilized monthly and idle rates, its costs would be $125,016.82.[7]

### E. ComEd Failed to Mitigate its Labor Costs

ComEd claims it did not have extra workers on site when the arm failed but cites as proof

---

[6] The three pieces of equipment that should have remained onsite following the week ending 12-21-14 were charged at $4,521.20/week. Ex. 266:0011; PSF ¶ 163. Applying the 50% monthly rate values the equipment at $2,260.60/week. Applying the 34% idle rate on top of the monthly rate values the equipment at $768.60/week.

[7] Worksheets calculating the equipment cost alternatives are included as Attachment B. *See also* PSF ¶¶ 161-63; Ex. 266:0010-12 (Adjustments had to be made to Richard Conklin's totals to reflect the deductions ComEd admitted it had to make, but the underlying reasoning and support remains the same).

that it had "one crew onsite on December 13." ComEd's Brief, p. 12. The failure happened on December 5, and Joseph Mahoney admitted: 1) just prior to the arm failure, MJ increased its manpower and equipment to meet an outage that had been decreased in duration; and 2) after the arm failure, MJ did nothing to reduce its manpower. PSF ¶¶ 203-04. The question is not whether MJ's crew should have been reduced prior to December 13, but how reduced it should have been.

MJ failed to reduce its labor between December 9-12 when it was performing inspections of the Pelco arms to determine the root cause of the failure. Good project management required ComEd to forecast the labor requirement for the first week, which was not done. LaFontaine 807:11-813:5. Had ComEd properly managed MJ, it would have known inspections could be done with a nine-person crew (1 General Foreman; 2 Foremen; 6 Workers), with the remainder being demobilized. PSF ¶ 205. Instead, MJ used an average of 3 Foremen and 10 Workers during this time: removing the excess crew would have saved $26,700.80 in X002 costs. Exs. 266:0009-10, 267:0002-03; Conklin 895:17-897:8, 945:5-951:17; Exs. 16 & 18; Ex. 527:0014 (adjusted totals).

### F. ComEd Improperly Calculated its X003 Costs

ComEd claims it is owed $872,912.12 for X003, which ignores that $105,208.32 was from the original scope. Ex. 58, PSF ¶ 194. Mr. Hosfield, who did not discuss the X003 amounts with anyone, admitted $105,208.32 "is what was charged to install the original arms" and the remainder "would be the incremental amount to get the arms installed." Hosfield 671:8-672:7. ComEd is not entitled to $105,208.32 of its claimed X003 costs because it cannot bill twice for the same work.

### G. ComEd Should Not be Reimbursed for its Non-Destructive Testing Costs

ComEd directed TEAM to non-destructively test arms supplied by Pelco despite knowing such testing was inaccurate. TEAM was unable to test to the standard and instead tested "for informational purposes" only. Vaca 552:7-553:4. ComEd's reliance on § 4.2.1 of the contract is

misplaced as that only allows for costs of "examining" "any rejected Material or Other Material," with "Other Material" being defined as "personal and real property damaged by the non-conforming Material or otherwise adversely affected by the performance of the Work." These definitions do not encompass TEAM performing arbitrary testing on 43 arms. The $15,781.06 ComEd paid TEAM was for non-destructive *and* destructive testing. Pelco concedes destructive testing was necessary but it is ComEd's burden to prove what portion of the bill relates to that testing, which ComEd has failed to meet. Therefore, ComEd is not entitled to its testing costs.

### H. ComEd is not Entitled to the Costs for the Valmont Replacement Arms

Mr. Hosfield admits ComEd would not have purchased Valmont arms if Pelco had been able to provide arms to ComEd's satisfaction. Hosfield 623:1-13. Pelco's Post-Trial Brief shows it was not given this opportunity. ComEd is not entitled to the $259,266.65 it paid to Valmont.

### I. ComEd is not Entitled to its Matting Costs for March 2015

ComEd claimed $86,159.85 in matting costs for March 2015. This would not have been incurred had ComEd not terminated Pelco. As of December 17, Pelco could have supplied all 64 arms within two weeks. PSF ¶¶ 70, 75-77; Scott 1040:13-23. Had ComEd not terminated Pelco on January 2, 2015, Pelco could have delivered replacement arms before January 12. *Id.* By using Valmont, ComEd knew they weren't going to get arms for an extended period of time while with Pelco they would not have that delay. PSF ¶¶ 220-22. ComEd never went to Valmont or attempted to expedite the arm delivery which caused the schedule to slip. PSF ¶ 215. Mr. Bartolameolli testified that Valmont's shifting replacement schedule made it more difficult to tie down outages. PSF ¶¶ 215-16. It was only after the arms came in that ComEd rescheduled the outages and made a priority to allow MJ to put them up. PSF ¶ 218. It would have been just as easy for ComEd to get priority outages had Pelco arms arrived by January 12 due to the importance of this work.

14

Conklin 905:14-907:8; LaFontaine 874:11-875:10. Mr. Hosfield agreed it's possible getting replacement arms by January 15 would have eased schedule and outage pressures on ComEd. PSF ¶ 219. Whether by going with Pelco or properly managing Valmont, ComEd should have finished the replacement work in February and not incurred any March matting costs.

### J. ComEd Did Not Need to Replace All 64 Pelco Arms with Valmont Arms

Pelco delivered 64 arms to the site. After the failure, Pelco provided an additional fourteen arms. 45 of the 78 arms were tested (2 destructively; 43 non-destructively) and only two were found to have issues. These arms were on the D line. PSF ¶ 198. The F-line arms were never tested, and ComEd never found lack of penetration on any E-line arms. PSF ¶¶ 196-97. Despite this, ComEd terminated Pelco and ordered 64 replacement arms from Valmont. Ordering 64 arms was excessive and inflated ComEd's costs. Had MJ only replaced two Pelco arms, the X003 and Valmont costs would be reduced. Mr. Conklin analyzed MJ's X003 proposal and determined the only activity that would have remained if MJ did not have to replace all 64 arms would be the removal of the temporary supports, which cost $28,542.08. PSF ¶ 195. The remaining X003 costs would be removed. *Id.* Likewise, ComEd would have incurred a fraction of its costs for the replacement arms if it only ordered 2 replacement arms. ComEd paid $259,266.65 for the Valmont arms, which comes out to $4,051.04 per arm, or $8,102.08 for the two arms found to contain weld penetration issues. The remaining costs would not be recoverable.

### IV. CONCLUSION

Because ComEd improperly terminated Pelco, it should be awarded no damages. To the extent this Court finds ComEd would be entitled to damages, ComEd's failure to manage its subcontractor or mitigate its damages, or to provide backup support for its claimed X002 costs, means ComEd's damages should be reduced by the amounts identified in this brief.

Case: 1:16-cv-00611 Document #: 161 Filed: 07/06/20 Page 16 of 16 PageID #:3739

Respectfully submitted,

By:   /s/*Robert J. Franco*
      Robert J. Franco

*One of the Attorneys for Pelco Structural, LLC*

Robert J. Franco
Andrew P. Lesko
**FRANCO MORONEY BUENIK, LLC**
500 West Madison St., Suite 2440
Chicago, Illinois 60661-2510
312-469-1000
312-469-1011 – fax
robert.franco@francomoroney.com
andrew.lesko@francomoroney.com