**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EXELON BUSINESS SERVICES COMPANY, LLC,<br><br>   Plaintiff,<br><br>   v.<br><br>PELCO STRUCTURAL, LLC,<br><br>   Defendant. | Case No.: 1:16-cv-00611<br><br>Hon. Robert M. Dow, Jr. |

**PELCO STRUCTURAL, LLC'S REPLY BRIEF**

NOW COMES Pelco Structural, LLC ("Pelco"), by and through its counsel FRANCO MORONEY BUENIK, LLC, and for its Reply in Support of its Post-Trial Brief, states as follows:

**ARGUMENT**

ComEd led the investigation into the root cause of the arm failure and demanded 14 additional arms from Pelco to keep its schedule fluid while ComEd completed that investigation. Yet ComEd now seeks $2,154,664.32, arguing that Pelco should have refused ComEd's demand for those 14 additional arms and otherwise prohibited ComEd from handling the investigation into the root cause of the arm failure. That sophistry is not only illogical, but ComEd's theory is at odds with the contract which places the burden on ComEd to identify any nonconformance and thereafter allow a cure. Once ComEd completed its investigation and the root cause of the failure was identified, Pelco was never given the opportunity to provide conforming replacement arms. By materially breaching the contract, ComEd cannot make a claim for damages. Alternatively, ComEd should be barred from recovering damages following ComEd's wrongful termination of Pelco and should otherwise have its damages reduced for failing to mitigate.

1

### A. Section 4.2.1 Places the Burden on ComEd to Identify Any Noncompliance in Pelco's Products and to Thereafter Allow A Cure.

ComEd claims Pelco only analyzed its cure argument under Section 11.3 of the contract, apparently ignoring Pelco's Post-Trial Brief pp. 3-4 (analyzing Sections 4.2.1, 4.4, and 11.3 and noting: "*Read together, these provisions* make clear that Pelco has the right to "re-perform, repair or replace the Work" so long as Pelco "promptly commence[s] and diligently proceed[s] to do so." emphasis added)). Focusing only on Section 4.2.1 does ComEd no favors as it removes the "diligence" requirement and only requires Pelco to "promptly correct by repair or replacement any (i) non-conforming Material." JSF ¶ 15.

Unfortunately for ComEd, a closer examination of Section 4.2.1 also shows how ComEd's cure argument fails. Section 4.2.1 places the burden on ComEd to identify any nonconformance in the arms prior to Pelco's right to cure arising. *See* Ex. 320, Section 4.2.1 ("If Any Material does not comply with the foregoing warranties *and [ComEd] gives [Pelco] notice of such noncompliance . . . then [Pelco] shall* . . . promptly correct by repair or replacement any (i) non-conforming Material." (emphasis added)). It is up to ComEd, not Pelco, to conduct the root cause investigation and identify the nonconformance. This approach makes sense. It would be inconceivable for a small steel pole manufacturer from Oklahoma to fly to Illinois to take control of ComEd property. Further, this point was proven at trial by Mark Bartolameolli, who emphasized that "[Pelco] *were there to assist* [ComEd]" in determining the root cause of the arm failure. Barto 204:4-13 (emphasis added). Section 4.2.1 also plainly envisions a joint effort by ComEd and Pelco in developing replacement arms, providing: "The decision whether to repair or replace shall be made with the concurrence of [Exelon] and the repair or replacement shall be scheduled consistent with [Exelon's] operating requirements." Ex. 320, Section 4.2.1. Either way, Pelco had the right to cure following the discovery of the root cause of the failure and was not given that opportunity.

There can be no serious argument that Pelco was not prompt in its efforts to correct non-conforming product. When Mark Bartolameolli demanded fourteen additional arms, Pelco provided them by the week ending December 12, 2014. After issues concerning weld penetration were first identified by ComEd on December 15, Pelco caused the priority-one arms to be manufactured and placed in a hold position at fit and weld within three days so ComEd and its inspectors could inspect the welding process. PSF ¶¶ 69-70, 75-77; Scott 1040:13-23. It is clear that Pelco was promptly proceeding with its efforts to replace the arms consistent within ComEd's operating requirements when it was improperly terminated on January 2, 2015.

### B. Reverse Bevels were Originally Believed to be the Cause of the Arm Failure.

Pelco has exhaustively detailed how both Pelco and Exelon originally believed the cause of the arm failure was a reverse bevel. *See* Pelco Post-Trial Brief, pp. 7-8, 13-14. ComEd's preliminary report makes no mention of weld penetration: it only addresses reverse bevels. Exs. 317, 22. Likewise, none of Pelco's initial testing focused on weld penetration: it focused only on reverse bevels. *See* Ex. 301:0006-08, 11 (all testing related to the bevel condition). ComEd intentionally ignores the causal relationship between reverse bevels and weld penetration: namely, that reverse bevels can result in inadequate weld penetration, and by eliminating reverse bevels, you eliminate any resulting weld penetration issues that were caused by those reverse bevels. Ex. 301:0011 (*"[T]he 'reverse' bevel* didn't allow proper penetration into the base metal of the shaft, *resulting in a weaker weld joint* and ultimately the arm failure." (emphasis added)).

This Court need not look past the trial testimony of Tyler Petersen, who was crystal clear that reverse bevels were the suspected original cause of the failure and that weld penetration only became a concern after the destructive testing results came in. Prior to that, weld penetration was only an "engineering hypothesis." *See* PSF ¶¶ 3-11, 16-18, 25-26, 98-99, 130-34. ComEd did not identify weld penetration as a nonconformance prior to the Landow Report or prior to demanding

fourteen additional arms from Pelco. Against this, it is uncontroverted that Pelco was terminated prior to having the opportunity to cure the weld penetration issue in violation of the Contract.

### C. Pelco Could have Cured Any Welding Issues to ComEd's Satisfaction.

The only weld that actually failed was the arm-to-clamp weld. For those types of welds, Tyler Petersen of ComEd agreed that full penetration welds inspected and approved by a ComEd inspector would have satisfied ComEd's requirements. PSF ¶¶ 141-47. Wes Oliphant, the only engineering expert called at trial, confirmed this plan was prudent and would have satisfied all ComEd's requirements. PSF ¶¶ 141-42. There is no contrary evidence.

ComEd now tries to create a straw man by claiming Pelco never could have cured the purportedly nonconforming kerf cuts. Not only did the kerf cuts have nothing to do with the failure at hand, the Record is clear that Pelco was never given the opportunity to cure any purportedly nonconforming kerf cuts. Moreover, ComEd's entire kerf cut-related argument is that Pelco did not have the ability to use full penetration welds at the kerf cuts.[1] Full penetration welds were not required at the kerf cuts, and ComEd cannot point to a single piece of evidence indicating that ComEd would not have accepted partial penetration welds at the kerf cuts that were inspected and approved by a ComEd inspector. ComEd did not ask a single question about the acceptability of partial penetration kerf cuts at trial, and cannot use an absence of evidence on this meaningless point as substantive evidence against Pelco. If that were not enough, the Record is clear that kerf cuts do not violate the specification. That was the testimony of Wes Oliphant, with no competent contrary evidence being adduced at trial.

The fact is that a ComEd inspector was offered the opportunity to observe that every aspect

---

[1] Because kerf cuts are allowed under the contract, Pelco does not need to show it could have manufactured arms without them, making Pelco's ability to bend arms without kerf cuts irrelevant. Hypothetically, if during the replacement process ComEd decided to prohibit the use of kerf cuts, ComEd itself identified two solutions it would have been accepting of during closing arguments: "outsource the weld bending to another vendor or work[ing] with the client to fix the problem." Tr. 1064:18-19. Pelco agrees these proposed solutions would have satisfied ComEd.

4

of every weld requirement was satisfied, regardless of what type of weld was used at either the arm-to-clamp welds or the kerf cuts. Mark Bartolameolli agreed this would have been sufficient, stating: "[A ComEd inspector] could check whatever was necessary to ensure that we're getting a quality product." PSF ¶ 81. As ComEd admitted at trial, Pelco could have cured.

### D. ComEd's Failure to Mitigate its Costs Means its Damages Cannot Exceed $357,499.08.

ComEd materially breached the contract and should be awarded no damages. Alternatively, ComEd should only be awarded costs reasonably incurred until its breach. As detailed in Pelco's Response Brief, Ex. 412 contains no backup, such that ComEd has failed to prove an entitlement to any of its X002 costs. Any claimable X002 damages must be reduced because ComEd mismanaged the remediation work of MJ which resulted in excessive costs. Further, ComEd failed to mitigate its damages by not negotiating reduced equipment rates or demobilizing excess equipment and labor. If the Court finds ComEd should not have demobilized but should have utilized monthly rates, its total claimable costs through January 2, 2015 would be $357,499.08. [2] If the Court finds ComEd should not have demobilized but should have utilized monthly and idle rates, its claimable costs would be $328,494.13. If the Court finds ComEd should have demobilized on December 19, its claimable costs would be $333,839.39

### CONCLUSION

Because ComEd did not provide Pelco an opportunity to cure the weld penetration issues identified by the destructive test results, ComEd has materially breached its contract with Pelco and should not be awarded any damages. To the extent this Court finds that ComEd would be entitled to damages up until the time of its January 2, 2015 breach of contract, ComEd should not be able to recover more than $357,499.08 in total damages.

---

[2] Worksheets calculating ComEd's total claimable damages are included as Attachment A.

Respectfully submitted,

By:   /s/*Robert J. Franco*_____
      Robert J. Franco

*One of the Attorneys for Pelco Structural, LLC*

Robert J. Franco
Andrew P. Lesko
**FRANCO MORONEY BUENIK, LLC**
500 West Madison St., Suite 2440
Chicago, Illinois 60661-2510
312-469-1000
312-469-1011 – fax
robert.franco@francomoroney.com
andrew.lesko@francomoroney.com

6