# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EXELON BUSINESS SERVICES COMPANY, LLC, | |
| Plaintiff, | Case No.: 1:16-cv-00611 |
| v. | Hon. Robert M. Dow, Jr. |
| PELCO STRUCTURAL, LLC, | |
| Defendant. | |

## PLAINTIFF EXELON BUSINESS SERVICES COMPANY, LLC'S POST-TRIAL REPLY BRIEF

Heather H. Harrison (#6296693)
Tracy A. Hannan (#6281834)
EXELON CORPORATION
10 S. Dearborn St., 49th Floor
Chicago, Illinois 60603
Telephone: (312) 394–8164
Facsimile: (312) 394–8322
heather.harrison@exeloncorp.com
tracy.hannan@exeloncorp.com

Mariangela M. Seale (#6293433)
Brian O. Watson (#6304248)
Lauren Jaffe (#6316795)
Joy Anderson (#6320219)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
Telephone: (312) 471–8700
Facsimile: (312) 471–8701
mseale@rshc-law.com
bwatson@rshc-law.com
ljaffe@rshc-law.com
janderson@rshc-law.com

## INTRODUCTION

Pelco's effort to avoid responsibility for the costs Exelon paid because of Pelco's defective conductor arms—costs that the contract unambiguously allocated to Pelco—is never-ending. In exchange for more than $1 million from Exelon, Pelco delivered two sets of nonconforming conductor arms; hid nonconformities in both sets and then mischaracterized them when found out; caused a catastrophic failure on a critical transmission project; conducted no destructive testing on its defective welding; and nearly six years later has refused to pay anything, even as required by the contract.

Pelco begins with the delusional argument that Exelon's damages are "in response to the failure of [a] single weld of a single arm." Resp. 1, ECF No. 161. As this Court is well-aware, and as Pelco's own inspection report and witnesses proved at trial, Pelco's conductor arms were riddled with welding defects. And when Pelco showed not only once, but repeatedly, that its welding could not be trusted, Exelon made the reasonable choice to avoid another tremendously dangerous failure and paid to replace Pelco's defective arms. Pelco's nonstop attempts to add extralegal and contractual burdens to Exelon—such as conducting an investigation into Pelco's welding issues, allowing Pelco multiple attempts to cure despite its abysmal track record and the impossibility of cure, addressing the danger in Pelco's defective arms with a skeleton crew and minimal equipment, and increasing the burden on Exelon to prove more than "reasonable" damages—should end now.

As detailed in its opening and response briefs, Exelon carried its burden on its breach of contract claim, and Pelco failed to meet its burden on its cure and mitigation affirmative defenses. Indeed, Exelon only seeks a portion of the costs it paid to safely and reasonably address Pelco's pervasive welding defects and catastrophic arm failure—costs that do not even

1

include the more than $1 million in purchase price Exelon paid for Pelco's defective product. Exelon respectfully requests that the Court enter judgment in its favor for $2,154,664.32, plus prejudgment interest and prevailing party costs.

## LEGAL STANDARD

Pelco confuses the parties' evidentiary burdens. As its opening brief explains, Exelon must "merely establish a 'reasonable basis for computing damages,' . . . and may do so 'in any reasonable manner.'" *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 518 (7th Cir. 2011) (quotations and citations omitted); ECF No. 155 at 2–3. Despite many unsupported pronouncements in its response brief, *Pelco* bears the burden to prove its affirmative defense of failure to mitigate. *Ner Tamid Congregation of N. Town v. Krivoruchko*, 08 C 1261, 2009 WL 10696538, at *4, *5 n.5 (N.D. Ill. July 9, 2009) ("It is [defendant's] burden to prove failure to mitigate, not offer various figures for speculation.") (citations omitted); *see* ECF No. 161 at 4, 8–9, 14. To prove failure to mitigate, Pelco "must demonstrate that [Exelon] failed to exercise reasonable diligence and ordinary care in attempting to minimize the damages after injury has been inflicted. The injured party is not, however, required to take steps that involve undue risk or burden." *Ner Tamid*, 2009 WL 10696538, at *4 (internal quotation marks and citations omitted).

## ARGUMENT

Pelco does not even state the standard for a failure-to-mitigate affirmative defense, much less carry its burden to prove it. Pelco's arguments, most of which are unsupported by any legal or evidentiary authority, fail. First, as detailed in its opening brief, Exelon proved a "reasonable basis for computing damages" which included, among other evidence, the contract, hundreds of stipulated MJ and Exelon business records (including Exhibit 412), and extensive fact and expert

2

witness testimony. *Dynegy*, 648 F.3d at 518; ECF No. 155 at 8–20. Second, Pelco's arguments about X002 equipment and labor, X003, non-destructive testing, and replacement of Pelco's defective arms, defy reality and fail to establish a lack of "reasonable diligence and ordinary care." *Ner Tamid*, 2009 WL 10696538, at *4. Pelco's suggestions involve "undue risk or burden," and should not reduce Exelon's damages. *Id.*

I. **Exelon Met Its Burden To Prove A "Reasonable Basis" For Computing Damages.**

A. **The Contract Supports Exelon's Damages.**

The contract is clear that Pelco must pay the "cost of replacement" of its nonconforming arms, including "all costs and expenses associated with . . . replacement[.]" JSF 16. Costs "associated" with replacement include "removal or replacement of systems, structures or other parts of [Exelon's] facility." *Id.* Pelco is also responsible for "all expenses of . . . examining . . . any rejected Material[.]" *Id.* As Exelon's opening and response briefs described, all of Pelco's arms were nonconforming. ECF No. 155 at 3–8, 23–24; ECF No. 160 at 3–6, 10–12.[1]

Contrary to Pelco's argument, the contract does not require Exelon to either provide Pelco an opportunity to attempt an illusory cure or to accommodate even more welding deficiencies. *See, e.g.*, ECF No. 160 at 5–6, 11; *Safeco Ins. Co. v. Renn*, 07 C 3024, 2011 WL 13258220, at *6 (N.D. Ill. Aug. 17, 2011) (the terms of the parties' agreement controls plaintiff's actions; compliance with these terms precludes failure to mitigate affirmative defense); *Am. Fid. Fire Ins. Co. v. Gen. Ry. Signal Co.*, 184 Ill. App. 3d 601, 614 (1st Dist. 1989) (victim of breach not required to accept breacher's offer to perform the original contract on new or modified terms,

---

[1] That Pelco argues its thicker steel in its replacement arms would be a "betterment" defies belief—thicker steel is heavier and carries different load properties, which are considerations Pelco did not make and still does not understand. *See* ECF No. 161 at 1; ECF No. 155 at 6.

3

and breacher "cannot . . . limit . . . damages to only those which would have resulted if its offer had been accepted.").

Nor does the contract require Exelon to investigate the deficiencies in Pelco's welds or determine a "root cause" of Pelco's welding failures. *See* ECF No. 163 at 2; ECF No. 60 at 6–7. Section 4.2.1 requires simply that Exelon give Pelco "notice" that Pelco did not comply with the contract's warranty provisions, which Exelon did by informing Pelco of the arm failure and by inviting Pelco to come investigate. *See* JSF ¶¶ 15, 56; *see also* 810 ILCS 5/1-202(d) (Under the UCC, "[a] person 'notifies' or 'gives' a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it."). Pelco had "notice" of the deficiencies in its product from its own inspection and knowledge of its manufacturing process. *See* 810 ILCS 5/1-202(a) ("a person has 'notice' of a fact if the person: (1) has actual knowledge of it; (2) has received a notice or notification of it; or (3) from all the facts and circumstances known to the person at the time in question, has reason to know that it exists.").

## B. Exhibit 412 Supports Exelon's Damages.

Pelco attacks Exhibit 412, which is a stipulated business record, as inadmissible under Federal Rule of Evidence 1006, inaccurate, and unreliable. ECF No. 161 at 3–6, 8–9. These attacks are both untimely and wrong.

Exhibit 412 was properly admitted in evidence. Pelco stipulated to the admissibility of Exhibit 412, which is not a Rule 1006 summary but rather a business record under Federal Rule of Evidence 803(6). *See Rowe v. Shulkin*, 17-CV-9258, 2019 WL 2060951, at *1 (N.D. Ill. May 9, 2019) (rejecting argument that evidence offered as business record was inadmissible under Rule 1006); *Zayre Corp. v. S.M. &. R. Co., Inc.*, 86 C 5303, 1987 WL 26090, at *3 (N.D. Ill. Nov. 27, 1987), *aff'd sub nom. Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145 (7th Cir. 1989)

4

(data compilations, even if underlying documents are not available, qualified as business records under Rule 803(6)); *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts[, even if it had been] prepared specifically for trial[,] is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business.").

Along with hundreds of stipulated MJ and Exelon business records and days of fact and expert witness testimony by Mr. Mahoney, Mr. Bartolameolli, Ms. Erbach, Mr. Mowry, Mr. Holtz, and Mr. Hosfield, Exhibit 412 provides a "reasonable basis for computing damages" related to X002. *See Dynegy*, 648 F.3d at 518 ("Plaintiffs are not required to prove damages to the exact cent; they must merely establish a 'reasonable basis for computing damages,' . . . and may do so 'in any reasonable manner'"). Exhibit 412 details MJ's costs that Exelon actually incurred, and Exelon openly backed out expenses related to the original scope of work rather than the emergency (e.g., $257,583.37 in matting and $115,496.68 in equipment, JSF ¶¶ 121, 124), errors in communication (e.g., labor and miscellaneous costs related to the week of January 11, JSF ¶¶ 120, 122), and a typo (e.g., $10,500 reflected as a matting charge, ESF ¶ 256).[2]

  **C.**   **Mr. Hosfield's Testimony Supports Exelon's Damages.**

Pelco's argument that $400,000 charged by MJ in its X002 invoice should have been attributed to X001 is wrong. *See* ECF No. 161 at 6–8. Pelco bases this argument, which Mr. Hosfield rebutted at trial, on a typo in an email. *See* Ex. 236-0001; Hosfield 667:2–668:16. As Mr. Hosfield testified, the email is an interim figure, not a final invoice, which is why he did not use the numbers in the email. Hosfield 667:2–668:16. Mr. Hosfield reasonably relied on MJ's

---

[2] Pelco's argument that Exhibit 412 is actually a "December Accrual" is nonsensical. The document Pelco dubs a "December Accrual" is a December estimate totaling $1.4 million in X001 and X002 work. X002, which details emergency expenses incurred between December and February, is not the same thing. *See* ECF No. 161 at 5–6.

5

final invoice rather than an accrual email, the attachment of which actually matches the final invoice. *See Dynegy*, 648 F.3d at 510, 518 (expert reliance on invoices, payment records, and bookkeeper notes, rather than transaction forms, is reasonable).

        **D.      The Amounts Exelon Actually Paid Support Its Damages.**

Pelco also argues that *Pyramid Dev., LLC v. Dukane Precast, Inc.*, 40 N.E.3d 1185, 1195–96 (Ill. App. Ct. 2014), and *Arthur v. Catour*, 216 Ill. 2d 72, 82 (Ill. 2005), should remove the presumption of reasonableness for bills that Exelon paid. ECF No. 161 at 3–6. Neither case supports Pelco's view. In *Pyramid*, the plaintiff "kept no records to substantiate plaintiff's damages claims"; admitted that it kept no accurate records; and admitted that "none of the figures he supplies on any of the documents were accurate." 40 N.E.3d at 1195–96. Here, unlike the plaintiff in *Pyramid*, Exelon kept extensive records to substantiate its damages; openly corrected the few errors in Exhibit 412; and offered detailed evidence of its damages on top of Exhibit 412. *Pyramid* is inapposite.

*Arthur* is even more off point. There, the plaintiff could "not make a *prima facie* case of reasonableness based on the bill alone, because she cannot truthfully testify that the total billed amount has been paid." *Arthur*, 216 Ill. 2d at 82. Here, it is undisputed that Exelon paid MJ's bills. JSF ¶ 137; ESF ¶¶ 236, 245, 247, 248, 254. And the costs Exelon seeks under X002 are not "estimated"; as shown in Exhibit 412, as well as MJ and Exelon representatives' testimony at trial, they are charges Exelon actually incurred. *See* ECF No. 161 at 4; ESF ¶¶ 236 (Exelon seeks $266,524.87 for X002 labor costs that Exelon paid MJ); 254 (Exelon seeks $174,323.05 that it paid MJ for matting costs under X002); 245 (Exelon seeks $539,873.45 in equipment costs paid to MJ under X002); 247 ($2,596.12 for emergency locates paid to MJ under X002); 248 ($23,367.00 for miscellaneous expenses paid to MJ under X002).

6

## II. Pelco Did Not Meet Its Burden To Prove Its Affirmative Defense Of Failure To Mitigate.

Pelco's remaining arguments about equipment, labor, X003, non-destructive testing, and replacement of Pelco's defective arms, do not establish that Exelon failed to exercise "reasonable diligence and ordinary care." *Ner Tamid*, 2009 WL 10696538, at *4. Pelco instead insists that Exelon should have undertaken "undue risk or burden." *Id*. As such, Pelco's arguments should not reduce Exelon's damages.

### A. Exelon Mitigated Equipment Costs.

Pelco claims that: (1) Exelon did not "consider[] reducing equipment costs during the relevant time frame"; (2) the emergency was over by December 7; (3) there was "no concern" about getting equipment back in the event of another arm failure; and (4) Exelon's "failure to mitigate its equipment costs by either demobilizing and/or reducing the rates means those damages cannot be recovered against Pelco." ECF No. 161 at 9–10. These claims ignore the facts and are untethered to legal authority.

First, as Exelon described in its opening brief, not only did Exelon *consider* reducing costs, but Exelon *did* reduce costs by demobilizing 30 pieces of equipment during the disputed period. ECF No. 155 at 15. Second, Pelco's argument that the emergency was over is nonsensical in light of its other argument that, although the team knew that a Pelco arm had catastrophic deficiencies, no one was aware of the extent of the deficiencies in its arms by December 7. *See* ECF No. 157 at 5–6. If no one knew how bad the arms were, and the only conclusive testing showed dangerously inadequate welding penetration, the emergency could not be "over" until all of Pelco's arms were removed from the air above a busy, four-lane highway. *See id*. Third, mitigation, which eschews undue risk or burden on the part of the injured party, cannot require waiting "a few extra days" for emergency equipment to arrive should more lines

7

go down or the highway be obstructed, *see* ECF No. 161 at 10; *Ner Tamid*, 2009 WL 10696538, at *4, and Pelco cites nothing to support this argument.³

Mitigation does not require renegotiating contracts in the middle of a construction project—here, Pelco and Exelon's, or Exelon and MJ's.  *See Ner Tamid*, 2009 WL 10696538, at *6 (doctrine of mitigation does not "impose a burden on the vendee of doing what the contract relieved him from, in order that the guilty party might be saved from the full consequences of his willful wrongdoing.") (quoting *Coppola v. Marden, Orth & Hastings Co.*, 282 Ill. 281, 285 (1917)); *Safeco Ins. Co. v. Renn*, 07 C 3024, 2011 WL 13258220, at *6 (N.D. Ill. Aug. 17, 2011) (declining to find failure to mitigate because the parties' agreement "has language addressing th[e] situation" of their dispute).

Indeed, as Pelco and its experts learned during trial, Exelon and MJ's contract already called for hourly equipment rates, which, despite their name, included the discounts inherent in monthly rates.  *See* ECF No. 155 at 10, ESF ¶ 87.  Pelco has not established, through Mr. Conklin or anyone else, that Exelon could have renegotiated lower rates with MJ, nor was Exelon required to undertake the burden of doing so.  *See Ner Tamid*, 2009 WL 10696538, at *6 ("a claim of failure to mitigate damages is not a basis for a hypercritical examination of a plaintiff's conduct, . . . and a plaintiff need only use reasonable efforts in minimizing his damages; undue efforts or expense are not required."); *Safeco*, 2011 WL 13258220, at *6 (failure to mitigate affirmative defense did not survive summary judgment because plaintiff acted according to the parties' contract); ECF No. 155 at 11–12.

---

³ That Exelon and MJ had planned demobilizations and pre-ordered equipment during non-emergent work says nothing of a specific piece of equipment's availability during an emergency.  See ECF No. 155 at 15.  For example, MJ had to use additional equipment to hold tension because the equipment onsite at the time of the emergency was too small and started sliding.  Mowry 336:19–25.

8

### B. MJ's Labor Was Reasonable.

Pelco's labor argument is incorrect. The outage for which Exelon increased crews lasted from November 8–16, 2014. Ex. 218-0003; *see also* ECF No. 161 at 13. The next outage—the outage during which the Pelco arm failed, and for which MJ forecasted premium time but not additional crews—did not begin until December 1, two weeks after the November crews had demobilized. Ex. 218-0003. Pelco has not argued that MJ *added* labor after the failure. *See* ECF No. 161 at 12–13. Thus, the labor crew onsite on December 13 is most likely the crew that started on December 1, not the crew that completed its work in November. Therefore, there is no evidence that Exelon used unreasonable labor crews following Pelco's arm failure. *See also* ECF No. 155 at 12–14.

### C. The Lump Sum Cost of X003 Was Accurate And Reasonable.

Pelco argues, based on Exhibit 238 and a few questions of Mr. Hosfield, that X003 included $105,238.32 of costs attributable to X001. ECF No. 161 at 13. The evidence does not support Pelco's interpretation. In Exhibit 238, Mr. Bartolameolli asked Ms. Tower for data on the amount Exelon was charged to install Pelco's original arms versus the cost of replacing Pelco's arms with Valmont arms (which included take-down and other tasks). Ex. 238; Hosfield 672:13–15 ("what they're asking for is, 'How much did we pay to have the original arms installed, and what's the difference that they paid the 872,912?'"). Ms. Tower responded that replacing Pelco's arms—a more complicated job—cost $767,703.80 more than the original installation. *Id.* The $105,000 "had nothing to do with" and should not be deducted from the lumpsum X003 costs. *See* Bartolameolli 257:25.

### D. Exelon Is Entitled To Non-Destructive Testing Costs.

Pelco argues that Exelon's damages should not include nondestructive inspection costs, even though the contract allocates "all expenses of examining . . . any rejected Material" to

9

Pelco.[4]  JSF ¶ 16.  TEAM Industrial examined the rejected Material—Pelco's arms.  Therefore, the contract requires Pelco to pay for the inspection.[5]

### E. Pelco Arms Never Could Have Cured.

Pelco suggests that Exelon should not have paid for matting in March 2015 and should not have paid for Valmont arms, because Exelon should have used Pelco's arms instead.  ECF No. 161 at 14–15.  As detailed in its opening and response briefs, Exelon could not—and was not required by the contract to—use Pelco's arms.  ECF No. 155 at 3–8, 23–24; ECF No. 160 at 3–6, 10–12; *Am. Fid. Fire Ins. Co.*, 184 Ill. App. 3d at 614.

### CONCLUSION

It is time to bring Pelco's delays to an end.  Exelon has proven breach of contract, and Pelco has failed to prove its cure and mitigation affirmative defenses.  Exelon respectfully requests that the Court enter judgment in its favor and against Pelco in the amount of $2,154,664.32, plus prejudgment interest and prevailing party costs.

---

[4] The breakdown in costs of destructive versus nondestructive testing is in Exhibits 389 and 583, which the parties cite in their Joint Statement of Facts.  JSF ¶ 92.

[5] Pelco's suggestion, unsupported by any citation, that Exelon conducted nondestructive testing "despite knowing such testing was inaccurate," ECF No. 161 at 13, is backwards.  *See* ECF No. 160 at 7 n.7.

Dated: July 13, 2020	Respectfully submitted,

**EXELON BUSINESS SERVICES COMPANY, LLC**

*/s/ Lauren Jaffe*
Heather H. Harrison (#6296693)
Tracy A. Hannan (#6281834)
EXELON CORPORATION
10 S. Dearborn St., 49th Floor
Chicago, Illinois 60603
Telephone: (312) 394–8164
Facsimile: (312) 394–8322
heather.harrison@exeloncorp.com
tracy.hannan@exeloncorp.com

Mariangela M. Seale (#6293433)
Brian O. Watson (#6304248)
Lauren Jaffe (#6316795)
Joy Anderson (#6320219)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison St, Ste. 2900
Chicago, Illinois 60602
Telephone: (312) 471–8700
Facsimile: (312) 471–8701
mseale@rshc-law.com
bwatson@rshc-law.com
ljaffe@rshc-law.com
janderson@rshc-law.com

11

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that these papers were filed and served on all counsel of record via the Court's CM/ECF electronic filing system on July 13, 2020.

*/s/ Lauren Jaffe*