**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

EXELON BUSINESS SERVICES )
COMPANY, LLC, )
                           )
           Plaintiff, )     Case No. 16-cv-611
                           )
   v. )
                           )
PELCO STRUCTURAL, LLC, )
                           )
           Defendant. )
                           )
                           )     Judge Robert M. Dow, Jr.

**MEMORANDUM OPINION AND ORDER**

Exelon Business Services Company, LLC ("Plaintiff") brought this breach of contract action against Pelco Structural, LLC ("Defendant"). After a bench trial and for the reasons explained below, the Court determines that Defendant breached the contract and is liable to Plaintiff for $2,749,932.82, an amount that includes prejudgment interest. Plaintiff's motion to admit additional evidence [153] is denied. The Court will enter a final judgment under Federal Rule of Civil Procedure 58 consistent with this opinion. Civil case terminated.

**I.     Background**

Plaintiff contracted with Defendant to provide transmission poles and arms for a construction project. During construction, one of the newly installed arms failed, falling to the ground. Plaintiff eventually purchased arms from a different supplier, and it brought this suit for damages against Defendant. The Court conducted a bench trial on the matter, and it sets forth below its findings of fact and conclusions of law, as required under Federal Rule of Civil Procedure 52(a). The facts are drawn from the evidence and testimony presented at trial. To the extent that

any finding of fact may be more properly characterized as a conclusion of law, it should be so construed. Similarly, to the extent that any conclusion of law may be more properly characterized as a finding of fact, it should be so construed.

## II.    Findings of Fact[1]

### A.    Admission of Testimony and Evidence

Before making findings of fact, the Court must resolve several evidentiary issues. First, Plaintiff moves to admit additional exhibits for impeachment purposes. [153]. In its motion, Plaintiff explains that after the trial concluded, Defendant's former president, Phil Albert, filed a suit against Defendant, and Defendant counterclaimed. [*Id.*, at 1–2]. Albert was a witness at this trial by way of designated deposition. Plaintiff argues that Albert's pleadings contradict his sworn deposition testimony and that Defendant's counterclaim attacks Albert's credibility. As Plaintiff recognizes, the Court has broad discretion in deciding whether to reopen a bench trial. See *Johnson v. Hix Wrecker Serv., Inc.*, 528 F. App'x 636, 639 (7th Cir. 2013); [153, at 2]. Here, the Court declines to do so. For starters, the subjects of the proposed impeachment are plainly collateral. Moreover, the portion of Albert's deposition Plaintiff seeks to impeach was never designated for trial. Compare [153, at 3], with [Ex. 292]. Accordingly, the Court denies Plaintiff's motion [153].

Second, Plaintiff argues that Defendant's expert witness James Lafontaine is not qualified as an expert and therefore his opinions are inadmissible. [155, at 21–22]. While the Court did not find Mr. Lafontaine's testimony particularly helpful, it chose to provisionally admit the testimony at trial, assess its value in light of the testimony as a whole, and either rely on or disregard that testimony as appropriate in rendering its final disposition. This approach is consistent with the

---

[1] All citations to "Ex." refer to a trial exhibit. All citations to "Tr." refer to the trial transcript.

Seventh Circuit's teaching about the critical distinction between a jury trial and a bench trial with respect to testimony proffered under Federal Rule of Evidence 702:

> Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened. See *United States v. Brown*, 415 F.3d 1257, 1268–69 (11th Cir. 2005). That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); see also *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (observing that "the court in a bench trial need not make reliability determinations before evidence is presented" because "the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting"); *Brown*, 415 F.3d at 1269 ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

Third, Defendant argues that Exhibit 412 is inadmissible under Federal Rule of Evidence 1006. As described below, Exhibit 412 is a spreadsheet showing the breakout of a portion of the expenses caused by the arm failure. It was put together during the construction project by MJ Electric, the contractor hired to install the poles and arms and respond to the arm failure. The parties stipulated to the admissibility of certain exhibits—including Exhibit 412—prior to trial. [135]. At the start of trial, the Court confirmed that the stipulated exhibits were "100 percent nonproblematic and therefore stipulated to by both sides." [Tr., at 10:18–19]. Defendant's counsel then moved for the admission of the exhibits into evidence, and he explained that the document with the stipulations identifies all limitations. [*Id.*, at 10:20–11:1]. The document does not include any limitation for Exhibit 412. [135, at 9]. The Court recognizes that Defendant later raised an

objection to this exhibit based on Federal Rule of Evidence 1006. [Tr., 303:22–304:3, 642:25–643:3].

The Seventh Circuit has explained that "a stipulation is binding unless it creates 'manifest injustice' (see Rule 16(e)) or was made inadvertently or on the basis of a legal or a factual error." *Pittman by Hamilton v. Cnty. of Madison*, 863 F.3d 734, 736–37 (7th Cir. 2017) (overturning a district court that sustained a hearsay objection to evidence to which the parties stipulated); see also *United States v. Friedman*, 2018 WL 3456341, at *5 n.3 (N.D. Ill. July 18, 2018) (explaining that counsel's stipulation to the admission of evidence was binding absent manifest injustice of a mistake of law or fact). Additionally, a court can refuse stipulated evidence under Federal Rule of Evidence 403 if the evidence is irrelevant. *Pittman by Hamilton*, 863 F.3d at 736–37. Defendant does not argue that Exhibit 412 creates a manifest injustice, that its stipulation was based on a mistake of law or fact, or that the exhibit is irrelevant. Instead, it suggests that Exhibit 412 is inaccurate and unreliable, and asserts that it was not provided the documents MJ Electric used to create the spreadsheet. [161, at 8–9]. However, as explained below, *infra* II.B.7; IV.B.1, nothing in the record suggests that Exhibit 412 is unreliable. Accordingly, the Court honors the stipulation.[2]

---

[2] As suggested by Plaintiff at trial, it is also likely that Exhibit 412 is not a Rule 1006 summary and instead is a business record, admissible under Federal Rule of Evidence 803(6). [Tr., at 643:4–9]. MJ Electric created this spreadsheet during the construction project; it was not created for the purpose of summarizing documents that cannot be conveniently examined in court. [Tr., 302:5–9]; see *Zayre Corp. v. S.M. &. R. Co.*, 1987 WL 26090, at *3 (N.D. Ill. Nov. 27, 1987) (explaining that data compilation was a business record such that Rule 1006 did not apply). However, given that the parties stipulated to its admission, it is possible that Plaintiff did not as cleanly lay a foundation for Exhibit 412's admission as a business record as it otherwise would have—providing another reason to honor the parties' stipulation. Nevertheless, business records need not be perfect to be admissible, and it is highly likely that Exhibit 412 would have been admitted under Rule 803(6) but for the stipulation.

### B.    Facts

#### 1.    Plaintiff Contracts with Defendant for Transmission Poles and Arms

In 2013, Plaintiff began planning a transmission project to accommodate the new Elgin-O'Hare Expressway ("Elgin-O'Hare project").  [151, at ¶ 1].  The project called for Plaintiff to (1) replace existing transmission structures, (2) install taller, wider-spaced transmission poles, and (3) raise the height of transmission circuits that then spanned Thorndale Avenue.  [*Id.*, at ¶ 3].  The project required 11 transmission poles and 64 conductor arms.  [*Id.*, at ¶ 4].  Plaintiff contracted with Defendant for the manufacture of the transmission poles and arms.  [*Id.*, at ¶ 9].

The Master Terms and Conditions for Services and Materials ("contract") required that Defendant "perform the Work as set forth in the Purchase order and Other Contract Documents." [Ex. 320, at 14].  The Contract Documents include the Purchase Order, any Change Orders, the Project Schedule, the Special Terms and Conditions, Drawings, and Specifications, among other documents.  [*Id.*, at 13]; [151, at ¶ 12].  Section 4.1 of the contract sets out several warranties, including that the poles and arms would "comply with the Specifications contained in or developed in accordance with the Contract Documents"; be "free from defects in design, workmanship and materials"; be "suitable for [their] intended purpose"; be "fit for the particular purpose intended"; and be "fully tested in accordance with the Contract Documents."  [Ex. 320, at 17–18].  Section 4.2.1 states:

> If any Material does not comply with the foregoing warranties and Buyer gives Contractor notice of such noncompliance within two (2) years * * * then Contractor shall (at its sole expense) promptly correct by repair or replacement any (i) non-conforming Material and (ii) any materials, equipment and other personal and real property damaged by the non-conforming Material or otherwise adversely affected by the performance of the Work ("Other Material"). * * * Notwithstanding any other provisions in these Terms and Conditions to the contrary, all costs and expenses associated with access to or repair or replacement of Material or the Other Material, including removal or replacement of systems, structures or other parts of Buyer's facility and all transportation costs, shall be paid by Contractor, and Buyer

may charge Contractor all expenses of unpacking, examining, repacking and reshipping any rejected Material or Other Material.

[*Id.*, at 18]. Section 4.3 of the contract explains that "Buyer's inspection, testing, acceptance, payment, or use of any Material or Services shall not affect the warranties and obligations of Contractor under these Terms and Conditions or the Contract Documents, and such warranties and obligations shall survive any such inspection, testing, acceptance, payment, or use." [*Id.*, at 19]. Section 4.4 of the contract, titled "Buyer's Right to Perform," provides:

> In the event of Contractor's failure to repair or replace the Material or Other Material, or Contractor's failure to re-perform the Services, in accordance with the terms hereof, Buyer, after notice to Contractor, may correct any deficiencies in the Material or Services, or may purchase replacement Material or Services. Buyer may either invoice Contractor for the cost of correcting the deficiencies (including the costs directly attributable to other services that are required to be performed in connection with the correction of such deficiencies), invoice Contractor for the cost of replacement, or, deduct the cost associated with correction or replacement from any payments due or subsequently due [to] Contractor.

[*Id.*].

The Specifications required that all parts "be fabricated in accordance with drawings approved by" Plaintiff. [Ex. 141, at 20]. The drawings had to include "metal thickness," "welding symbols and detail as required," and "all information required for fabrication." [*Id.*, at 26]. Here, the approved drawings called for 80% weld penetration at the arm-to-clamp weld. [151, at ¶ 28]. Weld penetration is the amount of bonding between the weld metal and the base metal. Full penetration welds are 100% bonded, and partial penetration welds are less than 100% bonded. [*Id.*, at ¶¶ 29–31]. The approved drawings did not show any relief cut welds.[3] [Tr., at 984:24–985:4]. Relief cut welds are "a slit or a notch made so that a part can be bent with minimal consequence of wrinkling the compressive face of the member." [*Id.*, at 724:14–16].

---

[3] The parties also refer to these types of cuts as kerf cuts and tiger stripe welds. Following the terminology in the joint statement of facts [151, at ¶¶ 68–69], the Court uses the term "relief cut welds."

After Plaintiff approved the drawings, Defendant created fabrication drawings, which instruct welders on how to make welds. [*Id.*, at 973:16–21]. These fabrication drawings did not show relief welds at the arm bend. [Ex. 108]. After Defendant manufactured the original and replacement arms, Defendant's engineer created drawings and written procedures for relief cut welds. [Ex. 130]. These documents required 66% weld penetration for the relief cut welds. [Ex. 284, at 119:2–8]; [Tr., at 988:13–989:16].

In June 2014, Defendant delivered 11 transmission poles and 64 arms to Plaintiff and, in exchange, Plaintiff paid Defendant $1,072,915.00. [151, at ¶¶ 33–34]. Plaintiff does not seek to recover the amount it paid for the poles or arms. [*Id.*, at ¶ 35].

### 2.    Plaintiff Contracts with MJ Electric to Install the Poles and Arms

Plaintiff hired MJ Electric to remove the existing transmission structures and install Defendant's poles and arms. [*Id.*, at ¶ 36]. MJ Electric is one of Plaintiff's contractors of choice. [Tr., at 43:19–22]. To become a contractor of choice, MJ Electric went through an approximately three-month long negotiation process with Plaintiff to set labor and equipment rates for future contracts. [*Id.*, at 54:18–19; 381:13–19]. The labor rates were based off of union wages and increase annually by amounts set under the contractor-of-choice agreement. [*Id.*, at 274:11–19]. The equipment rates were set in 2011 and fixed for the duration of the contractor-of-choice agreement, regardless of the time of year or whether MJ Electric owned or rented the equipment. [*Id.*, at 118:14–19; 274:20–275:4]. MJ Electric calculates equipment charges using an hourly rate, but the negotiated hourly rate includes discounts associated with long-term or monthly rentals. [*Id.*, at 274:20–275:4].

To install the arms, Plaintiff sought and obtained system outages from the Transmission Systems Operations ("TSO") because the system cannot be energized while transmission

structures are replaced. [151, at ¶ 40]. To accomplish work during assigned outages, the work was divided into three series, E, D, and F. [*Id.*, at ¶¶ 43–44]. TSO reduced the length of the outage for the first November series, the series E, by five days. [*Id.*, at ¶47]. In response, MJ Electric added more crews, equipment, and premium time. [*Id.*, at ¶ 50]. The D series began on December 1, 2014. [*Id.*, at ¶ 48]. This series was originally scheduled to end on December 14, 2014, but TSO again reduced the length of the outage and shifted the end date to December 10, 2014. [*Id.*] In response, MJ Electric worked more premium time, but did not increase the number of crews. [*Id.*, at ¶ 51]; [Ex. 218, at 3]. Scope change order X001 ("X001") tracked expenses related to the change in outages in the original arm installation project. [Tr., at 318:25–319:1]; [Ex. 218]. X001 expenses are unrelated to Defendant and the arm failure. [Tr., at 244:23–245:3].

The worksite was near a gas main and golf course. [Tr., at 49:18–50:4]. To protect the ground from equipment and to prevent equipment from getting stuck in the ground, wood matting was used. [*Id.*, at 73:15–18]. Without the matting, the worksite was inaccessible. [*Id.*, at 50:3–4].

### 3. Arm Failure and Initial Reponses

On December 5, 2014, one of the arms detached from a pole in the D series and fell to the ground, striking another arm on its way down. [151, at ¶¶ 54–55]. Defendant's expert Wesley Oliphant agreed that this failure was "catastrophic." [Tr., at 724:11–13]. On December 8, 2014, Defendant arrived onsite, and Plaintiff and Defendant began conducting inspections, including visual and ultrasonic testing. [151, at ¶¶ 56–57]. Based on these inspections, Defendant created a Field Inspection Report. [Ex. 301]. The report concluded that there was a "[c]omplete weld failure" and "virtually no weld penetration" on "the shaft-to-clamp weld of [the] conductor arm" that fell. [*Id.*, at 3]. It also explained that the failed arm and several other arms had "reverse

bevels." [*Id.*, at 11]. A bevel is "an angle that is cut into a base metal to allow for [welders] to weld." [151, at ¶ 58]. A reverse bevel is a bevel that is "cut on the back side of [a] weld." [*Id.*]. Proper bevels are needed "in order to allow the proper penetration of the weld and the weld material." [*Id.*, at ¶ 59]. The report notes that "[w]hile Pelco Structural personnel were onsite, the decision was made between Pelco and [Exelon] to replace all the LS1494 conductor arms and LS1495 conductor arms for added assurance to ComEd," for a total of 14 replacement arms. [Ex. 301, at 11].

Defendant delivered two additional arms on December 10, 2014, and 12 additional arms on December 12, 2014. [151, at ¶ 65]. Defendant used the same manufacturing process for the replacement arms as it did for the original arms. [*Id.*, at ¶ 66]. The only difference was that Defendant paid extra attention to the bevels. [*Id.*]. Defendant also made the replacement arms with thicker material (3/8") than the original arms (5/16"), [*id.*, at ¶ 67], which deviated from the drawings, [Tr., at 999:25–1000:5]. When Defendant manufactured the replacement arms, it did not have conclusive knowledge of what caused the failure of the arm that fell. [*Id.*, at 1041:19– 1042:5]. However, Defendant was aware that the reverse bevels and weld penetration were an issue. [Ex. 301, at 3]. When Plaintiff received the replacement arms, it noticed for the first time that both the replacement and original arms had relief cut welds along the bends of the arm shaft. [151, at ¶¶ 68–69].

### 4. TEAM Industrial Testing and Defendant's Termination

Plaintiff hired TEAM Industrial ("TEAM") to perform testing on the arms. [*Id.*, at ¶ 70]. Partial penetration welds, like the ones on the arms here, cannot be conclusively tested by nondestructive means; instead, partial penetration welds must be destructively tested, and destructively testing an arm destroys it. [*Id.*, at ¶¶ 73–75]. TEAM conducted nondestructive,

ultrasonic testing on approximately 48 arms, including the 14 additional arms supplied by Plaintiff. [*Id.*, at ¶ 76.]. After TEAM began nondestructive testing, it learned that the welds were partial penetration welds. [Tr., at 542: 6–13]. Jose Vaca, a TEAM operations manager, told Plaintiff's Joe Landise that it could not do accurate testing of partial penetration welds with nondestructive testing. [*Id.*, at 546:12–17]. Vaca told Landise that even determining whether a weld had at least a 50% weld deposit was "very difficult to do" but that TEAM would "try to" do so. [*Id.*, at 546:22–547:3]. On December 15, 2014, TEAM sent Plaintiff its preliminary testing results. [Ex. 481]; [Tr., at 548:12–13]. These results reflected that roughly half of the tested arms did not meet the 50% weld deposit criteria. [Ex. 481]; [Tr., at 545:15–54:13]. On December 17, 2014, TEAM sent the final nondestructive testing report, which indicates that two of the tested welds did not meet the criteria. [Ex. 487]. The finalized report states "[i]nspection conducted for informational purposes only" because it isn't possible to conclusively test partial penetration welds using nondestructive methods. [*Id.*]; [Tr., at 556:19–22].

Because the welds could not be conclusively tested through nondestructive means, TEAM recommended that Exelon use destructive testing, and Exelon agreed. [Tr., at 542:11–543:10]. TEAM then hired Mark Landow, a metallurgist, to test samples from one of the original arms and one of the replacement arms. [*Id.*, at 427:15–20, 559:6–12, 576:25–577:5]. The destructive testing showed that none of the arm-to-clamp welds achieved 80% weld penetration and that none of the relief-cut welds achieved 66% weld penetration. [151, at ¶¶ 95–96]. Plaintiff received the preliminary destructive test results on December 29, 2014, and the final report on January 5, 2015. [*Id.*, at ¶¶ 97–98]. Plaintiff paid TEAM $15,781.06 for the nondestructive and destructive testing. [*Id.*, at ¶ 92].

While TEAM was conducting the tests, Plaintiff was engaged in internal discussions and discussions with Defendant about next steps. On December 14, 2014, Mark Bartolameolli, Plaintiff's project manager for the Elgin-O'Hare project [Tr., at 131:13–15], emailed Ankita Malhotra, another Exelon employee, stating:

> Just completed our call; one of the items brought up was to have Pelco manufacture new arms for us as required, while in parallel have another vendor manufacture the same arms, too. The reason for this is the group feels as though Pelco can possibly get the arms to us faster since they have the arm designs in their system. * * * We also want to have Pelco follow ComEd's third party testing procedure with regards to validation of the welds. * * * Please find out if Kasey from Pelco will be available at 15:00 or later today for a call to discuss the manufacturing of new arms and the discussion of their welding procedure.

[Ex. 26]. When Bartolameolli wrote "as required," he was expressing Plaintiff's then-intent to continue to work with Defendant; he was not aware of any contractual obligation to permit Defendant an opportunity to cure. [Tr., at 207:10–208:14].

On December 15, 2014, Bartolameolli emailed Kasey Scott, Defendant's Vice President of Sales [*Id.*, at 1021:25], with "the list of the arms and the priority for the deliveries of the structures in our current outage." [Ex. 30, at 2]. Scott responded, stating that the "priority 1 arms will be ready for third party inspection on" December 18, 2014. [*Id.*, at 1]. As of December 16, 2014, Plaintiff still planned to install replacement arms manufactured by Defendant. [151, at ¶ 85].

On December 22, 2014, Scott emailed Bartolameolli, asking how Defendant "should proceed with the replacement arms you had requested." [Ex. 37]. These replacement arms were in addition to the 14 replacement arms Defendant had already delivered to Plaintiff. [Ex. 30]. Bartolameolli responded that he was "expecting the last of the test results sometime later this afternoon," and that once he received those results, Plaintiff would "make a decision and let [Scott] know." [Ex. 37]. Bartolameolli emailed Scott on December 23, 2014, telling him that the "testing lab was about 70% complete on the tests" and that Plaintiff had an internal call set for December

26 to "determine [Plaintiff's] next steps in the process." [Ex. 38]. On December 29, 2014, Scott emailed Bartolameolli to "check[] in to see how the meeting went on Friday the 26th regarding the inspection findings." [*Id.*]. He asked that Bartolameolli "let us know how we are to proceed at your earliest convenience." [*Id.*]. On January 2, 2015, after reviewing the preliminary destructive testing results, Plaintiff informed Defendant that it decided to purchase arms from another vendor, Valmont. [151, at ¶ 106].

### 5. MJ Electric's Response to the Arm Failure

Immediately after the arm failure, MJ Electric took steps to secure the site, assess damage, install guard structures to protect traffic, stabilize and secure wires, and clean the spill from a crane the arm hit on its way down, among other things. [*Id.*, at ¶ 109]. MJ Electric assisted Plaintiff and TEAM with inspections on December 8, 9, 10, 11, 12, and 13, 2014. [*Id.*, at ¶¶ 114–15]. For example, to inspect arms already in the air, MJ Electric provided a foreman and a spotter, a crane operator, and an individual to go aloft with the individual conducting the test. [*Id.*, at ¶ 116]. During the week ending December 14, 2014, MJ equipment also moved equipment off the right-of-way and moved Defendant's arms. [*Id.*, at ¶ 118]. During the week ending December 21, 2014, MJ Electric changed dead-end insulators that had broken and changed i-strings. [*Id.*, at ¶ 119]. MJ crews were onsite during the week ending on January 11, 2015, because Plaintiff did not inform MJ Electric that it did not need to be there. [Ex. 40]. Plaintiff paid MJ Electric for this time [Tr., at 285:12–286:1], but Plaintiff does not seek the labor costs it incurred during this week. [151, at ¶ 120].

Scope change order X002 ("X002") tracked expenses of the emergency work done to address the arm failure. [151, at ¶ 107]. MJ Electric performed work on X002 on a time and equipment ("T&E") basis because there was not a defined scope of the work that would have

enabled it to charge a lump-sum cost.  [*Id.*, at ¶ 108]; [Tr., at 77:6–19, 277:7–13].  MJ Electric used the rates that were pre-negotiated as part of its contractor-of-choice agreement with Plaintiff. [Tr., at 160:8–161:1].  MJ Electric billed Plaintiff a total in $282,522.58 in labor costs for X002. [Ex. 412]; [Ex. 378].  Because Plaintiff does not seek labor costs for the week ending on January 11, 2015, it seeks $266,524.87 in damages for labor costs incurred under X002.  [Ex. 378]. Plaintiff also paid and seeks to recover $2,596.12 in expenses for a subcontractor for emergency locates, which were required to determine whether it was safe to dig holes for guard structures. [Ex. 412, at 11]; [Tr., at 62:16–22].

After the arm failure, MJ Electric demobilized some but not all of the equipment onsite. [Ex. 383].  Plaintiff did not know if another arm would fail, and it kept equipment onsite partly for this reason.  [Tr., at 94:18–96:2].  Additionally, winter is peak season for transmission work.  [151, ¶ 39].  If Plaintiff demobilized equipment, it would likely have been difficult to get back onsite, making it harder to respond to another emergency.  [Tr., at 184:7–12].  Further, as discussed below, the date on which Plaintiff expected to receive replacement arms from Valmont shifted multiple times [151, at ¶¶ 129, 133], making it more difficult to determine when it would need equipment to install the new arms.  MJ Electric billed Plaintiff $659,577.65 in equipment costs for X002. [Ex. 378].  Plaintiff's damages expert determined that $115,000 of those costs were attributable to the original scope of the work and should have been billed under X001.  [Tr. 594:14–595:4]. Therefore, Plaintiff seeks $539,873.45 in X002 equipment costs.  [Ex. 378].

MJ Electric kept the matting on the job site in order to provide access to the site in case another arm failed.  [Tr., at 73:19–74:2].  Plaintiff paid $442,426.42 in matting costs under X002. [Ex. 412, at 11–12].  However, $10,500 of that amount is attributable to a typographical error by MJ Electric.  [Tr., at 901:10–21].  Additionally, Plaintiff's damages expert determined that

$257,583.37 should have been billed under X001. [Ex. 378]; [Tr., at 594:18–23]. Plaintiff does not seek to recover either of these costs and instead seeks to recover $174,323.05 in matting costs under X002. [Ex. 378].

In addition to labor, equipment, and matting costs, Plaintiff incurred $25,865.00 for miscellaneous costs, including dumpsters, sanitary facilities, per diems, and hotels. [Ex. 412, at 2, 4, 6, 10]. Because it does not seek miscellaneous costs for the week ending in January 11, 2015, Plaintiff seeks $23,367.00 in miscellaneous costs under X002. [*Id.*]; [Tr. 595:18–20].

### 6. Replacing Defendant's Arms with Valmont's Arms

On December 14, 2014, Plaintiff began discussing engaging another supplier to manufacture replacement arms so that it would have another option if needed. [151, at ¶¶ 86–87]. On December 19, 2014, Valmont estimated that it could deliver replacement arms on January 19, 2015. [*Id.*, at ¶ 128]. The delivery schedule shifted throughout January, with the arms being delivered on February 12, 2015. [*Id.*, at ¶¶ 129, 133]. Plaintiff paid Valmont $259,266.65 to manufacture custom replacement arms that fit on Plaintiff's clamps and poles. [*Id.*, at ¶ 134].

MJ Electric removed Defendant's arms and replaced them with Valmont arms. Plaintiff paid MJ Electric under scope change order X003 ("X003"). [151, at ¶ 135]. MJ Electric charged a lump-sum amount of $872,912.12 for the work under X003. [*Id.*, at ¶ 136–37]. It did so because, unlike X002, it had a detailed scope of work and was therefore able to estimate the cost. [Tr., at 77:6–14]; [Ex. 221]. Under a lump-sum contract, if the contractor incurs more costs than provided by the lump-sum amount, it would have had to bear that cost. [Tr., at 53:13–54:5].

### 7. Parties' Factual Disputes Regarding Accuracy of Tracking Expenses

Before turning to its legal conclusions, the Court addresses the parties' factual arguments, which involve the accuracy of MJ Electric's expenses. First, Defendant argues that Exhibit 412,

a spreadsheet showing MJ Electric's X002 expenses [Tr., at 278:9–12], is inaccurate. Karen Erbach,[4] a senior project manager at MJ Electric, worked with her assistant to compile Exhibit 412. [*Id.*, at 273:6–7, 302:5–12]. As senior project manager, Erbach approved time sheets for labor and equipment. [*Id.*, at 281:16–282:8]. She and her assistant created Exhibit 412 "during the project." [*Id.*, at 302:8–9]. Defendant suggests that Erbach put Exhibit 412 together "after the fact" in May 2015, and that it was "difficult to put together." [161, at 4–5] (citing Tr., at 320:10–322:17). However, in doing so, Defendant cites to a portion of the transcript where Erbach discusses putting together a spreadsheet breaking out the X003 lump-sum amount, not the X002 T&E costs. [Tr., at 320:16–321:2]. Defendant next cites to a May 27, 2015 email, claiming that it relates to the "creation of Ex. 412." [156, at ¶ 169]. But this email similarly relates to the creation of a spreadsheet showing X003 costs. [Ex. 239]; [Tr., at 320:16–321:2]. Defendant also relies on a May 29, 2015 email to date Exhibit 412. [156, at ¶ 169]; [Ex. 60]. Although this email shows that MJ Electric emailed Exhibit 412 to Plaintiff on May 29, 2015, it does not indicate that the spreadsheet was created in late May 2015. In fact, the attached document is titled "X002 – Pelco Pole Failure FINAL =1-22-15.xlsx," suggesting that the document was finalized on January 22, 2015. [Ex. 60]. Further, Exhibit 412 itself lists costs from the week of January 18, 2015 on as "[f]orecasted costs." [Ex. 412, at 12]. If the document was created in May 2015, those costs would not have been forecasted. For all these reasons, the Court concludes that MJ Electric created Exhibit 412 during the project, not months afterward.

Defendant next argues that Exhibit 412 is inaccurate because MJ Electric simply reused a previous total provided for cumulative December accruals from both X001 and X002. [161, at 5–6]. On December 16, 2014, Erbach emailed Bartolameolli with "December Accruals" and

---

[4] During the events of this case, Karen Erbach's name was Karen Tower, as the exhibits reflect. [Tr., at 161:12–17].

"Estimated Scope Changes." [Ex. 219]. The email indicates that the total "December Accrual" for both X001 and X002 was $1,413,963.09. [*Id.*]. Exhibit 412 shows that the X002 costs were incurred through February 2015 and totaled $1,414,993.61. [Ex. 412, at 11–12]. Defendant asserts that because these numbers are roughly the same, then Plaintiff and MJ Electric simply must have used the December accrual number as the X002 cost. Essentially, Defendant seems to be suggesting that instead of calculating the T&E costs for X002, MJ Electric worked backwards to roughly match the December accrual number by fabricating data on labor hours works and equipment onsite. However, nothing in the record suggests that MJ Electric fabricated these data or that it had any incentive to match the X002 costs with the December accrual. Therefore, contrary to Defendant's assertion, the Court concludes that MJ Electric did not "simply ma[k]e up the values contained within" Exhibit 412. [161, at 5].

Defendant also contends that the equipment costs that Plaintiff seeks to recover for the weeks ending in January 18, 2015, to February 15, 2015, are estimated and not actual costs. [161, at 4]. It is true that Exhibit 412 lists these costs as "[f]orecasted costs" [Ex. 412, at 12], and the expert exhibit relying on the exhibit notes as much. [Ex. 383, at 2]. That said, Exhibit 412 indicates that these forecasted costs were for "[e]quipment left on site for securing the site." [Ex. 412, at 12]. Consistent with this forecast, MJ Electric's general superintendent testified that it left equipment onsite. [Tr., at 94:15–22]. Even Defendant's experts concluded that equipment was left onsite until February 15, 2015. [Tr., at 864:11–20, 893:1–3; 897:9–898:2]. Finally, in its statement of facts, Defendant lists Exhibit 412's forecasted equipment charges for the weeks ending in January 18, 2015, through February 15, 2015, as what MJ Electric actually charged Plaintiff. [156, at ¶ 162]. Accordingly, although Exhibit 412 describes the later equipment charges as forecasted, it represents the actual equipment costs.

16

Next, Defendant argues that Plaintiff's damages expert included $255,000 of X001 costs in his X002 damages calculation. [161, at 6–8]. On March 17, 2015, Sarwath Munawar, who worked for Plaintiff, emailed Erbach about the approval of a February invoice. [Ex. 236]; [Ex. 408]. He used Plaintiff's internal tracking codes of 12FRT009, which corresponds with X001, and 12FRT012, which corresponds with the combined costs of X002 and X003. [Ex. 236, at 1]; [Tr., at 662:16–663:7]. The invoice and the spreadsheet Munawar attached to the email allocate $145,000 to 12FRT009 and $400,000 to 14FRT012. [Id., at 3]; [Ex. 408]; [Tr., at 666:10–12]. The body of the email switches the numbers; it indicates that roughly $400,000 of the February invoice was for 12FRT009 and that roughly $145,000 was for 14FRT012. [Ex. 236, at 1]. Defendant argues that the body of the email is evidence that Plaintiff's damages expert included $255,000 in X001 costs in his X002 damages calculation. However, given the fact that the invoice and underlying data allocate $400,000 to the X002/X003 code, it is most likely that the body of the email contained a typo. Further, the documents represented how the Plaintiff internally recorded accruals, and not the actual costs. [Tr., at 667:13–668:16]. And as the expert explained, the numbers in the email, spreadsheet, and invoice were interim accrual numbers as opposed to final ones, and he did not use the interim accrual numbers when calculating damages. [Tr., at 667:3–7, 669:12–670:12]. Thus, the Court concludes that any error did not affect the expert's damages calculation.

In addition to challenging the accuracies of the X002 costs, Defendant also argues that X003 costs included X001 costs. On April 8, 2015, Bartolameolli emailed Erbach, stating that he needed a "break out [of] the costs" for installing the original 64 arms and the cost to install the replacement arms. [Ex. 238]. He estimated the labor cost of installing the original 64 arms was $105,208.32. [Id.]. Erbach responded, writing:

X003 – Replacement arms = $872,912.12 * * *
Less original arms= $105,208.32
Difference = $767,703.80

[*Id.*]. Defendant argues that this email demonstrates that X003 includes $105,208.32 of X001 costs. But the email itself only shows the difference between the labor costs of installing the original arms and what MJ Electric billed Plaintiff to replace the arms. Contrary to Defendant's suggestion, it does not indicate that MJ Electric included any X001 costs in its X003 lump-sum calculations or "bill[ed] twice for the same work." [161, at 13].

### III. Legal Standards

In Illinois, "[i]n order to plead a cause of action for breach of contract, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages. Only a duty imposed by the terms of a contract can give rise to a breach." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (alterations in original) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. Ap. Ct. 2004)). Here, there isn't a dispute as to whether a valid and enforceable contract existed or whether Plaintiff substantially performed. Instead, Defendant argues that it did not breach the contract.

The outcome of this case is largely dependent on the parties' contract. "In construing a contract, the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). To do so, courts "first look to the language of the contract itself." *Id.* "A contract must be construed as a whole, viewing each provision in light of the other provisions." *Id.* "If the contract language is unambiguous, it should be given its plain and ordinary meaning." *Virginia Sur. Co. v. N. Ins. Co. of New York*, 866 N.E.2d 149, 153 (Ill. 2007).

IV.    **Conclusions of Law**

A.    **Liability**

1.    **The Contract's Curing Provision**

The contract provides Defendant the opportunity to cure.  As noted above, section 4.2.1 provides that "[i]f any Material does not comply with the" warranties listed in section 4.1 "and Buyer gives Contractor notice of such noncompliance within two (2) years * * * then Contractor shall (at its sole expense) promptly correct by repair or replacement any (i) non-conforming Material and (ii) any materials, equipment and other personal and real property damaged by the non-conforming Material or otherwise adversely affected by the performance of the Work."  [Ex. 320, at 18].  In other words, if Defendant provides Plaintiff with non-conforming material, the contract gives the Defendant an opportunity to provide conforming material.  The Defendant must do so "promptly."  [*Id.*].

However, if the Defendant does not provide conforming material, then the Plaintiff may exercise its rights under section 4.4.  [*Id.*, at 19].  Under this section, if the Defendant "fail[s] to repair or replace the Material or Other Material * * * Buyer, after notice to Contractor, may correct any deficiencies in the Material or Services, or may purchase replacement Material or Services." [*Id.*].  The contract does not provide the Defendant multiple attempts to cure.  That is, nothing in the contract suggests that if the Defendant replaces non-conforming arms with more non-conforming arms, then the Defendant is afforded a third opportunity to provide more arms. Defendant relies on section 11.3 of the contract to argue that it has an ongoing right to cure so long as it "promptly commence[s] and diligently proceed[s] to do so."  [157, at 4]; [Ex. 320, at 25]. However, this section applies to work that Plaintiff rejected prior to acceptance.  [Ex. 320, at 25]. Here, Plaintiff initially accepted the arms, and therefore this section does not apply.

### 2. The 14 Additional Arms Provided Were Defective and Extinguished Any Further Right to Cure

After the arm failed on December 5, Plaintiff provided 14 additional arms by December 12. As noted in Defendant's Field Inspection Report "[w]hile Pelco Structural personnel were onsite, the decision was made between Pelco and [Exelon] to replace all the LS1494 conductor arms and LS1495 conductor arms for added assurance to ComEd," for a total of 14 replacement arms. [Ex. 301, at 11]. Thus, Defendant provided these additional arms in an attempt to replace non-conforming material per section 4.2.1 of the contract. [Ex. 320, at 18].

At trial, Plaintiff demonstrated multiple ways in which the arms were non-conforming. First, these 14 arms, along with all of the original arms, were bent using relief cut welds. Because these welds were not included in Defendant's drawings as required by the Specifications, they violated the warranty that the arms would "comply with the Specifications." [Ex. 320, at 17]. True, as Defendant notes, Plaintiff did not initially reject the arms for this reason and instead it requested more arms from Defendant after learning of these relief cut welds. [Ex. 30]. However, the Court notes that Plaintiff could have rejected the arms immediately after learning of the relief cuts. Additionally, the replacement arms did not conform with the drawings because they were made with thicker material than called for by the drawings. [Tr., at 999:25–1000:5]. Further, the destructive tests demonstrated that neither an original arm nor a replacement arm achieved 80% weld penetration for the arm-to-clamp welds as required by the drawings. [151, at ¶¶ 28, 95]. These tests also revealed that both arms failed to achieve 66% weld penetration for the relief cut welds as specified by Defendant's drawings. [*Id.*, at 96]. Thus, the replacement arms were non-conforming, and indeed suffered the same defect that caused the original arm failure. [Tr., at 450:21–451:7].

Defendant sets forth four arguments for why it nevertheless retained its right to cure. First, Defendant asserts that Plaintiff had a duty to determine the root cause of the arm failure and that Defendant "had the right to cure following the discovery of the root cause of the failure." [163, at 2]. In doing so, Defendant notes that its right to cure is triggered when "any Material does not comply with the foregoing warranties *and Buyer gives Contractor notice of such noncompliance*." [Ex. 320, at 19] (emphasis added). Although this language requires Plaintiff to notify Defendant of its noncompliance, it does not require the Plaintiff to discover the root cause of the noncompliance. See *Virginia Sur. Co.*, 866 N.E.2d at 153 (explaining that unambiguous contract language "should be given its plain and ordinary meaning"). In further support of this argument, Defendant cites to testimony of Bartolameolli where he explained that Defendant was onsite after the arm failure "to assist" Plaintiff with determining the root cause. [Tr., at 204:11–13]; [157, at 6–7]. However, his description of the role Defendant played onsite does not alter the parties' contractual rights. Further, Defendant's initial report concluded that there was a "[c]omplete weld failure" and "virtually no weld penetration" on "the shaft-to-clamp weld of [the] conductor arm" that fell. [Ex. 301, at 3]. Thus, Defendant was aware of a weld penetration issue in the failed arm before the destructive test results.

Second, Defendant notes that Plaintiff requested additional replacement arms after noticing the relief cut welds and after receiving the preliminary nondestructive testing results indicating lack of weld penetration in about half of the tested arms. [157, at 9–10]. However, neither fact indicates that Defendant had a continuing right to cure. As noted above, Plaintiff could have rejected the arms based on the relief cut welds, but it did not. Regarding the testing results, when Plaintiff requested additional replacement arms on December 15, 2014, it knew that the nondestructive testing results it had received were preliminary and that even finalized

21

nondestructive testing could not conclusively determine weld penetration. [Ex. 481]; [Tr., at 546:22–547:3]. Therefore, the fact that Plaintiff chose not to treat these preliminary nondestructive testing results as dispositive does not mean it could not later reject Defendant's attempt to cure. And, as explained above, the contract did not afford Defendant multiple attempts to cure. [Ex. 320, at 19].

Third, Defendant argues that Bartolameolli "admitted" that it had a continuing right to cure in a December 14 email and that this admission in fact granted it a further right to cure. [157, at 15–17]. In that email, Bartolameolli wrote: "Just completed our call; one of the items brought up was to have Pelco manufacture new arms for us as required." [Ex. 26]. However, as explained above, this email expressed Bartolameolli's hope to continue to work with Defendant, and Bartolameolli was not aware of any cure provisions in the contract when he wrote this email. [Tr., at 207:10–208:14]. Moreover, Bartolameolli sent this email before learning of the destructive testing results. Accordingly, this email did not create a continued right to cure for the Defendants.

Fourth, Defendant suggests that because TEAM only definitively tested the welds of two arms, Plaintiff could only have rejected those arms and not the remainder. [161, at 15]. But this argument ignores the reality of the situation. The only way that Plaintiff could have definitively tested the arms was to destroy them. [151, at ¶¶ 73, 75]. To suggest that Plaintiff must have destroyed the arms in order to determine whether they were conforming is nonsensical. Further, all arms—the originals and the replacements—were manufactured using the same process. [151, at ¶ 66]. Plaintiff did not have to conclusively test every weld in order to reject the arms. And, given the fact that Defendant would be liable for the costs of additional testing, it is possible that additional testing only would have increased the total damages chargeable to Defendant in this action.

22

Because the replacement arms Defendant provided were non-conforming, it "fail[ed] to repair or replace" non-conforming arms. [Ex. 320, at 19]. Accordingly, Defendant breached the contract and Plaintiff was permitted to purchase replacement arms from another supplier. [*Id.*]; see also *TAS Distrib. Co.*, 491 F.3d at 631.

### B. Damages

Under section 4.2.1 of the contract, Defendant is liable for "all costs and expenses associated with access to or repair or replacement of Material or the Other Material, including removal or replacement of systems, structures or other parts of Buyer's facility and all transportation costs." [Ex. 320, at 18]. Further, Defendant is liable for "all expenses of unpacking, examining, repacking and reshipping any rejected Material or Other Material." [*Id.*]. Under section 4.4 of the contract, once Defendant failed to cure, it became liable for "the cost of correcting the deficiencies (including the costs directly attributable to other services that are required to be performed in connection with the correction of such deficiencies)." [*Id.*, at 19]. Together, these provisions make Defendant liable for the costs incurred responding to the emergency, testing the rejected arms, and removing and replacing the arms. In other words, Defendant is liable for the X002 and X003 costs, as well as the cost of the testing and Valmont arms. Defendant argues that Plaintiff is not entitled to the amount of damages it requests because it failed to prove its damages with reasonable certainty and failed to mitigate its labor and equipment costs. Defendant also asserts that it is not liable for the cost of nondestructive testing, and it makes several damages arguments based on Plaintiff's right to replace its arms with Valmont arms.

1.    **Plaintiff Proved Its Damages with Reasonable Certainty**

"In Illinois, in order to recover for breach of contract, a plaintiff must establish both 'that he sustained damages * * * [and] he must also establish a reasonable basis for computation of those damages.'" *TAS Distrib. Co.*, 491 F.3d at 632 (alterations in original) (quoting *Ellens v. Chi. Area Off. Fed. Credit Union*, 576 N.E.2d 263, 267 (Ill. App. Ct. 1991)). Plaintiff may do so "in any reasonable manner." *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 518 (7th Cir. 2011) (quoting *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 627 (Ill. 2006)). As discussed above, the failure of Defendant's arm caused Plaintiff to suffer damages. Further, Plaintiff established a reasonable basis for its damages through its damages expert and its and MJ Electric's internal tracking and billing. Notably, Plaintiff is not speculating as to the damages it incurred; instead, it seeks damages based on what it actually paid under X002 and X003, for testing, and for the Valmont arms.

Resisting this conclusion, Defendant argues that Exhibit 412, which MJ Electric created to track X002 expenses, is too unreliable to serve as a basis for damages. [161, at 3–6]. The majority of Defendant's arguments are based on factual disagreements and are therefore discussed above. In its remaining argument, Defendant implies that because Plaintiff's damages expert identified matting and equipment charges in Exhibit 412 that should have been charged to X001, the entirety of the exhibit is unreliable. However, Plaintiff's careful review of this and other documents and its deduction of costs further demonstrates the reasonable basis on which Plaintiff has calculated its damages.

2.    **Plaintiff Did Not Fail to Mitigate Damages**

The duty to mitigate is an affirmative defense for which Defendant bears the burden. See *Pioneer Bank & Tr. Co. v. Seiko Sporting Goods, U.S.A. Co.*, 540 N.E.2d 808, 813 (Ill. App. Ct.

1989); *Ellis v. Sheahan*, 412 F.3d 754, 756 (7th Cir. 2005). The duty "forbids the victim of a breach of contract, which might well be involuntary, to allow his damages to balloon (when he could easily prevent that from happening)." *R.R. Donnelley & Sons Co. v. Vanguard Transp. Sys., Inc.*, 641 F. Supp. 2d 707, 717 (N.D. Ill. 2009) (quoting *Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC*, 476 F.3d 436, 440 (7th Cir. 2007)). However, "an injured party need only avoid those damages he can 'without undue risk, burden, or humiliation.'" *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1035 (Ill. App. Ct. 2012) (quoting *E. St. Louis Sch. Dist. No. 189 v. Hayes*, 604 N.E.2d 557, 561 (Ill. App. Ct. 1992)). Further, "the duty to mitigate may not be invoked by one who has breached a contract as grounds for a hypercritical examination of the injured party's conduct, or as evidence that the injured party might have taken steps which seemed wiser or would have been more advantageous to the breaching party." *Pioneer Bank & Tr. Co.*, 540 N.E.2d at 813. In short, the duty to mitigate "imposes a duty upon the injured party 'to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted.'" *Grothen v. Marshall Field & Co.*, 625 N.E.2d 343, 347 (Ill. App. Ct. 1993) (quoting Duty to Mitigate, BLACK'S LAW DICTIONARY (5th ed. 1979)); see also Duty to Mitigate, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining duty to mitigate as a "nonbreaching party's or tort victim's duty to make reasonable efforts to limit losses resulting from the other party's breach or tort"). It does not require the injured party to bear additional risk or take on additional burdens.

Here, Defendant argues that Plaintiff failed to mitigate both its labor and equipment damages. Regarding labor damages, Defendant argues that MJ Electric increased the number of crews onsite just before the arm failure and afterward did nothing to reduce the number of crews. [161, at 12–13]. However, as explained above, MJ Electric did not have an additional crew onsite

at the time of the arm failure.  [151, at ¶ 51]; [Ex. 218, at 3].  Instead, to handle the shortened outage for the D series, MJ Electric increased its premium time.  [151, at ¶ 51]; [Ex. 218, at 3].

Regarding equipment damages, Defendant argues that Plaintiff should have mitigated damages by demobilizing more equipment and by renegotiating its equipment rates with MJ Electric.  [161, at 9–12].  However, both arguments assume that Plaintiff should have taken on additional risk or burden, which is not required by the duty to mitigate.  First, Defendant argues that Plaintiff should have demobilized equipment because the emergency was over after December 8, 2014, and that there was no concern about getting equipment back.[5]  However, as explained above, Plaintiff reasonably feared that another arm could fall and was entitled to maintain equipment for this reason.  Further, particularly because winter is the peak time for transmission work, Plaintiff may have faced difficulty getting equipment back onsite when needed, either to deal with an emergency or to install the Valmont arms.  Plaintiff's duty to mitigate did not require it to bear these risks.  *InsureOne Indep. Ins. Agency, LLC*, 976 N.E.2d at 1035.

Defendant next argues that Plaintiff should have mitigated its equipment damages by renegotiating its equipment rates with MJ Electric.  [161, at 11].  In doing so, Defendant makes the factual assumption that the rate charged by MJ Electric would have been lower if it were a monthly rate rather than an hourly rate.  However, as explained above, although MJ Electric calculates equipment charges using an hourly rate, the negotiated hourly rate includes discounts associated with long-term or monthly rentals.  [Tr., at 274:20–275:4].  Therefore, Defendant's argument fails as a factual matter.  Moreover, Plaintiff did not need to assume a burdensome task such as renegotiating its years-long contract with a longtime contractor of choice in order to

---

[5] Defendant also argues that Plaintiff should have demobilized equipment because, prior to the arm failure, MJ Electric was already planning to demobilize equipment as part of the original scope of the work.  [161, at 12].  But this argument conflates planned work with emergency work.  After the arm failure, MJ Electric did not know when it would need what equipment so it could not continue with planned demobilizations.

mitigate damages. *InsureOne Indep. Ins. Agency, LLC*, 976 N.E.2d at 1035; see also *Grothen*, 625 N.E.2d at 347 (Ill. At. Ct. 1993) (explaining that plaintiff need exercise only "reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted").

### 3.     Plaintiff Is Entitled to Nondestructive Testing Costs

Defendant argues that it should not be liable to Exelon for the cost of the nondestructive testing. [161, at 13–14]. It notes that under section 4.2.1 of the contract, it is liable for the cost of Plaintiff "examining" "any rejected Material or Other Material." [Ex. 320, at 18]. It argues that the definitions of "Material" and "Other Material" does not encompass the arms that TEAM nondestructively tested. But the contract defines "Material" as "all material, equipment, components, products, supplies, goods, and documentation to be furnished by Contractor and necessary to complete the Work set forth in the Purchase Order." [*Id.*, at 10]. This definition clearly encompasses the arms that Defendant provided Plaintiff, and Defendant is liable for the costs of nondestructive testing.

### 4.     Damages Arguments Based on Liability

Finally, Defendant argues that it is not liable for the cost of matting during March 2015 or for all 64 Valmont arms. [161, at 14–15]. However, both of these arguments are dependent on the finding that Plaintiff had to provide Defendant another opportunity to cure. Specifically, Defendant contends that it should not reimburse Plaintiff for the March 2015 matting because Plaintiff would not have incurred this cost had it not terminated Defendant. It also argues that because testing conclusively determined that only two arms lacked weld penetration, Plaintiff was only entitled to replace two arms. As explained above, however, Plaintiff was entitled to terminate Defendant and replace all 64 arms. Accordingly, these arguments fail.

### 5.     Summary of Damages and Prejudgment Interest

In sum, Plaintiff is entitled to $15,781.06 for testing costs; $266,524.87 in damages for X002 labor costs incurred under X002; $2,596.12 in subcontractor costs related to emergency locates under X002; $539,873.45 in X002 equipment costs; $174,323.05 in X002 matting costs; and $23,367.00 in X002 miscellaneous costs. It is also entitled to $872,912.12 for the work under X003 and $259,266.65 for the cost of the Valmont replacement arms. These amounts sum to $2,154,644.32.

Plaintiff is also entitled to 5% in prejudgment interest. Illinois law provides that "[c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing." 815 Ill. Comp. Stat. Ann. 205/2. "Instruments of writing" include "construction contracts." *Ameritech Info. Sys., Inc. v. Bar Code Res., Inc.*, 331 F.3d 571, 575 (7th Cir. 2003). "The creditor must, however, prove that the money due was a liquidated amount or subject to easy computation." *Id.* Here, the damages were easy to calculate. "[C]ompound prejudgment interest is the norm in federal litigation." *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 937–38 (7th Cir. 2003). As Plaintiff's claim accrued in 2015, and with interest compounding annually, Plaintiff is entitled to a total of $2,749,932.82.[6]

---

[6] In calculating compound interest, the Court used the formula $P(1+r/n)^{nt}$, where P is the principal amount, r is the annual rate, n is the number of times interest is compounded per year, and t is the number of years during which interest has been compounding. Thus, using numbers from this case here, the award including interest is $2,154,644.32*(1+.05/1)^1*5 = $2,749,932.82. See INVESTOPEDIA, *Compound Interest*, https://www.investopedia.com/terms/c/compoundinterest.asp; U.S. SEC. AND EXCHANGE COMM'N *Compound Interest Calculator*, investor.gov (yielding same results as formula).

## V.  Conclusion

For the reasons stated above, Defendant breached the contract, and Plaintiff is entitled to $2,749,932.82 in damages.  Plaintiff's motion to admit additional evidence [153] is denied.  The Court will enter a final judgment under Federal Rule of Civil Procedure 58 consistent with this opinion.  Civil case terminated.

Dated: November 30, 2020

Robert M. Dow, Jr.
United States District Judge